# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| VICTORIA ROSS, individually and on behalf of herself and all others similarly situated,<br><br>          Plaintiff,<br><br>   vs.<br><br>UNIVERSITY OF PITTSBURGH MEDICAL CENTER,<br><br>          Defendant. | **Case No.**   1:24-cv-16<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Victoria Ross, on behalf of herself and all others similarly situated UPMC Skilled Healthcare Workers[1] (the "Class"), brings this action for damages and injunctive relief under the antitrust laws of the United States against Defendant University of Pittsburgh Medical Center ("UPMC").[2]

---

[1]     Skilled Healthcare Workers are defined as licensed practical nurses (LPNs), Nurses, Medical Assistants, registered nurses (RNs), Nurse Assistants, and Orderlies who currently or formerly worked at a UPMC facility providing in-patient health care.

[2]     As explained herein, Defendant UPMC operates its network of hospitals either directly or by way of subsidiary and affiliate entities that are owned by, report to, and/or are under the control of UPMC.  UPMC's website (https://www.upmc.com/locations/hospitals) currently states that its health care system "is made up of over 35 hospitals throughout" the regions comprising the "Relevant Market" (defined herein).  UPMC lists its hospitals by region as follows: **Southwest Pennsylvania Region** (UPMC Children's Hospital of Pittsburgh: Pittsburgh, PA (Lawrenceville); UPMC East: Monroeville, PA; UPMC Horizon – Greenville: Greenville, PA; UPMC Horizon – Shenango Valley: Farrell, PA; UPMC Jameson: New Castle, PA; UPMC Magee-Womens Hospital: Pittsburgh, PA (Oakland); UPMC McKeesport: McKeesport, PA; UPMC Mercy: Pittsburgh, PA (Uptown); UPMC Montefiore: Pittsburgh, PA (Oakland); UPMC Passavant – Cranberry: Cranberry Township, PA; UPMC Passavant – McCandless: Pittsburgh, PA (McCandless Township); UPMC Presbyterian: Pittsburgh, PA (Oakland); UPMC Shadyside: Pittsburgh, PA (Shadyside); UPMC St. Margaret: Pittsburgh, PA (Aspinwall); and UPMC Western Psychiatric Hospital: Pittsburgh, PA (Oakland)); **Northwest**

## I.      SUMMARY OF THE ACTION

1.      This is a civil antitrust action under Section 2 of the Sherman Act, 15 U.S.C. § 2, for treble damages and other relief arising out of UPMC's anticompetitive conduct directed at the employment of Skilled Healthcare Workers at UPMC owned and/or operated facilities providing acute inpatient care. UPMC used its monopsony power to prevent workers from exiting or improving their working conditions, to suppress workers' wages and benefits, and to drastically increase their workloads, through a draconian system of mobility restrictions and widespread labor law violations that lock employees into sub-competitive pay and working conditions.

2.      UPMC's mistreatment of its Skilled Healthcare Workers is one part of an overarching anticompetitive scheme implemented by UPMC to acquire and exploit: 1) monopoly power over the provision of hospital output services and 2) monopsony power over the employment of hospital workers (including Skilled Healthcare Workers).

3.      UPMC currently employs over 95,000 workers, making it the largest private-sector employer in Pennsylvania.  Over the past two decades UPMC has expanded its geographic reach and its market concentration. Currently UPMC comprises over 40 hospitals located

---

**Pennsylvania and Western New York Region** (UPMC Chautauqua: Jamestown, NY; UPMC Hamot: Erie, PA; UPMC Kane: Kane, PA; and UPMC Northwest: Seneca, PA); **Central Pennsylvania Region** (UPMC Carlisle: Carlisle, PA; UPMC Community Osteopathic: Harrisburg, PA; UPMC Hanover: Hanover, PA; UPMC Harrisburg: Harrisburg, PA; UPMC Lititz: Lititz, PA; UPMC Memorial: York, PA; and UPMC West Shore: Mechanicsburg, PA); **North Central Pennsylvania region** (UPMC Cole: Coudersport, PA; UPMC Muncy: Muncy, PA; UPMC Wellsboro: Wellsboro, PA; and UPMC Williamsport: Williamsport, PA); **West Central Pennsylvania Region** (UPMC Altoona: Altoona, PA; UPMC Bedford: Everett, PA; and UPMC Somerset: Somerset, PA); **Maryland Region** (UPMC Western Maryland: Cumberland, MD).

throughout the Relevant Market defined below.  It is now the 18th largest hospital chain in the country and boasts an annual revenue of $26 billion.

4.     Yet most of UPMC's growth in the hospital output and labor input markets has been achieved through anticompetitive conduct. UPMC pursued a series of mergers and acquisitions in order to expand its reach and in order to become the dominant in-hospital services provider (and employer) throughout the Relevant Market. From 1996 to 2018, UPMC made approximately 28 acquisitions of competitor healthcare service providers. These anticompetitive acquisitions, however, were not done to expand the reach of healthcare to the communities served by these facilities, they were done to expand UPMC's market power and at the same time that UPMC was acquiring these facilities, it was also reducing the availability of healthcare services within the Relevant Market. During the 1996-2019 period, UPMC closed four hospitals and downsized three others, eliminating 353 beds and 1,367 full-time and 433 part-time healthcare service jobs, resulting in reduced healthcare quality and outcomes as well as reduced employment opportunities for the communities those hospitals served.

5.     UPMC's anticompetitive conduct did not only result in anticompetitive effects on output, but also on labor. In a sustained effort to maximize profits at the expense of its labor, UPMC employed a series of interconnected anticompetitive restraints in order to limit its employees' mobility and to suppress wages. As explained below, UPMC used the monopsony power it acquired over the employment of hospital healthcare workers as a result of its acquisition and downsizing conduct to harm workers and competition in the hospital healthcare labor market by: using restraints like noncompete clauses and do-not-rehire blacklists to keep workers from leaving; suppressing wages to sub-competitive levels while also reducing staffing and increasing workloads; and suppressing workers' labor law rights to keep them from

improving working conditions or forming unions. Each of these restraints alone is anticompetitive, but combined, their effects are magnified.  UPMC wielded these restraints together as a systemic strategy to suppress worker bargaining power and wages. As a result, UPMC's Skilled Healthcare Workers were required to do more while earning less—while they were also subjected to increasingly unfair and coercive workplace conditions.

6.      An economic consultant who studied UPMC's tactics found that UPMC used its increasing buying power in the labor markets to artificially suppress wages for UPMC's workers. When UPMC's market share increases, UPMC workers' wages fall relative to comparable hospital workers at a rate of 30 to 57 cents per hour in reduced pay on average for every 10% increase in UPMC's market share.  This "wage penalty" applied to virtually all UPMC employees including the plaintiff class of Skilled Healthcare Workers as well as other categories of UPMC employees, even including low-wage workers in job categories such as laundry and linen workers and contract housekeepers.

7.      In addition to lowering wages, UPMC also further suppressed workers' effective compensation by increasing their workload without offering additional compensation. Staffing ratios (workers to patients) at UPMC hospitals have decreased at the same time that staffing ratios on average have increased at other Pennsylvania hospitals. As of 2020, UPMC staffing ratios are on average 19 percent lower than the average staffing ratio at non-UPMC hospitals. And the onerous staffing ratios UPMC imposed on its workers correlates inversely with UPMC's regional market share, meaning that staffing ratios are lowest (i.e., workers are required to care for more patients) where UPMC has the highest market share and conversely, staffing ratios are highest where UPMC has lower market shares.

8.      UPMC's tactics, in combination, allowed it to maximize its leverage over its workers. At the same time that UPMC was suppressing pay and increasing workloads, it was also preventing workers from leaving their jobs and from using collective bargaining power that might have allowed them to improve their working conditions. UPMC's tactics of suppressed pay and understaffing, combined with mobility restraints and suppression of on-the-job labor rights are linked. Had UPMC been subject to competitive market forces, it would have had to raise wages to attract more workers and provide higher staffing levels in order to avoid degrading the care it provided to its patients, and in order to prevent losing patients to competitors who could provide better quality care. UPMC's low wages, chronic understaffing and sub-par treatment of its workers, however, suggests that UPMC didn't need to raise wages to preserve adequate working conditions and it did not need to provide better quality healthcare because within the Relevant Market UPMC has monopsony power over health care employment and monopoly power over healthcare services with little competitive pressure in the regions where it operates.

