**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JENNIFER MIZELL, MARIA PAULDING, KATHLEEN PEAPPLES, VICTORIA ROSS, AND NATHAN SIMPSON, individually and on behalf of themselves and all others similarly situated, | |
| | **Case No.  1:24-cv-16** |
| Plaintiffs, | |
| | **AMENDED CLASS ACTION COMPLAINT** |
| vs. | |
| UNIVERSITY OF PITTSBURGH MEDICAL CENTER, | **JURY TRIAL DEMANDED** |
| Defendant. | |

## <u>TABLE OF CONTENTS</u>

I.    SUMMARY OF THE ACTION ................................................................... 1

II.    JURISDICTION AND VENUE ................................................................. 5

III.    THE PARTIES ........................................................................................... 6

IV.    AGENTS AND CO-CONSPIRATORS .................................................... 8

V.    CLASS ACTION ALLEGATIONS ......................................................... 9

VI.    FACTUAL ALLEGATIONS ................................................................... 11

    A.    Monopsony Power in Hospital Markets .............................................. 11

    B.    UPMC's Anticompetitive Acquisition of Market Power ..................... 19

        1.    UPMC Facilities ........................................................................ 20

        2.    UPMC Acquired Market Power Through Anticompetitive Competitor
             Acquisitions and Facility Shutdowns ......................................... 21

    C.    UPMC's Monopoly and Monopsony Power Have Harmed Competition in
        Both Output and Input Markets ........................................................... 28

        1.    UPMC's Monopoly Power in the Hospital Services Output Market, *i.e.*,
             the Market for Hospital Services in the Relevant Market ........................ 28

        2.    UPMC Maintained and Expanded its Monopoly Power in the Relevant
             Market by Engaging in Anticompetitive Conduct Intended to Raise
             Costs and Prevent Expansion of Rivals, Creating Barriers to Entry for
             Current or Potential Competitors ................................................ 32

        3.    UPMC's Market Power Enabled it to Wield Monopsony Power in the
             Relevant Labor Input Market Which It Used to Suppress Wages and
             Benefits, to Increase Workloads and to Prevent Workers from Seeking
             Other Employment Opportunities .............................................. 36

            a.    UPMC Used its Monopsony Power to Artificially Depress
                 Wages ........................................................................... 37

            b.    UPMC Used its Monopsony Market Power to Degrade
                 Working Conditions for UPMC's Healthcare Workers ............... 41

            c.    Declining and Depressed Staffing Ratios are Evidence of
                 UPMCs Monopsony Power ......................................... 42

            d.    UPMC Used its Monopsony Market Power to Create Rules

that Restricted the Ability of Employees to Switch Jobs in Order to Pursue Increased Compensation or Better Opportunities ......... 44

e.    UPMC Used its Monopsony Market Power for Hiring Skilled Healthcare Workers to Force UPMC Healthcare Workers to Agree to Unreasonable Anticompetitive Restrictions ................... 48

f.    UPMC Used its Monopsonist Market Power for Hiring Skilled Healthcare Workers to Prevent UPMC Healthcare Workers from Forming Unions That Could Have Collectively Bargained for Better Wages and Conditions Without Fear of Discrimination or Retaliation by UPMC ...................................... 51

VII.    FRAUDULENT CONCEALMENT ................................................................. 53

VIII.    CAUSES OF ACTION ................................................................................. 55

COUNT I:  Violations of Section 2 of the Sherman Act – Monopolization / Monopsonization ......................................................................... 55

COUNT II:  Violations of Section 2 of the Sherman Act –  Attempted Monopolization / Monopsonization ......................................................... 56

IX.    PRAYER FOR RELIEF ................................................................................. 57

X.    JURY TRIAL DEMANDED ......................................................................... 58

Plaintiffs Jennifer Mizell, Maria Paulding, Kathleen Peapples, Victoria Ross, and Nathan

Simpson, on behalf of themselves and all other similarly situated UPMC Skilled Healthcare

Workers[1] (the "Class"), brings this action for damages and injunctive relief under the antitrust

laws of the United States against Defendant University of Pittsburgh Medical Center ("UPMC").

Based upon personal knowledge, information, belief, and investigation of counsel, Plaintiffs

specifically allege:

## I.     SUMMARY OF THE ACTION

1.      This is a civil antitrust action under Section 2 of the Sherman Act, 15 U.S.C. § 2,

for treble damages and other relief arising out of UPMC's anticompetitive conduct directed at the

employment of Skilled Healthcare Workers by UPMC at UPMC owned and/or operated facilities

providing acute inpatient care. UPMC acquired and used its monopsony power to prevent

workers from exiting or improving their working conditions, to suppress workers' wages and

benefits, and to drastically increase their workloads, through a draconian system of mobility

restrictions and widespread labor law violations that lock employees into sub-competitive pay

and working conditions.

2.      In January 2023, Congresswomen Summer Lee (D-PA) and then Pennsylvania

Representative Sara Innamorato, along with the American Economic Liberties Project,[2]

confirmed what many in western and central Pennsylvania already knew: that UPMC had

---

[1] "Skilled Healthcare Workers" is defined herein as workers who possess specialized in-patient hospital skills or qualifications that they have obtained as a result of either formal education and training or as the result of extensive on-the-job training and includes, without limitation, licensed practical nurses (LPNs), Nurses, Medical Assistants, registered nurses (RNs), Nurse Assistants, Orderlies, and Pharmacy workers.

[2] The American Economic Liberties Project is an American non-profit organization that advocates for the aggressive enforcement of antitrust regulations to restore competitive balance to markets negatively impacted by concentrated economic power exercised by monopolies.

amassed considerable power over its workers, which it wields to keep wages low, conditions unsatisfactory, and to prevent unionization, and that "UPMC has used its power to depress wages, degrade working conditions, extract money from the public, and, ultimately, create a crisis for the communities in which it operates and in which we live."

3.      Economists refer to this market situation as "monopsony" where there is a single buyer of goods or services and many sellers. It is the inverse of "monopoly" where there is only a single seller and many buyers.

4.      UPMC's mistreatment of its Skilled Healthcare Workers is one part of an overarching anticompetitive scheme implemented by UPMC to acquire and exploit: (1) monopoly power over the provision of hospital output services and (2) monopsony power over the employment of hospital workers (including Skilled Healthcare Workers).

5.      UPMC currently employs over 95,000 workers, making it the largest private-sector employer in Pennsylvania. Over the past two decades UPMC has expanded its geographic reach and its market concentration. Currently, UPMC comprises over 35 hospitals located throughout the Relevant Market defined below. It is now the 18th largest hospital network in the country and boasts annual revenue of $26 billion.[3]

6.      Yet most of UPMC's growth in the hospital output and labor input markets has been achieved through anticompetitive conduct. UPMC pursued a series of mergers and acquisitions in order to expand its reach and in order to become the dominant in-hospital services provider (and employer) throughout the Relevant Market. From 1996 to 2018, UPMC made

_____

[3] As explained herein, Defendant UPMC operates its network of hospitals either directly or by way of subsidiary and affiliate entities that are owned by, report to, and/or are under the control of UPMC. UPMC's website (https://www.upmc.com/locations/hospitals) currently states that its health care system "is made up of over 35 hospitals throughout" the 6 regions comprising the "Relevant Market" (defined herein).

approximately 28 acquisitions of competitor healthcare service providers. These anticompetitive acquisitions, however, were not done to expand the reach of healthcare to the communities served by these facilities, they were done to expand UPMC's market power. Indeed, at the same time that UPMC was acquiring these facilities, it was also reducing the availability of healthcare services within the Relevant Market. During the 1996-2019 period, UPMC closed four hospitals and downsized three others, eliminating 353 beds and 1,367 full-time and 433 part-time healthcare service jobs; resulting in reduced healthcare quality and outcomes as well as reduced employment opportunities for the communities those hospitals served.

7.      UPMC's anticompetitive conduct did not only result in anticompetitive effects on output, but also on labor. In a sustained effort to maximize profits at the expense of its labor, UPMC employed a series of interconnected anticompetitive restraints to limit its employees' mobility and to suppress wages. As explained below, UPMC used the monopsony power it acquired over the employment of hospital healthcare workers (as a result of its acquisition and downsizing conduct) to harm competition (and ultimately workers) in the hospital healthcare labor market by: using restraints which amount to functional noncompete restrictions and a do-not-rehire blacklist policy to keep workers from leaving; suppressing wages to sub-competitive levels while also reducing staffing and increasing workloads; and suppressing workers' labor law rights to keep them from improving working conditions or forming unions. Each of these restraints alone is anticompetitive, but combined, their effects are magnified. UPMC wielded these restraints together as a systemic strategy to suppress worker bargaining power and wages. As a result, UPMC's Skilled Healthcare Workers were required to do more while earning less— while they were also subjected to increasingly unfair and coercive workplace conditions.

8.      Economists who studied UPMC's tactics found that UPMC used its increasing

buying power in the labor markets to artificially suppress wages for UPMC's workers. This economic study found that when UPMC's market share increases, UPMC workers' wages fall relative to comparable hospital workers. These workers suffer a 30 to 57 cent per hour reduction in pay, on average, for every 10% increase in UPMC's market share.[4] This UPMC "wage penalty" applied to virtually all UPMC employees, including the proposed Class of Skilled Healthcare Workers as well as other categories of UPMC employees, even low-wage workers in job categories such as laundry and linen workers and contract housekeepers.

9.      In addition to lowering wages, UPMC also further suppressed workers' effective compensation by increasing their workload without offering additional compensation. In a competitive environment, if an employer increases the work an employee is expected to perform, it would have to raise wages in order to avoid losing the employee to a competitor who can offer better working conditions or higher pay. A monopsonist, however, can increase workloads while keeping wages stagnant because workers have few or indeed no alternative options for employment.

10.      Staffing ratios (workers to patients) at UPMC hospitals have decreased at the same time that staffing ratios on average have increased at other Pennsylvania hospitals. As of 2020, UPMC staffing ratios are on average 19 percent lower than the average staffing ratio at non-UPMC hospitals. And the onerous staffing ratios UPMC imposed on its workers correlates inversely with UPMC's regional market share, meaning that staffing ratios are lowest (*i.e.*, workers are required to care for more patients) where UPMC has the highest market share and conversely, staffing ratios are highest where UPMC has lower market shares.

---

[4] This finding is consistent with several other studies that have considered the anticompetitive effect hospital mergers have had on wages for hospital workers.

11.     UPMC's monopolist/monopsonist tactics, in combination, allowed it to maximize its leverage over its workers. Had UPMC been subject to competitive market forces, it would have had to offer competitive wages to attract workers and it would have had to maintain higher staffing levels in order to maintain the quality of care it provided to its patients, so that it would not lose patients to competitors who could provide better quality care. Because UPMC had monopoly power regarding health care services, however, it could use its monopsony power to implement policies that reduced its labor costs even if those policies degraded its quality of care because it would not lose business. And that is what it did, suppressing pay and increasing workloads while also imposing mobility restraints to prevent workers from leaving their jobs and suppressing labor rights to prevent workers from trying to improve their working conditions. In other words, UPMC's low wages, chronic understaffing and sub-par treatment of its workers, suggests that UPMC didn't need to raise wages or preserve adequate working conditions and it did not need to provide better quality healthcare because within the Relevant Market, UPMC has monopsony power over health care employment and monopoly power over healthcare services with little competitive pressure in the regions where it operates.

## II.     JURISDICTION AND VENUE

12.     The Court has subject matter jurisdiction over the Plaintiffs' federal antitrust claims, under Section 2 of the Sherman Act, 15 U.S.C. § 2, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 & 26. Plaintiffs' federal antitrust claims arise under federal law, 28 U.S.C. §§ 1331 & 1337, and specifically under federal statutes regulating commerce and trade.

13.     Plaintiffs and the proposed Class have been injured, and are likely to continue to be injured, as a direct result of UPMC's unlawful conduct.

