# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JENNIFER MIZELL, MARIA
PAULDING, KATHLEEN PEAPPLES,
VICTORIA ROSS, and NATHAN
SIMPSON, individually and on behalf of
those similarly situated,

        **Plaintiffs,**

        v.

THE UNIVERSITY OF PITTSBURGH
MEDICAL CENTER,

        **Defendant.**

Civil Action No. 1:24-cv-00016-SPB

Electronically Filed

Oral Argument Requested

---

## BRIEF IN SUPPORT OF DEFENDANT'S MOTION TO
## DISMISS UNDER FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)

David C. Kiernan
JONES DAY
555 California St., 26th Fl.
San Francisco, CA 94104
Telephone: 415.626.3939
Fax: 415.875.5700
dkiernan@jonesday.com

Peter Schwingler
JONES DAY
90 South Seventh Street, Suite 4950
Minneapolis, MN 55402
Telephone: 612.217.8866
Fax: 844.345.3178
pschwingler@jonesday.com

Rebekah B. Kcehowski (PA ID No. 90219)
Anderson T. Bailey (PA ID No. 206485)
JONES DAY
500 Grant Street, Suite 4500
Pittsburgh, PA 15219
Telephone: 412.391.3939
Fax: 412.394.7959
rbkcehowski@jonesday.com
atbailey@jonesday.com

*Counsel for Defendant UPMC*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................ 3

LEGAL STANDARD........................................................................................... 5

ARGUMENT..................................................................................................... 7

I. Plaintiffs Do Not Plead Either Required Component of a Relevant Antitrust Market.................................................................................................... 7

    A. Plaintiffs Do Not Plead Essential Elements of the Product Market....................... 8

    B. Plaintiffs' Geographic Market Allegations Are, at Best, Legal Conclusions Insufficient to State a Claim ................................................ 10

II. Plaintiffs Fail to Allege Monopsony Power in Any Market ........................................... 13

III. Plaintiffs Fail to Allege Exclusionary Conduct Required Under the Sherman Act......... 15

    A. Plaintiffs' Complaints About UPMC's Past Acquisitions Say Nothing About Exclusionary Conduct................................................ 16

    B. Plaintiffs' Employment Grievances Do Not Show Harm to Competition........... 18

    C. None of the Other Conduct Alleged in the Complaint Supports a Claim............ 21

IV. The Alleged Exclusionary Conduct Falls Well Outside the Limitations Period ............. 22

CONCLUSION.................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Am. Bearing Co. v. Litton Indus., Inc.,*
729 F.2d 943 (3d Cir. 1984) .............................................................................7

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ............................................................................1, 9, 17

*Barr Lab'ys, Inc. v. Abbott Lab'ys,*
978 F.2d 98 (3d Cir. 1992) .................................................................13, 14, 15

*Bay Area Surgical Mgmt. LLC v. Aetna Life Ins. Co.,*
166 F. Supp. 3d 988 (N.D. Cal. 2015) ............................................................11, 13

*Bd. of Trs. of Teamsters Local 863 Pension Fund v. Foodtown, Inc.,*
296 F.3d 164 (3d Cir. 2002) ...........................................................................23

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) ....................................................................................5, 6

*Brennan v. Chestnut,*
973 F.2d 644 (8th Cir. 1992) ..........................................................................22

*Burns v. Cover Studios, Inc.,*
818 F. Supp. 888 (W.D. Pa. 1993) ..............................................................16, 17, 19

*Byrnes v. DeBolt Transfer, Inc.,*
741 F.2d 620 (3d Cir. 1984) ...........................................................................23

*Cable Line, Inc. v. Comcast Cable Commc'ns of Pa., Inc.,*
767 F. App'x 348 (3d Cir. 2019) .............................................................6, 7, 8, 9

*Cable Line, Inc. v. Comcast Cable Commc'ns of Pennsylvania, Inc.,*
2018 WL 2209518 (M.D. Pa. May 14, 2018) ....................................................11, 12

*Car Carriers, Inc. v. Ford Motor Co.,*
745 F.2d 1101 (7th Cir. 1984) ..........................................................................6

*Carpenter Tech. Corp. v. Allegheny Techs. Inc.,*
2011 WL 4528303 (E.D. Pa. Sept. 30, 2011) ..........................................................14

*Concord Assocs., L.P. v. Entm't. Props. Trust*,
   817 F.3d 46 (2d Cir. 2016) ............................................................................................... 11

*Coronavirus Rep. v. Apple, Inc.*,
   85 F.4th 948 (9th Cir. 2023) ................................................................................................ 7

*Eichorn v. AT & T Corp.*,
   248 F.3d 131 (3d Cir. 2001) ..................................................................................... passim

*Fed. Trade Comm'n v. Walmart Inc.*,
   664 F. Supp. 3d 808 (N.D. Ill. 2023) ................................................................................ 21

*Garr v. U.S. Healthcare*,
   22 F.3d 1274 (3d Cir. 1994) ............................................................................................... 21

*Hanger v. Berkley Grp., Inc.*,
   2015 WL 3439255 (W.D. Va. May 28, 2015) ............................................................ 11, 13

*Harrison Aire, Inc. v. Aerostar Int'l, Inc.*,
   423 F.3d 374 (3d Cir. 2005) ........................................................................................ 13, 14

*In re Aspartame Antitrust Litig.*,
   416 F. App'x 208 (3d Cir. 2011) ................................................................................. 22, 23

*Int'l Ass'n of Heat & Frost Insulators & Asbestos Workers v. United Contractors*
   *Ass'n, Inc. of Pittsburgh, Pa.*,
   483 F.2d 384 (3d Cir. 1973) ............................................................................................... 22

*Jacobs v. Tempur-Pedic Int'l, Inc.*,
   626 F.3d 1327 (11th Cir. 2010) ......................................................................................... 19

*Lektro-Vend Corp. v. Vendo Co.*,
   660 F.2d 255 (7th Cir. 1981) ............................................................................................. 20

*Midwestern Mach. Co. v. Nw. Airlines, Inc.*,
   392 F.3d 265 (8th Cir. 2004) ........................................................................................ 17, 24

*Molinari v. Consol Energy Inc.*,
   2012 WL 5932979 (W.D. Pa. Nov. 27, 2012) ................................................................... 10

*Multiple Energy Techs., LLC v. Under Armour, Inc.*,
   2021 WL 807722 (W.D. Pa. Mar. 3, 2021) ......................................................................... 9

*Mylan Pharm. Inc. v. Warner Chilcott Public Ltd.*,
    838 F.3d 421 (3d Cir. 2016) ........................................................................ passim

*Ohio v. Am. Express Co.*,
    585 U.S. 529 (2018) ..................................................................................... 7

*Pac. Bell Tel. Co. v. LinkLine Commc'ns, Inc.*,
    555 U.S. 438 (2009) ..................................................................................... 15

*Par v. Wolfe Clinic, P.C.*,
    70 F.4th 441 (8th Cir. 2023) ........................................................................ 7

*Phila. Taxi Ass'n v. Uber Techs., Inc.*,
    886 F.3d 332 (3d Cir. 2018) ........................................................................ 16, 18

*Queen City Pizza v. Dominos Pizza*,
    124 F.3d 430 (3d Cir. 1997) ........................................................................ 7, 8, 9

*Reveal Chat Holdco, LLC v. Facebook, Inc.*,
    471 F. Supp. 3d 981 (N.D. Cal. 2020) ......................................................... 24

