**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JENNIFER MIZELL, MARIA PAULDING, KATHLEEN PEAPPLES, VICTORIA ROSS, AND NATHAN SIMPSON, individually and on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>UNIVERSITY OF PITTSBURGH MEDICAL CENTER,<br><br>Defendant. | **Case No. 1:24-cv-00016-SPB**<br><br>**Oral Argument Requested** |

**PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO STRIKE CLASS ALLEGATIONS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 23**

## TABLE OF CONTENTS

I. INTRODUCTION ..... 1

II. RELEVANT FACTUAL BACKGROUND ..... 2

A. Background ..... 2

B. UPMC's Acquisition of Market and Monopsony Power ..... 3

C. UPMC Used its Monopsony Power to Depress Wages ..... 4

D. UPMC Used its Monopsony Power to Degrade Working Conditions ..... 4

III. ARGUMENT ..... 6

A. UPMC's Motion to Strike Should Be Denied as Premature ..... 6

B. Plaintiffs Have Alleged Sufficient Facts to Demonstrate a Class May be Certified ..... 8

1. Rule 23(a) ..... 9

2. Rule 23(b)(2) ..... 10

3. Rule 23(b)(3) ..... 13

a. Ascertainability ..... 13

b. Predominance ..... 15

IV. CONCLUSION ..... 18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allen v. Dairy Farms of Am., Inc.*,
No. 5:09-CV-230, 2014 WL 2610613 (D. Vt. June 11, 2014) ....................15

*Austin v. Invention Submission Corp.*,
No. 19-1396, 2020 WL 2771076 (W.D. Pa. Apr. 13, 2020) ....................7

*Ballard v. Navient Corp.*,
No. 3:18-CV-121, 2021 WL 1899874 (M.D. Pa. Mar. 31, 2021) ....................7

*Broadcom Corp. v. Qualcomm Inc.*,
501 F.3d 297 (3d Cir. 2007) ....................16

*Byrd v. Aaron's Inc.*,
784 F.3d 154 (3d Cir. 2015) ....................13, 14

*Carrera v. Bayer Corp.*,
727 F.3d 300 (3d Cir. 2013) ....................14

*Cohen v. Chi. Title Ins. Co.*,
242 F.R.D. 295 (E.D. Pa. 2007) ....................12

*Davis v. D.R. Horton Inc.*,
No. 19-1686-LPS-JLH, 2020 WL 6042091 (D. Del. Oct. 13, 2020) ....................12

*Dewey v. Volkswagen Aktiengesellschaft*,
681 F.3d 170 (3d Cir. 2012) ....................9

*Dieter v. Aldi, Inc.*,
No. 2:18-cv-00846, 2018 WL 6191586 (W.D. Pa. Nov. 28, 2018) ....................6, 7, 8

*DiFlavis v. Choice Hotel Int'l Inc.*,
No. 18-3914, 2019 WL 1505860 (E.D. Pa. Apr. 5, 2019) ....................7

*Durso v. Samsung Elecs. Am., Inc.*,
No. 2:12-CV-05352 DMC, 2013 WL 5947005 (D.N.J. Nov. 6, 2013) ....................6

*Fiorarancio v. Cap. One Bank (USA)* N.A.,
No. 21-cv-15775, 2023 WL 2357800 (D.N.J. Jan. 26, 2023) ....................6

*Gray v. BMW of N. Am., LLC*,
22 F. Supp. 3d 373 (D.N.J. 2014) ....................7

*Heinzl v. Cracker Barrel Old Country Store, Inc.*,
No. 2:14-CV-1455, 2015 WL 1925811 (W.D. Pa. Apr. 24, 2015) ........ 8

*Huber v. Taylor*,
No. 002–304, 2011 WL 4553154 (W.D. Pa. Sept. 29, 2011) ........ 12

*In re Domestic Drywall Antitrust Litig.*,
322 F.R.D. 188 (E.D. Pa. 2017) ........ 15

*In re High-Tech Emp. Antitrust Litig.*,
985 F. Supp. 2d 1167 (N.D. Cal. 2013) ........ 14, 17, 18

*In re Processed Egg Prod. Antitrust Litig.*,
321 F.R.D. 555 (E.D. Pa. 2017) ........ 12

*In re Suboxone (Buprenorphine Hydrochloride & Nalaxone) Antitrust Litig.*,
421 F. Supp. 3d 12 (E.D. Pa. 2019) ........ 9, 11

*In re Suboxone (Buprenorphine Hydrochlorine & Naloxone) Antitrust Litig.*,
967 F.3d 264 (3d Cir. 2020) ........ 17

*In re Thalomid & Revlimid Antitrust Litig.*,
No. 14-6997, 2018 WL 6573118 (D.N.J. Oct. 30, 2018) ........ 13

*In re Vascepa Antitrust Litig. Direct Purchaser Plaintiffs*,
No. CV 21-12747 (RK), 2024 WL 3717375 (D.N.J. Aug. 8, 2024) ........ 8

*Jaraczewski v. Equity Nat'l Title & Closing Servs.*,
No. CV 23-274, 2024 WL 3861248 (W.D. Pa. Aug. 19, 2024) ........ 6, 7, 8, 13

*Le v. Zuffa*,
2:15-cv-01045-RFB-BNW, 2023 WL 5085064 (D. Nev. Aug. 9, 2023) ........ 16

*Marcus v. BMW of N. Am., LLC*,
687 F.3d 583 (3d Cir. 2012) ........ 9

*Martin v. Ford Motor Co.*,
765 F. Supp. 2d 673 (E.D. Pa. 2011) ........ 8

*Migyanko v. Kohl's Corp.*,
No. 2:20-cv-328, 2020 WL 5798239 (W.D. Pa. Sept. 29, 2020) ........ 6

*Mills v. Serv. First Credit Union*,
No. 4:11–CV–686, 2011 WL 3236313 (M.D. Pa. July 28, 2011) ........ 7, 9

*Nitsch v. Dreamworks Animation SKG Inc.*,
315 F.R.D. 270 (N.D. Cal. 2016) ........ 14

*Rebel Oil Co. v. Atl. Richfield Co.*,
51 F.3d 1421 (9th Cir. 1995) ........ 16

*Robb v. Lock Haven Univ. of Pa.*,
No. 4:17-CV-00964, 2019 WL 2005636 (M.D. Pa. May 7, 2019) ........ 11

*Royal Mile Co. v. UPMC*,
No. 10–1609, 2013 WL 5436925 (W.D. Pa. Sept. 27, 2013) ........ 15

*Santiago v. Total Life Changes LLC*,
No. 20-cv-18581, 2022 WL 2619855 (D.N.J. July 7, 2022) ........ 6