## II.      JURISDICTION AND VENUE

9.      The Court has subject matter jurisdiction over the Plaintiff's federal antitrust claims, under Section 2 of the Sherman Act, 15 U.S.C. § 2, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 & 26.  The Plaintiff's federal antitrust claims arise under federal law under 28 U.S.C. §§ 1331 & 1337, and specifically under federal statutes regulating commerce and trade.

10.      Plaintiff and the proposed Class have been injured, and are likely to continue to be injured, as a direct result of UPMC's unlawful conduct.

11.     The Court has personal jurisdiction because UPMC's principal place of business and headquarters are located at 200 Lothrop Street, Pittsburgh, PA 15213.  UPMC is a non-profit healthcare provider which employs thousands of skilled healthcare providers.

12.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22, and 28 U.S.C. § 1391(b) and (c) because during the Class Period defendant UPMC resided, transacted business, was found, or had agents in this District, and because a substantial part of the events giving rise to the claims occurred in this District.

### III.     THE PARTIES

13.     Plaintiff Victoria Ross is an adult individual residing in Erie, Pennsylvania. During the relevant time period, Ms. Ross was employed as a nurse at UPMC-Hamot hospital in Erie, Pennsylvania.

14.     Defendant University of Pittsburgh Medical Center (hereinafter, "UPMC") is the 18th largest hospital chain in the country, and the largest private-sector employer in Pennsylvania with its corporate headquarters located at 200 Lothrop Street, Pittsburgh, Pennsylvania, 15213.

15.     Upon information and belief, Defendant has common ownership over hospitals in its healthcare system.

16.     As such, Defendant is the alter ego for its member hospitals, meaning that Defendant and its member hospitals function as a single employer.  Accordingly, Defendant was and/or is the employer (single, joint, or otherwise) of the Plaintiff and Class Members.

### IV.     AGENTS AND CO-CONSPIRATORS

17.     The anticompetitive and unlawful conduct alleged herein against UPMC in this Complaint was authorized, ordered, and/or performed by its officers, agents, employees, or

representatives while actively engaged in the management, direction or control of UPMC's business affairs.

18.     Individuals alleged to have engaged in misconduct of the laws listed herein are alleged to have done so on behalf of all members of the UPMC corporate family.  Various others, presently unknown to Plaintiffs, may have participated as co-conspirators in the violations alleged in this complaint and performed acts and made statements in furtherance thereof.

19.     The officers, agents, employees, or representatives operated under the explicit and apparent authority of their principals.

20.     UPMC's subsidiaries, affiliates, and agents operated as a single unified entity.

21.     All references in this Complaint made to any act, deed, or transaction of UPMC or a UPMC corporate subsidiary or affiliate means that the relevant UPMC entity engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of UPMC's business or affairs.  The conduct alleged in this complaint was committed by UPMC or was authorized, ordered or done by UPMC's respective officers, agents, employees, or representatives while actively engaged in the management of UPMC's overarching business or affairs.

## V.     CLASS ACTION ALLEGATIONS

22.     Plaintiff brings this action against UPMC on behalf of herself and on behalf of the members of the following class (the "Class Members") under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure:

> All Skilled Healthcare Workers employed at a UPMC affiliated facility providing primary, secondary, tertiary, and quaternary

inpatient acute care hospital services, including predecessors, subsidiaries, and/or related entities of any such facility, at any time from February 14, 1996, until UPMC's unlawful anticompetitive conduct ceases.

Excluded from the proposed Class are UPMC, UPMC subsidiaries and affiliates, UPMC's boards of directors, UPMC senior executives who promulgated and/or implemented UPMC's anticompetitive employment practices, and governmental entities.

23.     Subject to additional information obtained through further investigation and discovery, the Class definition may be expanded or narrowed.

24.     The Class is so numerous that joinder of all members in this action is impracticable.  The proposed Class contains thousands of similarly situated current and/or former UPMC workers.

25.     Questions of law and fact common to the Class include:

a.  Whether, when, and how UPMC used its monopsony power to impose restrictions that limited worker mobility in order to prevent employees from switching jobs within the UPMC system to obtain higher wages or better working conditions;

b.  Whether, when, and how UPMC used its monopsony power to blacklist employees by using "do not hire" lists as an *in terrorem* tactic to prevent employees from seeking work outside the UPMC system in order to pursue better opportunities;

c.  Whether, when, and how UPMC implemented anticompetitive employment practices intended to suppress health care workers' wages;

d.  Whether, when, and how UPMC used its monopsony power to degrade work conditions by assigning workers additional responsibilities and/or time without increased compensation and by degrading work benefits;

e.  Whether, when, and how UPMC used anticompetitive tactics to prevent employees from unionizing;

f.  Whether UPMC concealed the existence of its anticompetitive tactics from Plaintiff and the Class;

g. Whether UPMC's anticompetitive tactics restrained trade, commerce, or competition for Skilled Healthcare Workers in the Relevant Market;

h. Whether Plaintiff and the Class have suffered antitrust injury;

i. Whether Plaintiff and the Class are entitled to injunctive relief; and

j. The appropriate measure of damages.

26.     Plaintiff's claims are typical of the claims of the members of the Class, and Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff and all members of the Class are similarly affected by UPMC's wrongful conduct in that they were paid less than they would have been in a competitive market.

27.     Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class.  Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the Class.

28.     Plaintiff is represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

29.     The questions of law and fact common to Plaintiff and the members of the Class as set out above predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

30.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress

for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

31.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendant.

32.     Class membership is readily definable and Class members are easily identified. Records of the names and addresses for members of the Class exist in the files of Defendant UPMC.

## VI.     FACTUAL ALLEGATIONS

33.     This class action challenges UPMC's anticompetitive employment practices. UPMC has used its monopsony over Skilled Healthcare Workers to engage in predatory conduct directed at Skilled Healthcare Workers employed at UPMC facilities in order to increase its profitability by: preventing workers from switching jobs within and beyond the UPMC network so that they could find better opportunities; artificially depressing wages; degrading work conditions; and preventing union organizing.

34.     In addition to the damages UPMC's conduct has inflicted on its employees, UPMC's monopolization of hospital services has also resulted in negative outcomes for the public, including higher costs, lower quality of care, and less price transparency.

35.      UPMC is a $26 billion "non-profit" health care provider and insurer based in Pittsburgh, Pennsylvania. As explained in more detail below, over the past several decades, UPMC has expanded from a system of 12 hospitals serving the Pittsburgh metropolitan area into a major network of 40 hospitals located throughout Central and Western Pennsylvania, including adjacent portions of Ohio, Southwestern New York, Northwestern Maryland, and West Virginia

(the "Relevant Market").[3]  UPMC's rise to dominance in the Relevant Market was largely due to its anticompetitive conduct directed at both the hospital services output market and the hospital labor input market.  By and through a series of strategic acquisitions, UPMC became the dominant leader in the hospital healthcare services and skilled healthcare worker employment within the Relevant Market, significantly reducing competition in both in-patient hospital services and hospital employment.

A.     **UPMC Acquired Market Power Through Anticompetitive Competitor Acquisitions and Facility Shutdowns.**

36.     In 1990, Medical and Health Care Division ("MHCD") acquired Montefiore Hospital, merged with Presbyterian University Hospital, and formed the entity now known as UPMC.

---

[3]     The following map from UPMC's website depicts the relevant geographic regions (collectively, the Relevant Market) where UPMC is the dominant provider of hospital services:



See https://www.upmc.com/locations/regions

37.     In 1996, UPMC moved to acquire South Side, Aliquippa and Braddock hospitals, and in 1997 it merged with several other hospitals including St. Margaret Memorial, Shadyside, and Passavant hospitals. Two years later, UPMC merged with Magee-Women's Hospital.  These initial mergers and acquisitions led to the consolidation of these hospitals, which are a major portion of UPMC's current health system. That same year, UPMC became an independent nonprofit corporation.

38.     In 1998, UPMC acquired McKeesport Hospital located in Pittsburgh, Pennsylvania.  UPMC's purpose for acquiring the hospital was, *inter alia,* to expand its market share in furtherance of maintaining its monopsony in Pennsylvania's Skilled Healthcare Worker labor market.  In 2000, UPMC downsized the McKeesport hospital's core units such as the hospital's Critical Care Unit.  Subsequently, the unit went from 12 beds to closing in 2020.  The intensive care unit went from having 12 beds to now having only two beds.  UPMC also eliminated the medical-surgical unit, "Crawford 2." The closure of these McKeesport Hospital facilities led to the elimination of hundreds of hospital jobs.  For example, in 2018 the McKeesport Hospital employed 765 full-time and 259 part-time workers.  However, by 2021, those numbers decreased to 529 full-time and 203 part-time workers.