14.     The Court has personal jurisdiction because UPMC's principal place of business and headquarters are located at 200 Lothrop Street, Pittsburgh, PA 15213. UPMC is a non-profit healthcare provider which employs thousands of Skilled Healthcare Workers.

15.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22, and 28 U.S.C. § 1391(b) and (c) because during the Class Period defendant UPMC resided, transacted business, was found, or had agents in this District; and because a substantial part of the events giving rise to the claims occurred in this District.

### III.     THE PARTIES

16.     Plaintiff, Jennifer Mizell is an adult individual residing in Pittsburgh, Pennsylvania. During the relevant time period Ms. Mizell was employed as a Nurse by UPMC. From 2005 through 2011, Ms. Mizell worked at UPMC Shadyside as a Registered Nurse, and from 2022 to the present, Ms. Mizell has been employed as a UPMC travelling nurse.

17.     Plaintiff, Maria Paulding is an adult individual residing in Erie, Pennsylvania. During the relevant time period (from January 6, 2023 to October 2, 2023), Ms. Paulding was employed as a Senior Practitioner Nursing Student by UPMC.

18.     Plaintiff, Kathleen Peapples is an adult individual residing in Erie, Pennsylvania. During the relevant time period, Ms. Peapples was employed by UPMC as a senior surgical technologist at UPMC Hamot located in Erie, Pennsylvania.

19.     Plaintiff Victoria Ross is an adult individual residing in Erie, Pennsylvania. During the relevant time period, Ms. Ross was employed as a Registered Nurse at UPMC Hamot located in Erie, Pennsylvania.

20.     Plaintiff, Nathan Simpson is an adult individual residing in Fader, Virginia. During the relevant time period, Mr. Simpson was employed by UPMC as a Registered Nurse.

Mr. Simpson worked as a UPMC traveling nurse at UPMC Passavant, UPMC Community

Osteopathic, UPMC Carlisle, UPMC St. Margaret, and UPMC Hanover.

21.     Defendant University of Pittsburgh Medical Center (hereinafter, "UPMC") is the

18th largest hospital system in the country, and the largest private-sector employer in

Pennsylvania with its corporate headquarters located at 200 Lothrop Street, Pittsburgh,

Pennsylvania, 15213.[5]

22.     Upon information and belief, UPMC has common ownership and control over

hospitals in its healthcare system from the time that those hospitals joined the UPMC system and

during the time that they have been operated as a UPMC facility.

---

[5] As noted above, UPMC's website (https://www.upmc.com/locations/hospitals) currently states that its health care system "is made up of over 35 hospitals throughout" the 6 regions comprising the "Relevant Market" (defined herein).  UPMC lists its hospitals by region as follows: **Southwest Pennsylvania Region** (UPMC Children's Hospital of Pittsburgh: Pittsburgh, PA (Lawrenceville); UPMC East: Monroeville, PA; UPMC Horizon – Greenville: Greenville, PA; UPMC Horizon – Shenango Valley: Farrell, PA; UPMC Jameson: New Castle, PA; UPMC Magee-Womens Hospital: Pittsburgh, PA (Oakland); UPMC McKeesport: McKeesport, PA; UPMC Mercy: Pittsburgh, PA (Uptown); UPMC Montefiore: Pittsburgh, PA (Oakland); UPMC Passavant – Cranberry: Cranberry Township, PA; UPMC Passavant – McCandless: Pittsburgh, PA (McCandless Township); UPMC Presbyterian: Pittsburgh, PA (Oakland); UPMC Shadyside: Pittsburgh, PA (Shadyside); UPMC St. Margaret: Pittsburgh, PA (Aspinwall); and UPMC Western Psychiatric Hospital: Pittsburgh, PA (Oakland)); **Northwest Pennsylvania and Western New York Region** (UPMC Chautauqua: Jamestown, NY; UPMC Hamot: Erie, PA; UPMC Kane: Kane, PA; and UPMC Northwest: Seneca, PA); **Central Pennsylvania Region** (UPMC Carlisle: Carlisle, PA; UPMC Community Osteopathic: Harrisburg, PA; UPMC Hanover: Hanover, PA; UPMC Harrisburg: Harrisburg, PA; UPMC Lititz: Lititz, PA; UPMC Memorial: York, PA; and UPMC West Shore: Mechanicsburg, PA); **North Central Pennsylvania region** (UPMC Cole: Coudersport, PA; UPMC Muncy: Muncy, PA; UPMC Wellsboro: Wellsboro, PA; and UPMC Williamsport: Williamsport, PA); **West Central Pennsylvania Region** (UPMC Altoona: Altoona, PA; UPMC Bedford: Everett, PA; and UPMC Somerset: Somerset, PA); **Maryland Region** (UPMC Western Maryland: Cumberland, MD).

23.     As such, Defendant is the alter ego for its member hospitals, meaning that Defendant and its member hospitals function as a single employer. Accordingly, Defendant was and/or is the employer (single, joint, or otherwise) of the Plaintiffs and Class Members.

## IV.     AGENTS AND CO-CONSPIRATORS

24.     The anticompetitive and unlawful conduct alleged herein against UPMC in this Complaint was authorized, ordered, and/or performed by its officers, agents, employees, or representatives while actively engaged in the management, direction or control of UPMC's business affairs.

25.     Individuals alleged to have engaged in violations of the laws listed herein are alleged to have done so on behalf of all members of the UPMC corporate family. Various others, presently unknown to Plaintiffs, may have participated as co-conspirators in the violations alleged in this Complaint and performed acts and made statements in furtherance thereof.

26.     At all times, the officers, agents, employees, or representatives operated under the explicit and apparent authority of their principals.

27.     UPMC's subsidiaries, affiliates, and agents operated as a single unified entity.

28.     All references in this Complaint made to any act, deed, or transaction of UPMC, or a UPMC corporate subsidiary or affiliate, means that the relevant UPMC entity engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of UPMC's business or affairs. The conduct alleged in this complaint was committed by UPMC or was authorized, ordered or done by UPMC's respective officers, agents, employees, or representatives while actively engaged in the management of UPMC's overarching business or affairs.

8

## V.    CLASS ACTION ALLEGATIONS

29.    Plaintiffs bring this action against UPMC on behalf of themselves and on behalf of the members of the following class (the "Class") under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure:

> All Skilled Healthcare Workers who are or have been employed by UPMC at a UPMC affiliated facility providing primary, secondary, tertiary, and quaternary inpatient acute care hospital services (including predecessors, subsidiaries, and/or related entities of any such facility) in the Relevant Market at any time from February 14, 1996 until UPMC's unlawful anticompetitive conduct ceases.
>
> Excluded from the proposed Class are UPMC, UPMC subsidiaries and affiliates, UPMC's boards of directors, UPMC senior executives who promulgated UPMC's anticompetitive employment practices, and governmental entities.

30.    Subject to additional information obtained through further investigation and discovery, the Class definition may be expanded or narrowed.

31.    The Class is so numerous that joinder of all Class members in this action is impracticable. The proposed Class contains thousands of similarly situated current and/or former UPMC Skilled Healthcare Workers.

32.    Questions of law and fact common to the Class include:

a.    Whether, when, and how UPMC used its monopsony power to impose restrictions that limited worker mobility in order to prevent employees from switching jobs within the UPMC system to obtain higher wages or better working conditions;

b.    Whether, when, and how UPMC used its monopsony power to blacklist employees by employing a "do not rehire" policy as an *in terrorem* tactic to prevent employees from seeking work outside the UPMC system in order to pursue better opportunities;

c.    Whether, when, and how UPMC implemented anticompetitive employment practices intended to suppress health care workers' wages;

d.  Whether, when, and how UPMC used its monopsony power to degrade work conditions by assigning workers additional responsibilities and/or time without increased compensation and by degrading work benefits;

e.  Whether, when, and how UPMC used anticompetitive tactics to prevent employees from unionizing;

f.  Whether UPMC concealed the existence and/or implementation of its anticompetitive tactics from Plaintiffs and the Class;

g.  Whether UPMC's anticompetitive tactics restrained trade, commerce, or competition for Skilled Healthcare Workers in the Relevant Market;

h.  Whether Plaintiffs and the Class have suffered antitrust injury;

i.  Whether Plaintiffs and the Class are entitled to injunctive relief; and

j.  The appropriate measure of damages.

33.  Plaintiffs' claims are typical of the claims of the members of the Class, and Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs and all members of the Class are similarly affected by UPMC's wrongful conduct in that they were paid less than they would have been in a competitive market.

34.  Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class.  Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Class.

35.  Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

36.  The questions of law and fact common to Plaintiffs and the members of the Class, as set out above, predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

37.  Class action treatment is a superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit a large number of

similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

38.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendant.

39.     Class membership is readily definable and Class members are easily identified. Records of the names and addresses for members of the Class exist in the files of Defendant UPMC.

## VI.     FACTUAL ALLEGATIONS

### A.     Monopsony Power in Hospital Markets

40.     The exercise of market power can harm competition in both output (sell-side) and input (buy-side) markets. Regulators, economists, and antitrust scholars have long recognized that seller power can result in higher prices, reduced quality, and can erect barriers to competitive entry. The same anticompetitive conduct can affect input markets, where buyer power can suppress the prices sellers can obtain for their wares or the wages they can obtain for their services.

41.     Economists use the term "monopsony" to describe a market situation where a single buyer of a product or service faces multiple sellers. It is the inverse of the term "monopoly" where a single seller dominates the production or supply of a product or service.

Whereas monopoly power is market power on the sell (output) side of a market, monopsony power is market power on the buy (input) side of a market.[6]

42.     It is well established in economics that a seller with monopoly power will charge more for its product than a seller who has to compete with other sellers.  Similarly, an employer with monopsony power will pay a lower wage than an employer who has to compete with other employers to hire workers.  Accordingly, the ability of an employer, such as UPMC, to exercise buyer power in an input market for labor harms competition and workers by suppressing wages, decreasing working conditions, and reducing the number of workers that would have otherwise obtained employment.

43.     As described in this Complaint, the abuse of market power by Defendant UPMC has resulted in these exact harms.

44.     The realization that employers possess buying power over their employees is by no means novel. Economists have long recognized that the economic relationships in labor markets require unique scrutiny. Adam Smith, a pioneer of economics, wrote in his 1776 book, *The Wealth of Nations* that "in disputes with workmen, masters must generally have the advantage[.]" Adam Smith recognized that, in the natural state of things, "masters" (*i.e.*, employers) wielded market power over their employees to control their wages.

45.     More recently, Nobel-laureate David Card has stated in his recent presidential address to the American Economic Association, "the time has come to recognize that many—or

---

[6] *See Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312 (2007); *see also Nat'l Collegiate Athletic Ass'n. v. Alston*, 594 U.S. 69, 87(2021), ("They [the parties] do not contest that the NCAA enjoys monopoly (or, as it's called on the buyer side, monopsony) control in that labor market—such that it is capable of depressing wages below competitive levels and restricting the quantity of student-athlete labor."); *Khan* v. *State Oil Co.*, 93 F. 3d 1358, 1361 (CA7 1996) ("[M]onopsony pricing … is analytically the same as monopoly or cartel pricing and [is] so treated by the law"), vacated and remanded on other grounds, 522 U.S. 3 (1997).

even most—firms have some wage setting power."[7] As the United States has become confronted with increasingly high levels of inequality and falling labor shares in national income, academics have found renewed interest in studying the imbalance in economic power between employers and workers in the labor market.

46.    Monopsony has become an increasing focus of economic research on the functioning of labor markets. The effects of monopsony power on a labor market are comparable to the effects of monopoly power on a product market. Just as a monopolist can set prices above a competitive price value in a monopolized product market, a monopsonist can set wages below competitive wage value in a monopsonized labor market. And just like competition with other sellers constrains a seller from gaining too much market power in a product market, competition with other employers also constrains an employer from gaining too much market power in a labor market. In a competitive labor market, competing firms compete to hire workers by offering better wages or better opportunities. When there are only a few employers, or even a single employer, such constraints are eliminated.