*Royal Mile Co. v. UPMC*,
    40 F. Supp. 3d 552 (W.D. Pa. 2015) ........................................................... 24

*Ryan LLC v. Fed. Trade Comm'n*,
    2024 WL 3297524 (N.D. Tex. July 3, 2024) ............................................... 20

*SEI Glob. Servs., Inc. v. SS&C Advent*,
    496 F. Supp. 3d 883 (E.D. Pa. 2020) ......................................................... 16, 18

*Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*,
    376 F.3d 1065 (11th Cir. 2004) ................................................................... 19

*Spectrum Sports, Inc. v. McQuillan*,
    506 U.S. 447 (1993) ..................................................................................... 7, 15

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001) ........................................................................ 6, 8, 10, 14

*Tunis Bros. Co. v. Ford Motor Co.*,
    952 F.2d 715 (3d Cir. 1991) ........................................................................ 11

*United States v. United States Sugar Corp.*,
    73 F.4th 197 (3d Cir. 2023) ......................................................................... 17

*Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP,*
540 U.S. 398 (2004) ......................................................................... passim

*W. Penn Allegheny Health Sys. v. UPMC,*
No. 09-cv-0480 (W.D. Pa.) ...........................................................21

*Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.,*
549 U.S. 312 (2007) ........................................................................6

*Z Techs. Corp. v. Lubrizol Corp.,*
753 F.3d 594 (6th Cir. 2014) .......................................................24

**STATUTES**

15 U.S.C. § 15b .................................................................................22

**RULES**

Fed. R. Civ. P. 9(b) ..........................................................................23

Fed. R. Civ. P. 23(d) ........................................................................13

**OTHER AUTHORITIES**

I ABA Antitrust Section, ANTITRUST LAW DEVELOPMENTS ch. 2C(3)(a) (9th ed.
2022) ..............................................................................................21

Bureau of Labor Statistics, Occupational Outlook Handbook, *Nursing Assistants
and Orderlies* ...............................................................................10

D.E. Yett, AN ECONOMIC ANALYSIS OF THE NURSE SHORTAGE 190–191 (1975) ........10

## INTRODUCTION

The unprecedented theory of antitrust liability set out in this case fails as a matter of law. Plaintiffs contort antitrust law to attack labor and employment matters governed by separate federal statutory schemes (not antitrust law), as well as decades-old hospital acquisitions that were widely publicized and scrutinized by government agencies. The Complaint—now on its second iteration—fails to plead the requisite elements of any antitrust claim, relies on legal conclusions and implausible allegations that run afoul of *Twombly*, and is well outside the statute of limitations. To allow Plaintiffs' Sherman Act § 2 claims to proceed, the Court would need to accept that, for nearly three decades, UPMC has not faced any meaningful competition to employ all hospital nurses, medical assistants, nurse assistants, orderlies, pharmacy workers, and other so-called (but unidentified) "Skilled Healthcare Workers" at *any* facility in an area spanning more than 780 driving miles across most of Pennsylvania and parts of four other states. The Court would also need to accept that UPMC accomplished this in secret, despite the fact that every hospital merger cited in the Complaint was a public event. The hypotheses at the heart of this case defy "judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). The Complaint should be dismissed.

***First***, Plaintiffs do not define an antitrust market, a necessary first step in a Sherman Act § 2 case. Plaintiffs allege no facts about the disparate set of in-hospital jobs comprising the putative class (*see* Am. Compl. 1 n.1, ¶ 29), much less facts showing that jobs outside the four walls of a hospital are not reasonable competitive alternatives. The Complaint thus fails to allege a "product market" for the purchase of labor. For their "geographic market," Plaintiffs assert, without explanation, a "Relevant Market" conveniently coinciding with UPMC's entire domestic geographic footprint at the time the Complaint was filed. *See id*. ¶ 21 n.5, ¶ 71. That assertion is entirely disconnected from competition to employ the at-issue workers and is inconsistent with

allegations elsewhere in the Complaint that local "[c]ommuting zones" (not hundreds of miles) are used "to define relevant geographic boundaries for labor markets." *See id*. ¶ 122 n.22.

**Second**, beyond rote legal conclusions, Plaintiffs fail to allege monopsony power. The Complaint assumes monopoly power to provide inpatient hospital services in the entire "Relevant Market," then equates that with monopsony power to employ broad job categories. But Plaintiffs offer no alleged facts supporting their central but implausible assumption that monopoly power over inpatient healthcare services equates to monopsony power over labor, where hospital employees have more choices and options for employment than patients do for inpatient healthcare services. The Court has no indication, for instance, whether UPMC entities employ 10%, 50%, or 100% of "Skilled Healthcare Workers" over the five-state "Relevant Market." Moreover, the Complaint again contradicts Plaintiffs' own theory: Plaintiffs concede that UPMC's alleged percentage of inpatient hospital services varies substantially by geography (*see id.* ¶ 97), undermining any assumption UPMC is a monopolist (or monopsonist) everywhere it owns a hospital. Similarly, although Plaintiffs claim that UPMC's allegedly lower wages are "direct evidence" of monopsony power, their own allegations (assumed to be true at this stage) show that wages vary across UPMC's footprint based on market conditions. *See id*. ¶¶ 97, 142. That variation negates Plaintiffs' claims of monopsony power, rendering them implausible under *Twombly* and insufficient as a matter of law.

**Third**, Plaintiffs fail to allege exclusionary conduct. Recognizing that it is not unlawful to be a monopsonist or even for a monopsonist to pay lower wages, Plaintiffs allege UPMC wrongfully acquired monopoly power through a series of hospital acquisitions between 1996 and 2019 and maintained that power through so-called "mobility restrictions." None of that states a claim. The Complaint alleges no facts suggesting that UPMC's government-reviewed acquisitions

harmed competition.  Similarly, Plaintiffs' allegations fail to show that their so-called mobility restrictions, like tuition assistance programs and a purported "do not rehire" policy, even if true, exclude other employers from competing for the same workers.

**Finally**, Plaintiffs' claims are time-barred on their face.  No case—ever—has allowed a Plaintiff to seek nearly 30 years of damages under the Sherman Act based on claimed lower wages allegedly stemming from mergers consummated decades earlier, well outside the four-year statute of limitations.  Plaintiffs allege no acts of concealment, and neither fraudulent concealment nor any claim of continuing violations can rescue their claims.

For each of these independent reasons, the Complaint should be dismissed with prejudice.

## BACKGROUND

Plaintiffs are former and current employees of UPMC Hamot and certain other UPMC hospitals.  *Id.* ¶¶ 16–20.  They seek to represent a putative class of all "Skilled Healthcare Workers"—vaguely defined as "workers who possess specialized in-patient hospital skills or qualifications" including "licensed practical nurses (LPNs), Nurses, Medical Assistants, registered nurses (RNs), Nurse Assistants, Orderlies, and Pharmacy workers"—at all 40 UPMC hospitals since 1996.  *Id.* at 1 n.1, ¶ 29.  Plaintiffs allege no facts about the disparate jobs that they lump together as "Skilled Healthcare Workers" beyond a conclusory assertion that they have "specialized" but unidentified skills or qualifications.  *Id.* ¶ 56.  According to Plaintiffs, UPMC has "monopsony power" over the labor market for "Skilled Healthcare Workers" and exercised that power to suppress wages while increasing workloads, reducing employee mobility, and interfering with unionization.  *E.g.*, *id.* ¶¶ 1, 7, 11, 32, 117–118, 130–131, 141–145, 150–156.  Plaintiffs seek alleged lost wages for all putative class members employed at every UPMC hospital for the entire 28-year class period.