*Seaman v. Duke Univ.*,
No. 1:15-CV-462, 2018 WL 671239 (M.D.N.C. Feb. 1, 2018) ........ 14

*Shelton v. Bledsoe*,
775 F.3d 554 (3d Cir. 2015) ........ 11

*Sullivan v. DB Invs., Inc.*,
667 F.3d 273 (3d Cir. 2011) ........ 15

*Swank v. Wal-Mart Stores, Inc.*,
No. 2:13-CV-01185, 2015 WL 1508403 (W.D. Pa. Mar. 31, 2015) ........ 6, 8

*Todd v. Exxon Corp.*,
275 F.3d 191 (2d Cir. 2001) ........ 16

*Trunzo v. Citi Mortgage*,
No. 2:11-cv-01124, 2018 WL 741422 (W.D. Pa. 2018) ........ 7, 12, 14

*Turner v. McDonald's USA, LLC*,
No. 19 C 5524, 2020 WL 3044086 (N.D. Ill. Apr. 24, 2020) ........ 16

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) ........ 6

*Wilson v. Cnty. of Gloucester*,
256 F.R.D. 479 (D.N.J. 2009) ........ 12, 13

**Statutes**

15 U.S.C. § 2 ........ 9, 15

**Court Rules**

Fed. R. Civ. P. 12(b)(6) ........ 6

Fed. R. Civ. P. 23 ........ *passim*

**Other Authorities**

Ioana Elena Marinescu and Eric A. Posner, SSRN, Why Has Antitrust Law Failed Workers? (Feb. 14, 2019), https://ssrn.com/abstract=3335174 (accessed Aug. 19, 2024) ....................15

*Newberg on Class Actions* § 41; 26 (5th ed. 2014)....................10

SEIU, OP-ED: Washington can do better than UPMC (Sep. 19, 2023), https://seiuhcpa.org/op-ed-washington-can-do-better-than-upmc/ (accessed Aug. 18, 2024)....................10

# I. INTRODUCTION

Before any class discovery has taken place—indeed, before this Court has even set a schedule for such discovery (much less class certification briefing)—UPMC has filed their premature Motion to Strike Plaintiffs' class allegations. ECF 35 ("Motion" or "Motion to Strike").[1] Plaintiffs need not satisfy the elements necessary to certify a class pursuant to Rule 23 at the pleading stage. Rather, the law in this Circuit is that Plaintiffs are entitled to class discovery to substantiate their class allegations unless the Court concludes that the allegations in the complaint are so insufficient that even if they are true, class certification is a "clear impossibility." UPMC does not come close to meeting this standard.

Considering the allegations contained in Plaintiffs' First Amended Complaint (the "Complaint"),[2] class certification is plainly not a "clear impossibility." In fact, quite the opposite. Plaintiffs allege the type of class-wide evidence and economic analysis that are routinely accepted by federal courts as supporting class certification. For example, Plaintiffs allege they were harmed by a single anticompetitive scheme (*i.e.*, UPMC's exercise of monopsony power to suppress their wages), and how UPMC acquired monopoly power in the market for hospital healthcare services and monopsony power in the Relevant Market by way of a series of anticompetitive acquisitions and mergers. Plaintiffs support the plausibility of their allegations by referencing an economic study prepared by an independent economic consulting firm that substantiated (and quantified) the fact that UPMC used its monopsony power to suppress the wages for Skilled Healthcare Workers. Accepting these allegations as true, as the Court must at the at the pleading stage, this alone is enough to deny UPMC's motion as premature and allow Plaintiffs to proceed to discovery.

In addition to being premature, UPMC's Motion relies on distorting the allegations in the Complaint, on misapplying applicable law (and/or citing cases that are factually or procedurally

---

[1] *See* ECF 35 ("Motion" or "Motion to Strike"). Defendants Brief in Support of the Motion to Strike (ECF 39) is referred to herein as "Br."

[2] ECF 31. Citations to "¶" herein refer to paragraphs in the Complaint. Capitalized terms have the same meaning as set forth in the Complaint, unless otherwise defined herein.

inapplicable), and on its unfounded and incorrect conclusion that Plaintiffs do not need factual and expert discovery. None of UPMC's arguments are availing. For example, UPMC argues that Plaintiffs' alleged class is vague and amorphous when, in fact, Plaintiffs' class definition includes objective criteria used by academics and labor economists such as specific job titles and skills. Class members can easily determine who is in and out of the class merely by reference to their own job title. That is sufficient for Plaintiffs' class-wide allegations to survive. These are issues for class certification, not a motion to strike, and accordingly, UPMC's Motion should be denied.

## II. RELEVANT FACTUAL BACKGROUND

### A. Background

UPMC is the largest employer of Skilled Healthcare Workers[3] in the private sector in Pennsylvania with over 95,000 workers and over $26 billion in annual revenue. ¶¶ 5, 69, 118. Rather than entering new markets by competing, UPMC achieved its dominant position by way of a series of anticompetitive mergers and acquisitions of existing hospitals thereby expanding its monopoly without having to face competition. ¶¶ 74-90. UPMC became the dominant in-patient hospital services provider (and employer of Skilled Healthcare Workers) by way of a series of anticompetitive mergers, acquisitions, and facility shutdowns. ¶¶ 62-90, 124-134.

Between 1996 and 2018 UPMC acquired approximately 28 competitor healthcare providers in order to expand its footprint. ¶¶ 62-90. While UPMC was acquiring competitors in order to expand its market power, it was also reducing the availability of healthcare services within the Relevant Market. *Id*. During the same period that it acquired 28 competitors, it also closed four hospitals and downsized three others, eliminating 353 beds and 1,367 full-time and 433 part-time healthcare jobs. *Id*. The result of UPMC's anticompetitive conduct was that the communities where UPMC's hospitals are located

[3] Skilled Healthcare Workers are defined "as workers who possess specialized in-patient hospital skills or qualifications that they have obtained as a result of either formal education and training or as the result of extensive on-the-job training and includes, without limitation, licensed practical nurses (LPNs), Nurses, Medical Assistants, registered nurses (RNs), Nurse Assistants, Orderlies, and Pharmacy workers. Compl., at n.1. As discussed, *infra*, the Complaint contains allegations explaining who these employees are, why they differ from other employees, and that the inpatient hospital setting is unique. ¶¶ 8, 56-64, 91-92, 99, 120-125, 161.

saw a reduction in healthcare quality and outcomes, and, importantly, a reduction in healthcare employment opportunities. *Id.*; *see also* ¶ 6.