39.     UPMC continued to expand its operations in 2001 when Children's Hospital of Pittsburgh merged with UPMC.

40.     In 2008, UPMC merged with Mercy Hospital, and opened new Children's Hospital facilities in 2009.

41.     In 2011, UPMC acquired the Hamot Medical Center in Erie, Pennsylvania. In 2013, UPMC acquired the Altoona Regional Health System.  In 2016 UPMC acquired the Jameson Health System in New Castle, Pennsylvania.

42.     Between 2016 and 2017, UPMC acquired 15 hospitals in the Pennsylvania Relevant Market.

43.     On May 1, 2016, Jameson Memorial Hospital merged with UPMC and became UPMC Jameson.

44.     In October 2016, Susquehanna Health, a four-hospital system in North Central Pennsylvania, became the first domestic hospital outside of Western Pennsylvania to join UPMC.  As part of the above acquisition, UPMC acquired Williamsport Regional Memorial Hospital, a four-hospital health system in North Central Pennsylvania. Also, as part of the acquisition, UPMC made a $500 million investment in what ultimately became UPMC Susquehanna, which consisted of Williamsport Regional Medical Center, Divine Providence Hospital, Muncy Valley Hospital and Soldiers and Sailors Memorial Hospital.  On October 18, 2016, Soldiers and Sailors Memorial Hospital joined UPMC and became UPMC Wellsboro, in Wellsboro, Pennsylvania.  UPMC Wellsboro is a general medical and surgical facility.

45.     In 2018, UPMC merged with Charles Cole Memorial Hospital, forming UPMC Cole, a modern rural health care provider which consists of a hospital, health clinics, cancer care and other specialties.  UPMC Cole is part of the UPMC Susquehanna healthcare network, which was established in October 2016, and based in Lycoming County, Pennsylvania.

46.     In September 2017, UPMC further expanded its dominance in the south-central region of Pennsylvania by acquiring seven additional hospitals from Pinnacle Health in an anticompetitive acquisition.  The local media described the acquisition as "possibly the region's biggest, most dramatic health care development ever."[4] This anticompetitive expansion provided

---

[4]     David Wenner, Pinnaclehealth Makes Stunning Move With UPMC, But Watch For Rivals To Push Back Hard, PENN. REAL-TIME NEWS (Mar. 14, 2017), https://www.pennlive.com/news/2017/03/pinnaclehealth_makes_stunning.html.

UPMC with a controlling interest in hospitals in Harrisburg, Carlisle, and Sunbury in the Harrisburg-Carlisle area, Hanover and Memorial hospitals located within the York market, and two hospitals in Lancaster County.  These additional strategic acquisitions further solidified UPMC's dominance of the hospital labor input market in Pennsylvania, further evidence of its monopsony power in the Relevant Market.

47.     In October 2017, UPMC acquired Lock Haven Hospital from for-profit Quorum Health Corporation. A year after its acquisition, UPMC reduced capacity by approximately fifty percent. In 2018, a year post-acquisition, the hospital went from 47 licensed beds to 25 beds. The Pennsylvania Department of Health data shows that the beds "set up and staffed" were further reduced, decreasing from 25 beds in 2020 to only 12 beds in 2021.  The downsizing of Lock Haven led to the elimination of 224 full-time and 83 part-time jobs at the hospital. The closure of Lock Haven increased the workload of UPMC workers at other facilities within a thirty-mile radius, including other UPMC hospitals such as Williamsport Regional Hospital. The closure further demonstrates UPMC's intent to monopolize the North Central Pennsylvania Skilled Healthcare Worker labor market.

48.     In October 2017, UPMC acquired Sunbury Hospital, located in Sunbury, Pennsylvania. In March 2020, UPMC closed the facility forcing residents to travel more than forty minutes by car to UPMC Williamsport Regional, or an hour south to UPMC Harrisburg. This closure diminished access to health care and the quality of in-patient hospital care in this market. Equally important, the closure of Sunbury Hospital eliminated 148 full-time and 68 part-time hospital employees. The closure of Sunbury Hospital enhanced UPMC's market power and reduced competition in the Relevant Market for hospital healthcare services and skilled healthcare employment Pennsylvania.

49.     Similarly, UPMC acquired two Lancaster hospitals in 2017. Within two years of these acquisitions, UPMC wasted no time in closing the hospitals, which resulted in a reduction in capacity in its newly dominated market. For example, immediately after acquiring Lancaster Regional Hospital, UPMC significantly reduced the number of beds "set up and staffed" in 2018 by nearly half of its original 136 beds, to 78 beds.  Then in late 2018, UPMC announced its plans to close Lancaster Regional Hospital by March 2019. This closure forced residents to commute to UPMC Lititz, the closest UPMC hospital, which is about thirty minutes by car. The closure of Lancaster Hospital also led to the elimination of 526 full-time and 123 part-time jobs.  Moreover, the closure of Lancaster Hospital further cemented UPMC's monopsony power in the Relevant Market for Skilled Healthcare Workers.

50.     In 2017, UPMC also closed the maternity unit, and dialysis service at Bedford Hospital in Bedford, Pennsylvania. The nearest maternity hospital for local Bedford patients was a UPMC hospital in Altoona that had been acquired by UPMC in 2013, which is about forty miles away by car. UPMC substantially downsized Altoona's capacity. The Altoona hospital employed 750 full-time Registered Nurses in 2014, but after the UPMC acquisition, the Altoona hospital reduced its staff, employing approximately 517 full-time Registered Nurses.

51.     In 2019, UPMC acquired Somerset Hospital. Shortly after the acquisition, UPMC downsized the hospital from 98 beds "set up and staffed" to 56 beds by the end of 2021.

52.     In January 2023, UPMC Lock Haven publicly announced that it would no longer provide in-patient services, that it intended to reduce its facility down to an outpatient emergency department, and that it would transfer some of its employees to positions at other UPMC facilities spread throughout the region. The Mayor of Lock Haven expressed his concern over the closure of the hospital which served the community for more than 100 years. The closure forces

patients to travel long distances for in-patient care, with closest options being Geisinger Jersey

Shore Hospital or UPMC Williamsport, which are approximately 20 and 35 minutes away,

respectively. The Lock Haven emergency department will be licensed to UPMC Williamsport.

**B.     UPMC Facilities**

53.     UPMC's health care facilities in the Relevant Market currently include centers for

cancer, neurosurgery, psychiatry, rehabilitation, geriatrics, and women's health. UPMC's current

operations include the following:

- UPMC has forty (40) academic, community, and specialty hospitals in Pittsburgh and beyond with over 8,800 licensed beds.[5]

- UPMC Hillman Cancer Center has more than sixty (60) centers and two hundred (200) cancer experts in Western Pennsylvania and Ohio.

- UPMC has twelve (12) Pittsburgh-area UPMC Senior Communities.

- UPMC has more than forty-five (45) children's pediatric locations throughout Pennsylvania.

- UPMC has several urgent care locations throughout Western Maryland, Southwest Pennsylvania, Northwest Pennsylvania, Central Pennsylvania, Altoona/Bedford West Central, Pennsylvania.

- UPMC has the largest rehabilitation network in Western Pennsylvania, offering inpatient and outpatient rehab at more than ninety (90) locations.

- UPMC has eight hundred (800) doctors' offices and outpatient sites.

- UPMC directly employs 21,000 nurses with many more who are affiliated with the UPMC system.

- UPMC directly employs five thousand (5,000) physicians with many more who are affiliated with the UPMC system.

- In total, UPMC currently employs more than 95,000 workers and is the largest non-governmental employer in the state of Pennsylvania.

---

[5]     *See* fn. 2, *supra* for a list of UPMC hospitals by region located in the Relevant Market compiled from UPMC website.

54.     As noted, in conjunction with its acquisitions spree, UPMC also reduced the availability of hospital services and employment within the Relevant Market.  From at least 1996 through 2019, UPMC harmed competition for hospital labor and hospital services in the regions where it operated by acquiring 28 hospital systems, eliminating four hospitals, and downsizing three others.  As a result of these anticompetitive acts, UPMC eliminated 353 beds and 1,367 full-time and 433 part-time jobs at the facilities it closed and/or downsized.

**C.     UPMC Monopolization Reduced Competition for Hospital Services in the Relevant Market**

55.     Competition in hospital services is associated with positive outcomes for both the public at-large and the skilled labor which hospitals employ. Increased competition is associated with lower patient mortality. Indeed, one study found that a 10 percentage-point drop in hospital concentration led to a nearly 3 percent drop in the 30-day mortality rate.