47.    While antitrust law has long recognized the harms that the exercise of "seller power" can effectuate on consumers, its mirror image, "buyer power," has garnered less regulatory attention until more recently. As observed by Professors Ioana Marinescu and Herbert Hovenkamp: "Concentration in labor markets is very likely as high or higher than in many of the product markets in which firms sell. As a result, the antitrust law against anticompetitive mergers affecting employment markets is certainly underenforced, very likely by a significant amount." According to economist Eric Posner, lawsuits claiming wage fixing in labor markets are

---

[7] David Card, Who Set *Your* Wage, Presidential Address to American Economic Association, January 2022, *available at* https://davidcard.berkeley.edu/papers/Card-presidential-address.pdf (emphasis in original).

adjudicated at a rate 10-times lower than the corresponding rate for cases alleging price fixing in product markets. This has, in turn, allowed anticompetitive monopsonist labor practices to continue unabated, leading to reduced competition and compensation for labor, and diminishing the market power of workers in the labor force.

48.     In his review of economic literature studying monopsony in labor markets, labor economist Alan Manning observed, "The bottom line from these studies is that there seems to be a large amount of monopsony power. If anything, there seems to be much more monopsony in the labor market than one might have expected a priori."[8]

49.     The Council of Economic Advisors' 2016 Report reflected the growing realization that buyer power resulting from reduced inter-firm competition has resulted in the suppression of wages below competitive levels.[9] The report explained:

> There is also growing concern about an additional cause of inequity—a general reduction in competition among firms, shifting the balance of bargaining power towards employers. Such a shift could explain not only the redistribution of revenues from worker wages to managerial earnings and profits, but also the rising disparity in pay among workers with similar skills. These trends also have broader implications for the economy as a whole: instead of promoting growth, forces that undermine competition tend to reduce efficiency, and can lead to lower output, employment, and social welfare.

50.     The exercise of monopsony power is particularly salient in healthcare, the industry in which UPMC operates. Donald Sullivan observed in his 1989 paper titled *Monopsony Power in the Market for Nurses* that "The market for hospital nurses is literally the textbook

---

[8] Alan Manning, *Monopsony in Labor Markets: A Review*, 74(1), ILR REVIEW 3-26, 6 (January 2021).

[9] Council of Economic Advisers Issue Brief, Labor Market Monopsony: Trends, Consequences, and Policy Responses, October 2016, *available at* https://obamawhitehouse.archives.gov/sites/default/files/page/files/20161025_monopsony_labor_mrkt_cea.pdf.

example of monopsony in the labor market."[10] Sullivan's observation reflected a continued

realization that health economist Donald Yett had discussed over two decades earlier in 1975

book, *An Economic Analysis of the Nurse Shortage*. Yett explained that:[11]

> Most local nurse markets are variants of two prototypes—one
> characterized by monopsony, and the other by oligopsony—with
> respect to their hospital sectors. Although diversity exists in terms
> of their non-hospital sectors, it exerts only minor influence on the
> general level of nurse salaries because hospitals, which employ 70
> percent of all active nurses, are the dominant employers.

51.     Referencing much of the literature on the subject of buyer power in labor markets,

the U.S. Treasury, in concert with the Department of Justice (DOJ) and Federal Trade

Commission (FTC), issued a March 2022 report titled "The State of Labor Market Competition,"

which addressed the market conditions that enable and sustain the exercise of monopsony power.

The report explained the antitrust harm to workers from industry consolidation: "[c]oncentration

in particular industries and locations can lead to workers receiving less pay, fewer benefits, and

worse conditions than what they would under conditions of greater competition."

52.     The exercise of monopsony power has affected hospital workers generally,

particularly medically skilled workers. In a 2021 study, Professors Elena Prager and Matt

Schmitt examined whether wage growth slowed due to increases in consolidation following

hospital mergers.[12] They found that when mergers resulted in a high degree of concentration, the

---

[10] Donald Sullivan, Monopsony Power in the Market for Nurses, NBER Working Paper #3031,
July 1989 at 1.

[11] DONALD YETT, AN ECONOMIC ANALYSIS OF THE NURSE SHORTAGE 224 (Lexington Books
1975). Yett further presaged the current nurse shortage conditions, ("When nurse demand is
increasing relative to supply wages will not rise as much under conditions of monopsony or
oligopsony as they would in more competitive labor markets.") *Id.* at 225.

[12] Prager, Elena, and Matt Schmitt. 2021. "Employer Consolidation and Wages: Evidence from
Hospitals." *American Economic Review*, 111 (2): 397-427.

effects were most pronounced for medically skilled workers (including nursing and pharmacy jobs), but less so for a group of other skilled, mostly white collar, non-medical workers.[13]

53.     Recent economic work has explained that health care labor markets are particularly susceptible to harm arising from monopsonist practices. David Wasser, an economist with the U.S. Census Bureau, has noted that "[e]conomists have long looked to the health care industry as an example of where monopsonistic labor markets are likely to occur." Dr. Wasser's position is supported by academic research. For example, Brent Fulton, an economist at University of California Berkley, found in a 2016 market study of hospitals that 90% of 328 metropolitan statistical areas studied qualified as "highly concentrated" based on the fact that they had an HHI[14] of more than 2,500. This was a continuation of a trend of hospital markets towards concentration beginning in the 1990s and continuing through the 2000s.

54.     This higher concentration in hospital markets is associated with increased cost and reduced quality for hospital services in the "output market," *i.e.*, the market for hospital services. In 2012, the Robert Woods Johnson Foundation studied the impact of hospital consolidations. The review determined that hospital consolidations resulted in higher prices and did not lead to improved quality of care. Accordingly, the review concluded that hospital competition (not consolidation) improved quality of care. Importantly, however, consolidation and concentration that reduce competition resulting in negative effects on quality of care also have negative effects on wages for hospital workers.

---

[13] *Id.*

[14] The Herfindahl-Hirschman Index ("HHI") measures concentration of a market. The Department of Justice considers an HHI above 2,500 to reflect a highly concentrated market and an HHI between 1,500 and 2,500 to reflect a moderately concentrated market.

55.     Studies reaching back to the 1970s have also shown wages for nurses in areas with high hospital market concentrations find large, negative correlations, *i.e.*, as market concentration increases, wages decrease. Indeed, it seems axiomatic that as employers get larger, they can exert more market power in the labor market.

56.     Certain types of workers, such as nurses, pharmacy technicians, medical assistants and others are particularly susceptible to market concentration in the hospital system because they have specialized skills that do not easily translate to other jobs. Specialized workers are only able to perform specialized tasks in a few firms in that specific industry, so workers with specialized skills only have a few options for their labor. Therefore, hospitals compete primarily with other hospitals for their labor. For other types of workers who may not be as specialized, hospitals compete with a broader array of employers to attract and retain workers. For example, Trauma Nurses who typically work in Emergency Rooms and Intensive Care Units likely cannot find comparable work in a non-hospital setting whereas a kitchen worker at a hospital can potentially find jobs at other institutions that need kitchen staff.

57.     Accordingly, consistent with economic theory, consolidation in the hospital market may also lead to even more pronounced anticompetitive effects in the labor market because many of the employees are specialized labor.

58.     Recent research has confirmed the above theory, finding significant negative wage effects for skilled hospital workers when the markets become more concentrated. A 2021 paper published by economists Elena Prager and Matt Schmitt found lower wages and depressed wage growth for skilled nursing and pharmacy hospital workers as hospital markets became more concentrated. Further, according to Professors Prager and Schmitt, available data indicate that these effects are not generated by pre-merger differences in wage trends nor post-merger

changes in labor quantity or labor composition.[15] Likewise, a 2023 working paper published by the Center for Economic and Policy Research found, consistent with Professors Prager and Schmitt, significant decreases in the wages for skilled hospital workers in markets with higher hospital concentrations.

59.     As alleged herein, UPMC is one such hospital system which has steadily increased its market concentration, and thus increased its monopsony power over its employees. UPMC has increased its market power through both mergers and closures of hospitals, exacerbating the hospital concentration levels in the regions where it is present. But UPMC has done more — by way of additional anticompetitive acts described herein, it has wielded its monopsony power to further suppress worker wages and reduce workplace quality.

60.     This class action challenges UPMC's anticompetitive employment practices. UPMC has used its monopsony over Skilled Healthcare Workers to engage in predatory conduct directed at Skilled Healthcare Workers employed at UPMC facilities in order to increase its profitability, including by: preventing Skilled Healthcare Workers from switching jobs, both within and beyond the UPMC network, so that these workers could find better employment opportunities; artificially depressing wages; degrading work conditions; and preventing union organizing.

61.     In addition to the damages UPMC's conduct has inflicted on its employees, UPMC's monopolization of hospital services has also resulted in negative outcomes for the public, including higher costs, lower quality of care, and less price transparency, leading to further downward pressure on wages.

---

[15] *Supra* n.12.

**B.      UPMC's Anticompetitive Acquisition of Market Power**

62.     Competition in hospital services yields positive outcomes for both the public at-large and the skilled labor which hospitals employ, a conclusion well supported by the economic literature, as indicated above. Increased competition is associated with better patient outcomes, including lower patient mortality. Indeed, one study found that a 10 percentage-point drop in hospital concentration led to a nearly 3 percent drop in the 30-day mortality rate.

63.     Conversely, consolidation in hospitals has been recognized to cause pernicious effects. Simply put, consolidation in healthcare tends to increase healthcare costs and reduce quality. The Federal Trade Commission's Bureau of Economic Analysis has said consolidated hospitals charge 40-50 percent higher prices than those in competitive markets.

64.     Increased hospital concentration also has effects in the labor market in the form of reduced number of hospital employers and suppressed wages. According to one study, within four years of concentration-increasing hospital mergers, wages were 4.0 percent lower for skilled non-health professionals and 6.8 percent lower for nursing and pharmacy workers than they otherwise would have been but-for the merger.

65.     Notwithstanding the benefits associated with competition in the hospital space, the market for hospitals has become far more concentrated. The American Hospital Association documents 1,577 hospital mergers from 1998 to 2017 with the pace of mergers accelerating over that time period. Between 2010 and 2017, there were 778 hospital mergers across the United States, and acquisition revenue hit a record high in 2022.

66.     Hospitals have also expanded their monopoly power over healthcare services through "vertical" consolidation by acquiring physician practices.  In 2006, 28 percent of primary physicians were employed by hospitals. By 2016, that number had risen to 44 percent.

67.     In the case of UPMC, the aforementioned mergers, acquisitions and facility shut-downs cemented UPMC's monopsony power throughout the Relevant Market.  UPMC is now the largest non-governmental employer in the Commonwealth of Pennsylvania. UPMC is now also the 18th largest hospital network in the United States.  As a result, in the areas where UPMC operates, it is often the only purveyor of hospital services and employer of Skilled Healthcare Workers. UPMC has used its hospital acquisitions along with other anticompetitive acts to acquire monopoly power over the provision of health care services and monopsony power over the employment of skilled in-hospital healthcare workers within the Relevant Market. For instance, in Allegheny County, UPMC employs approximately 67 percent of all hospital employees; and controls about 60 percent of all licensed hospital beds. Meanwhile, in Pittsburgh, UPMC employs 76 percent of all hospital employees and controls roughly 71 percent of all licensed hospital beds.

### 1.     UPMC Facilities

68.     UPMC's health care facilities in the Relevant Market currently include centers for cancer, neurosurgery, psychiatry, rehabilitation, geriatrics, and women's health. UPMC's current operations include the following:

- forty (40) academic, community, and specialty hospitals in Pittsburgh and beyond with over 8,800 licensed beds;[16]
- more than sixty (60) centers and two hundred (200) cancer experts in Western Pennsylvania and Ohio as part of the UPMC Hillman Cancer Center;
- twelve (12) Pittsburgh-area UPMC Senior Communities;
- more than forty-five (45) children's pediatric locations throughout Pennsylvania;

---

[16] *See, e.g.,* note 2, *supra* for a list of UPMC hospitals by region located in the Relevant Market compiled from UPMC website.