Plaintiffs' theory is that UPMC acquired monopsony power through a series of hospital acquisitions between 1996 and 2019, transforming UPMC from a few hospitals in Pittsburgh to an integrated network of hospitals "throughout Central and Western Pennsylvania, including adjacent portions of Ohio, Southwestern New York, Northwestern Maryland, and West Virginia." *Id.* ¶¶ 71, 75–89. Plaintiffs also allege that, during that same 28-year period, UPMC closed four hospitals and downsized three others. *Id.* ¶¶ 6, 70. Without explanation, Plaintiffs then refer to the collective geographic footprint of all UPMC hospitals at the time the Complaint was filed— covering much of Pennsylvania and parts of four neighboring states—as the "Relevant Market." *Id.* ¶¶ 5 n.3, 21 n.5, 71.

These acquisitions purportedly made UPMC the "dominant in-hospital services provider" with "monopoly power" "throughout the Relevant Market." *Id.* ¶¶ 4, 6. Plaintiffs never allege UPMC's share of the market for inpatient services throughout the entire "Relevant Market." Far from alleging market share consistent with monopoly power, the Complaint alleges considerable variation in UPMC's inpatient market share measured by "licensed beds" in eleven "statistical areas" where its hospitals are located. *E.g., id.* ¶¶ 73, 97. In many such areas, UPMC's alleged market share is either around 50% (including in Pittsburgh and Erie, where other integrated providers also compete) or much lower (including one with only 7% UPMC share). *Id.* ¶ 97.

The Complaint further alleges that "UPMC's monopolization of hospitals also made it a monopsonist regarding the employment of hospital health workers within the Relevant Market." *Id.* ¶ 117. According to Plaintiffs, because UPMC facilities became the allegedly dominant provider of inpatient hospital services, those facilities also became the dominant employer of all nurses, medical assistants, and other hospital workers everywhere UPMC operates. The

Complaint, however, offers no facts to show that UPMC's facilities are the only meaningful employers for any of the varied job categories included in the class, much less all of them.

The Complaint goes on to allege that UPMC has maintained its monopsony power by "inhibit[ing] worker mobility." *Id.* ¶¶ 141, 143. Plaintiffs allege, for example, that UPMC facilities use a systemwide, "market-based" salary structure that allegedly prevents employees from seeking an increase in compensation at another UPMC facility (*id.* ¶ 142); places employees who leave on a "do-not-rehire blacklist" (*id.* ¶¶ 142–145); and uses tuition assistance programs that fund additional—and optional—education for workers but allegedly require repayment if an employee uses that education to leave UPMC for a position with another provider (*id.* ¶¶ 154–156). Plaintiffs also reference "non-compete restrictions" but do not allege that they or any other purported class member actually had a noncompete agreement. *Id.* ¶¶ 150–153. Finally, Plaintiffs allege that UPMC has resisted efforts to unionize at certain facilities and vaguely reference decade-old labor grievances. *Id.* ¶¶ 163–167. But the Complaint also acknowledges that the alleged "Skilled Healthcare Workers" interested in being union members can join UPMC's "competitors," where a larger share of employees have decided that unionization is worthwhile. *Id.* ¶ 166.

Plainly aware that they purport to allege exclusionary conduct outside the four-year limitations period, Plaintiffs clumsily invoke fraudulent concealment. *Id.* ¶¶ 168–174. Their claims, though, are based on public events (*e.g.*, mergers) and policies that, as even they allege, were no secret to anyone. *Id.* ¶ 119 (alleging that "[i]t has been long understood by UPMC nurses that they are paid less than nurses at comparable hospitals"); *see also id.* ¶¶ 2, 93.

## LEGAL STANDARD

"[T]he costs of modern federal antitrust litigation . . . counsel against sending the parties into discovery when there is no reasonable likelihood that the plaintiffs can construct a claim." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (dismissing Sherman Act claim on the

pleadings (alteration in original) (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984))).  A Sherman Act complaint must include more than mere "labels and conclusions" or "a formulaic recitation of the elements." *Id.* at 555.  It must allege "enough facts to state a claim to relief that is plausible on its face"; merely "conceivable" claims are insufficient and "must be dismissed." *Id.* at 570.  "[I]nsisting upon some specificity in pleading" is particularly appropriate here, where Plaintiffs seek to create a "massive factual controversy" involving a broad class of workers employed at any UPMC facility over a span of three decades.  *Id.* at 558 (quoting *Car Carriers*, 745 F.2d at 1107).

Plaintiffs bring claims for "Monopolization/Monopsonization" and "attempted Monopolization/Monopsonization" under Sherman Act § 2.  Am. Compl. ¶¶ 175–186.  Plaintiffs conflate monopolization and monopsonization throughout the Complaint, but their claims are a theory of monopsony—*i.e.*, "the exercise of market power on the buy side . . . of a market." *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 320 (2007).  Because monopsony is the "mirror image" of monopoly, the legal standards are the same, though the markets vary.  *Todd v. Exxon Corp.*, 275 F.3d 191, 202 (2d Cir. 2001).

To state a monopsonization claim, Plaintiffs must allege: (1) "the possession of [monopsony] power in the relevant market"; and (2) "the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Verizon Comm'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004) (quotation marks omitted).  Put another way, dominant commercial success and expansion alone are not unlawful; a plaintiff must "allege monopsony power and conduct by the monopsonist that excludes its rivals—*i.e.*, other buyers in the same market." *Cable Line, Inc. v. Comcast Cable Comm'ns of Pa., Inc.*, 767 F. App'x 348, 351 (3d Cir. 2019).  For

attempted monopsonization, Plaintiffs must allege that UPMC (1) "engaged in predatory or anticompetitive conduct with (2) a specific intent" to monopsonize a relevant market "and (3) a dangerous probability of achieving" monopsony power. *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993).

## ARGUMENT

Plaintiffs' claims fail as a matter of law. Their lengthy and stale list of run-of-the-mill *employment* grievances omits essential elements of an *antitrust* theory under § 2 of the Sherman Act. They fail to allege either component of a relevant antitrust market, do not plausibly allege market power, and point to no exclusionary conduct. And even then, their grievances are long past the expiration date. Plaintiffs' claims fail.

## I. Plaintiffs Do Not Plead Either Required Component of a Relevant Antitrust Market

The starting point for any § 2 claim is a relevant antitrust market, which is "the area of effective competition," defined by the boundary around the products or services that competitively constrain each other. *Ohio v. Am. Express Co.*, 585 U.S. 529, 543 (2018) (quotation marks omitted). This is foundational to every § 2 claim because, as the Third Circuit has explained, an alleged monopsonist's power and "ability to exclude competitors cannot be determined" absent a properly defined market. *Am. Bearing Co. v. Litton Indus., Inc.*, 729 F.2d 943, 949 (3d Cir. 1984). Courts thus regularly dismiss antitrust claims for failure to allege a valid market. *See, e.g.*, *Queen City Pizza v. Dominos Pizza*, 124 F.3d 430, 436, 441 (3d Cir. 1997) (affirming dismissal for lack of properly defined market); *Cable Line*, 767 F. App'x at 352 ("Complaint does not adequately allege the relevant market, which is fatal to their [§ 2] claim."); *Par v. Wolfe Clinic, P.C.*, 70 F.4th 441, 446, 448–449 (8th Cir. 2023) (holding failure to allege either component—there, a geographic market—requires dismissal); *Coronavirus Rep. v. Apple, Inc.*, 85 F.4th 948, 957 (9th Cir. 2023),

*cert. denied*, No. 23-1089 (May 13, 2024) ("Because Plaintiffs-Appellants do not meet the threshold step of defining a relevant market, we reject their antitrust claims.").