### B. UPMC's Acquisition of Market and Monopsony Power

UPMC's current operations include forty (40) academic, community and specialty hospitals located within the Relevant Market with over 8,800 beds. ¶¶ 68-69. The Complaint alleges that UPMC's rise to dominance was not due to superior business acumen or historic accident, but instead the result of a series of strategic anticompetitive acquisitions of competitor healthcare systems in geographically regions that allowed it to systematically reinforce and expand its market power. ¶¶ 10-61, 72. UPMC's strategy of hospital consolidation throughout the Relevant Market began in the 1990s and continued through the 2000s. ¶¶ 76-90. The result of these acquisitions and consolidation is that UPMC acquired monopsony power in the Relevant Market. ¶¶ 68-69, 76-90.

UPMC maintains monopsony levels of control of inpatient workers in the Relevant Market. For example, in Allegheny County, UPMC employs approximately 67% of the hospital employees and controls 60% of licensed hospital beds. ¶¶ 67, 91-102. In Pittsburgh, UPMC alone employs 76% of the hospital employees and controls roughly 71% of all licensed hospital beds. ¶¶ 67, 91-102. A review of UPMC's market share by ZIP code demonstrates that UPMC's market share exceeds 50% in all six regions that comprise the Relevant Market. ¶¶ 72-73. Further, most of the hospital markets in the regions where UPMC operates are considered "highly concentrated" when measured using the Herfindahl-Hirschman Index (HHI) which is a metric used by antitrust enforcers to determine market concentration. ¶¶ 53, 96-98.

UPMC also used its market power to engage in additional anticompetitive conduct intended to drive existing competitors out of the Relevant Market or to keep potential competitors from entering the Relevant Market. For example, UPMC has coerced insurers to enter into exclusive dealing agreements with UPMC, preventing them from offering to cover comparable medical services performed by competing hospitals. ¶¶ 62-90, 103-116. UPMC has also been alleged to have been an antitrust recidivist, including by refusing to deal with health insurance providers with its rival

Highmark. ¶¶ 109-10, 112-113. In February 2019, former Attorney General Josh Shapiro filed a petition to intervene in the battle between UPMC and Highmark to protect Pennsylvanians from UPMC's "corporate greed." ¶ 115.

### C. UPMC Used its Monopsony Power to Depress Wages

The Complaint also contains allegations evidencing actual suppression of wages as a result of UPMC's exercise of monopsony power. Plaintiffs cite independent research conducted by Econ One Research, a prominent economic expert research and consulting firm, analyzing UPMC's operations. Econ One concluded that UPMC's campaign of acquiring dominant market share in new regions by acquiring competitors resulted in increased market concentration and decreased-wages for Skilled Healthcare Workers. ¶¶ 117-128. Econ One's analysis found that UPMC was able to impose a significant $1,289.60 annual "wage penalty" on UPMC nurses when compared to nurses who worked at hospitals in markets unaffected by UPMC's conduct. ¶¶ 122, 123.

In addition, Plaintiffs reference academic research which explains that this result is precisely what is to be expected when a hospital provider with monopsony power like UPMC wields its monopsony power. Professors Elena Prager and Matt Schmitt have done research and published articles finding that hospital consolidations and mergers lead to depressed healthcare industry wage growth. ¶¶ 52, 58, 120. In addition, a 2012 Robert Woods Johnson Foundation study found that hospital consolidation and concentration that reduced competition also negatively affected hospital workers. ¶ 54. Indeed, studies dating back to the 1970's have shown decreased wages for nurses working in markets with high market concentrations. ¶ 55.

### D. UPMC Used its Monopsony Power to Degrade Working Conditions

UPMC also imposed onerous terms of employment on its Skilled Healthcare Workers in order to maximize its profitability. UPMC achieved this by requiring its employees to do more work without additional pay, and to minimize their ability to demand better working conditions. ¶¶ 139-149. As part of the anticompetitive scheme, UPMC required its nurses to care for more patients without providing additional pay. ¶¶ 129-138. A hospital's staffing ratios (i.e., the number of staff per patient) measure

the labor purchased by a hospital relative to the demand for its services. ¶ 133. Even as UPMC's market power increased, it decreased its staffing ratios when compared with hospital systems in other markets. ¶¶ 134-136. The result is that UPMC is able to pay its Skilled Healthcare Workers less than comparable hospitals while requiring them to do more work than required by competitors. ¶ 137.

UPMC also imposes restrictions on Skilled Healthcare Workers that prevent them from seeking alternative comparable employment opportunities and inhibits them from being able to negotiate better working conditions from UPMC. ¶¶ 99, 139-149. These restrictions include: (1) enforcing a system-wide salary structure, preventing workers from being able to negotiate for higher pay by taking a job at a different UPMC facility, ¶ 142; (2) employing a do-not-rehire blacklist policy that would punish any employee who dared to leave UPMC to take a position at a competing facility, ¶ 143;[4] and (3) imposing restrictions such as Tuition Assistance Programs (otherwise known as "TRAP" or Training Repayment Programs) that would saddle employees with onerous debt obligations if they were to leave UPMC employment, ¶¶ 154-56. Labor experts and the FTC have also noted that blacklist policies such as the one used by UPMC function as de facto non-compete clauses– i.e., disincentivize workers from leaving UPMC. ¶ 153.

Finally, UPMC aggressively suppresses and stifles efforts by workers to organize. The ability of workers to organize and form a labor union is a potential way for workers to limit or arrest an employer's market power. ¶¶ 158-167. Suppression of the ability to unionize, which is what UPMC has done, can exacerbate an employer's monopsony power. ¶ 160. UPMC has been able to prevent the organization and formation of unions at almost all of its facilities by engaging in surveillance, harassment, intimidation, and if necessary, termination. ¶¶ 163-164. UPMC's union-busting activities is evidenced by the fact that it has faced 133 unfair labor practices charges since 2012 including 159 separate allegations. ¶¶ 165-166. Approximately 74% of those violations related to UPMC attempting to prevent workers from unionizing. ¶ 165.

---

[4] The purpose of imposing this restriction was to inhibit current UPMC employees from leaving UPMC, not to prevent UPMC from rehiring former employees when necessary. ¶ 145. Accordingly, the in terrorem effect of this policy worked to prevent workers from leaving. ¶¶ 146-147.

## III. ARGUMENT

At the conclusion of fact and expert discovery, when a plaintiff typically moves to certify a proposed class, the court conducts a "rigorous analysis" to determine if the plaintiff has satisfied the requirements of Rule 23. *See* *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350–51 (2011). The standard is different, however, where, as is the case here, a defendant makes a preemptive motion to strike class allegations at the pleadings stage. "When evaluating a motion to strike allegations of a complaint, the court must accept as true all factual allegations in the complaint and view all reasonable inferences in the light most favorable to Plaintiffs, just as on a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)." *Durso v. Samsung Elecs. Am., Inc.*, No. 2:12-CV-05352 DMC, 2013 WL 5947005, at *3 (D.N.J. Nov. 6, 2013) (citation omitted). Applying this standard, "[i]n this circuit, 'class allegations [are] stricken prior to a motion for certification ***only*** when class certification is a ***clear impossibility***.'" *Dieter v. Aldi, Inc.*, No. 2:18-cv-00846, 2018 WL 6191586, at *6 (W.D. Pa. Nov. 28, 2018) (emphasis added).