56.     Conversely, consolidation in hospitals has been recognized to cause pernicious effects. Despite claims from the hospital industry to the contrary, consolidation in healthcare tends to increase healthcare costs and reduce quality. The Federal Trade Commission's Bureau of Economic Analysis has said consolidated hospitals charge 40-50 percent higher prices than those in competitive markets. Increased hospital concentration in local labor markets also have effects in the labor market in the form of reduced number of hospital employers and suppressed wages. According to one study, within four years of concentration-increasing hospital mergers, wages were 4.0 percent lower for skilled non-health professionals and 6.8 percent lower for nursing and pharmacy workers, but-for the merger.

57.     Notwithstanding the benefits associated with competition in the hospital space, the market for hospitals has become far more concentrated. Between 2010 and 2017, there were

778 hospital mergers across the United States, and acquisition revenue hit a record high in 2022. Nearly half of all physicians in the United States work for a hospital or hospital system.

58.     In the case of UPMC, the aforementioned mergers, acquisitions and shut-downs cemented UPMC's monopoly power throughout the Relevant Market.  UPMC is now the largest non-governmental employer in the state of Pennsylvania. As a result, in the areas where UPMC operates, it is often the only purveyor of hospital services and employer of Skilled Healthcare Workers. UPMC is now the 18th largest hospital chain in the United States. UPMC has used its hospital acquisitions along with other anticompetitive acts to acquire monopoly power over the provision of health care services and monopsony power over the employment of skilled in-hospital healthcare workers within the Relevant Market.  For instance, in Allegheny County, UPMC employs approximately 67 percent of all hospital employees; and controls about 60 percent of all licensed hospital beds.  Meanwhile, in Pittsburgh, UPMC employs 76 percent of all hospital employees and controls roughly 71 percent of all licensed hospital beds.

     **D.**     **UPMC's Monopoly and Monopsony Power**

          **1.**     **UPMC's Monopoly Power in the Relevant Hospital Health Services Output Market**

59.     UPMC's anticompetitive conduct has affected the market for primary (i.e., "general"), secondary, tertiary and quaternary inpatient acute care hospital services in the Relevant Market.

60.     The core of a hospital's business is acute inpatient care. Patients whose treatment or conditions require an overnight hospital stay cannot be safely or effectively treated on an outpatient basis. Primary, secondary, tertiary and quaternary inpatient care services[6] cannot be

---

[6]     Primary or general care is provided when a patient consults with a primary care provider. Secondary care refers to services provided by a specialist such as an oncologist or endocrinologist. Tertiary care refers to specialized care in a hospital setting requiring specialized

offered in an outpatient facility due to the complexity of the level of care. Accordingly, outpatient care is not a substitute for inpatient care.

61.     As noted, UPMC has a longstanding history of acquiring hospitals in the Relevant Market to not only expand its footprint, but also to acquire and expand its monopoly power over health services (and employment of healthcare providers).  UPMC is also notorious for using its market power to acquire, and subsequently shut down, hospitals to reduce competition. In other instances, UPMC acquired hospitals and then shut down major departments and service lines. This has had the effect of driving patients to seek care at other UPMC facilities, further consolidating UPMC's market power.

62.     UPMC maintains a high market share for in-patient hospital services in each of the localities in which it operates.

63.     The Herfindahl-Hirschman Index ("HHI") measures concentration of a market. The Department of Justice considers HHI above 2500 as highly concentrated markets and HHI between 1500 and 2500 as a moderately concentrated market.

64.     An analysis of market power based on licensed beds per hospital based on data collected by the Pennsylvania Department of Health in 2021 for discrete statistical areas within the Relevant Market reveals that UPMC's dominant market share supports finding it has monopoly power throughout the Relevant Market:

---

equipment and expertise such as dialysis or heart surgery and includes specialized trauma care beyond intensive care units. Quaternary care is an advanced level of specialized care that includes experimental procedures or uncommon or rare surgeries.

| Statistical Area | UPMC Market Share (2020) | HHI (2021) |
|---|---|---|
| New Castle | 100% | 10,000 |
| Oil City | 100% | 10,000 |
| Williamsport | 94% | 8,472 |
| Altoona | 89% | 7.353 |
| Lock Haven | 85% | 5,241 |
| Somerset | 56% | 4,367 |
| Pittsburgh | 55% | 2,703 |
| Erie | 54% | 3,696 |
| Harrisburg-Carlisle | 36% | 5,001 |
| York-Hanover | 17% | 6,269 |
| Lancaster | 7% | 5,158 |

65.     As indicated by the table above, UPMC's market share is evidence of its monopoly power within the Relevant Market.  For example, UPMC has more than 50% market share in the Pittsburgh and Erie regions and substantially more than 50% market share in several smaller regions including Williamsport (94% market share) and Altoona (89% market share). Moreover, UPMC's HHI values for all of these regions (even the ones where UPMC's market share appears to be less dominant) are in excess of 2,500 (with some being multiples above that number).  These findings are evidence further supporting the conclusion that the Relevant Market is highly concentrated and that UPMC has monopoly power.

66.     UPMC has also reduced output in the Relevant Market by closing and downsizing hospital or hospital services in certain localities wherein UPMC acquired hospitals, causing a

reduction in capacity and decreasing access and service quality for patients in the Relevant

Market.  For some services such as secondary, tertiary or quaternary care requiring additional

expertise and specialization, such downsizing may cause patients to travel further at greater

expense to receive the care they need, compromising patient care and safety.

67.     Studies have shown that UPMC's acquisitions of various hospitals have adversely

affected patients, as well as healthcare workers, and local residents. The impact of UPMC's

acquisitions have also led to increased costs, diminished quality of care, reduced price

transparency for patients, as well as reduced wages for employees and degrading working

conditions for hospital workers as alleged herein.

> **2.     UPMC Maintained and Expanded its Monopoly Power in the Relevant Market by Engaging in Anticompetitive Conduct Intended to Raise Costs and Prevent Expansion of Rivals, Creating Barriers to Entry for Current or Potential Competitors**

68.     The hospital healthcare market has natural barriers to entry including: (1) large

capital costs required to construct and to continually maintain and upgrade the hospital; (2) costs

of recruiting and paying a large specialized and skilled medical staff; (3) negotiating costs

associated with contracting with third-party payors; and (4) and the costs associated with

drawing in patients who are already familiar with hospitals in the market.

69.     In addition to these natural barriers to entry in the relevant market, UPMC also

engaged in anticompetitive actions aimed at creating additional barriers to entry by harming rival

hospital systems to prevent their expansion and to frustrate the entrance of potential competitors.

70.     For example, on information and belief, UPMC coerced insurers to enter into

exclusive dealing agreements with UPMC, preventing them from offering to cover comparable

medical services their insureds may have sought from competing hospitals. UPMC also allegedly

punished insurance companies that refused to cooperate with UPMC by either excluding them or

demanding more favorable terms than its competitors when negotiating provider agreements. As a result, UPMC created barriers to entry and expansion for competitors and potential competitors in the Relevant Market for healthcare services output.

71.     UPMC has been subject to prior antitrust lawsuits alleging it engaged in anticompetitive conduct aimed at its competitors since at least 1999.

72.     For example, as alleged in a lawsuit brought by UPMC's rival in the Pittsburgh region, West Penn Allegheny Health Network ("West Penn"), as early as 1999 UPMC engaged in a series of anticompetitive actions aimed at frustrating an attempted merger between West Penn and several distressed health providers with the result of erecting barriers to entry, and with the intent of undercutting competition and expansion by its rival West Penn.

73.     The alleged anticompetitive actions undertaken by UPMC included: (1) legal challenges to the putative merger; (2) discouraging investors from purchasing West Penn bonds; (3) inducing UPMC's health plan to refuse to include West Penn in its network of participating providers except on a limited basis; (4) repeatedly refusing to pay West Penn for out-of-network medically necessarily emergency care services provided by West Penn to UPMC Health Plan members; and (5) deliberately disseminating false information about West Penn's financial condition to potential bond purchasers and credit rating agencies to adversely affect West Penn's financial standing. These actions appear to have been designed to, and succeeded at, raising barriers to the survival of West Penn, UPMC's only substantial competition in the Pittsburgh region at the time.