- several urgent care locations throughout Western Maryland, Southwest Pennsylvania, Northwest Pennsylvania, Central Pennsylvania, and West Central Pennsylvania;

- the largest rehabilitation network in Western Pennsylvania, offering inpatient and outpatient rehab at more than ninety (90) locations; and

- eight hundred (800) doctors' offices and outpatient sites.

69.     UPMC currently employs more than 95,000 workers and is the largest non-governmental employer in the Commonwealth of Pennsylvania; and directly employs 21,000 nurses (with many more who are affiliated with the UPMC system), and 5,000 physicians (with many more who are affiliated with the UPMC system).

70.     As noted, in conjunction with its acquisitions spree, UPMC also reduced the availability of hospital services and employment within the Relevant Market.  From at least 1996 through 2019, UPMC harmed competition for hospital labor and hospital services in the regions where it operated by acquiring 28 hospital systems, eliminating four hospitals, and downsizing three others. As a result of these anticompetitive acts, UPMC eliminated 353 beds and 1,367 full-time and 433 part-time jobs at the facilities it closed and/or downsized.

### 2.     UPMC Acquired Market Power Through Anticompetitive Competitor Acquisitions and Facility Shutdowns.

71.     UPMC is a $26 billion "non-profit" health care provider and insurer based in Pittsburgh, Pennsylvania.[17] As explained in more detail below, over the past several decades, UPMC has expanded from a system of 12 hospitals serving the Pittsburgh metropolitan area into

---

[17] UPMC's "non-profit" status does not diminish the plausibility of the antitrust violations alleged herein because "[r]esearch evidence shows not-for-profit hospitals exploit market power just as much as for-profits." *See* Diagnosing the Problem: Exploring the Effects of Consolidation and Anticompeittive Conduct in Healthcare Markets: Hearing Before the Subcommittee on Antitrust, Commercial and Administrative Law, 116th Cong. (March 7, 2019) (Statement by Martin Gaynor, E.J. Barone Univesity Professor of Economics and Public Policy Heinz College, Carnegie Mellon University, at p.2).

a major network of over 35 hospitals located throughout Central and Western Pennsylvania, including adjacent portions of Ohio, Southwestern New York, Northwestern Maryland, and West Virginia (the "Relevant Market"). The following map from UPMC's website depicts the relevant geographic regions (collectively, the Relevant Market) where UPMC is the dominant provider of hospital services:



*See* https://www.upmc.com/locations/regions.

72.     UPMC's rise to dominance in the Relevant Market was largely due to its anticompetitive conduct directed at both the hospital services output market and the hospital labor input market.  By and through a series of strategic acquisitions, UPMC became the dominant leader in the hospital healthcare services and Skilled Healthcare Worker employment

within the Relevant Market, significantly reducing competition in both inpatient hospital services and hospital employment.[18]

73.     The following map provides a more granular view of UPMC market share by zip codes within the Relevant Market based on Center for Medicare & Medicaid Services ("CMS") Hospital Service Area data that records inpatient visits by Medicare beneficiaries.  The darker regions, where UPMC's market share exceeds 50%, matches up with the above map outlining the 6 regions that comprise the Relevant Market:

---

[18] In the 2023 Merger Guidelines, the FTC and DOJ warned that a "firm that engages in an anticompetitive pattern or strategy of multiple acquisitions in the same or related business lines may violate Section [2 of the Sherman Act]." U.S. Dep't of Justice & Fed. Trade Comm'n, Horizontal Merger Guidelines (2023) at 23, n.42; *see also id.* at 23 (stating that "[w]here one or both of the merging parties has engaged in a pattern or strategy of pursuing consolidation through acquisition, the Agencies will examine the impact of the cumulative strategy . . . to determine if that strategy may substantially lessen competition or tend to create a monopoly"). In late 2023, the FTC brought a "serial acquisitions" claim against an anesthesia services provider and the private equity firm that created it, alleging that the provider had monopolized the anesthesiology market in Texas through a series of strategic tuck-in acquisitions over many years. *See FTC v. U.S. Anesthesia Partners, Inc., et al.*, No. 4:23-CV-03560, 2024 WL 2137649, at *1-2, 18 (S.D. Tex. May 13, 2024). On May 13, 2024, the court denied the provider's motion to dismiss in its entirety. *See id.* at *6-9.



74.    UPMC participated in the well-documented period of hospital consolidation that

started in the 1990s and continued through the 2000s.

75.    In 1990, Medical and Health Care Division ("MHCD") acquired Montefiore

Hospital, merged with Presbyterian University Hospital, and formed the entity now known as

UPMC.

76.    In 1996, UPMC moved to acquire South Side, Aliquippa and Braddock hospitals,

and in 1997, it merged with several other hospitals including St. Margaret Memorial, Shadyside,

and Passavant hospitals. Two years later, UPMC merged with Magee-Women's Hospital. These

initial mergers and acquisitions led to the consolidation of these hospitals, which are a major

portion of UPMC's current health system. That same year, UPMC became an independent

nonprofit corporation.

77.     In 1998, UPMC acquired McKeesport Hospital located in Pittsburgh, Pennsylvania.  UPMC's purpose for acquiring the hospital was, *inter alia,* to expand its market share in furtherance of maintaining its monopsony in Skilled Healthcare Worker labor market. In 2000, UPMC downsized the McKeesport Hospital's core units. For example, the Hospital's Critical Care Unit went from 12 beds to zero (closing in 2020); the Intensive Care Unit went from having 12 beds to now having only two beds; and the Medical-Surgical Unit, "Crawford 2," was eliminated. The closure of these McKeesport Hospital facilities led to the elimination of hundreds of hospital jobs. In fact, in 2018 the McKeesport Hospital employed 765 full-time and 259 part-time workers but by 2021, those numbers had decreased to 529 full-time and 203 part-time workers.

78.     UPMC continued to expand its operations in 2001 when Children's Hospital of Pittsburgh merged with UPMC. In 2008, UPMC merged with Mercy Hospital, and opened new Children's Hospital facilities in 2009.

79.     In 2011, UPMC acquired the Hamot Medical Center in Erie, Pennsylvania. In 2013, UPMC acquired the Altoona Regional Health System.

80.     Between 2016 and 2017, UPMC acquired 15 hospitals in the Relevant Market.

81.     In 2016 UPMC acquired the Jameson Health System. Pursuant to the merger, on May 1, 2016, Jameson Memorial Hospital merged with UPMC and became UPMC Jameson.

82.     In October 2016, Susquehanna Health, a four-hospital system in North Central Pennsylvania, became the first domestic hospital outside of Western Pennsylvania to join UPMC. As part of the above acquisition, UPMC acquired Williamsport Regional Memorial Hospital, a four-hospital health system in North Central Pennsylvania. Also, as part of the acquisition, UPMC made a $500 million investment in what ultimately became UPMC

Susquehanna, which consisted of Williamsport Regional Medical Center, Divine Providence Hospital, Muncy Valley Hospital and Soldiers and Sailors Memorial Hospital. On October 18, 2016, Soldiers and Sailors Memorial Hospital joined UPMC and became UPMC Wellsboro, in Wellsboro, Pennsylvania.  UPMC Wellsboro is a general medical and surgical facility.

83.     In September 2017, UPMC further expanded its dominance in the south-central region of Pennsylvania by acquiring seven additional hospitals from Pinnacle Health in an anticompetitive acquisition.  The local media described the acquisition as "possibly the region's biggest, most dramatic health care development ever."[19] This anticompetitive expansion provided UPMC with a controlling interest in hospitals in Harrisburg, Carlisle, and Sunbury in the Harrisburg-Carlisle area, Hanover and Memorial hospitals located within the York market, and two hospitals in Lancaster County.  These additional strategic acquisitions further solidified UPMC's dominance of the hospital labor input market in Pennsylvania, further evidence of its monopsony power in the Relevant Market.

84.     In October 2017, UPMC acquired Lock Haven Hospital from for-profit Quorum Health Corporation. A year after its acquisition, UPMC reduced capacity by approximately fifty percent. In 2018, a year post-acquisition, the hospital went from 47 licensed beds to 25 beds. The Pennsylvania Department of Health data shows that the beds "set up and staffed" were further reduced, decreasing from 25 beds in 2020 to only 12 beds in 2021.  The downsizing of Lock Haven led to the elimination of 224 full-time and 83 part-time jobs at the hospital. The closure of Lock Haven increased the workload of UPMC workers at other facilities within a thirty-mile radius, including other UPMC hospitals such as Williamsport Regional Hospital. The

---

[19] David Wenner, PinnacleHealth Makes Stunning Move With UPMC, But Watch for Rivals to Push Back Hard, PENN. REAL-TIME NEWS (Mar. 14, 2017), https://www.pennlive.com/news/2017/03/pinnaclehealth_makes_stunning.html.

closure further demonstrates UPMC's intent to monopolize the North Central Pennsylvania

Skilled Healthcare Worker labor market.

85.    In October 2017, UPMC also acquired Sunbury Hospital, located in Sunbury,

Pennsylvania. In March 2020, UPMC closed the facility forcing residents to travel more than

forty minutes by car to UPMC Williamsport Regional, or an hour south to UPMC Harrisburg.

This closure diminished access to health care and the quality of inpatient hospital care in this

region. Equally important, the closure of Sunbury Hospital eliminated 148 full-time and 68 part-

time hospital employees. The closure of Sunbury Hospital enhanced UPMC's market power and

reduced competition in the Relevant Market for hospital healthcare services and skilled

healthcare employment.

86.    Similarly, UPMC acquired two Lancaster hospitals in 2017. Within two years of

these acquisitions, UPMC wasted no time in closing the hospitals, which resulted in a reduction

in capacity in its newly dominated region. For example, immediately after acquiring Lancaster

Regional Hospital, UPMC significantly reduced the number of beds "set up and staffed" in 2018

by nearly half of its original 136 beds, to 78 beds.  Then in late 2018, UPMC announced its plans

to close Lancaster Regional Hospital by March 2019. This closure forced residents to commute

to UPMC Litiz, the closest UPMC hospital, which is about thirty minutes by car. The closure of

Lancaster Hospital also led to the elimination of 526 full-time and 123 part-time jobs.  Moreover,

the closure of Lancaster Hospital further cemented UPMC's monopsony power in the Relevant

Market for Skilled Healthcare Workers.

87.    In 2017, UPMC also closed the maternity unit, and dialysis service at Bedford

Hospital in Bedford, Pennsylvania. The nearest maternity hospital for local Bedford patients was

a UPMC hospital in Altoona that had been acquired by UPMC in 2013, which is about forty

miles away by car. UPMC substantially downsized Altoona's capacity. The Altoona hospital employed 750 full-time Registered Nurses in 2014, but after the UPMC acquisition, the Altoona hospital reduced its staff, employing approximately 517 full-time Registered Nurses.

88.     In 2018, UPMC merged with Charles Cole Memorial Hospital, forming UPMC Cole, a modern rural health care provider which consists of a hospital, health clinics, cancer care and other specialties.  UPMC Cole is part of the UPMC Susquehanna healthcare network, which was established in October 2016, and based in Lycoming County, Pennsylvania.

89.     In 2019, UPMC acquired Somerset Hospital. Shortly after the acquisition, UPMC downsized the hospital from 98 beds "set up and staffed" to 56 beds by the end of 2021.

90.     In January 2023, UPMC Lock Haven publicly announced that it would no longer provide inpatient services, that it intended to reduce its facility down to an outpatient emergency department, and that it would transfer some of its employees to positions at other UPMC facilities spread throughout the region. The Mayor of Lock Haven expressed his concern over the closure of the hospital which served the community for more than 100 years. The closure forces patients to travel long distances for inpatient care, with closest options being Geisinger Jersey Shore Hospital or UPMC Williamsport, which are approximately 20 and 35 minutes away, respectively. The Lock Haven emergency department will be licensed to UPMC Williamsport.