Plaintiffs bear the burden of alleging both components of a relevant market: (i) the product at issue and (ii) the geographic area. *See Queen City*, 124 F.3d at 436; *Cable Line*, 767 F. App'x at 352. Here, Plaintiffs fail to allege facts that support (i) a product market of "Skilled Healthcare Workers" solely at inpatient facilities, or (ii) a geographic market that coincides with UPMC's entire domestic footprint at the time of the Complaint. Each flaw requires dismissal.

## A. Plaintiffs Do Not Plead Essential Elements of the Product Market

The relevant product market must include the set of products that compete with each other. Thus, a product market's boundaries are "determined by the reasonable interchangeability of use or"—in more technical terms—"the cross-elasticity of demand between the product itself and substitutes for it." *Queen City Pizza*, 124 F.3d at 436 (quotation marks omitted). In a case involving the purchase of inputs like labor, the product market is not composed of "competing *sellers* [i.e., the employees] but of competing *buyers*," *i.e.*, alternative employers. *Todd*, 275 F.3d at 202 (emphasis added). Thus, the relevant product market must include "all" companies "who actively compete for employees with the skills and training possessed by plaintiffs." *Eichorn v. AT & T Corp.*, 248 F.3d 131, 147–148 (3d Cir. 2001), *as amended* (June 12, 2001).

Here, Plaintiffs fail to allege any product market, much less a valid antitrust market. The words "product market" appear nowhere in the Complaint. And although Plaintiffs identify certain generic positions as so-called "Skilled Healthcare Workers" with undefined "specialized in-patient hospital skills or qualifications" for the class definition (Am. Compl. 1 n.1), they make no effort to establish that the jobs comprise a product market. For example, Plaintiffs do not allege any facts about job requirements, duties, wage levels, or qualifications for each listed position. *See id.*

¶ 56; *see also id*. at 1 n.1, ¶ 29.  Without such allegations, Plaintiffs cannot establish that the jobs in the putative class constitute a discrete labor market.  *See, e.g.*, *Queen City*, 124 F.3d at 436.

Dismissal is similarly warranted where a plaintiff fails to "allege any facts concerning" the other "buyer[s]" in a monopsony market—here, the competing employers for Plaintiffs' list of workers.  *Cable Line*, 767 F. App'x at 351–352; *see also* *Multiple Energy Techs., LLC v. Under Armour, Inc.*, 2021 WL 807722, at *2 (W.D. Pa. Mar. 3, 2021)* (dismissing § 2 claim for failure to allege facts about "the cross-elasticity of demand of the products in the relevant market").  For example, in *Eichorn*, former technical employees of a manufacturer of "network access products for the telecommunications industry" brought antitrust claims against several corporations alleging that the defendants "conspired to fix the cost of labor in the market." 248 F.3d at 136, 139.  The Third Circuit rejected plaintiffs' narrow market definition limited to the functions of plaintiffs' current positions.  Instead, the test was whether the technical employees were "reasonably interchangeable by consumers"—*i.e.*, the technology companies that employ workers.  *Id.* at 147 (quotation marks omitted).  The relevant market had to include all "technology companies and network services providers who actively compete for employees with the skills and training possessed by plaintiffs." *Id.* at 147–148.

Critically, Plaintiffs allege no factual support for the proposition that "acute inpatient care" hospitals are the only employers for each job in the putative class.  Am. Compl. ¶ 29.  That omission is hardly surprising when viewed "in light of judicial experience and common sense." *Iqbal*, 556 U.S. at 679.  Plaintiffs fail to allege supporting facts because no such facts exist.  To recognize the proposed class of "Skilled Healthcare Workers" limited to inpatient facilities as a valid product market (*see* Am. Compl. 1 n.1, ¶ 29), one would have to accept that hospitals do not compete for such labor with outpatient facilities, clinics, nursing homes, retail pharmacies, or other

providers.  But doctors' offices, ambulatory surgery centers, and many other types of non-hospital healthcare providers need—and compete for—nurses, medical assistants, and others.

Plaintiffs' own sources incorporated into the Complaint show just that:  Because there are "overlapping markets for nurses," they may easily "shift between comparable hospital and non-hospital positions."  D.E. Yett, AN ECONOMIC ANALYSIS OF THE NURSE SHORTAGE 190–191 (1975) (incorporated in Am. Compl. ¶ 50 n.11).  Physicians, for example, "have little difficulty recruiting nurses . . . [from] hospitals" to work for the physicians at "appreciably" similar salaries. *Id.* at 191.  Similarly, Rite Aid, CVS, Walgreens, and independent pharmacies (all of which vastly outnumber in-hospital pharmacies) need and compete for "pharmacy workers."  Nor do Plaintiffs offer any facts from which the Court could infer that nursing assistants, who the U.S. government says "provide basic care and help patients with activities of daily living," are candidates for roles only at hospitals.  *See* Bureau of Labor Statistics, Occupational Outlook Handbook, *Nursing Assistants and Orderlies* (noting nurses also work in residential facilities).[1]  Simply put, Plaintiffs' allegations fail to show, as they must, that "Skilled Healthcare Workers" "could not obtain similar employment with similar remuneration" outside the hospital setting, to which their class definition is limited.  *See Molinari v. Consol Energy Inc.*, 2012 WL 5932979, at *6 (W.D. Pa. Nov. 27, 2012). That is dispositive.

**B.     Plaintiffs' Geographic Market Allegations Are, at Best, Legal Conclusions Insufficient to State a Claim**

A geographic market must "conform to commercial reality."  *Eichorn*, 248 F.3d at 147 (quotation marks omitted).  In a labor monopsony case, the relevant geographic area is where workers—given their skills and the industry realities—can reasonably turn for alternative employment.  *Todd*, 275 F.3d at 202–204; *see also Eichorn*, 248 F.3d at 147–148.  But "mere

---

[1] *See* https://www.bls.gov/ooh/healthcare/nursing-assistants.htm#tab-1 (visited July 19, 2024).

delineation of a geographical area, without reference to a market as perceived by consumers . . . fails to meet the legal standard necessary for the relevant geographic market." *Tunis Bros. Co. v. Ford Motor Co.*, 952 F.2d 715, 727 (3d Cir. 1991). Indeed, the Third Circuit has made clear that a geographic market defined so that "it only includes the defendants" is "unrealistic." *Eichorn*, 248 F.3d at 147. Courts thus dismiss Sherman Act cases when plaintiffs provide "no basis on which to justify their proposed geographic market definition," *Concord Assocs., L.P. v. Entm't. Props. Trust*, 817 F.3d 46, 53 (2d Cir. 2016), or when the boundaries of the market are implausible or at odds with commercial reality, *see id.* at 53–55; *Bay Area Surgical Mgmt. LLC v. Aetna Life Ins. Co.*, 166 F. Supp. 3d 988, 996–997 (N.D. Cal. 2015); *Hanger v. Berkley Grp., Inc.*, 2015 WL 3439255, at *10 (W.D. Va. May 28, 2015).