Accordingly, Plaintiffs here are required only to have plausibly alleged facts advancing a prima facie showing of the elements of Rule 23. *See* *Swank v. Wal-Mart Stores, Inc.*, No. 2:13-CV-01185, 2015 WL 1508403, at *2 (W.D. Pa. Mar. 31, 2015) (stating "Thus, [i]t is only when no amount of discovery or time will allow for plaintiffs to resolve deficiencies in class definitions under Rule 23, that a motion to strike class allegations should be granted.'"). Here, the Complaint makes a prima facie showing of the requirements of Rule 23 and UPMC cannot show that obtaining class certification is a "clear impossibility" after Plaintiffs have had the benefit of discovery.

### A. UPMC's Motion to Strike Should Be Denied as Premature

District courts within the Third Circuit, including this Court, "have typically concluded that motions to strike class action allegations filed before plaintiffs move for class certification are premature."[5] *Jaraczewski v. Equity National Title & Closing Servs.*, No. CV 23-274, 2024 WL 3861248, at

[5] *See, e.g.*, *Fiorarancio v. Cap. One Bank (USA)*, N.A., No. 21-cv-15775, 2023 WL 2357800, at *4–6 (D.N.J. Jan. 26, 2023) (noting that the motion to strike was premature because discovery was incomplete); *Santiago v. Total Life Changes LLC*, No. 20-cv-18581, 2022 WL 2619855, at *6 (D.N.J. July 7, 2022) (denying motion to strike class allegations where the record was "not adequately developed for this Court to determine whether the matter should proceed on a representative basis"); *Migyanko v. Kohl's*

*7 (W.D. Pa. Aug. 19, 2024) (Baxter, J.). This is because "class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Id.* (internal quotation marks omitted) (quoting *Wal–Mart Stores. Inc. v. Dukes*, 564 U.S. at 351). Indeed, "[t]he very nature of this fact-bound inquiry is such that it is rarely amenable to a resolution on the pleadings alone." *Ballard v. Navient Corp.*, No. 3:18-CV-121, 2021 WL 1899874, at *6 (M.D. Pa. Mar. 31, 2021), *rep. & rec. adopted*, 2021 WL 1660843 (M.D. Pa. Apr. 28, 2021); *Dieter*, 2018 WL 6191586, at *6. (explaining that "class allegations are stricken" at pleading stage "only when class certification is a clear impossibility").

UPMC's Motion fits squarely within the cases holding motions to strike at the pleadings stage are premature. This very Court recently rejected a preemptive motion to strike class allegations in near identical circumstances. *See Jaraczewski*, 2024 WL 3861248, at *6–7 (explaining the Third Circuit "disapprove[s] . . . of premature class certification decision[s] at the motion to dismiss stage when there had been no motion for class certification and no discovery.") (citing *Landsman & Funk PC v. Skinder-Struass Assocs*, 640 F.3d 72 (3d Cir. 2011)). Proceedings here are at the earliest stage: Plaintiffs have not yet moved for class certification, and there has been no discovery. *Id.* at *7 ("[D]iscovery is essential to determining whether a case can be maintained as a class action.") (citing *Gray*, F.Supp.3d at 386). Indeed, without an evidentiary record, UPMC cannot show that certification of a class will be

---

*Corp.*, No. 2:20-cv-328, 2020 WL 5798239 at *4 (W.D. Pa. Sept. 29, 2020) ("Procedurally, this case is in its infancy and the Court does not believe it appropriate to strike the class allegations prior to discovery."); *Austin v. Invention Submission Corp.*, No. 19-1396, 2020 WL 2771076, at *10 (W.D. Pa. Apr. 13, 2020) ("Because discovery is essential to determining whether a case can be maintained as a class action, a motion to strike that is filed before a plaintiff has moved to certify a class is premature."); *DiFlavis v. Choice Hotel Int'l Inc.*, No. 18-3914, 2019 WL 1505860, at *7 (E.D. Pa. Apr. 5, 2019) ("It is premature to strike any class or collective allegations at this early stage of the case, particularly given that the parties have not yet conducted discovery on these issues."); *Trunzo v. Citi Mortgage*, No. 2:11-cv-01124, 2018 WL 741422, at *10 (W.D. Pa. 2018) (denying motion to strike at the pleadings stage because movant "has not advanced an argument sufficient to demonstrate that class discovery will necessarily fail to illuminate any further evidence" supporting certification); *Gray v. BMW of N. Am., LLC*, 22 F. Supp. 3d 373, 386 (D.N.J. 2014) (denying motion to strike class allegations at pleadings stage and noting that "discovery is . . . integral" to class determination); *Mills v. Serv. First Credit Union*, No. 4:11–CV–686, 2011 WL 3236313, at *1 (M.D. Pa. July 28, 2011) (concluding that the case was not "one of the 'rare' or 'few' cases in which the court should dismiss or strike class claims with no discovery, solely on the basis of the pleadings").

a "clear impossibility." *Dieter*, 2018 WL 6191586, at *6.

Further, UPMC's Motion raises complex arguments that "implicate multifaceted class certification issues which are inappropriate to decide at this time given that they may depend on factual information that 'comes to light during discovery.'" *In re Vascepa Antitrust Litig. Direct Purchaser Plaintiffs*, No. CV 21-12747 (RK), 2024 WL 3717375, at *2 (D.N.J. Aug. 8, 2024). Accordingly, without addressing the merits (or lack thereof) of UPMC's specific arguments as to why it believes class certification may be inappropriate, this Court may deny UPMC's Motion as premature. *See Jaraczewski*, 2024 WL 3861248, at *7 (where this Court was "loath to strike Plaintiffs' class allegations before allowing class discovery, the opportunity to amend, and, ultimately, the filing of a motion for class certification"); *see also Martin v. Ford Motor Co.*, 765 F. Supp. 2d 673, 680 (E.D. Pa. 2011) ("Since the Motion to Strike filed by Defendant is premature, the merits of this argument will not be addressed at this stage of the case.").

Plaintiffs should be afforded the opportunity to develop their class claims and UPMC's Motion to Strike should be denied.