74.     Beginning in 2002, UPMC also allegedly colluded with the largest health insurer in the Pittsburgh region, Highmark, in order to restrain competition in hospital and health plan markets and to further impair West Penn. UPMC agreed to exclusively deal with Highmark for

health insurance and refused to contract on reasonable terms with any competing health insurer. In exchange, UPMC would receive increased reimbursement rates from Highmark, enabling Highmark to share monopoly profits from UPMC's limited competition. Highmark additionally allegedly agreed to not offer its health plan to members that did not include UPMC as an in-network provider and terminated its low-cost insurance plan utilized by many West Penn patients. Highmark also engaged in other anticompetitive activities that did not directly benefit Highmark but benefited UPMC by frustrating West Penn.

75.     Moreover, on information and belief, at UPMC's direction Highmark repeatedly obstructed West Penn's attempts to refinance its loan from Highmark for the proposed 2000 merger and discriminated against West Penn when awarding grants.  Highmark also allegedly leaked confidential information regarding West Penn to UPMC.  Highmark did not take these actions for its own benefit, instead it cited fear of retaliation by UPMC as its motivation for engaging in this anticompetitive conduct.

76.     These are only a few examples of UPMC raising barriers to entries for rival hospital systems.

77.     UPMC also has abused its market power by punishing insurance companies, by excluding and refusing to contract with them, and/or by demanding favorable terms, in order to create further barriers for rival hospital and health insurance systems.

78.     Lacking a competitive contract with UPMC, prior to 2009 no major national health insurance provider was able to achieve more than a 10% commercial market share in the six-county Pittsburgh metropolitan area because, as West Penn alleged:

> it is extremely difficult for a new market entrant to build an adequate and marketable provider network without reasonable access to UPMC's facilities, especially in oncology, obstetrics, and mental health.  Employers in the Pittsburgh area typically require their health plans to provide access to UPMC facilities.  Without a competitive contract with

UPMC, Highmark rivals like United cannot offer an attractive health insurance product to employers.

79.     UPMC maintained its dominance despite the efforts of potential competitors.  For example, in 2005 and 2006, United, a large insurer with a track record of successes in other markets attempted to enter the Pittsburgh market.  However, UPMC refused to contract with United on competitive terms, thereby blocking United's access to UPMC's two principal Pittsburgh hospitals (Presbyterian and Shadyside).  UPMC also refused United's efforts to purchase the UPMC Health Plan.  Because United was unable to include UPMC in its network it was unable to enter the Pittsburgh health care market.

80.     UPMC also took action against Highmark when it felt that Highmark was thwarting its anticompetitive scheme.  After Highmark announced its intention to affiliate with West Penn in 2011, UPMC refused to renew its health insurance provider contracts with Highmark that had been in place since 2002 and were due to expire after December 31, 2012, on the basis that Highmark had become a UPMC competitor as a provider.  Since 2012 UPMC has also threatened to refuse or has actually refused, to contract with Highmark or allow Highmark plan participants to use UPMC health care facilities, even when, at times, the refusal is in contravention of UPMC's obligations.  Some of the anticompetitive acts UPMC has taken to drive healthcare consumers away from UPMC rival health plans include: barring all Community Blue insurance members from receiving treatment at UPMC healthcare facilities in or about 2013; undertaking a misleading marketing campaign to drive healthcare consumers away from rival health plans; refusing to contract with Highmark plans after their 2012 agreements expired in 2014; and refusing to negotiate new consent decrees with Highmark after existing consent decrees they agreed to in 2014 expired in 2019.

81.     This has the effect of preserving UPMC's market power and limiting expansion for competitor hospital systems.

       **3.**      **UPMC's Market Power Enabled it to Wield Monopsony Power in the Relevant Labor Input Market Which It Used to Suppress Wages and Benefits, to Increase Workloads and to Prevent Workers from Seeking Other Employment Opportunities**

82.     UPMC's monopolization of hospitals also made it a monopsonist regarding the employment of hospital health workers within the Relevant Market.  UPMC used this power to increase its profits by intentionally suppressing wages and implementing other employment restrictions and practices that expanded its monopsonist power at the expense of its workers including, but not limited to, imposing mobility restrictions and noncompete terms on employees to limit their ability to seek alternative employment, and suppressing any effort of employees to unionize so that UPMC Healthcare Workers would have to accept sub-competitive wages and degraded work conditions imposed by UPMC.

83.     As noted above, UPMC, with over 95,000 employees in Pennsylvania, is the state's largest private employer.  As further described herein, there is compelling direct evidence that UPMC used its monopsony power in the Relevant market to artificially depress wages (*i.e.,* impose a wage penalty) and to degrade work conditions for its hospital employees.  More particularly, a wage study found that increases in UPMC's market share correlated to a statistically significant wage penalty that UPMC imposed on its employees and also to lower staffing ratios at UPMC hospitals meaning that its employees were required to take on more work responsibilities.  Additional direct evidence of UPMC's market power includes: UPMC's use of coercive tactics such as noncompete restrictions and do-not-rehire blacklists to limit worker mobility and denial of workers' labor law rights to form labor unions that could seek better work conditions.  Taken together, this conduct is evidence that UPMC had (and used) the

power to impose lower effective compensation and higher workloads on its employees, and that UPMC had the ability to lock in those effects through mobility restrictions that prevented workers from exercising rights to improve their working conditions.

> **i.      UPMC Used its Monopsony Power to Artificially Depress Wages**

84.     UPMC nurses have joked that they are paid less than nurses at comparable hospitals, remarking that UPMC stands for "You Pay Me Cheap." Econ One Research conducted a study that confirmed the nurses' suspicions.

85.     Econ One conducted an empirical study and measured a statistically significant relationship between market concentration and wages to the extent that wages tend to be lower in more concentrated markets when compared to less concentrated markets. Econ One determined the market for hospital healthcare was concentrated when measured by reference to the HHI index even before UPMC implemented its monopolization scheme due to the fact that each geographic area was served by only a few hospitals. UPMC's campaign of acquiring a dominant market share by acquiring competitors resulted in even more concentrated markets. Accordingly, Econ One found that UPMC's monopolization scheme had an adverse and statistically significant negative impact on wages within the Relevant Market. Accordingly, the Econ One findings support the claim that UPMC employees are paid less than hospital workers in adjacent markets in Pennsylvania as a consequence of UPMC's unlawful and exclusionary conduct. In other words, Econ One's study provides empirical support that UPMC used its monopsony market power to suppress the wages of its hospital workers.

86.     The Econ One study compared wages at UPMC hospitals with comparator hospitals in markets unaffected by UPMC's presence. The study found that nurse wages at UPMC hospitals are notably lower when compared to the average wages in commuting zones

with comparable cost of living from at least 2008 through 2019.[7]  This indicates that UPMC has

been able to exercise its monopsonist buying power to impose a wage penalty by restraining

employee wages below competitive levels.

87.    For example, as noted in the below table, Licensed Practical Nurses (LPNs) at

UPMC facilities in five commuting zones where UPMC has a presence received on average

$1.31 per hour less than LPNs at hospitals in commuting zones with a comparable cost of living.

In addition to LPNs, as set out in the table, other categories of nurses also experienced significant

wage penalties as a result of UPMC's anticompetitive conduct.  These wages penalties are

significant.  Assuming a 40-hour work week and a 52-week work year, UPMC Nurses

experience an average annual income penalty of $1,289.60.

**Average Nurse Wages at UPMC and non-UPMC Hospitals by Nurse Category**
**(Survey Years 2008-2019)**

| Nurse Category | UPMC Average Wage | Non-UPMC Average Wage | Wage Differential |
|---|---|---|---|
| LPNs | $19.97 | $21.28 | ($1.31) |
| Nurses | $27.18 | $27.80 | ($0.62) |
| Medical Assistants | $14.93 | $15.49 | ($0.56) |
| RNs | $31.78 | $32.15 | ($0.37) |
| Nurse Assistant/ Orderlies | $13.89 | $14.10 | ($0.21) |

88.    The Econ One study found that the wage penalty UPMC was able to impose on

most of its skilled workers increased as UPMC acquired additional market share.  Based on

_____

[7]    "Commuting zones" have been used by multiple labor market studies to define
relevant geographic boundaries for labor markets.  Research has shown that workers seeking
alternative jobs make no more than 20% of their applications outside of their commuting zone.

regression analysis, as UPMC market share and concentration increased, there is a negative and statistically significant impact on the differential between UPMC wages and non-UPMC wages. In other words, as UPMC market share increases, UPMC wages fall relative to non-UPMC wages.