C.     **UPMC's Monopoly and Monopsony Power Have Harmed Competition in Both Output and Input Markets**

1.     **UPMC's Monopoly Power in the Hospital Services Output Market, *i.e.*, the Market for Hospital Services in the Relevant Market**

91.     UPMC's anticompetitive conduct has affected the market for primary (*i.e.*, "general"), secondary, tertiary and quaternary inpatient acute care hospital services in the Relevant Market. Evidence of UPMC's dominance of the output market (*i.e.*, UPMC's monopoly

28

power) has explanatory power for UPMC's dominance of the input or labor market and

anticompetitive effects therein (*i.e.*, monopsony power).

92.     The core of a hospital's business is acute inpatient care, *i.e.*, patients whose

treatment or conditions require an overnight hospital stay because they cannot be safely or

effectively treated on an outpatient basis. Primary, secondary, tertiary and quaternary inpatient

care services[20] cannot be offered in an outpatient facility due to the complexity of the level of

care. Accordingly, outpatient care is not a substitute for inpatient care.

93.     As noted, UPMC has a longstanding history of acquiring hospitals in the Relevant

Market to not only expand its footprint, but also to acquire and expand its monopoly power over

health services (and employment of healthcare providers).  UPMC is also notorious for using its

market power to acquire, and subsequently shut down, hospitals to reduce competition. In other

instances, UPMC acquired hospitals and then shut down major departments and service lines.

This has had the effect of driving patients to seek care at other UPMC facilities, further

consolidating UPMC's market power.

94.     UPMC maintains a high market share for inpatient hospital services in each of the

localities in which it operates.

95.     As previously noted, the Herfindahl-Hirschman Index ("HHI") measures

concentration of a market. The Department of Justice considers an HHI above 2,500 to reflect a

---

[20] Primary or general care is provided when a patient consults with a primary care provider.
Secondary care refers to services provided by a specialist such as an oncologist or
endocrinologist. Tertiary care refers to specialized care in a hospital setting requiring specialized
equipment and expertise such as dialysis or heart surgery and includes specialized trauma care
beyond intensive care units. Quaternary care is an advanced level of specialized care that
includes experimental procedures or uncommon or rare surgeries.

highly concentrated market and an HHI between 1,500 and 2,500 to reflect a moderately concentrated market.

96.     A study by economist Zarek C. Brot-Goldberg found that a hospital merger that results in an HHI increase of over 200 with a post-merger HHI of over 2,500 indicates a significant increase in the hospital's market power and results in significant increases in healthcare costs, increasing inpatient hospital service costs by an average of 5.4%.

97.     An analysis of market power based on "licensed beds per hospital" using data collected by the Pennsylvania Department of Health in 2021 for discrete statistical areas within the Relevant Market, reveals that UPMC's dominant market share supports finding it has monopoly power throughout the Relevant Market:

| Statistical Area | UPMC Market Share (2020) | HHI (2021) |
| --- | --- | --- |
| New Castle | 100% | 10,000 |
| Oil City | 100% | 10,000 |
| Williamsport | 94% | 8,472 |
| Altoona | 89% | 7.353 |
| Lock Haven | 85% | 5,241 |
| Somerset | 56% | 4,367 |
| Pittsburgh | 55% | 2,703 |
| Erie | 54% | 3,696 |
| Harrisburg-Carlisle | 36% | 5,001 |
| York-Hanover | 17% | 6,269 |
| Lancaster | 7% | 5,158 |

98.     As indicated by the table above, UPMC's market share is evidence of its monopoly power within the Relevant Market. For example, UPMC has more than 50% market share in the Pittsburgh and Erie regions and substantially more than 50% market share in several smaller regions including Williamsport (94% market share) and Altoona (89% market share). Moreover, UPMC's HHI values for all of these regions (even the ones where UPMC's market share appears to be less dominant) are in excess of 2,500 (with some being multiples above that number). These findings are direct evidence further supporting the conclusion that the Relevant Market is highly concentrated and that UPMC has monopoly power.

99.     UPMC has also reduced output in the Relevant Market by closing and/or downsizing hospitals, or hospital services, in certain localities wherein UPMC acquired hospitals, causing a reduction in capacity and decreasing access and service quality for patients in the Relevant Market. For some services such as secondary, tertiary or quaternary care requiring additional expertise and specialization, such downsizing may cause patients to travel further at greater expense to receive the care they need, compromising patient care and safety.

100.     As UPMC increased its market share throughout the Relevant Market by way of its acquisitions of competitor facilities, it also reduced the number of beds at its facilities that it set up and staffed, despite having the license to operate additional beds. For example, UPMC decreased its bed utilization from 96% in 2013 to 81% in 2021 as its total market share increased over that same period.

101.     This correlation between UPMC's increasing market share and a reduction in the utilization rate of licensed hospital beds suggests that UPMC made a strategic decision to restrict the availability of beds, potentially reducing patient access to healthcare services or undermining the quality of care in the relevant market. In addition, by reducing its bed utilization rate, UPMC

also reduced its demand for Skilled Healthcare Workers, further strengthening its monopsony power.

102.   Studies have shown that UPMC's acquisitions of various hospitals adversely affected patients, as well as healthcare workers, and local residents. The impact of UPMC's acquisitions has led to increased costs, diminished quality of care, reduced price transparency for patients, as well as reduced wages for employees and degrading working conditions for hospital workers, as alleged herein.

> **2.    UPMC Maintained and Expanded its Monopoly Power in the Relevant Market by Engaging in Anticompetitive Conduct Intended to Raise Costs and Prevent Expansion of Rivals, Creating Barriers to Entry for Current or Potential Competitors**

103.   The hospital healthcare market has natural barriers to entry including: (1) large capital costs required to construct and to continually maintain and upgrade the hospital; (2) costs of recruiting and paying a large specialized and skilled medical staff; (3) negotiating costs associated with contracting with third-party payors; and (4) and the costs associated with drawing in patients who are already familiar with hospitals in the market.

104.   Health systems that have acquired market power frequently use anticompetitive tactics to create additional barriers to entry to maintain or enhance their market power. These tactics include, but are not limited to, entering into restrictive contracts with insurers in order to try to hamper the free flow of patients to competitors, refusing to accept patients with certain types of insurance, and engaging in "data blocking" where a hospital system may impede the flow of patient information to providers outside the system, thereby making it more difficult for patients to switch providers.

105.   In addition to the above-noted natural barriers to entry, UPMC also engaged in these other anticompetitive tactics aimed at creating additional barriers to entry that prevented

the expansion of rival hospital systems and frustrated the entrance of potential additional competitors.

106.    For example, on information and belief, UPMC coerced insurers to enter into exclusive dealing agreements with UPMC, preventing them from offering to cover comparable medical services if performed by competing hospitals. UPMC also allegedly punished insurance companies that refused to cooperate with UPMC by either: excluding and refusing to contract with them; or demanding more favorable terms than its competitors when negotiating provider agreements.

107.    Some of UPMC's alleged anticompetitive tactics and conduct, dating as far back as 1999, resulted in prior antitrust lawsuits. For example, in 2009, UPMC's only substantial rival in the Pittsburgh region at the time, West Penn Allegheny Health Network ("West Penn"), brought a lawsuit against UPMC alleging that UPMC had engaged in a series of anticompetitive actions aimed at frustrating West Penn's August 2000 merger with several distressed health providers, including by creating additional barriers to entry with the intent of undercutting competition and preventing expansion by its rival, West Penn.

108.    West Penn alleged that UPMC undertook numerous anticompetitive actions that included: (1) legal challenges to the putative merger; (2) discouraging investors from purchasing West Penn bonds; (3) inducing UPMC's health plan to refuse to include West Penn in its network of participating providers except on a limited basis; (4) repeatedly refusing to pay West Penn for out-of-network medically necessarily emergency care services provided by West Penn to UPMC Health Plan members; and (5) deliberately disseminating false information about West Penn's financial condition to potential bond purchasers and credit rating agencies to adversely

affect West Penn's financial standing. These actions were alleged to have been designed to eliminate West Penn, UPMC's only viable competitor in the Pittsburgh region at the time.

109.    In addition, beginning in 2002, UPMC allegedly colluded with the largest health insurer in the Pittsburgh region, Highmark, to restrain competition in hospital and health plan markets and to further undermine West Penn. UPMC allegedly entered into an exclusive deal with Highmark for health insurance and refused to contract on reasonable terms with, or sell its health insurance affiliate to, any competing health insurer. In exchange, UPMC purportedly received reimbursement rates from Highmark that were significantly higher than rates West Penn received, enabling Highmark to share monopoly profits from UPMC's limited competition. Highmark additionally agreed to include UPMC as an in-network provider in all its health plans and terminated its low-cost insurance plan, a plan that was utilized by many West Penn patients.

110.    Dating back to the relevant time, UPMC's monopoly power in the Hospital Services Output Market gave it outsized power over health insurers seeking to compete in the six-county Pittsburgh metropolitan area. As West Penn alleged:

> [I]t is extremely difficult for a new market entrant to build an adequate and marketable provider network without reasonable access to UPMC's facilities, especially in oncology, obstetrics, and mental health.  Employers in the Pittsburgh area typically require their health plans to provide access to UPMC facilities. Without a competitive contract with UPMC, Highmark rivals like United cannot offer an attractive health insurance product to employers.

111.    For example, in 2005 and 2006, United, a large insurer with a track record of successes in other markets, attempted to enter the Pittsburgh market.  However, as part of its alleged conspiracy with Highmark, UPMC refused to contract with United on competitive terms, thereby blocking United's access to UPMC's two principal Pittsburgh hospitals (Presbyterian and Shadyside).  UPMC also refused United's efforts to purchase the UPMC Health Plan.

Because United was unable to include UPMC in its network it was unable to enter the Pittsburgh health care market.

112.    Later, UPMC took similar action against Highmark once it believed that Highmark may threaten its anticompetitive scheme.  In 2011, after Highmark announced its intention to affiliate with Allegheny Health Network (AHN) and West Penn, UPMC refused to renew its health insurance provider contracts with Highmark, contracts that had been in place since 2002 and were due to expire after December 31, 2012, on the basis that Highmark became a threat to UPMC as an insurance provider.[21]

113.    Since 2012, UPMC has also threatened to refuse, or has actually refused, to contract with Highmark or allow Highmark plan participants to use UPMC health care facilities, even when, at times, the refusal is in contravention of UPMC's obligations.  Some of the anticompetitive acts UPMC has taken to drive healthcare consumers away from UPMC rival health plans include: barring all "Community Blue" insurance members from receiving treatment at UPMC healthcare facilities in or about 2013; undertaking a misleading marketing campaign to drive healthcare consumers away from rival health plans; and refusing to contract with Highmark plans after their 2012 agreements expired in 2014.

114.    The conflict between UPMC and Highmark, including UPMC's refusal to accept Highmark members at its facilities, led to the Pennsylvania Attorney General's involvement to protect Pennsylvanian's access to health care services. In 2014, Highmark and UPMC each entered into a Consent Decree with the Office of Attorney General, the Insurance Department, and the Department of Health. The Consent Decrees required UPMC and Highmark to accept

---

[21] UPMC offers an insurance product that is purchased by Pennsylvania for its Medicaid recipients but does not cover services provided by non-UPMC doctors.

each other's members at their facilities until the expiration of the Consent Decrees on June 30, 2019. In 2019, as the Consent Decrees neared their expiration date, the Pennsylvania Attorney General argued that UPMC had violated the terms of its consent decree and that UPMC was withholding access to care for patients whose employers have contracts with competing health plans and was refusing to negotiate payment terms with self-insured employers.