Here, as in the cited dismissed cases, Plaintiffs' proposed geographic market does not have—and Plaintiffs have failed to allege—any relation to competition or commercial reality. Plaintiffs merely allege, in a conclusory fashion, that the "Relevant Market" for their list of jobs encompasses UPMC's entire geographic footprint, no more and no less. Am. Compl. ¶ 71, 5 n.3. The Complaint offers no facts, let alone a supporting explanation, as to why the geographic market happens to align perfectly with UPMC's physical presence when the Complaint was filed. *Cf. Eichorn*, 248 F.3d at 147 ("By defining the market so narrowly that it only includes the defendants, plaintiffs' proffered geographic and product markets are unrealistic," as market for plaintiffs' labor was "much broader."); *Cable Line, Inc. v. Comcast Cable Commc'ns of Pennsylvania, Inc.*, 2018 WL 2209518, at *7 (M.D. Pa. May 14, 2018), *aff'd*, 767 F. App'x 348 ("Plaintiffs appear to believe that they may define a market by where *they themselves* operate" but "the [Complaint] does not provide any justification for defining the market in this manner.").

Notably, the Complaint also does not explain (as it must) why—for any of the jobs at issue—hospitals outside of UPMC's footprint are not reasonable alternatives for employees within the alleged market. *See, e.g.*, *Eichorn*, 248 F.3d at 147; *Cable Line*, 2018 WL 2209518, at *7. For example, Plaintiffs allege that Dauphin County and Northumberland County are in the "Relevant Market," but Schuylkill County (which sits between them and is home to both Lehigh Valley Health Network and Geisinger hospitals) is not. *See* Am. Compl. ¶¶ 71, 5 n.3. Why not? The Complaint is silent. Plaintiffs' allegations do not show that Schuylkill County jobs are out of the picture for employees in Dauphin or Northumberland Counties: they provide no reason to exclude the former from the geographic market, especially when that market reaches out miles and miles in other directions to encompass, for instance, Pittsburgh, Erie, and Cumberland, Maryland.

Nor does the Complaint explain why the geographic market for the entire class period—from 1996 on—happens to align with UPMC's footprint at the time the Complaint was filed. The Complaint elsewhere concedes that UPMC's footprint has changed significantly over that 28-year period. *See id*. ¶¶ 74–89, 93. And when the Complaint does touch upon issues related to competition, such as market shares and a so-called "wage study," Plaintiffs ignore their "Relevant [five-state] Market" entirely, focusing instead—in wholly contradictory positions—on *local* shares and *local* wages. *Id.* ¶ 97 (setting out 11 "discrete statistical areas within the Relevant Market"), ¶ 123 (describing "five commuting zones where UPMC has a presence"); *id*. ¶ 122 n.22 (stating "'[c]ommuting zones' have been used by multiple labor market studies to define relevant geographic boundaries for labor markets"). Plaintiffs' unsupported, arbitrary, and implausible geographic market, contradicted by their own other allegations, does not state a claim.

Likewise, the Complaint does not explain why the geographic market is the same for each job title.[2] Plaintiffs simply assume that competition for registered nurses involves the same employers as for nurse assistants, medical assistants, pharmacy workers, orderlies, and any other position with "specialized in-patient hospital skills or qualifications." *Id.* at 1 n.1. Mere assumptions do not state a claim. Plaintiffs must allege facts showing their proposed market reflects commercial realities based on the skills of the workers, education, demand, and other industry factors. *See Hanger*, 2015 WL 3439255, at *10 (discussing *Eichorn*, 248 F.3d at 147); *Bay Area Surgical*, 166 F. Supp. 3d at 996–997. Their failure to do so is another reason to dismiss.

## II. Plaintiffs Fail to Allege Monopsony Power in Any Market

Because Plaintiffs fail to allege either component of a relevant market, they also fail to plausibly allege that UPMC has monopsony power (or a dangerous probability of achieving it) "in the relevant market." *Verizon*, 540 U.S. at 407. Even independent of that fundamental defect, Plaintiffs have failed to allege facts demonstrating monopsony power in *any* market. Monopsony power is the "mirror image" of monopoly power, and the same legal standards apply. *Supra* at 6. The usual way to plead monopoly or monopsony power is to allege a dominant share in a properly defined market. *See, e.g., Harrison Aire, Inc. v. Aerostar Int'l, Inc.*, 423 F.3d 374, 381–382 (3d Cir. 2005). As for establishing a "dangerous probability" of achieving monopoly power for an attempt claim, courts similarly consider significant market share, as well as the "strength of competition, probable development of the industry, the barriers to entry, the nature of the anti-competitive conduct, and the elasticity of consumer demand." *Barr Lab'ys, Inc. v. Abbott Lab'ys*, 978 F.2d 98, 112 (3d Cir. 1992).

---

[2] This omission is exemplary of the deficiencies in Plaintiffs' class allegations, which UPMC addresses in its separate motion to strike class pursuant to Federal Rule of Civil Procedure 23(d).

The key question is this: What is UPMC's alleged market share of "Skilled Healthcare Workers" in the "Relevant Market"? The Complaint never purports to answer that question; and it makes no other attempt to demonstrate either monopsony power or a "dangerous probability" of achieving the same. *See Harrison, 423 F.3d at 381; Barr Lab'ys, 978 F.2d at 112.* Plaintiffs fail to allege UPMC's market share for any job title in any area, much less across the entire "Relevant Market." The only allegations of market share in the Complaint address the wrong market—the provision of inpatient hospital services. Am. Compl. ¶ 97. Such services are what UPMC is *selling*, not the labor it is *buying*. And even those allegations undercut Plaintiffs' claims, as they show that UPMC has less than 20% of the licensed inpatient hospital beds in at least two areas within its footprint and less than 60% of such beds in most of the locations that Plaintiffs selected to display. *Id.* Plaintiffs' allegations are thus insufficient to establish monopoly power over inpatient services in the "Relevant Market," much less monopsony power over labor.

Absent such allegations of "structural evidence of a monopolized market," a plaintiff must show "direct evidence" of monopsony power in other ways, *i.e.*, facts demonstrating that the defendant has successfully excluded competing employers from the market or paid wages below competitive levels. *See Mylan Pharm. Inc. v. Warner Chilcott Public Ltd., 838 F.3d 421, 434–435 (3d Cir. 2016); see also Todd, 275 F.3d at 202.* And such allegations are insufficient in the Third Circuit unless accompanied by "an analysis of the defendant's costs" and allegations "that the defendant had an abnormally high price-cost margin" and "restricted output." *Carpenter Tech. Corp. v. Allegheny Techs. Inc., 2011 WL 4528303, at *12 (E.D. Pa. Sept. 30, 2011)* (quotation marks omitted); *see also Mylan, 838 F.3d at 434–435* (holding plaintiff must allege costs, price-cost margin, and restricted output to demonstrate supracompetitive prices through direct evidence).

As the Third Circuit has recognized, such direct evidence "is only rarely available." *Mylan*, 838 F.3d at 434 (quotation marks omitted).[3]

Here, Plaintiffs have none of these allegations. Instead, they rely on a purported "study" by a lobbying arm of the Service Employees International Union ("SEIU") for the proposition that UPMC allegedly has the power to suppress wages. The SEIU "study," according to Plaintiffs, suggests that as UPMC's "market share" for hospital services increases, wages at UPMC facilities decrease relative to hospitals in other markets. Am. Compl. ¶ 127. Tellingly, the authors chose not to identify either the hospitals or the markets selected as comparators. Regardless, even this one-sided, non-peer-reviewed, and fundamentally flawed "study" undermines Plaintiffs' case: if wages at UPMC facilities in fact vary based on local market shares, that suggests UPMC does *not* have the power to exclude competing employers and suppress wages everywhere it owns a hospital. This is obvious given the allegation that UPMC's share of licensed beds in several locations is under 20%. *Id.* ¶ 97.