**B. Plaintiffs Have Alleged Sufficient Facts to Demonstrate a Class May be Certified**

Notably, as observed by a court in this District, "[c]ourts routinely reject preemptive motions to strike class allegations except in the rare case. This is true not only in cases seeking injunctive relief under Rule 23(b)(2), but even in cases for damages under Rule 23(b)(3)." *Heinzl v. Cracker Barrel Old Country Store, Inc.*, No. 2:14-CV-1455, 2015 WL 1925811 at *2 (W.D. Pa. Apr. 24, 2015); *see also Swank*, 2015 WL 1508403, at *2 ("courts grant motions to dismiss class allegations before class discovery only in the 'rare few [cases] where the complaint itself demonstrates that the requirements for maintaining a class action cannot be met.' Thus, '[i]t is only when no amount of discovery or time will allow for plaintiffs to resolve deficiencies in class definitions under Rule 23, that a motion to strike class allegations should be granted."). Setting aside the improper timing of UPMC's motion to strike, Plaintiffs have alleged sufficient facts that, if accepted as true, show unambiguously that a class can and will be certified.

**1. Rule 23(a)[6]**

Plaintiffs adequately allege facts sufficient to satisfy Rule 23's numerosity, commonality, typicality, and adequacy requirements. *See* Fed. R. Civ. P. 23(a).

***Numerosity*** is met if the potential number of class members exceeds 40. *See, e.g.*, *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 595 (3d Cir. 2012) (citing *Stewart v. Abraham*, 275 F.3d 220, 226–27 (3d Cir. 2001)). ***Commonality*** is satisfied when a complaint alleges a central or overriding issue sufficient to establish a common question. In the context of a Section 2 claim, this element is easily met because "an allegation of . . . monopolization will generally be treated as a 'central' or 'single overriding' issue . . . sufficient to establish a common question." *In re Suboxone (Buprenorphine Hydrochloride & Nalaxone) Antitrust Litig.*, 421 F. Supp. 3d 12, 48 (E.D. Pa. 2019) (citations omitted), *aff'd sub nom. In re Suboxone (Buprenorphine Hydrochlorine & Naloxone) Antitrust Litig.*, 967 F.3d 264 (3d Cir. 2020). ***Typicality*** is satisfied if "the claims of the named Plaintiffs and the absent class members rely on the same legal theories and arise from the same 'core pattern' of alleged conduct by the Defendant." *Id.* at*49. **Adequacy** is met where the "interests and incentives between the representative plaintiffs and the rest of the class" are aligned. *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 183 (3d Cir. 2012).

The Complaint easily satisfies the requirements of Rule 23(a). ***First***, Plaintiffs allege that "UPMC currently employs . . . 21,000 nurses" who are part of the defined class of Skilled Healthcare Workers. ¶ 53. This far exceeds the requisite for numerosity. ***Second***, Plaintiffs plausibly allege Section 2 monopolization and monopsonization claims sufficient to establish a common question. *See* ¶¶ 132-141; *Suboxone*, 421 F. Supp. 3d at 48. ***Third***, the named Plaintiffs' claims rely on the same theories as the claims of absent class members, namely that UPMC abused its market power by monopolizing and restricting output in the Hospital Services Output Market which also gave it monopsony power in the Relevant Market for employing Skilled Healthcare Workers, and that UPMC abused this power in order to artificially depress the wages and work conditions it imposed on Plaintiffs and absent class members, making their claims typical. ¶¶ 33, 91-102, 117-128. ***Finally***, Plaintiffs' counsel are

[6] UPMC does not challenge Plaintiffs' class allegations under Rule 23(a).

experienced antitrust lawyers and there is no allegation of any conflict between the named Plaintiffs and absent class members. At this stage, Plaintiffs' allegations satisfy Rule 23(a).

**2. Rule 23(b)(2)**

As a leading treatise on class actions states, "Rule 23(b)(2) authorizes class when actions when all the prerequisites of Rule 23(a) have been met, and 'the party opposing the class acted or refused to act on grounds that apply to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.'" *Newberg on Class Actions* § 41; 26 (5th ed. 2014) (quoting Fed. R. Civ. P. 23(b)(2)). To maintain an injunctive relief class under Rule 23(b)(2), a class representative must show that the defendant "has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

Plaintiffs have alleged facts which, taken as true, satisfy Rule 23(b)(2). *See* Section II.A, *supra*. Further, Plaintiffs plausibly allege ongoing harm and the threat of future injury to all class members. *See, e.g.*, ¶¶ 117-138. Indeed, Plaintiffs allege that UPMC currently wields its monopsony power to pay Plaintiffs and absent class members subcompetitive wages and downgrade their working conditions. *See* ¶¶ 117-138. These allegations suffice to make out an injunctive claim under Rule 23(b)(2).

There is no evidence to suggest—and UPMC does not aver—that anything has changed since Plaintiffs filed the Complaint, or that anything will change without the Court's intervention. Quite the opposite. Recent events such as UPMC's acquisition (in July of 2024) of another hospital system *after* the filing of the Complaint suggests UPMC only intends to strengthen its grip on the Relevant Market and Hospital Services Output Market, thereby increasing its current and future ability to harm Plaintiffs and absent class members as alleged.[7] Accordingly, Plaintiffs have plausibly alleged "a

---

[7] By way of example, Plaintiffs allege that UPMC's market share in the Pittsburgh statistical area is 55%. ¶ 97. In June 2024, however, not long after Plaintiffs filed the Complaint, UPMC acquired the financially struggling Washington Health System ("WHS") over fears raised by SEIU that "UPMC will blow smoke about what they will do for [the community], then do the opposite." SEIU, OP-ED: Washington can do better than UPMC (Sep. 19, 2023), https://seiuhcpa.org/op-ed-washington-can-do-better-than-upmc/ (accessed Aug. 18, 2024). Since WHS is located within the Pittsburgh statistical area, it is reasonable to infer that UPMC's market share has increased. As Plaintiffs alleged, as UPMC's

significant threat of injury from an impending violation . . . or from a contemporary violation likely to continue or recur . . . for which [Plaintiffs] would be entitled to compensation if the injury actually occurred." *Suboxone*, 421 F. Supp. 3d 12 at 69 (cleaned up) (citations and quotation marks omitted). That is all that is required at this stage.

UPMC incorrectly suggests that Plaintiffs cannot pursue class claims under Rule 23(b)(2) as a matter of law. *See* Br. at 15. UPMC argues that Plaintiffs' class definition is "vague," that the Skilled Healthcare Workers Class lacks "cohesiveness," and that Plaintiffs' claim for monetary damages precludes certification of an injunctive relief class. *See id.* at 15–17. Each of these arguments fails.