89.     The Econ One study also found that the UPMC "wage penalty" was pervasive and extended beyond just Skilled Healthcare Workers.  As noted in the below table, the UPMC "wage penalty" included, without limitation, physicians, administrators, and even low-wage workers such as laundry and linen workers and contract housekeepers:

### Average Hospital Worker Wages at UPMC and Non-UPMC Hospitals by Job Category (Survey Years 2011-2020)

| Job Category | UPMC Average Wage | Non-UPMC Average Wage | Wage Differential |
|---|---|---|---|
| Physician Administrative (under contract) (Part A Medicare) | $125.17 | $135.79 | ($10.61) |
| Direct Patient Care (under contract) | $53.22 | $61.90 | ($8.68) |
| Dietary (under contract) | $23.05 | $29.05 | ($6.00) |
| Home office and Contract Physicians - Teaching (Part A Medicare) | $111.87 | $116.69 | ($4.82) |
| Physician - Administrative (Part A Medicare) | $140.62 | $145.38 | ($4.77) |
| Housekeeping (under contract) | $18.95 | $23.12 | ($4.17) |
| Employee Benefits | $31.70 | $34.12 | ($2.42) |
| Social Service | $27.59 | $29.80 | ($2.21) |
| Nursing Administration | $35.55 | $37.03 | ($1.48) |
| Pharmacy | $36.82 | $37.66 | ($0.84) |
| Maintenance and Repairs | $23.91 | $24.53 | ($0.62) |
| Laundry and Linen Service | $13.09 | $13.64 | ($0.55) |
| Physician - Teaching (Part A Medicare) | $119.30 | $119.33 | ($0.03) |
| Dietary | $15.30 | $15.29 | $0.01 |
| Housekeeping | $13.61 | $13.44 | $0.16 |
| Cafeteria | $14.98 | $14.47 | $0.51 |
| Skilled Nursing Facility | $22.82 | $22.30 | $0.52 |
| Physician and Non-Physician (Part B Medicare) | $126.63 | $119.85 | $6.78 |

**Note:** *Wage differentials equal to average UPMC wage minus average non-UPMC wage; negative numbers imply average UPMC wages below average non-UPMC wages.*

90.     This wage penalty analysis indicates that UPMC's monopsony power is so pervasive that even low-wage UPMC workers do not have viable outside employment substitutes.

91.     Econ One also performed a regression analysis of the UPMC wage penalty across several of the geographic regions comprising the Relevant Market and found that both increased market concentration and increased UPMC market share have a negative and statistically significant impact on the UPMC wage differential. Thus, when either market concentration (measured by HHI) or UPMC's market share increases, UPMC wages fall relative to wages in the comparison regions within the commuting zone. The study found that a 10% increase in UPMC's market share within a commuting zone led to an average reduction in pay per hour for UPMC employees of between 30 cents and 57 cents per hour across all worker wages, all else being equal.

92.     UPMC workers themselves report that they are not sufficiently paid for the type of work they perform. An RN who had previously been employed at Braddock Hospital before it was acquired and closed by UPMC was later rehired at UPMC McKeesport Hospital. She reported that she was paid at a 15-year rate, despite her 28 years of experience in the field. A physician who was previously employed at UPMC for nine years realized she was grossly underpaid, resigned from UPMC and chose to work for another hospital.  At the other hospital, that physician received a 50 percent pay increase, reduced working hours, and is not required to be on call every third night and every third weekend like when she was employed at UPMC.

   ii.     **UPMC Used its Monopsony Market Power to Degrade Working Conditions for UPMC's Healthcare Workers**

93.     UPMC's monopsony power does not only manifest in the form of decreased

wages, but also in the form of subcompetitive working conditions.

94.     Another common complaint amongst UPMC workers is that the benefits

are also sub-competitive.  UPMC workers have reported that their health insurance,

which is provided through UPMC's health plan, is not only expensive but minimal.

Many UPMC workers have even complained that they have accumulated medical debt,

which is attributed to their employer, but they cannot pay off the debt.  For example, one

UPMC employee stated:

> [W]e care about our jobs. But our wages are so low and our benefits so
> terrible that we have to visit the foodbank just to survive. Many of us are
> in medical debt to our own employer - a hospital. How ironic is that? …
> I'm not able to support my family. I live in public housing and cannot
> afford a vehicle. I work for the largest health system in the state taking
> care of other people and still owe $20,000 for my own health care.

### iii.     Declining and Depressed Staffing Ratios are Evidence of UPMCs Monopsony Power.

95.     Reduced and depressed staffing ratios also provide additional direct evidence of

UPMC's monopsony power in the Relevant Market. For instance, lower staffing ratios tend to

show that UPMC has the ability to require its employees to care for more patients without

additional pay.  Lower staffing ratios further indicates a reduction in the quality of care and

service provided to patients (i.e., each patient receives less individualized attention and care),

thus demonstrating UPMC's exercise of market power in downstream healthcare markets.

96.     The lack of viable options for employment outside of UPMC hospitals, in effect,

forces UPMC workers to accept UPMC's increasingly onerous terms of employment including,

for example, nurses who have had to take on more responsibilities and more work as UPMC

forced on them increased staff-to-patient ratio in order to cut costs at the expense of its workers

and its patients.

97. As UPMC's market share increased it substantially increased its employees' workload by simply reducing its workforce and requiring the remaining employees to make up the difference. Staffing ratios, which represent the number of staff per patient, measures the labor purchased by a hospital relative to the demand for its hospital services. UPMC's ability to decrease staffing ratios at its facilities indicates monopsony and monopoly power to the extent that: 1) UPMC had the power to require its workers to provide additional care to its patients without providing them with additional pay; and 2) UPMC was able to reduce the overall quality of the care UPMC patients received without suffering a drop in the demand for its hospital services. One nurse reported, "The most upsetting part of UPMC's ongoing refusal to invest in staffing and a healthy work environment is their disregard for the people that depend on us most—our patients." As UPMC increased its market power, the staffing ratios between workers and patients at UPMC hospitals decreased substantially.

98. Comparing UPMC's staffing ratios to non-UPMC hospitals in Pennsylvania from 2011 to 2020 shows that as UPMC acquired monopoly power in the Relevant Market it significantly decreased staffing ratios at its hospitals. Conversely, the staffing ratios at non-UPMC hospitals during the same time period have increased. UPMC's staffing ratio was on average four percent higher than its competitors in Pennsylvania in 2011. That substantially changed by 2020 when the average was reduced by 19 percent when compared with its competitors that year. More particularly, from 2011 to 2020, the average staffing ratio at UPMC hospital decreased from 5.34 to 4.83. On the other hand, staffing ratios at non-UPMC hospitals during this time increased from 5.13 to 5.96.

99.     UPMC's staffing ratios did not decrease across the board.  Instead, in regions where UPMC has a higher percentage of market share, its staffing ratios are lower. However, in related regions where UPMC has a lower market share, its staffing ratios are much higher.

100.     UPMC's decreased staffing ratios required the nurses it kept on to do more work while it was also decreasing their pay.  In a 2022-2023 survey, 93% of responding hospital workers in Southwestern Pennsylvania reported that their workloads substantially increased after they began working for UPMC. Approximately 84% of those workers reported that these increases were due to staff reductions and chronic understaffing.

101.     Depressing staffing-to-patient ratio results in higher workloads and is, effectively, a pay cut because workers are not being offered additional compensation in exchange for the additional work they are required to perform.  But, as noted above, even before factoring in the higher workloads, UPMC wages are lower than at comparable hospitals.  Accordingly, UPMC's increasing workloads, together with its sub-competitive wages, demonstrates that the overall widening gap of the wage differential for UPMC hospital workers in comparison to non-UPMC hospital workers.  This further indicates that UPMC workers' wages are low; and continue to decline as UPMC expands and becomes increasingly powerful.

102.     UPMC's problematic staff reductions and chronic understaffing issues were an integral part of its monopolization scheme that preceded the coronavirus pandemic.

> **iv.     UPMC Used its Monopsony Market Power to Create Rules that Restricted the Ability of Employees to Switch Jobs in Order to Pursue Increased Compensation or Better Opportunities**

103.     UPMC executives and high-level management know that UPMC maintains monopsony power over its employees and manifests this market power in the form of restrictions to mobility.

104.    Mobility is, *prima facie*, a necessary condition for competitive labor markets. Workers who cannot switch jobs have no ability to seek or negotiate better working conditions. Thus, mobility restrictions are direct restraints on competition.  When workers are prevented from seeking alternative comparable employment opportunities, they are not only inhibited from pursuing better work opportunities, but they are also inhibited from being able to negotiate better working conditions with their current employer.  Accordingly, an employer who can successfully impose such direct restraints on workers possesses market power.   UPMC not only has the power to exercise such restrictions but imposes them to the detriment of its employees.