115.    In February 2019, Pennsylvania Attorney General Josh Shapiro filed a petition to intervene in the battle between UPMC and Highmark. The Attorney General urged UPMC to "change its mind" and "do the right thing" and stated that he had to act to protect Pennsylvanians" from UPMC's "corporate greed."

116.    UPMC's anticompetitive conduct had the effect of preserving UPMC's market power and limiting expansion for competitor hospital systems.

> **3.    UPMC's Market Power Enabled it to Wield Monopsony Power in the Relevant Labor Input Market Which It Used to Suppress Wages and Benefits, to Increase Workloads and to Prevent Workers from Seeking Other Employment Opportunities**

117.    UPMC's monopolization of hospitals also made it a monopsonist regarding the employment of hospital health workers within the Relevant Market. UPMC used this power to increase its profits by intentionally suppressing wages and implementing other employment restrictions and practices that expanded its monopsonist power at the expense of its workers including, but not limited to, imposing mobility restrictions and noncompete terms on employees to limit their ability to seek alternative employment, and suppressing any effort of employees to unionize so that UPMC Healthcare Workers would have to accept sub-competitive wages and degraded work conditions imposed by UPMC.

118.    As noted above, UPMC, with over 95,000 employees in Pennsylvania, is the Commonwealth's largest private employer. As further described herein, there is compelling

direct evidence that UPMC used its monopsony power in the Relevant Market to artificially depress wages (*i.e.,* impose a wage penalty) and to degrade employment conditions for its hospital employees. More particularly, a wage study found that increases in UPMC's market share correlated to: (1) a statistically significant wage penalty that UPMC imposed on its employees, and (2) lower staffing ratios at UPMC hospitals, meaning that its employees were required to take on more work responsibilities. Additional direct evidence of UPMC's market power includes UPMC's use of coercive tactics such as functional noncompete restrictions and do-not-rehire blacklists to limit worker mobility, and UPMC's denial of workers' labor law rights to form unions that could seek better work conditions. Taken together, this conduct is evidence that UPMC had (and used) the power to impose lower effective compensation and higher workloads on its employees, and that UPMC had the ability to lock in those effects through mobility restrictions that prevented workers from exercising rights to improve their working conditions.

> **a.    UPMC Used its Monopsony Power to Artificially Depress Wages**

119.    It has been long understood by UPMC nurses that they are paid less than nurses at comparable hospitals, remarking that UPMC stands for "You Pay Me Cheap."

120.    Several recent economic studies have concluded that hospital mergers generally result in high rates of consolidation and are associated with the suppression of industry-specific skilled worker wages. One 2020 study, in particular, found that hospital mergers in the top quartile, when measured by the change of HHI, resulted in significant wage suppression for nurses and pharmacy workers that was persistent and increasing. The study found that by the four-year mark after merger, nursing and pharmacy worker wages were 6.8 percent lower than

they would have been absent the merger.  As previously alleged, mergers are not the only means of consolidation, facility closures can also increase market concentration.

121.    Recently, Econ One Research conducted an empirical study of UPMC's operations and concluded that UPMC's campaign of acquiring a dominant market share by acquiring competitors resulted in increased market concentration. Econ One found that UPMC's monopolization scheme had an adverse and statistically significant negative impact on wages within the Relevant Market. Accordingly, the Econ One findings support the claim that UPMC employees are paid less than hospital workers in adjacent markets in Pennsylvania as a consequence of UPMC's unlawful and exclusionary conduct. In other words, Econ One's study provides empirical support that UPMC used its monopsony market power to suppress the wages of its hospital workers.

122.    The Econ One study compared wages at UPMC hospitals with comparator hospitals in markets unaffected by UPMC's presence. The study found that nurse wages at UPMC hospitals are notably lower when compared to the average wages in commuting zones with comparable cost of living from at least 2008 through 2019.[22]  This indicates that UPMC has been able to exercise its monopsony buying power to impose a wage penalty by restraining employee wages below competitive levels.

123.    For example, as noted in the below table, Licensed Practical Nurses (LPNs) at UPMC facilities in five commuting zones where UPMC has a presence received on average $1.31 per hour less than LPNs at hospitals in commuting zones with a comparable cost of living.

---

[22] "Commuting zones" have been used by multiple labor market studies to define relevant geographic boundaries for labor markets.  Commuting zones consist of geographically contiguous groups of counties between which residents commute to work, constructed based on U.S. Census commuting flow data.  Research shows that workers seeking alternative jobs make no more than 20% of their applications outside of their commuting zone.

In addition to LPNs, as set out in the table, other categories of Skilled Healthcare Workers who are part of the Class also experienced significant wage penalties as a result of UPMC's anticompetitive conduct. These wages penalties are significant. For example, assuming a 40-hour work week and a 52-week work year, UPMC Nurses experience an average annual income penalty of $1,289.60.

**Average Nurse Wages at UPMC and non-UPMC Hospitals by Nurse Category**
**(Survey Years 2008-2019)**

| Nurse Category | UPMC Average Wage | Non-UPMC Average Wage | Wage Differential |
|---|---|---|---|
| LPNs | $19.97 | $21.28 | ($1.31) |
| Nurses | $27.18 | $27.80 | ($0.62) |
| Medical Assistants | $14.93 | $15.49 | ($0.56) |
| RNs | $31.78 | $32.15 | ($0.37) |
| Nurse Assistant/ Orderlies | $13.89 | $14.10 | ($0.21) |
| Pharmacy | $36.82 | $37.66 | ($0.84) |

124.    The Econ One study found that the wage penalty UPMC was able to impose on most of its Skilled Healthcare Workers increased as UPMC acquired additional market share. Based on regression analysis, as UPMC market share and concentration increased, there is a negative and statistically significant impact on the differential between UPMC wages and non-UPMC wages. In other words, as UPMC market share increases, UPMC wages fall relative to comparator non-UPMC wages.

125.    The Econ One study also found that the UPMC "wage penalty" was pervasive and extended beyond just Skilled Healthcare Workers. As noted in the below table, the UPMC

"wage penalty" included, without limitation, physicians, administrators, and even low-wage

workers such as laundry and linen workers and contract housekeepers:

**Average Hospital Worker Wages at UPMC and Non-UPMC Hospitals by Job Category (Survey Years 2011-2020)**

| Job Category | UPMC Average Wage | Non-UPMC Average Wage | Wage Differential |
|---|---|---|---|
| Physician Administrative (under contract) (Part A Medicare) | $125.17 | $135.79 | ($10.61) |
| Direct Patient Care (under contract) | $53.22 | $61.90 | ($8.68) |
| Dietary (under contract) | $23.05 | $29.05 | ($6.00) |
| Home office and Contract Physicians - Teaching (Part A Medicare) | $111.87 | $116.69 | ($4.82) |
| Physician - Administrative (Part A Medicare) | $140.62 | $145.38 | ($4.77) |
| Housekeeping (under contract) | $18.95 | $23.12 | ($4.17) |
| Employee Benefits | $31.70 | $34.12 | ($2.42) |
| Social Service | $27.59 | $29.80 | ($2.21) |
| Nursing Administration | $35.55 | $37.03 | ($1.48) |
| Maintenance and Repairs | $23.91 | $24.53 | ($0.62) |
| Laundry and Linen Service | $13.09 | $13.64 | ($0.55) |
| Physician - Teaching (Part A Medicare) | $119.30 | $119.33 | ($0.03) |

*Note: Wage differentials equal to average UPMC wage minus average non-UPMC wage; negative numbers imply average UPMC wages below average non-UPMC wages.*

126.    This wage penalty analysis indicates that UPMC's monopsony power is so

pervasive that even low-wage UPMC workers do not have viable outside employment

substitutes.

127.    Econ One also performed a regression analysis of the UPMC wage penalty across

several of the geographic regions comprising the Relevant Market and found that both increased

market concentration and increased UPMC market share have a negative and statistically

significant impact on the UPMC wage differential. Thus, when either market concentration

(measured by HHI) or UPMC's market share increases, UPMC wages fall relative to wages in

the comparison regions within the commuting zone. The study found that a 10% increase in

UPMC's market share within a commuting zone led to an average reduction in pay per hour for UPMC employees of between 30 cents and 57 cents per hour across all worker wages, all else being equal.

128.   UPMC workers themselves report that they are not sufficiently paid for the type of work they perform. A Registered Nurse who had previously been employed at Braddock Hospital before it was acquired and closed by UPMC was later rehired at UPMC McKeesport Hospital. She reported that she was paid at a 15-year rate, despite her 28 years of experience in the field. A physician who was previously employed at UPMC for nine years realized she was grossly underpaid, resigned from UPMC and chose to work for another hospital.  At the other hospital, that physician received a 50 percent pay increase, reduced working hours, and is not required to be on call every third night and every third weekend as she was when she was employed at UPMC.

> **b.**   **UPMC Used its Monopsony Market Power to Degrade Working Conditions for UPMC's Healthcare Workers**

129.   UPMC's monopsony power does not only manifest in the form of decreased wages, but also in the form of subcompetitive working conditions.

130.   UPMC workers have also complained that UPMC provides sub-competitive benefits, such as expensive but minimal health insurance plans. Many UPMC workers have even complained that they have accumulated medical debt, which is attributed to their employer, but they cannot pay off the debt.  For example, one UPMC employee stated:

> [W]e care about our jobs. But our wages are so low and our benefits so terrible that we have to visit the foodbank just to survive. Many of us are in medical debt to our own employer - a hospital. How ironic is that? … I'm not able to support my family. I live in public housing and cannot afford a vehicle. I work for the largest health

system in the state taking care of other people and still owe $20,000
for my own health care.

        **c.**      **Declining and Depressed Staffing Ratios are Evidence of
UPMCs Monopsony Power**

131.    Reduced and depressed staffing ratios also provide additional direct evidence of

UPMC's monopsony power in the Relevant Market. For instance, lower staffing ratios tend to

show that UPMC has the ability to require its employees to care for more patients without

additional pay.  Lower staffing ratios further indicates a reduction in the quality of care and

service provided to patients (*i.e.*, each patient receives less individualized attention and care),

thus demonstrating UPMC's exercise of market power in downstream healthcare markets.

132.    The lack of viable options for employment outside of UPMC hospitals, in effect,

forces UPMC workers to accept UPMC's increasingly onerous terms of employment including,

for example, nurses who have to take on more responsibilities and more work as a result of these

increased staff-to-patient ratios imposed by UPMC to cut costs at the expense of its workers and

its patients.

133.    As UPMC's market share increased, it substantially increased its employees'

workload simply by reducing its workforce and requiring the remaining employees to make up

the difference. Staffing ratios, which represent the number of staff per patient, measures the labor

purchased by a hospital relative to the demand for its hospital services. UPMC's ability to

decrease staffing ratios at its facilities indicates monopsony and monopoly power to the extent

that: (1) UPMC had the power to require its workers to provide additional care to its patients

without providing them with additional pay; and (2) UPMC was able to reduce the overall

quality of the care UPMC patients received without suffering a drop in the demand for its

hospital services. One nurse reported, "[t]he most upsetting part of UPMC's ongoing refusal to

invest in staffing and a healthy work environment is their disregard for the people that depend on us most—our patients."

134.    As UPMC increased its buyer and seller power, the staffing ratios between workers and patients at UPMC hospitals decreased substantially. This outcome evinces the nexus between output and input markets for healthcare services; the exercise of buyer power in the latter not only harms workers but also degrades quality and harms consumers in the former. The reverse is also true; monopoly power in output markets exacerbates monopsony power over workers, constraining labor mobility and permitting UPMC to profit by lowering wages accordingly.

135.    Comparing UPMC's staffing ratios to non-UPMC hospitals in Pennsylvania from 2011 to 2020 shows that as UPMC acquired monopoly power in the Relevant Market it significantly decreased staffing ratios at its hospitals. Conversely, the staffing ratios at non-UPMC hospitals during the same time period increased. UPMC's staffing ratio was on average four percent higher than its competitors in Pennsylvania in 2011. That substantially changed by 2020 when the average was reduced by 19 percent when compared with its competitors that year. More particularly, from 2011 to 2020, the average staffing ratio at UPMC hospital decreased from 5.34 to 4.83. On the other hand, staffing ratios at non-UPMC hospitals during this time increased from 5.13 to 5.96.