## III. Plaintiffs Fail to Allege Exclusionary Conduct Required Under the Sherman Act

Plaintiffs' Complaint also does not plausibly allege that UPMC acquired or maintained alleged monopsony power through anticompetitive or "exclusionary" conduct in a relevant market. "Simply possessing monop[sony] power and charging monop[sony] prices does not violate § 2." *Pac. Bell Tel. Co. v. LinkLine Commc'ns, Inc.*, 555 U.S. 438, 447–448 (2009). Indeed, the exercise of monopoly or monopsony power lawfully acquired is "not only *not* unlawful," but it is an "important element of the free-market system." *Verizon*, 540 U.S. at 407 (emphasis added). Thus,

---

[3] As discussed, Plaintiffs do not plausibly allege that UPMC has a "dangerous probability" of achieving monopsony power as required for their attempt claim. Plaintiffs also include no allegations about anticompetitive practices directed to other employers. *See infra* Part III; *Barr Lab'ys*, 978 F.2d at 112. Thus, they fail twice over to allege any facts suggesting UPMC's conduct "threatens actual [monopsonization]." *Spectrum*, 506 U.S. at 456 (quotation marks omitted).

to state a claim under § 2, Plaintiffs must also allege that UPMC willfully acquired or maintained monopsony power through anticompetitive or exclusionary conduct, as distinct from "growth or development as a consequence of a superior product, business acumen, or historic accident." *Id.* (quotation marks omitted).

To qualify as exclusionary, the alleged conduct must have "destroy[ed] competition itself," rather than harmed a competitor. *Mylan*, 838 F.3d at 438 (quotation marks omitted); *Burns v. Cover Studios, Inc.*, 818 F. Supp. 888, 892 (W.D. Pa. 1993) ("[A]nticompetitive conduct is conduct designed to eliminate competition, and not just a competitor."). This means Plaintiffs must allege that UPMC foreclosed rival employers from competing "on some basis other than the merits." *Mylan*, 838 F.3d at 438 (quotation marks omitted). Failure to plead exclusionary conduct mandates dismissal. *SEI Glob. Servs., Inc. v. SS&C Advent*, 496 F. Supp. 3d 883, 896–899 (E.D. Pa. 2020), *aff'd*, 2022 WL 2356730 (3d Cir. June 30, 2022); *see also Phila. Taxi Ass'n v. Uber Techs., Inc.*, 886 F.3d 332, 341, 346 (3d Cir. 2018) (affirming dismissal of complaint "devoid of allegations of truly anticompetitive conduct").

## A.   Plaintiffs' Complaints About UPMC's Past Acquisitions Say Nothing About Exclusionary Conduct

Plaintiffs allege that UPMC obtained monopsony power by acquiring rival hospitals and closing certain facilities. *E.g.*, Am. Compl. ¶¶ 6, 74–90, 93. As explained below, their claims predicated on the hospital acquisitions—all of which occurred from 1996 to 2019—are time-barred and thus insufficient to state a claim. *Infra* Part IV. Timeliness aside, the Complaint does not show that any of the prior acquisitions were "exclusionary."

Plaintiffs recite UPMC's history of acquisitions as if an anticompetitive effect from them were self-evident. *See* Am. Compl. ¶¶ 74–89. But, as courts have repeatedly emphasized, mergers have positive impacts on competition in many ways. Indeed, mergers often benefit consumers,

and "exposing a firm to perpetual liability under the Clayton Act simply because its business history includes a merger would chill pro-competitive business combinations." *Midwestern Mach. Co. v. Nw. Airlines, Inc.*, 392 F.3d 265, 272 (8th Cir. 2004). Mergers and acquisitions are therefore presumptively lawful. *See United States v. United States Sugar Corp.*, 73 F.4th 197, 203 (3d Cir. 2023) (government "must establish a prima facie case that the merger is anticompetitive"). Plaintiffs do not allege anything to overcome that presumption here.

Moreover, Plaintiffs fail to allege any facts showing that any of UPMC's past acquisitions harmed competition for labor. Nor could they: given the failure to plead a valid market, they offer no starting point for assessing whether any (much less all) of those acquisitions excluded other employers from competing to hire the workers in Plaintiffs' proposed class in that market. Instead, they simply assert that UPMC's acquisitions were generally "exclusionary" or "anticompetitive." *E.g.*, Am. Compl. ¶¶ 6, 70, 72, 83, 86. Such conclusory statements are entitled to no weight. *Iqbal*, 556 U.S. at 681.

Plaintiffs' allegations about UPMC's 2016 acquisition of Susquehanna Health exemplify this problem. As Plaintiffs concede, UPMC expanded into a new region when it acquired Susquehanna, located in North Central Pennsylvania. Am. Compl. ¶ 82. But Plaintiffs do not explain how this acquisition harmed competition in the labor market. *See Mylan*, 838 F.3d at 438; *Burns*, 818 F. Supp. at 892. They do not, for example, allege that UPMC and Susquehanna competed for workers before the acquisition, and they do not allege that UPMC's acquisition of Susquehanna prevented other employers from competing for workers.

Plaintiffs also allege that UPMC eliminated jobs following some of these acquisitions by closing certain facilities, downsizing others, and decreasing its utilization of licensed beds. *See, e.g.*, Am. Compl. ¶¶ 93, 99–101. But these allegations miss the point: They say nothing about

*competition* to employ putative class members. There is no reason to believe one employer's alleged reduction in force would prevent any other employer from entering, expanding, or competing on the merits in any way. If anything, UPMC's supposed elimination of positions would make it *easier* for competitors to hire labor. Once again, failure to plead an injury to competition requires dismissal. *See Phila. Taxi Ass'n*, 886 F.3d at 346; *SEI Glob. Servs.*, 496 F. Supp. 3d at 896–899.

### B. Plaintiffs' Employment Grievances Do Not Show Harm to Competition

Plaintiffs also allege UPMC acquired and maintained monopsony power through various employment practices: noncompete agreements with physicians; a system-wide salary structure; tuition assistance programs; and a purported "do not rehire" plan. *E.g.*, Am. Compl. ¶¶ 7, 11, 141–145, 150–156. None of these allegations comes close to showing exclusionary conduct.

As for noncompetes, Plaintiffs do not allege that they or other putative class members have noncompete clauses. Plaintiffs instead allege that certain physicians (not part of the putative class) agreed to noncompete provisions. *Id.* ¶¶ 151–152. This is irrelevant. To allege that UPMC monopsonized "Skilled Healthcare Workers," Plaintiffs must allege restraints on competition for *those workers*. Pointing to so-called "mobility restraints" (*id.* ¶¶ 140–141) on a different group of employees (here, physicians) says nothing about competition for workers in the putative class.