First, UPMC is wrong when it argues that the "vagueness of Plaintiffs' alleged class precludes certification under . . . Rule 23(b)(2)." *Id.* at 15. Plaintiffs' class definition is based on objective criteria such as specific job titles. *See* Compl., at n.1; *see also* ¶ 56 (explaining that economic theory recognizes that certain hospital workers have specialized skills valuable in specific industries"). Plaintiffs' class definition is corroborated by independent economic and academic research. *E.g.*, ¶ 52 (study finding wage decreases "most pronounced for medically skilled workers"), ¶¶ 123–26 (economic study indicating wage suppression for specific job titles at UPMC).

Ignoring Plaintiffs' allegations, UPMC relies on two cases involving motions for class certification that were filed after the close of discovery. In fact, when considered in context, each of these cases supports denial of UPMC's Motion. In *Shelton v. Bledsoe*, 775 F.3d 554 (3d Cir. 2015), the Third Circuit *reversed* the lower court's denial of class certification while holding, under Rule 23(b)(2), that a properly defined class is one that is "sufficiently cohesive" and is "capable of . . . description by a readily discernible, clear, and precise statement of the parameters defining the class." 775 F.3d at 564. In *Robb v. Lock Haven Univ. of Pa.*, No. 4:17-CV-00964, 2019 WL 2005636, at *12–13 (M.D. Pa. May 7, 2019), even though the proposed class definition was "nebulous," the court denied certification *without prejudice*. Indeed, the court even granted plaintiffs leave to move for certification of three discrete subclasses. *Id.* Here, Plaintiffs plausibly allege a class definition that is neither vague nor

market share increases, wages for Skilled Healthcare Workers decrease. *E.g.,* ¶¶ 117-128. Therefore, UPMC's ability to pay subcompetitive wages has increased since the filing of the Complaint.

nebulous, but rather "discernible, clear, and precise" and therefore sufficient to advance a claim for relief under Rule 23(b)(2). Even so, this is an improper basis for dismissal and any dismissal should be without prejudice.

Second, UPMC states that Plaintiffs' proposed class "fails Rule 23(b)(2) for lack of cohesiveness." Br. at 15. That is incorrect. To demonstrate cohesiveness, Plaintiffs must show that the following elements are "susceptible of common proof": (1) actual or threatened injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur; (2) causation; and (3) likelihood that the equitable relief will redress the injury. *In re Processed Egg Prod. Antitrust Litig.*, 321 F.R.D. 555, 559 (E.D. Pa. 2017). Plaintiffs have plausibly alleged (1) actual or threatened antitrust injury (subcompetitive wages and degraded working conditions); (2) causation (UPMC's exercise of monopoly and monopsony power to inflict such injury); and (3) that equitable relief will redress the injury (UPMC will not stop unless it is made to stop). *See* ¶¶ 190–93. Each of those elements are susceptible to common proof, such as UPMC's contemporaneous business records, fact witness testimony, and expert evidence. *See, e.g.*, *Trunzo*, 2018 WL 741422, at *7. Accordingly, Plaintiffs plausibly allege facts sufficient to show cohesiveness. Yet, UPMC again relies on cases with a far more advanced posture, *i.e.*, cases addressing class certification after plaintiffs have had the benefit of discovery. *See, e.g.*, *Huber v. Taylor*, No. 002–304, 2011 WL 4553154, at *6 (W.D. Pa. Sept. 29, 2011) (proceedings had been active for nine years and there had been "extensive and protracted discovery"). Unlike the cases cited by UPMC, this case is at the pleading stage where all inferences must be drawn in Plaintiffs' favor and when doing so, the Complaint shows cohesiveness.

Third, UPMC argues that Plaintiffs' claims for monetary damages "bars any Rule 23(b)(2) class as a matter of law." Br. at 15. That is a misstatement of the law. District courts within the Third Circuit routinely certify classes under both Rule 23(b)(2) and Rule 23(b)(3) in the same litigation.[8] There is no

[8] *See, e.g.*, *Wilson v. Cnty. of Gloucester*, 256 F.R.D. 479, 491–92 (D.N.J. 2009) (noting that "certifying the equitable portion of this suit under (b)(2), and the damages portion under (b)(3), allows for the best of both worlds."); *Cohen v. Chi. Title Ins. Co.*, 242 F.R.D. 295, 301 (E.D. Pa. 2007) (noting that "[a]ny remedy could include both money damages and enjoining the [alleged] conduct"); *cf.* *Davis v. D.R. Horton Inc.*, No. 19-1686-LPS-JLH, 2020 WL 6042091, at *2 (D. Del. Oct. 13, 2020) (noting that courts

"brightline rule" requiring an election between one or the other. *In re Thalomid & Revlimid Antitrust Litig.*, No. 14-6997, 2018 WL 6573118 at *24 (D.N.J. Oct. 30, 2018). Rather, "when a Rule 23(b)(2) class is proposed alongside Rule 23(b)(3) classes, the correct approach is to rigorously analyze whether the proposed class is appropriate." *Id.* (quoting *In Processed Egg Prod.*, 312 F.R.D. at 166). Here, Plaintiffs seek damages and injunctive relief on behalf of themselves and similarly situated Skilled Healthcare Workers. *See* ¶¶ 187–193. Plaintiffs submit that they have plausibly alleged facts sufficient to support a class under both Rule 23(b)(2) and Rule 23(b)(3).

UPMC notes several cases where courts declined to certify a Rule 23(b)(2) class where plaintiffs sought damages in addition to injunctive relief. *See* Br. at 17. However, Rule 23 allows district courts to separately certify the liability and damages portions of a class action. *See Wilson*, 256 F.R.D. at 491 ("In short, certifying the equitable portion of this suit under (b)(2), and the damages portion under (b)(3), allows for the best of both worlds."). Given the timing of its motion, UPMC would have the Court undertake "an early, uninformed evaluation" that "[does] not comport with the 'rigorous analysis' required to resolve every class certification question," including this one. *Jaraczewski*, 2024 WL 3861248, at *6 (citing *Landsman & Funk PC*, 640 F.3d at 93).

**3. Rule 23(b)(3)**[9]

**a. Ascertainability**

UPMC states that Plaintiffs' proposed class definition cannot meet Rule 23(b)(3)'s ascertainability requirement because it is overly broad and predicated on "vague, amorphous criteria that provide no guidance to enable UPMC, the Court, or putative class members to identify who might be in the class." Br. at 7–8. UPMC is wrong. At the class certification stage, plaintiffs will be required to show that "(1) the class is 'defined with reference to objective criteria'; and (2) there is 'a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition.'" *Byrd v. Aaron's Inc.*, 784 F.3d 154, 163 (3d Cir. 2015) (quoting *Carrera v. Bayer*

---

in the Third Circuit certify classes under Rule 23(b)(2) and 23(b)(3) in the same litigation).