105.    Three of the principal tools that UPMC uses to restrict worker mobility are: enforcement of a system-wide salary structure, taking away the ability of UPMC employees to negotiate for higher pay by taking a job at a different UPMC facility; employing an *in terrorem* "do not rehire" blacklist for any employee who dares to leave UPMC to take a position at a competing facility; and forcing employees to agree to unreasonable non-compete restrictions.

106.    For example, UPMC has put in place a systemwide "market-based approach to establish salary structures. The salary structures are based on market data in defined geographical areas."  The result is that employees cannot increase their compensation by seeking a new position at a different UPMC hospital because "[i]f an employee transfers between structures (Pittsburgh to Southwest PA, Southwest PA to Western PA, Central PA to Pittsburgh or vice versa) into a position with the same or similar job duties, an employee's salary will be adjusted by the percentage difference between the market targets of the ranges."  In other words, UPMC uses its salary structure to prevent employees from being able to change employment in order to increase their compensation as they would be able to do in a competitive market.

107.    UPMC further inhibits worker mobility through the enforcement of its strict "Do Not Rehire" policy regardless of workplace infractions.  Another common complaint amongst UPMC's employees is that when they leave their positions at UPMC, the employees are put on UPMC's systemwide do-not-rehire blacklist, effectively preventing them from working throughout the entire UPMC healthcare system. Even workers who resigned from their positions at a UPMC facility and committed no workplace infractions, were barred from seeking employment at another UPMC location. One nurse who attempted to transfer to another UPMC hospital unit fell victim to this anticompetitive practice. After she was told that she had secured the new position at the other location, e-mailed her current supervisors to advise them she was leaving her current position.  She was subsequently informed that she no longer had the new position, and she was told that she would not be allowed to work for UPMC anymore. That nurse then attempted to secure employment with UPMC at various locations but was repeatedly denied. Another nurse who resigned after years of subpar pay and racial discrimination, was also denied future employment with UPMC. Although these workers submitted applications and went through the interviewing process for other positions, the hiring process would simply terminate.

108.    UPMC's "do not rehire" blacklist restraint was intended to (and does) prevent workers from leaving UPMC employment despite the adverse terms and conditions of employment that UPMC unilaterally imposed on them.

109.    Furthermore, many current UPMC employees, aware of the mobility restrictions, are unwilling to resign from their positions out of fear that they too will be placed on the "Do Not Rehire" list. In a 2022-2023 survey of UPMC workers, approximately 50% said that they believe they would be blacklisted should they resign from their positions with the hospital system.  And approximately 47% of UPMC workers reported that they had actually refrained

from applying for jobs with other employers because they feared being placed on the "Do Not Rehire" list would bar them from returning to UPMC in the future.

110.    UPMC has even fired and blacklisted skilled workers for complaining about understaffing issues. One worker explained, "And God help you if you're fired – for any reason at all thanks to at-will hiring—because UPMC controls most of the healthcare industry in the region, nurses can find themselves unable to get a job at all." Another former UPMC worker reported that after being fired for requesting UPMC address chronic understaffing issues, alternative employment "choices are so limited" that you can "essentially [be] blackballed from the majority of healthcare jobs in our area."

111.    On May 18, 2023, Congresswoman Summer Lee (D-PA) joined the SEIU Healthcare Pennsylvania and the Strategic Organizing Center in filing a joint antitrust complaint against UPMC, asking the U.S. Department of Justice to investigate Pennsylvania's largest private employer.

112.    Congresswoman Summer Lee summed up the effect UPMC's anticompetitive scheme has had on hospital care and employment in her hometown stating:

> My hometown Braddock lost our only hospital and largest employer back in 2010 for the same reason McKeesport is closing their ICU this year… It's the same reason Western PA is facing a hospital staffing crisis that's putting our loved ones' lives at risk–and the same reason our nurses and health aides, who are paid so little that they're in medical debt to the hospital they work for, face retaliation for speaking out for their patients being ripped off by skyhigh health care costs and declining quality of care: UPMC is abusing its power to exploit its workers and patients on the backs of taxpayers. I'm proud to stand alongside our hospital workers as they demand accountability and take their fight to Washington.[8]

---

[8]    Summer Lee Joins Workers, Unions as they File Groundbreaking Antitrust Complaint Against UPMC, Asking U.S. Department of Justice to Investigate Pennsylvania's Largest Private Employer (https://summerlee.house.gov/posts/summer-lee-joins-workers-unions-

v.   **UPMC Used its Monopsony Market Power for Hiring Skilled Healthcare Workers to Force UPMC Healthcare Workers to Agree to Unreasonable Non-Competition Restrictions**

113.   UPMC has required its workers, including but not limited to physicians and nurses, to agree to noncompete restrictions as a condition of employment.

114.   UPMC requires its physicians to sign noncompete restrictions as a condition of employment. These noncompete restrictions contain "non-solicitation provisions, tortious interference clauses (which prevents a doctor from raiding his or her former practice of employees) and surprisingly large geographical non-compete areas."

115.   UPMC's noncompete restrictions also bars physicians from obtaining future UPMC employment if they resign. UPMC's noncompete restrictions also block physicians who leave UPMC from practicing in the same geographic area (e.g., county) for one calendar year. For instance, one doctor has reported that she remained at UPMC as a practicing physician for three to four years longer than she wanted to due to the noncompete provision which prevented her from working anywhere within Allegheny County. That same doctor finally left UPMC in 2022 but to avoid UPMC's anticompetitive restrictions, she is now forced to commute 1.5 to 3.0 hours per day to work. She has also foregone providing her patients surgical care due to the distance from the hospital to where her patients would be admitted should they encounter any medical complications.

116.   UPMC's blacklist, described above, also functioned as a non-compete clause covering other Skilled Healthcare Workers. The FTC's proposed rule to ban noncompete clauses explains why and how UPMC's blacklist functions as a non-compete clause: "The term non-

as-they-file-groundbreaking-antitrust-complaint-against-upmc-asking-u-s-department-of-justice-to-investigate-pennsylvanias-largest-private-employer)

compete clause includes a contractual term that is a *de facto* non-compete clause because it has the effect of prohibiting the worker from seeking or accepting employment with a person or operating a business after the conclusion of the worker's employment with the employer." Accordingly, UPMC's refusal to rehire workers who leave UPMC, combined with the fact that UPMC controls a majority of the jobs in the Relevant Market, has the same effect on competition that a non-compete clause has – it disincentivizes workers from considering jobs elsewhere.

117.    UPMC has also exercised market power over its workers through the use of restraints such as noncompete restrictions that apply across the UPMC network of facilities and using "Tuition Assistance Programs" (otherwise known as "TRAP" or "Training Repayment Agreement Programs") to saddle employees with potentially disastrous debt obligations if the employees seek to end their UPMC employment.

118.    UPMC's Tuition Assistance Programs provide that nurses who receive training through UPMC's proprietary training program may be required to repay UPMC for their training.  This restriction provides that the employees can have their wages garnished to repay UPMC, and often provides that if their employment status changes for any reason—even including termination by UPMC without cause – they may be liable for full repayment.  These "shadow debt" or "debt peonage" provisions are often used to circumvent state-level bans on non-compete clauses, result in threatening employees with prohibitive debt if they seek to end their employment, effectively "trapping" them to stay with their current employer.

119.    TRAPs are frequently buried deep in employment contracts and are designed to trap the employee in substandard working conditions, reducing bargaining power and enhancing the employer's market dominance.  For a system like UPMC, which already possesses monopsonist market power over healthcare employment within the Relevant Market, a TRAP

program further enhances its market power because UPMC healthcare workers, who already

themselves with few alternative employment opportunities, would remain indebted to UPMC.

120.    UPMC's mobility restrictions, combined with the fact it has achieved monopsony

power by acquiring its competitors, have prevented its employees from obtaining higher wages

and improved working conditions and has decreased the number of and the quality of

employment opportunities available to its Skilled Healthcare Workers.

> **vi.    UPMC Used its Monopsonist Market Power for Hiring Skilled Healthcare Workers to Prevent UPMC Healthcare Workers from Forming Unions That Could Have Collectively Bargained for Better Wages and Conditions Without Fear of Discrimination or Retaliation by UPMC.**

121.    The ability of workers to organize and to form labor unions is a potential way for

workers to limit and arrest employer market power. Even in concentrated markets, workers who

collectively bargain can maintain higher wages by obtaining bargaining power vis-à-vis their

employer. Conversely, employers who are able to successfully suppress efforts to organize is

evidence of market power because they are able to stymie the efforts of workers to collectively

bargain for higher wages. Those workers are in turn more vulnerable to the employers' exercise

or abuse of that market power.