136.    UPMC's decreased staffing ratios required nurses to do more work while, at the same time, UPMC was decreasing their pay. In a 2022-2023 survey, 93% of responding hospital workers in Southwestern Pennsylvania reported that their workloads substantially increased after they began working for UPMC. Approximately 84% of those workers reported that these increases were due to staff reductions and chronic understaffing.

137.    Depressing staffing-to-patient ratio results in higher workloads and is, effectively, a pay cut because workers are not being offered additional compensation in exchange for the additional work they are required to perform. In other words, workers do not receive additional compensation commensurate with their increased productivity. This result reflects the very essence of monopsony power, which permits employers to pay workers below the competitive level, *i.e.,* the worker's marginal revenue product (MRP). But, as noted above, even before factoring in the higher workloads, UPMC pays lower wages than comparable hospitals. Accordingly, UPMC's increasing workloads, together with its sub-competitive wages, demonstrates the overall widening gap of the wage differential for UPMC hospital workers in comparison to non-UPMC hospital workers. This further indicates that UPMC workers' wages are low; and continue to decline as UPMC expands and becomes increasingly powerful.

138.    UPMC's problematic staff reductions and chronic understaffing issues were an integral part of its monopolization scheme that preceded the coronavirus pandemic.

**d.    UPMC Used its Monopsony Market Power to Create Rules that Restricted the Ability of Employees to Switch Jobs in Order to Pursue Increased Compensation or Better Opportunities**

139.    UPMC executives and high-level management know that UPMC maintains monopsony power over its employees and manifests this market power in the form of restrictions to mobility.

140.    Mobility is, *prima facie*, a necessary condition for competitive labor markets. Workers who cannot switch jobs have no ability to seek or negotiate better working conditions. Thus, mobility restrictions are direct restraints on competition.  When workers are prevented from seeking alternative comparable employment opportunities, they are not only inhibited from pursuing better work opportunities, but they are also inhibited from being able to negotiate better

working conditions with their current employer.  Accordingly, an employer who can successfully impose such direct restraints on workers possesses market power. UPMC not only has the power to exercise such restrictions but imposes them to the detriment of its employees.

141.    UPMC uses three principle tools across the UPMC system to restrict Skilled Healthcare Worker mobility: (1) enforcement of a system-wide salary structure, taking away UPMC employees' ability to negotiate for higher pay by taking a job at a different UPMC facility; (2) employing an *in terrorem* "do not rehire" blacklist policy for any employee who dares to leave UPMC to take a position at a competing facility; and (3) forcing employees to agree to restraints that amount to functional non-compete restrictions.

142.    For example, UPMC has put in place a systemwide "market-based approach to establish salary structures. The salary structures are based on market data in defined geographical areas."  The result is that employees cannot increase their compensation by seeking a new position at a different UPMC hospital because "[i]f an employee transfers between structures (Pittsburgh to Southwest PA, Southwest PA to Western PA, Central PA to Pittsburgh or vice versa) into a position with the same or similar job duties, an employee's salary will be adjusted by the percentage difference between the market targets of the ranges."  In other words, UPMC uses its salary structure to prevent employees from being able to change employment by moving to another UPMC facility anywhere within the Relevant Market in order to increase their compensation.

143.    UPMC further inhibits worker mobility by employing a "Do Not Rehire" policy regardless of workplace infractions.  Another common complaint amongst UPMC's employees is that when they leave their positions at UPMC, the employees are then subject to a UPMC systemwide do-not-rehire blacklist, effectively preventing them from working throughout the

entire UPMC healthcare system. For example, a travel nurse who began working at UPMC Altoona in or about September 2020, and had received several work awards, protested when, on May 15, 2022, her supervisor attempted to assign an additional patient to nurses who were already assigned too many patients. The supervisor threatened to report any nurse who rejected the additional assignment for "patient abandonment."  The next day this nurse told local news media about the staffing issues and within two weeks, her contract with UPMC was cancelled and a "do not hire" order was placed on her name throughout the UPMC network.  She was told by her recruiter that she "was not welcome to apply for any jobs within the UPMC system."  The recruiter subsequently told her that she was having a hard time finding her non-UPMC work because almost all the relevant medical work in the Altoona area is associated with UPMC.

144.    Even workers who resigned from their positions at a UPMC facility and committed no workplace infractions have been barred from seeking employment at another UPMC location. One nurse who attempted to transfer to another UPMC hospital unit fell victim to this anticompetitive practice. After she was told that she had secured the new position at the other location, she e-mailed her current supervisors to advise them she was leaving her current position. She was subsequently informed that she no longer had the new position, and she was told that she would not be allowed to work for UPMC anymore. That nurse then attempted to secure employment with UPMC at various locations but was repeatedly denied. Another nurse who resigned after years of subpar pay and racial discrimination, was also denied future employment with UPMC.

145.    UPMC's "do not rehire" blacklist restraint was intended to (and does) prevent workers from leaving UPMC employment despite the adverse terms and conditions of employment that UPMC unilaterally imposed on them.

146.     Furthermore, many current UPMC employees, aware of the mobility restrictions, are unwilling to resign from their positions out of fear that they too will be subjected to UPMC's "Do Not Rehire" policy. In a 2022-2023 survey of UPMC workers, approximately 50% said that they believe they would be blacklisted should they resign from their positions with the hospital system. And approximately 47% of UPMC workers reported that they had actually refrained from applying for jobs with other employers because they feared being placed on a "Do Not Rehire" list would bar them from returning to UPMC in the future.

147.     UPMC has even fired and blacklisted Skilled Healthcare Workers for complaining about understaffing issues. Workers have provided signed statements so stating. One worker explained, "And God help you if you're fired—for any reason at all thanks to at-will hiring—because UPMC controls most of the healthcare industry in the region, nurses can find themselves unable to get a job at all." Another former UPMC worker reported that after being fired for asking UPMC to address chronic understaffing issues, alternative employment "choices are so limited" that you can "essentially [be] blacklisted from the majority of healthcare jobs in our area."

148.     On May 18, 2023, Congresswoman Summer Lee (D-PA) joined the SEIU Healthcare Pennsylvania and the Strategic Organizing Center in filing a joint antitrust complaint against UPMC, asking the U.S. Department of Justice to investigate Pennsylvania's largest private employer.

149.     Congresswoman Summer Lee summed up the effect UPMC's anticompetitive scheme has had on hospital care and employment in her hometown stating:

> My hometown Braddock lost our only hospital and largest employer back in 2010
> for the same reason McKeesport is closing their ICU this year… It's the same
> reason Western PA is facing a hospital staffing crisis that's putting our loved
> ones' lives at risk–and the same reason our nurses and health aides, who are paid

so little that they're in medical debt to the hospital they work for, face retaliation for speaking out for their patients being ripped off by skyhigh health care costs and declining quality of care: UPMC is abusing its power to exploit its workers and patients on the backs of taxpayers. I'm proud to stand alongside our hospital workers as they demand accountability and take their fight to Washington.[23]

> **e.   UPMC Used its Monopsony Market Power for Hiring Skilled Healthcare Workers to Force UPMC Healthcare Workers to Agree to Unreasonable Anticompetitive Restrictions**

150.   UPMC has required its workers, including but not limited to physicians and nurses, to agree to anticompetitive restrictions as a condition of employment.

151.   UPMC requires many of its physicians to sign explicit noncompete restrictions as a condition of employment. These noncompete restrictions contain "non-solicitation provisions, tortious interference clauses (which prevents a doctor from raiding his or her former practice of employees) and surprisingly large geographical non-compete areas."

152.   UPMC's noncompete restrictions bar physicians from obtaining future UPMC employment if they resign. UPMC's noncompete restrictions also block physicians who leave UPMC from practicing in the same geographic area (*e.g.*, county) for one calendar year.  For instance, one doctor has reported that she remained at UPMC as a practicing physician for three to four years longer than she wanted to due to the noncompete provision which prevented her from working anywhere within Allegheny County. That same doctor finally left UPMC in 2022 but to avoid UPMC's anticompetitive restrictions, she is now forced to commute 1.5 to 3.0 hours per day to work. She has also foregone providing her patients with surgical care due to the

---

[23] Summer Lee Joins Workers, Unions as they File Groundbreaking Antitrust Complaint Against UPMC, Asking U.S. Department of Justice to Investigate Pennsylvania's Largest Private Employer, at https://summerlee.house.gov/posts/summer-lee-joins-workers-unions-as-they-file-groundbreaking-antitrust-complaint-against-upmc-asking-u-s-department-of-justice-to-investigate-pennsylvanias-largest-private-employer.

distance from the hospital to where her patients would be admitted should they encounter any medical complications.

153.    UPMC's blacklist, described above, also functions as a non-compete clause covering other Skilled Healthcare Workers. The FTC's proposed rule to ban noncompete clauses included an explanation of why and how UPMC's blacklist functions as a non-compete clause: "The term non-compete clause includes a contractual term that is a *de facto* non-compete clause because it has the effect of prohibiting the worker from seeking or accepting employment with a person or operating a business after the conclusion of the worker's employment with the employer."[24] Accordingly, UPMC's policy of refusing to rehire workers who leave UPMC, combined with the fact that UPMC controls a majority of the jobs in the Relevant Market, has the same effect on competition that a non-compete clause has—it disincentivizes workers from considering jobs elsewhere.

154.    UPMC has also exercised market power over its workers through the use of other restraints that function as noncompete restrictions and apply across the UPMC network of facilities, such as using "Tuition Assistance Programs" (otherwise known as "TRAP" or "Training Repayment Agreement Programs") to saddle employees with potentially disastrous debt obligations if the employees seek to end their UPMC employment.

---

[24] Although the FTC's final rule did not include a proposed provision that would have explicitly regulated "*de facto* non-competes" out of concerns that the phrase could be overly vague, the FTC's final rule still made clear that a "non-compete clause" includes "a term or condition of employment that prohibits a worker from, penalizes a worker for, or functions to prevent a worker from" seeking new employment.  Moreover, the final rule makes clear that a non-compete "'term or condition of employment' includes, but is not limited to, a contractual term or workplace policy, whether written or oral." Accordingly, even if UPMC's contracts with its Skilled Healthcare Workers did not include explicit noncomplete clauses, UPMC imposed on them both written and oral non-compete terms and conditions of employment.

155.    UPMC's Tuition Assistance Programs provide that nurses who receive training through UPMC's proprietary training program may be required to repay UPMC for their training.  This restriction provides that the employees can have their wages garnished to repay UPMC, and often provides that if their employment status changes for any reason—even including termination by UPMC without cause—they may be liable for full repayment.  These "shadow debt" or "debt peonage" provisions are often used to circumvent state-level bans on non-compete clauses, result in threatening employees with prohibitive debt if they seek to end their employment, effectively "trapping" them to stay with their current employer.

156.    TRAPs are frequently buried deep in employment contracts and are designed to trap the employee in substandard working conditions, reducing bargaining power and enhancing the employer's market dominance.  For a system like UPMC, which already possesses monopsony market power over healthcare employment within the Relevant Market, a TRAP program further enhances its market power because UPMC healthcare workers, who already have few alternative employment opportunities, would remain indebted to UPMC.[25]

157.    UPMC's mobility restrictions, combined with the fact it has achieved monopsony power by acquiring its competitors, have prevented its employees from obtaining higher wages and improved working conditions and has decreased the number of and the quality of employment opportunities available to its Skilled Healthcare Workers.

---

[25] The FTC's Final Non-Compete Clause Rule specifically identifies "TRAPs" as a type of restraint that may be a "functional non-compete[ ]."