Plaintiffs' attack on UPMC's wage structure is an even greater red herring. Alleging that UPMC uses a "market-based approach to establish salary structures," which vary "based on market data in defined geographical areas," Plaintiffs claim (without explanation) that this approach to compensation "restricts worker mobility" between UPMC facilities. *Id.* ¶¶ 142–143; *see also id.* ¶ 32 (claiming whether UPMC "limited worker mobility in order to prevent employees from switching jobs within the UPMC system" is a common question). But mobility *between UPMC's own facilities* is wholly beside the point. Plaintiffs must plausibly allege that UPMC's conduct

prevented *other* employers from competing for labor "on some basis other than the merits." *Mylan, 838 F.3d at 438*. On that element, the Complaint is silent. That is unsurprising: there is no reason to believe a "market-based" approach to wages at UPMC would prevent any other employer from competing to hire "Skilled Healthcare Workers." *See id.*; *Burns, 818 F. Supp. at 892*.

The Complaint is equally illogical and deficient with respect to tuition assistance programs. Plaintiffs simply assert, without explanation, that tuition assistance benefits give employees "few alternative employment opportunities." Am. Compl. ¶¶ 154–156. But Plaintiffs rest on mere legal conclusions and buzzwords; they offer no facts showing that the tuition assistance programs prevented other employers from competing to attract the various jobs they include as "Skilled Healthcare Workers." Such "sparse allegation[s]" are both unprecedented and precisely the type of "bare legal conclusion[s] that w[ere] insufficient in *Twombly* and *Iqbal*," as they provide "no basis on which a court could determine *how* harm to competition" resulted from UPMC's alleged conduct. *Jacobs v. Tempur-Pedic Int'l, Inc., 626 F.3d 1327, 1340 (11th Cir. 2010)*.

Plaintiffs' failure to allege that UPMC's tuition assistance benefit has harmed competition makes sense: there is no reason to believe that optional tuition assistance benefits would harm competition for labor among different employers. Such programs *increase* an employee's productivity and skill set, making the employee *more* attractive to UPMC's rivals. *See* Am. Compl. ¶ 155 (acknowledging employees receive training from these programs). Plaintiffs do not (and cannot) allege that UPMC's tuition benefits have stopped other employers from recruiting such employees by offering competitive wages, sign-on bonuses, or other benefits. Thus, Plaintiffs' conclusory assertions that such programs restrict "employment opportunities" fall well short of alleging exclusionary conduct. *See Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc., 376 F.3d 1065, 1076–1077 (11th Cir. 2004)* (affirming dismissal where plaintiff

did not allege "any harm to competition in the market, nor explain[] how any of the actions taken by [the defendant] could lead to monopolization of that market").

To the extent that Plaintiffs attempt to shoehorn tuition assistance into the framework of a "function[al] . . . noncompete restriction[]" (Am. Compl. ¶ 154), that effort serves only to highlight Plaintiffs' pleading failures. Plaintiffs fail to allege that any tuition assistance benefit has been *unreasonably* enforced by UPMC. *See, e.g.*, *Lektro-Vend Corp. v. Vendo Co.*, 660 F.2d 255, 265, 269, 272 (7th Cir. 1981) (explaining "[t]he recognized benefits of reasonably enforced noncompetition covenants are by now beyond question" and rejecting challenge to noncompete covenant under §§ 1 and 2 of the Sherman Act); *see also* *Ryan LLC v. Fed. Trade Comm'n*, 2024 WL 3297524, at *11 (N.D. Tex. July 3, 2024) (enjoining FTC's blanket prohibition on noncompetes and explaining FTC's "lack of evidence as to why [it] chose to impose such a sweeping prohibition . . . instead of targeting specific, harmful non-competes, renders the Rule arbitrary and capricious"). If the mere presence of a noncompete agreement "was sufficient evidence of anticompetitive effect, then virtually all noncompetitive covenants [in] . . . an employment contract would violate [the Sherman Act] even if reasonably enforced." *Lektro-Vend*, 660 F.3d at 269. That "proves too much." *Id.*

Plaintiffs' theory about the so-called "do not rehire blacklist" fares no better. Plaintiffs claim this alleged policy "effectively prevent[s] [workers] from working throughout the entire UPMC healthcare system," and thus "prevent[s] workers from leaving UPMC employment." Am. Compl. ¶¶ 143–145. These allegations are similarly conclusory. In any event, the Supreme Court has repeatedly curtailed the circumstances under which an alleged dominant firm is obligated to deal with another party. Those circumstances are now limited to instances in which the defendant has terminated a profitable, prior course of dealing and has no legitimate business justification for

refusing to deal.  *See Verizon*, 540 U.S. at 408–409 (rejecting duty to deal theory where defendant did not terminate prior, voluntary course of dealing and "forsake short-term profits to achieve an anticompetitive end"); *see generally* I ABA Antitrust Section, ANTITRUST LAW DEVELOPMENTS ch. 2C(3)(a) (9th ed. 2022) (collecting cases).  A company's alleged unilateral policy about whom to hire or not falls well outside that fact pattern.  Unsurprisingly, no case has ever held the antitrust laws to require a company to rehire employees who quit—never mind those who were fired.

### C.    None of the Other Conduct Alleged in the Complaint Supports a Claim

The remaining allegations about UPMC's conduct merely dredge up ancient history about Western Pennsylvania healthcare and recycle SEIU talking points about failed unionization efforts. Am. Compl. ¶¶ 108–114, 164–166.  For example, Plaintiffs lift allegations from past lawsuits, noting that the "West Penn" system previously alleged (15 years ago) that UPMC took "anticompetitive actions" (*id*. ¶¶ 107–108), and it refused to negotiate new consent decrees with Highmark in 2019 (*id*. ¶¶ 113–114).  *See also W. Penn Allegheny Health Sys. v. UPMC*, No. 09-cv-0480 (W.D. Pa.).  These allegations about allegations are not supported by any well-pleaded facts and are not cognizable here.  *Fed. Trade Comm'n v. Walmart Inc.*, 664 F. Supp. 3d 808, 825 (N.D. Ill. 2023) ("Allegations about allegations" are either not actionable or "not alleged with particularity"); *see also Garr v. U.S. Healthcare*, 22 F.3d 1274, 1278–1280 (3d Cir. 1994) (copying allegations from another complaint is insufficient pre-filing investigation).  Regardless, Plaintiffs do not connect these long-dismissed allegations about healthcare services to any impairment in any labor market.[4]

---

[4] As anyone in Western Pennsylvania would know—and judicially noticeable sources would demonstrate—West Penn became the integrated hospital system known as Allegheny Health Network, a subsidiary of Highmark Health, which competes with UPMC in Western Pennsylvania. UPMC and Highmark did not need to extend their Consent Decrees because they signed systemwide access agreements that gave most Highmark subscribers greater access to UPMC than under the prior Consent Decrees.

The same holds for Plaintiffs' unfounded claims about alleged anti-unionization efforts. *See* Am. Compl. ¶¶ 2, 7, 60, 158–166. Whether UPMC opposed unionization has no bearing on whether other firms can recruit employees *in competition with UPMC*. Not only do those allegations have nothing to do with competition for workers in the relevant labor market, but they are also outside the four-year statute of limitations. 15 U.S.C. § 15b. They lend no support to Plaintiffs' claims.[5]

## IV. The Alleged Exclusionary Conduct Falls Well Outside the Limitations Period

A suit under the Sherman Act must be "commenced within four years after the cause of action accrued." 15 U.S.C. § 15b. "An antitrust cause of action generally accrues" and the statute of limitations begins to run "when a defendant commits an act that injures a plaintiff's business." *In re Aspartame Antitrust Litig.*, 416 F. App'x 208, 211 (3d Cir. 2011) (quotation marks and alterations omitted). Save for the grab bag of alleged employment policies and programs—which, as explained above, do not constitute "exclusionary" conduct—all of the conduct alleged in the Complaint, including all of the hospital acquisitions, occurred prior to January 18, 2020, outside the four-year limitations period, making Plaintiffs' claims untimely on their face. *See, e.g.*, Am. Compl. ¶ 89. Plaintiffs' drastic, conclusory allegations that UPMC "fraudulently concealed" its conduct, *id.* ¶¶ 168–174, and that the alleged violations are "likely to continue," *id.* ¶ 13, do not save their untimely claims.