[9] UPMC does not challenge Plaintiffs' allegations as to Rule 23(b)(3)'s superiority requirement.

*Corp.*, 727 F.3d 300, 355 (3d Cir. 2013) (citation omitted). But that is not the case at this stage, where plaintiffs are required only to "advanc[e] a prima facie showing that discovery is likely to produce substantiation of the class allegations with respect to ascertainability." *Trunzo*, 2018 WL 741422, at *8. Indeed, a motion to strike class allegations before discovery on ascertainability grounds should be denied where "objective records in the defendant's possession" could "readily identify" class members at the class certification stage. *Id.* at *7 (citing *Byrd*, 784 F.3d at 169).[10]

It is also common sense that a corporation would have wage and employment data for its own employees that could be used to ascertain class members. But, Plaintiffs here go a step further and allege that UPMC is in possession of employment records, including data maintained by UPMC with respect to its "market-based approach to establish salary structures," that will enable Plaintiffs to ascertain the class by job title. ¶ 142. UPMC argues that such an approach would require "having to review the personnel information and professional history of each potential class member" and that this alone "prohibits even moving into discovery on the proposed class." Br. at 9. UPMC ignores the fact that this is routinely accepted in antitrust class actions in the employment sphere that have been certified in even broader, more numerous, and more diverse classes of employees than that here.[11]

---

[10] In addition, district courts within the Third Circuit have rejected "concerns of 'overly broad' . . . class descriptions in the ascertainability analysis." *Trunzo*, 2018 WL 741422, at *8; *see also* *Byrd*, 784 F.3d at 167–68 (holding that a district court's finding that "the proposed classes were not ascertainable because they were 'overly broad'" was an abuse of discretion). "Although some evidence used to satisfy ascertainability, such as corporate records, will actually identify class members . . . ascertainability only requires the plaintiff to show that class members *can be identified*." *Carrera v. Bayer Corp.*, 727 F.3d at 308 n.2 (emphasis added).

[11] *See, e.g.*, *In re High-Tech Emp. Antitrust Litig.*, 985 F. Supp. 2d 1167, 1177 (N.D. Cal. 2013) (where plaintiffs in no-poach class action identified class members' "job titles based on Defendants' own employment compensation data"); *Nitsch v. Dreamworks Animation SKG Inc.*, 315 F.R.D. 270, 285–86 (N.D. Cal. 2016) (where no-poach plaintiffs identified class members' job titles through compensation data allegedly maintained by defendant to "confirm or adjust . . . salary ranges" as part of alleged antitrust conspiracy); *Seaman v. Duke Univ.*, No. 1:15-CV-462, 2018 WL 671239, at *9 (M.D.N.C. Feb. 1, 2018) (finding ascertainability met in no-poach case where "defendants keep adequate records of their faculty and those persons are easily identifiable"). *See also* *Trunzo*, 2018 WL 741422, at *8 (rejecting defendant's claim that "such an inquiry would require painstaking mini-trials that would qualify such a process as 'administratively infeasible.'").

### b. Predominance

Rule 23's "predominance inquiry 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation,' and assesses whether a class action 'would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated.'"[12] *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 297 (3d Cir. 2011) (cleaned up) (citations omitted). "The three relevant elements of an antitrust claim that must be capable of common proof for the class to be certified under Rule 23(b)(3) are: (1) violation of antitrust laws, (2) antitrust impact, and (3) measurable damages." *In re Domestic Drywall Antitrust Litig.*, 322 F.R.D. 188, 201 (E.D. Pa. 2017) (citing *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311–12 (3d Cir. 2008)).

Plaintiffs bring monopolization and monopsonization claims (actual and attempted) under Section 2 of the Sherman Act. *See* ¶¶ 40–61. To state such claims, "a plaintiff must allege '(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historical accident.'" *Royal Mile Co. v. UPMC*, No. 10–1609, 2013 WL 5436925, at *29 (W.D. Pa. Sept. 27, 2013) (quoting *Schuylkill Energy Res., Inc. v. Penn. Power & Light Co.*, 113 F.3d 405, 412–13 (3d Cir. 1997)); *see also* *Allen v. Dairy Farms of Am., Inc.*, No. 5:09-CV-230, 2014 WL 2610613, at *7 (D. Vt. June 11, 2014) (noting that claims of monopolization and monopsonization apply the same legal standards) (citing *Weyerhaeuser Co. v. Ross–Simmons Hardwood Lumber Co.*, 549 U.S. 312, 322 (2007)). In the context of labor markets, "[e]mployers with monopsony power . . . can suppress wages (and degrade working conditions) in order to save labor costs."[13] Market power may

---

[12] According to UPMC, since Rule 23(b)(2)'s cohesiveness requirement is more "stringent" than Rule 23(b)(3)'s predominance requirement, a class that fails under Rule 23(b)(3) for lack of predominance necessarily fails under Rule 23(b)(2) for lack of cohesiveness. *See* Br. at 15 (citing *Gates v. Rohm & Haas Co.*, 655 F.3d 255, 264, 269–70 (3d Cir. 2011)). But if that is true, then so is the converse: if a class satisfies Rule 23(b)(2)'s cohesiveness requirement, then Rule 23(b)(3)'s predominance is also satisfied. As discussed above, Plaintiffs have made a prima facie showing of Rule 23(b)(2) cohesiveness by plausibly alleging that the elements of their claims are susceptible to common proof. It follows, therefore, that Plaintiffs have also plausibly alleged facts sufficient to advance a prima facie showing of predominance. UPMC's arguments to the contrary should be rejected for this reason alone.

[13] Ioana Elena Marinescu and Eric A. Posner, SSRN, Why Has Antitrust Law Failed Workers? (Feb. 14, 2019), https://ssrn.com/abstract=3335174 (accessed Aug. 19, 2024), at 6.

be demonstrated through "direct evidence of the injurious exercise of market power" or "circumstantial evidence pertaining to the structure of the market." *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995).