122.    UPMC, in order to maintain its monopsony over its workers, has engaged in a

system-wide effort to suppress and stifle efforts of UPMC workers to collectively organize.

123.    In Western Pennsylvania, UPMC has successfully prevented hospital workers

from forming unions. UPMC has engaged in several tactics to prevent the formation and

organization of unions. UPMC has been accused of blocking workers from attempting to

organize through surveillance, harassment, intimidation, and, if necessary, termination. UPMC's

union-busting policies were so pernicious that in 2014 and 2018, the National Labor Relations Board ruled that UPMC violated federal labor law by preventing workers from forming a union.

124.    UPMC has faced 133 unfair labor practice charges since 2012 and 159 separate allegations. Approximately seventy-four percent of the violations related to workers' efforts to unionize.

125.    UPMC's union prevention has impacted Allegheny County where, due to UPMC's efforts, only 2 percent of its hospital workers are in unions. This is not the case at UPMC's few competitors. For example, 34 percent of Allegheny Health Network hospital workers are union members. An employee of UPMC stated, "Any thoughts or questions about safety and you're 'flagged' or written up.  They try to fire anyone that voices concern or questions anything!" Another UPMC employee has alleged that "Employees feel threatened and concerned for their job if they try to raise issues. If managers do not like your suggestions, they sometimes use it against you."

126.    The fact that the UPMC facilities have imposed system-wide anticompetitive restrictions on the ability of its employees to seek alternative employment and to form an effective union means that the ability of UPMC workers to negotiate salary increases or improved working conditions is unreasonably diminished.

## VII.    FRAUDULENT CONCEALMENT

127.    Plaintiff and members of the proposed Class at all times exercised due diligence with respect to the facts alleged herein.  Prior to January 2023, when the American Economic Liberties Project Report was published, Plaintiff and members of the proposed Class did not and could not have uncovered UPMC's anticompetitive scheme with the exercise of reasonable diligence.  Plaintiff and members of the Proposed Class did not believe that their pay and

working conditions were being suppressed as a result of an anticompetitive scheme engineered by UPMC.

128.    Plaintiff and members of the proposed Class could not have inferred UPMC's anticompetitive scheme based on low wages, degraded working conditions, or reduced benefits because they did not have access to information regarding competitors' wages, working conditions, and benefits, and they did not have access to the statistical analysis that the report included.  Estimating competitive wage levels, work conditions and benefits requires specialized expertise not available to the ordinary healthcare worker, particularly with regard to other competing employers, and the impact of market concentration and anticompetitive acquisitions. Moreover, it is difficult for healthcare workers to draw any conclusions about the sufficiency of their salaries or work conditions because of a lack of transparency in the industry.

129.    To the extent that Plaintiff or members of the proposed Class suspected UPMC's policies were anticompetitive, UPMC's comprehensive efforts to conceal the scope of its scheme would have prevented Plaintiffs and members of the proposed Class from discovering it. Because Plaintiffs and members of the Proposed Class did not and could not have known about UPMC's efforts to conceal its conduct, they had no occasion to investigate further.

130.    By virtue of the fraudulent concealment by Defendants, the running of any statute of limitations has been tolled and suspended with respect to any claims that Plaintiff and the Class members have as a result of the unlawful conduct alleged in this Complaint.

131.    The foregoing allegations are likely to have evidentiary support after a reasonable opportunity for discovery.

**COUNT I**

**Violations of Section 2 of the Sherman Act**
**Monopolization / Monopsonization**

132.    Paragraphs 1 through 131 are incorporated by reference as if fully stated herein.

133.    UPMC possesses, and at all relevant times has possessed, monopoly power regarding the provision of hospital health care services and monopsony power regarding employment of skilled health care workers in the Relevant Market.  The actions described above, undertaken by UPMC directly and through its subsidiaries, are being undertaken in order to maintain and enhance UPMC's monopoly and monopsony power and, if not enjoined, threaten to achieve that result.  These actions are exclusionary and constitute unlawful monopolization/monopsonization of the Relevant Market for hospital health care employment in violation of Section 2 of the Sherman Act (15 U.S.C. § 2).

134.    During the Class Period, UPMC's illegal conduct had a substantial effect on interstate commerce.

135.    As a direct and proximate result of UPMC's violations of Section 2 of the Sherman Act, Plaintiff and the Class have suffered injury to their business and property, and further such injury is threatened if UPMC's actions are not enjoined.

136.    The actions of UPMC have substantially harmed the competition for hospital health care employment and, if not enjoined, threaten further harm to competition in the Relevant Market.

**COUNT II:**

**Violations of Section 2 of the Sherman Act –
Attempted Monopolization / Monopsonization**

137.    Paragraphs 1 through 136 are incorporated by reference as if fully stated herein.

138.    By engaging in the anticompetitive actions described above, UPMC has specifically intended to attain monopoly and monopsony power in the Relevant Market.  Based on UPMC's high market share, the high barriers to entry and other competitive conditions described above, and UPMC's anticompetitive actions, there is a dangerous probability that UPMC will achieve its goal and attain monopoly/monopsony power in the Relevant market to the extent it does not already possess such powers.  Such actions constitute unlawful attempted monopolization/monopsonization of the Relevant Market in violation of Section 2 of the Sherman Act (15 U.S.C. § 2).

139.    During the Class Period, UPMC's illegal conduct had a substantial effect on interstate commerce.

140.    As a direct and proximate result of UPMC's violations of Section 2 of the Sherman Act, Plaintiff and the Class have suffered injury to their business and property, and further such injury is threatened if UPMC's anticompetitive actions are not enjoined.

141.    The actions of UPMC have substantially harmed the competition for hospital health care employment and, if not enjoined, threaten further harm to competition in the Relevant Market.

## VIII.   PRAYER FOR RELIEF

**WHEREFORE**, as a result of the unlawful conduct alleged in this Complaint, Plaintiff respectfully requests that the Court enter judgment on her behalf and on behalf of the Class identified herein, adjudging and decreeing that:

1.      This action may be maintained as a class action under Rule 23(a), Rule 23(b)(2) and Rule 23(b)(3) of the Federal Rules of Civil Procedure with Plaintiff appointed as the designated representative for the Class and Plaintiff's counsel as class counsel;

2.      Defendant UPMC has monopolized and/or attempted to monopolize trade or commerce among the several states in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, and that Plaintiff and members of the Classes have been injured in their businesses and property, and are threatened with further injury as a result of UPMC's unlawful conduct;

3.      Plaintiff and members of the Class are entitled to recover damages sustained by them, as well as restitution or disgorgement, as provided by the relevant federal antitrust laws, and that a judgment in favor of Plaintiff and the Class be entered against UPMC in an amount to be trebled in accordance with such laws;

4.      UPMC, its subsidiaries, affiliates, successors, transferees, assignees, and the respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf be permanently enjoined and restrained from continuing and maintaining the monopolies and unfair business practices alleged herein;

5.      Plaintiff and members of the Class be awarded prejudgment and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial Complaint in this action;

6.      Plaintiff and members of the Class recover their costs of this suit, including reasonable attorneys' fees, expert fees, and costs as permitted by law; and

**7.**      Plaintiff and members of the Class receive such other and further relief as is just and proper under the circumstances.

### IX.    JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all issues so triable.


Dated: January 18, 2024                          Respectfully submitted,


                                                   */s/ Daniel C. Levin*

                                                 Austin B. Cohen, (PA Id. 78977)
                                                 Daniel C. Levin, (PA Id. 80013)
                                                 Keith J. Verrier, (PA Id.  86577)
                                                 **LEVIN SEDRAN & BERMAN LLP**
                                                 510 Walnut Street, Suite 500
                                                 Philadelphia, PA 19106-3997
                                                 Telephone: (215) 592-1500
                                                 Facsimile: (215) 592-4663
                                                 acohen@lfsblaw.com
                                                 dlevin@lfsblaw.com
                                                 kverrier@lfsblaw.com



                                                 Joseph R. Saveri
                                                 Christopher K.L. Young
                                                 **JOSEPH SAVERI LAW FIRM, LLP.**
                                                 601 California Street, Suite 1000
                                                 San Francisco, California 94108
                                                 Telephone: (415) 500-6800
                                                 Facsimile: (415) 395-9940
                                                 jsaveri@saverilawfirm.com
                                                 cyoung@saverilawfirm.com


                                                 *Counsel for Plaintiffs*