> **f.     UPMC Used its Monopsonist Market Power for Hiring Skilled Healthcare Workers to Prevent UPMC Healthcare Workers from Forming Unions That Could Have Collectively Bargained for Better Wages and Conditions Without Fear of Discrimination or Retaliation by UPMC**

158.     The ability of workers to organize and to form labor unions is a potential way for workers to limit and arrest employer market power. Unionization allows employees to collectively negotiate with their employer, countervailing employers' buying power in labor markets: the ability to set wages. Even in concentrated markets, workers who collectively bargain can maintain higher wages than they would have absent the ability to unionize.

159.     Economic research recognizes that unionization is associated with higher relative wage growths.

160.     In a 2020 study, Professors Benmelech, Bergman and Kim analyzed how employer concentration in local labor markets affects wages in the U.S. manufacturing sector using U.S. Census microlevel data.[26] The authors found that "consistent with labor market monopsony power, there is a negative relation between local-level employer concentration and wages that strengthens with time," and that "While employer concentration may enable firms to pay lower wages, unionization strengthens labor's bargaining position and may enable employees to diminish employers' monopsony power."[27] In other words, unionization serves as a check on the employers' market power, and suppression of the ability to unionize may exacerbate monopsony power.

---

[26] Efraim Benmelech, Nittai Bergman & Hyunseob Kim, *Strong Employers and Weak Employees: How Does Employer Concentration Affect Wages?,* 57(S) JOURNAL OF HUMAN RESOURCES S200-S50 (2020), *available at* http://jhr.uwpress.org/content/early/2020/12/03/jhr.monopsony.0119-10007R1.full.pdf+html.

[27] *Id*. at S200, S232.

51

161.     This is particularly true for nurses and other skilled employees. For example, one study found that "Wage growth slowdowns are attenuated in markets with strong labor unions, and wage growth does not decline after out-of-market mergers that leave local employer concentration unchanged."

162.     Unionization also provides other non-wage benefits to workers. As observed by Professors Suresh Naidu and Eric Posner, unions have sometimes standardized jobs across firms within industries, including with respect to workplace conditions and quality. Professors Naidu and Posner further observe that collective bargaining acts as a potential counterbalance for workers, helping them to overcome a lack of competition such as in monopsony.

163.     UPMC, in order to maintain its monopsony over its workers, has engaged in a system-wide effort to suppress and stifle efforts of UPMC workers to collectively organize.

164.     In Western Pennsylvania, UPMC has successfully prevented hospital workers from forming unions. UPMC has engaged in several tactics to prevent the formation and organization of unions. UPMC has been accused of blocking workers from attempting to organize through surveillance, harassment, intimidation, and, if necessary, termination. UPMC's union-busting policies were so pernicious that in 2014 and 2018, the National Labor Relations Board ruled that UPMC violated federal labor law by preventing workers from forming a union.

165.     UPMC has faced 133 unfair labor practice charges since 2012 and 159 separate allegations. Approximately seventy-four percent of the violations related to workers' efforts to unionize, indicating a system-wide suppression of unionization activity.

166.     UPMC's union prevention has impacted Allegheny County where, due to UPMC's efforts, only 2 percent of its hospital workers are in unions. This is not the case at UPMC's few competitors. For example, 34 percent of Allegheny Health Network hospital

workers are union members. An employee of UPMC stated, "[a]ny thoughts or questions about safety and you're 'flagged' or written up.  They try to fire anyone that voices concern or questions anything!" Another UPMC employee has alleged that "[e]mployees feel threatened and concerned for their job if they try to raise issues. If managers do not like your suggestions, they sometimes use it against you."

167.    The fact that the UPMC facilities have imposed system-wide anticompetitive restrictions on the ability of its employees to seek alternative employment and to form an effective union means that the ability of UPMC workers to negotiate salary increases or improved working conditions is unreasonably diminished.

## VII.    FRAUDULENT CONCEALMENT

168.    Plaintiffs and members of the proposed Class at all times exercised due diligence with respect to the facts alleged herein.  Prior to January 2023, when the American Economic Liberties Project report was published, Plaintiffs and members of the proposed Class did not uncover, and could not have uncovered with the exercise of reasonable diligence, the fact that UPMC's individually anticompetitive acts were actually part of a systemwide anticompetitive scheme.  Plaintiffs and members of the Proposed Class did not believe that their pay and working conditions were being suppressed as a result of an anticompetitive scheme engineered by UPMC.

169.    Without access to UPMC's internal documents, Plaintiffs and members of the proposed Class could not have inferred UPMC's anticompetitive scheme based on low wages, degraded working conditions, or reduced benefits because they did not have access to information regarding competitors' wages, working conditions, and benefits, and they did not have access to the statistical analysis that the American Economic Liberties Project report included.  Estimating competitive wage levels, work conditions and benefits requires specialized expertise not available to the ordinary healthcare worker, particularly with regard to other

competing employers, and the impact of market concentration and anticompetitive acquisitions. Moreover, it is difficult for healthcare workers to draw any conclusions about the sufficiency of their salaries or work conditions because of a lack of transparency in the industry.

170.    On information and belief, UPMC further conceals its anticompetitive practices by making it difficult for workers to access their employee files, including any employment contracts. Often, many workers do not have formal employment contracts but are provided with short summary documents delivered via text.

171.    Indeed, as part of their pre-complaint research, counsel for Plaintiff Ross sent a record request to UPMC asking it to provide her with her own employment file.  Initially UPMC claimed that Ms. Ross never worked for UPMC.  Counsel renewed the request with more information regarding Ms. Ross' employment, but UPMC refused again.  Despite several additional formal and informal requests, to date UPMC has steadfastly refused to provide Ms. Ross with copies of her own employee file.

172.    To the extent that Plaintiffs or members of the proposed Class suspected UPMC's policies were anticompetitive, UPMC's comprehensive efforts to conceal the scope of its scheme would have prevented Plaintiffs and members of the proposed Class from discovering it. Because Plaintiffs and members of the Proposed Class did not and could not have known about UPMC's efforts to conceal its conduct, they had no occasion to investigate further.

173.    By virtue of the fraudulent concealment by Defendants, the running of any statute of limitations has been tolled and suspended with respect to any claims that Plaintiffs and the Class Members have as a result of the unlawful conduct alleged in this Complaint.

174.    The foregoing allegations are likely to have evidentiary support after a reasonable opportunity for discovery.

## VIII.   CAUSES OF ACTION

### COUNT I:

### Violations of Section 2 of the Sherman Act –
### Monopolization / Monopsonization

175.    The foregoing paragraphs in this Complaint are incorporated by reference as if fully stated herein.

176.    UPMC possesses, and at all relevant times has possessed, monopoly power regarding the provision of hospital health care services and monopsony power regarding employment of Skilled Healthcare Workers in the Relevant Market. UPMC's monopoly of the output market enhanced, and is evidence of, UPMC's monopsony power in the labor market and the anticompetitive harms therein. The actions described above, undertaken by UPMC directly and through its subsidiaries, are being undertaken in order to maintain and enhance UPMC's monopoly and monopsony power and, if not enjoined, threaten to achieve that result.  These actions are exclusionary and constitute unlawful monopolization / monopsonization of the Relevant Market for hospital health care employment in violation of Section 2 of the Sherman Act (15 U.S.C. § 2).

177.    During the Class Period, UPMC's illegal conduct had a substantial effect on interstate commerce.

178.    As a direct and proximate result of UPMC's violations of Section 2 of the Sherman Act, Plaintiffs and the Class have suffered injury to their business and property.

179.    In addition, further injury to the business and property of Plaintiffs and the Class is threatened if UPMC's actions are not enjoined.

180.    The actions of UPMC have substantially harmed the competition for hospital health care employment and, if not enjoined, threaten further harm to competition in the Relevant Market.

**COUNT II:**

**Violations of Section 2 of the Sherman Act –
Attempted Monopolization / Monopsonization**

181.    The foregoing paragraphs in this Complaint are incorporated by reference as if fully stated herein.

182.    By engaging in the anticompetitive actions described above, UPMC has specifically intended to attain monopoly regarding the provision of hospital health care services and monopsony power regarding employment of Skilled Healthcare Workers in the Relevant Market. Based on UPMC's high market share, the high barriers to entry and other competitive conditions described above, and UPMC's anticompetitive actions, there is a dangerous probability that UPMC will achieve its goal and attain monopoly / monopsony power in the Relevant market to the extent it does not already possess such powers.  Such actions constitute unlawful attempted monopolization / monopsonization of the Relevant Market in violation of Section 2 of the Sherman Act (15 U.S.C. § 2).

183.    During the Class Period, UPMC's illegal conduct had a substantial effect on interstate commerce.

184.    As a direct and proximate result of UPMC's violations of Section 2 of the Sherman Act, Plaintiffs and the Class have suffered injury to their business and property.

185.    In addition, further injury to the business and property of Plaintiffs and the Class is threatened if UPMC's anticompetitive actions are not enjoined.

56

186.     The actions of UPMC have substantially harmed the competition for hospital

health care employment and, if not enjoined, threaten further harm to competition in the Relevant

Market.

### IX.     PRAYER FOR RELIEF

**WHEREFORE**, as a result of the unlawful conduct alleged in this Complaint, Plaintiffs

respectfully request that the Court enter judgment on her behalf and on behalf of the Class

identified herein, adjudging and decreeing that:

187.     This action may be maintained as a class action under Rule 23(a), Rule 23(b)(2)

and Rule 23(b)(3) of the Federal Rules of Civil Procedure with Plaintiffs appointed as the

designated representative for the Class and Plaintiffs' counsel as Class counsel;

188.     Defendant UPMC has monopolized and/or attempted to monopolize trade or

commerce among the several states in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2,

and that Plaintiffs and members of the Class have been injured in their businesses and property,

and are threatened with further injury as a result of UPMC's unlawful conduct;

189.     Plaintiffs and members of the Class are entitled to recover damages sustained by

them, as well as restitution or disgorgement, as provided by the relevant federal antitrust laws,

and that a judgment in favor of Plaintiffs and the Class be entered against UPMC in an amount to

be trebled in accordance with such laws;

190.     UPMC, its subsidiaries, affiliates, successors, transferees, assignees, and the

respective officers, directors, partners, agents, and employees thereof and all other persons acting

or claiming to act on their behalf be permanently enjoined and restrained from continuing and

maintaining the monopolies and unfair business practices alleged herein;

191.    Plaintiffs and members of the Class be awarded prejudgment and post-judgment

interest, and that such interest be awarded at the highest legal rate from and after the date of

service of the initial Complaint in this action;

192.    Plaintiffs and members of the Class recover their costs of this suit, including

reasonable attorneys' fees, expert fees, and costs as permitted by law; and

193.    Plaintiffs and members of the Class receive such other and further relief as is just

and proper under the circumstances.

## X.    JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all issues so triable.

Dated: May 23, 2024                          Respectfully submitted,

                                             _/s/ Daniel C. Levin_

                                             Austin B. Cohen, (PA Id. 78977)
                                             Daniel C. Levin, (PA Id. 80013)
                                             Keith J. Verrier, (PA Id.  86577)
                                             **LEVIN SEDRAN & BERMAN LLP**
                                             510 Walnut Street, Suite 500
                                             Philadelphia, PA 19106-3997
                                             Telephone: (215) 592-1500
                                             Facsimile: (215) 592-4663
                                             acohen@lfsblaw.com
                                             dlevin@lfsblaw.com
                                             kverrier@lfsblaw.com


                                             Joseph R. Saveri (*pro hac vice*)
                                             Christopher K.L. Young (*pro hac vice*)
                                             **JOSEPH SAVERI LAW FIRM, LLP.**
                                             601 California Street, Suite 1505
                                             San Francisco, California 94108
                                             Telephone: (415) 500-6800
                                             Facsimile: (415) 395-9940
                                             jsaveri@saverilawfirm.com
                                             cyoung@saverilawfirm.com


                                             *Counsel for Plaintiffs*