---

[5] Plaintiffs' conclusory, *ad nauseam* assertions that UPMC has committed "widespread labor law violations" are no more than window dressing. Am. Compl. ¶¶ 1, 3, 11, 32. In any event, *Garmon* preemption would require the NLRB—not this Court—to first adjudicate "[w]hether, when, and how UPMC used anticompetitive tactics to prevent employees from unionizing." Am. Compl. ¶¶ 32, 158–166; *see Int'l Ass'n of Heat & Frost Insulators & Asbestos Workers v. United Contractors Ass'n, Inc. of Pittsburgh, Pa.*, 483 F.2d 384, 399, 402, 404 (3d Cir. 1973), *amended and withdrawn*, 494 F.2d 1353. In this posture, Plaintiffs cannot rely on labor law predicates to establish a distinct claim. *See, e.g.*, *Brennan v. Chestnut*, 973 F.2d 644, 647 (8th Cir. 1992).

Fraudulent concealment requires a plaintiff to allege and prove three elements: "(1) fraudulent concealment; (2) failure on the part of the plaintiff to discover his cause of action notwithstanding such concealment; and (3) that such failure to discover occurred [notwithstanding] the exercise of due care on the part of the plaintiff." *Aspartame Antitrust Litig.*, 416 F. App'x at 211 (quotation marks omitted). It is well-settled in the Third Circuit that such allegations are subject to the heightened fraud pleading standard. Fed. R. Civ. P. 9(b); *see, e.g.*, *Byrnes v. DeBolt Transfer, Inc.*, 741 F.2d 620, 626 (3d Cir. 1984). The Complaint thus must allege "the circumstances of the alleged fraud with precise allegations of date, time, or place" or "some [other] means of injecting precision and some measure of substantiation into their allegations of fraud." *Bd. of Trs. of Teamsters Local 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164, 172 n.10 (3d Cir. 2002) (quotation marks omitted).

Plaintiffs make no attempt to meet this standard. They allege no acts of concealment, much less specifics about the date, time, place, and other circumstances.[6] Rather, Plaintiffs simply announce the legal conclusions that they and other members of the putative class "could not have uncovered" UPMC's alleged conduct "with the exercise of reasonable diligence," nor could they have "inferred" UPMC's anticompetitive scheme prior to the publication of a 2023 report. Am. Compl. ¶¶ 168–169. Likewise, they claim—without explanation—that, to the extent putative class members could have "suspected UPMC's policies were anticompetitive, UPMC's comprehensive efforts to conceal the scope of its scheme would have prevented [them] from discovering it." *Id.* ¶ 172. But this conclusory allegation conflicts with others in the Complaint that concede UPMC's

---

[6] Plaintiffs allege that UPMC has not provided Plaintiffs' counsel with the employee files of one of the Plaintiffs. Am. Compl. ¶ 171. This request came shortly before Plaintiffs filed suit and is a premature attempt to create a discovery dispute. In any event, the allegations about a single employee file say nothing about UPMC's alleged efforts to "fraudulently conceal" anticompetitive conduct in the marketplace that purportedly occurred long before this suit was filed.

alleged conduct was public. *See, e.g.*, *id.* ¶ 2 ("In January 2023, [politicians and interest groups] confirmed what many in western and central Pennsylvania *already knew* . . ."), ¶ 93 (asserting that that "UPMC is . . . *notorious* for using its market power to acquire, and subsequently shut down, hospitals to reduce competition"), ¶ 119 (alleging that "[i]t has *been long understood* by UPMC nurses that they are paid less than nurses at comparable hospitals") (all emphases added). And courts regularly dismiss such conclusory allegations of fraudulent concealment. *See, e.g.*, *Royal Mile Co. v. UPMC*, 40 F. Supp. 3d 552, 575–577 (W.D. Pa. 2015) (rejecting fraudulent concealment for failure to allege "affirmative act of concealment" and "due diligence in investigating cause of action"); *Reveal Chat Holdco, LLC v. Facebook, Inc.*, 471 F. Supp. 3d 981, 992–994 (N.D. Cal. 2020) (rejecting fraudulent concealment allegations for absence of affirmative misleading acts and lack of diligence).

Nor can Plaintiffs plead timely claims with their summary conclusion that they and the putative class members "are likely to continue to be injured." Am. Compl. ¶ 13. Courts reject as untimely alleged antitrust violations grounded in past mergers outside the limitations period. Mergers "occur in the public eye and at a reasonably certain date," and are thus unlike a conspiracy or other secretive conduct. *Midwestern Mach.*, 392 F.3d at 272. Moreover, once a "merger is completed, the plan to merge is completed, and no overt acts can be undertaken to further that plan." *Id.* at 271. Even if the initial merger were somehow unlawful, the "continued existence of a merged entity is not" itself a continuing Sherman Act violation; it is "simply the natural unabated inertial consequence" of the merger. *Id.* at 270–271; *see also Z Techs. Corp. v. Lubrizol Corp.*, 753 F.3d 594, 595, 598–599 (6th Cir. 2014) (rejecting § 2 claims based on price increase following merger or acquisition); *Reveal Chat Holdco*, 471 F. Supp. 3d at 994–995 ("The continuing violation doctrine does not make sense in the context of anticompetitive mergers."). And as to the

nonmerger conduct, none of that is exclusionary or actionable for the reasons discussed above. Thus, regardless of when that conduct allegedly occurred, it cannot support a claim.

## <u>CONCLUSION</u>

For the foregoing reasons, the Complaint fails to state a claim on which relief can be granted and should be dismissed.

Dated: July 22, 2024

Respectfully submitted,

/s/ *Rebekah B. Kcehowski*

David C. Kiernan (admitted pro hac vice)
JONES DAY
555 California St., 26th Fl.
San Francisco, CA 94104
Telephone: 415.626.3939
Fax: 415.875.5700
dkiernan@jonesday.com

Peter Schwingler (admitted pro hac vice)
JONES DAY
90 South Seventh Street, Suite 4950
Minneapolis, MN 55402
Telephone: 612.217.8866
Fax: 844.345.3178
pschwingler@jonesday.com

Rebekah B. Kcehowski
(PA ID No. 90219)
Anderson T. Bailey (PA ID No. 206485)
JONES DAY
500 Grant Street, Suite 4500
Pittsburgh, PA 15219
Telephone: 412.391.3939
Fax: 412.394.7959
rbkcehowski@jonesday.com
atbailey@jonesday.com

*Counsel for Defendant UPMC*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 22nd day of July, 2024, a true and correct copy of the Brief in

Support of Defendant's Motion to Dismiss Under Federal Rule of Civil Procedure 12(b)(6) was

filed and served on counsel of record via the United States District Court for the Western District

of Pennsylvania's CM/ECF system.

/s/ *Rebekah B. Kcehowski*
Rebekah B. Kcehowski
(PA ID No. 90219)
JONES DAY
500 Grant Street, Suite 4500
Pittsburgh, PA 15219
Telephone: 412.391.3939
Fax: 412.394.7959
rbkcehowski@jonesday.com