Here, Plaintiffs plausibly allege both direct and indirect proof of UPMC's monopoly and monopsony power that is common to the class.[14] For example, Plaintiffs plausibly allege that UPMC: (1) paid Plaintiffs and absent class members subcompetitive wages, and (2) controlled demand in the Relevant Market by restricting output in the Hospital Services Output Market. *See* ¶¶ 91–102, 117–128; *see also* *Rebel Oil*, 51 F.3d at 1434; *Todd v. Exxon Corp.*, 275 F.3d 191, 206 (2d Cir. 2001) (defining monopsony power in labor context as "defendants' *ability* to depress salaries") (emphasis added). Plaintiffs allege economic studies and analyses demonstrating UPMC paid subcompetitive wages. *Le v. Zuffa*, 2:15-cv-01045-RFB-BNW, 2023 WL 5085064, at *28–29 (D. Nev. Aug. 9, 2023) (certifying class in labor monopsony case where expert used regression modeling to demonstrate class-wide impact). Plaintiffs also allege that UPMC's market share is sufficient to establish dominance in the Relevant Market and significant barriers to entry. *See* ¶¶ 97–98, 103–106. In addition, Plaintiffs adequately allege that UPMC's antitrust violations caused "cognizable harm" to Plaintiffs and absent class members, as well as "an adverse effect on competition market-wide." *Todd*, 275 F.3d at 213; *Turner v. McDonald's USA*, LLC, No. 19 C 5524, 2020 WL 3044086, at *3 (N.D. Ill. Apr. 24, 2020) (the alleged "injury of depressed wages to [Skilled Healthcare Workers] due to [UPMC's] anticompetitive behavior" is an "injury to competition.") (cleaned up) (citations omitted). And Plaintiffs allege a common anticompetitive scheme which includes restrictions on mobility, retaliation, and degrading work quality, which was an outgrowth of a series of mergers, acquisitions and facility shutdowns. ¶¶ 117–67; *see also* *Le*, 2023 WL 5085064, at *21–28 (certifying class in labor monopsony case where class

---

[14] "If the plaintiff puts forth evidence of restricted output and supracompetitive prices, that is direct proof of the injury to competition which a competitor with market power may inflict, and thus, of the actual exercise of market power." *Rebel Oil*, 51 F.3d at 1434 (citation omitted). To demonstrate market power circumstantially, a plaintiff must show that the defendant has a dominant share in a relevant market, and significant barriers to entry. *See* *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 (3d Cir. 2007).

members were subject to common application of an anticompetitive scheme which included, *inter alia*, coercive contracts and a series of horizontal acquisitions).

All of these allegations will be subject to proof such as UPMC's contemporaneous business records, fact witness testimony, and expert evidence; all of which will be common to the Class. Accordingly, Plaintiffs have satisfied their burden of alleging the prima facie elements of all of Rule 23's requirements including predominance. UPMC cannot show that satisfying any of Rule 23's requirements at class certification will be a "clear impossibility."

UPMC's challenge on predominance boils down to a misguided argument that variations in market share across the Relevant Market and diversity in class membership render Plaintiffs' allegations relating to antitrust impact insusceptible to common proof. *See* Br. at 11–14. UPMC exaggerates the significance of any such variations, especially at the pleadings stage where Plaintiffs' burden of proof is substantially lower than at class certification. *See, e.g.*, *In re Suboxone (Buprenorphine Hydrochlorine & Naloxone) Antitrust Litig.*, 967 F.3d 264, 272 (3d Cir. 2020) ("Individualized determinations, . . ., are of no consequence in determining whether there are common questions concerning liability."); *see also id.* ("Although allocating the damages among class members may be necessary after judgment, 'such individual questions do not ordinarily preclude the use of the class action device.'") (citation omitted).

UPMC also appears to argue that the fact that the defined class of Skilled Healthcare Workers includes UPMC employees with different job responsibilities and different job titles means that they will be unable to prove predominance. Br. at 12–13. But, whether a Class member has a different job title or worked at a different UPMC facility is irrelevant to Plaintiffs' theory of harm. Indeed, predominance here is predicated on UPMC's conduct, not the Plaintiffs' job titles. The fact is that Plaintiffs and the proposed Class all suffered the same type of injury—reduced job mobility, degrade working conditions, and suppressed compensation—caused by UPMC's anticompetitive employment policies. In any event, classes consisting of multiple job titles have been certified by other courts in the antitrust context. *See, e.g.*, *In re High-Tech Emp.*, 985 F. Supp. at 1182, 1226–27 (finding predominance satisfied for class that "consists of job titles identified in Appendix B" to an expert

report).

In any event, Plaintiffs have alleged specific and non-conclusory facts—which must be accepted as true—setting forth how UPMC's conduct caused widespread harm across the Class. *E.g.*, ¶¶ 117–38. This includes an economic report prepared by an expert economics firm that studied the effect UPMC's anticompetitive employment practices had on its Skilled Healthcare Workers. *See* ¶¶ 119–28. UPMC also misrepresents the import of Plaintiffs' allegations that UPMC implemented a "systemwide 'market-based approach to establish salary structures" in order to restrict Skilled Healthcare Worker mobility. ¶¶ 141–42. UPMC's "market-based approach" was intended to ensure that the salaries UPMC paid for a particular position, when adjusted for any differences in the regional cost of living, would be the same so that workers could not increase their effective compensation by moving to another UPMC facility. ¶ 142. Accordingly, rather than demonstrate that class certification is impossible because of "varying forms of impact" across the Relevant Market due to its regionally adjusted wages, these allegations (when proven by way of discovery and expert analysis) show that the effective rate was uniform across the regions comprising the Relevant Market. In other words, these allegations *support* class certification by demonstrating that UPMC took steps to ensure that the impact of its wage suppression on Skilled Healthcare Workers would be uniform across the entire Relevant Market. *See* *In re High-Tech Emp.*, 958 F. Supp. 2d at 1197–1202 (certifying class in labor antitrust case where court found "persuasive Plaintiffs' contention that common questions about the impact of Defendants' focus on internal equity, and the effects of these factors . . . as a whole are likely to predominate over any individual questions"). Thus, common evidence exists to prove the Purchasers' antitrust theory and the resulting injury.

## IV. CONCLUSION

For the foregoing reasons, UPMC's motion should be denied.

Dated: September 5, 2024

Respectfully submitted,

*/s/ Daniel C. Levin*
Austin B. Cohen, (PA Id. 78977)
Daniel C. Levin, (PA Id. 80013)

Joseph R. Saveri
Christopher K.L. Young

**JOSEPH SAVERI LAW FIRM, LLP**
601 California Street, Suite 1505
San Francisco, California 94108
Telephone: (415) 500-6800
Facsimile: (415) 395-9940
jsaveri@saverilawfirm.com
cyoung@saverilawfirm.com

Craig Murphey
Steven E. Riley, Jr.
**PURCHASE, GEORGE & MURPHEY, P.C.**
2525 West 26 Street, Suite 200
Erie, PA 16506
Telephone: (814) 833-7100
Facsimile: (814) 835-0401
craig@purchasegeorge.com
triley@purchasegeorge.com

Keith J. Verrier, (PA Id. 86577)
**LEVIN SEDRAN & BERMAN LLP**
510 Walnut Street, Suite 500
Philadelphia, PA 19106-3997
Telephone: (215) 592-1500
Facsimile: (215) 592-4663
acohen@lfsblaw.com
dlevin@lfsblaw.com
kverrier@lfsblaw.com

*Counsel for Plaintiffs*