**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JENNIFER MIZELL, MARIA PAULDING, KATHLEEN PEAPPLES, VICTORIA ROSS, AND NATHAN SIMPSON, individually and on behalf of themselves and all others similarly situated, | **Case No.  1:24-cv-00016-SPB** |
| Plaintiffs, | |
| vs. | |
| UNIVERSITY OF PITTSBURGH MEDICAL CENTER, | **Oral Argument Requested** |
| Defendant. | |

**PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO
DISMISS UNDER FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)**

# <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ....................................................................................................1

II.     RELEVANT FACTUAL BACKGROUND ............................................................2

    A.      Background.................................................................................................2

    B.      UPMC's Acquisition of Market and Monopsony Power............................3

    C.      UPMC Used its Monopsony Power to Depress Wages ...............................4

    D.      UPMC Used its Monopsony Power to Degrade Working Conditions .........5

III.    ARGUMENT ...........................................................................................................6

    A.      Plaintiffs Properly Allege the Relevant Markets......................................7

        1.      Plaintiffs Have Alleged a Relevant Product (or Service) Market ......8

        2.      Plaintiffs Plausibly Allege a Geographic Market Consisting of Regions Where UPMC Operates Hospitals .........................................10

    B.      Plaintiffs Adequately Allege Monopoly Power in the Hospital Services Output Market and Monopsony Power in the Relevant Market.................12

        1.      Direct Evidence of Market Power: UPMC Controlled Demand and Paid Skilled Healthcare Workers Subcompetitive Wages .........................13

        2.      Indirect Evidence of Market Power: UPMC's Dominant Market Share Is Protected by High Barriers to Entry .................................................15

    C.      Plaintiffs Allege Exclusionary Conduct...................................................17

        1.      Acquisitions...............................................................................19

        2.      Mobility Restrictions..................................................................20

        3.      Restricting Rivals' Access to Inputs ..........................................20

        4.      Retaliation.................................................................................21

        5.      Antitrust Injury..........................................................................22

    D.      Plaintiffs' Claims Are Not Barred by the Statute of Limitations...................23

IV.     CONCLUSION ......................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Allen v. Dairy Farmers of Am., Inc.,*
    748 F. Supp. 2d 323 (D. Vt. 2010) ........................................................................................ 13, 15

*Am. President Lines, LLC v. Matson, Inc.,*
    633 F. Supp. 3d 209 (D.D.C. 2022) ...................................................................................... 21, 22

*In re Aspaartame Antitrust Litigation,*
    416 F. App'x. 208 (2011) ............................................................................................................ 24

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.,*
    No. 17CV205-MMA (MDD), 2018 WL 3032552 (S.D. Cal. June 19, 2018) ............................... 9

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) .................................................................................................................... 6

*Borough of Lansdale v. Phila. Elec. Co.,*
    692 F.2d 307 (3d Cir. 1982) ...................................................................................................... 11

*Broadcom Corp. v. Qualcomm Inc.,*
    501 F.3d 297 (3d Cir. 2007) ........................................................................................... 15, 18, 20

*Brown Shoe Co. v. United States,*
    370 U.S. 294 (1962) .................................................................................................................. 10

*Butterbaugh v. Chertoff,*
    479 F. Supp. 2d 485 (W.D. Pa. 2007) ...................................................................................... 6, 7

*Cable Line, Inc. v. Comcast Cable Commc'ns of Pa. Inc.,*
    767 F. App'x 348 (3d Cir. 2019) ............................................................................................... 10

*Campfield v. State Farm Mut. Auto. Ins. Co.,*
    532 F.3d 1111 (10th Cir. 2008) ........................................................................................... 13, 14

*Carpenter Tech. Corp. v. Allegheny Techs. Inc.,*
    No. 08–2907, 2011 WL 4528303 (E.D. Pa. Sept. 30, 2011) ..................................................... 14

*Carpenters Dist. Council v. United Contractors Ass'n,*
    484 F.2d 119 (6th Cir. 1973) .................................................................................................... 22

*Clarke v. Baptist Mem'l Healthcare Corp.,*
    No. 06-2377 MA/V, 2007 WL 9870961 (W.D. Tenn. May 17, 2007) ................................... 9, 10

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.,*
    370 U.S. 690 (1962) .................................................................................................................... 7

*In re Ductile Iron Pipe Fittings ("DIPF") Direct Purchaser Antitrust Litig.,*
    2013 WL 812143 (D.N.J. Mar. 5, 2013) ................................................................................... 16

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*,
   637 F.3d 435 (4th Cir. 2011) ........................................................................................................ 7

*In re eBay Seller Antitrust Litig.*,
   545 F. Supp. 2d 1027 (N.D. Cal. 2008) ...................................................................................... 15

*Ecker v. Williamsport Hosp.*,
   No. 1:16-CV-00693, 2016 WL 8200436 (M.D. Pa. Oct. 7, 2016) ................................................ 11

*Eichorn v. AT & T Corp.*,
   248 F.3d 131 (3d Cir. 2001), *as amended* (June 12, 2001) .......................................................... 10

*Free FreeHand Corp. v. Adobe Sys., Inc.*,
   852 F. Supp. 2d 1171 (N.D. Cal. 2012) ...................................................................................... 18

*Giordano v. Saks Inc.*,
   654 F. Supp. 3d 174 (E.D.N.Y. 2023) ..................................................................................... 9, 23

*Glen Holly Ent., Inc. v. Tektronix, Inc.*,
   352 F.3d 367 (9th Cir. 2003) ...................................................................................................... 20

*Graco Inc. v. PMC Glob., Inc.*,
   No. CIV.A. 08-1304, 2012 WL 762448 (D.N.J. Mar. 6, 2012) .................................................... 15

*Graham v. Cent. Garden & Pet Co.*,
   No. 22-CV-06507-JSC, 2023 WL 2744391 (N.D. Cal. Mar. 30, 2023) ........................................ 10

*Hanover 3201 Realty, LLC v. Village Supermarkets, Inc.*,
   806 F.3d 162 (3d Cir. 2015) .................................................................................................. 10, 11

*Harrison Aire, Inc. v. Aerostar Int'l, Inc.*,
   423 F.3d 374 (3d Cir. 2005) ....................................................................................................... 22

*Int'l Ass'n of Heat and Frost Insulators & Asbestos Workers v. United Carpenters Ass'n*,
   483 F.2d 384 (3d Cir. 1973) ....................................................................................................... 22

*Klehr v. A.O. Smith Corp.*,
   521 U.S. 179 (1997) ................................................................................................................... 24

*Le v. Zuffa, LLC*,
   216 F. Supp. 3d 1154 (D. Nev. 2016) ................................................................................. *passim*

*Le v. Zuffa, LLC*,
   No. 215CV01045RFBBNW, 2024 WL 195994 (D. Nev. Jan. 18, 2024) ........................... 14, 16, 21

*LePage's, Inc. v. 3M*,
   324 F.3d 141 (3d Cir. 2003) .................................................................................................. 18, 21

*Lifewatch Servs. Inc. v. Highmark Inc.*,
   902 F.3d 323 (3d Cir. 2018) ................................................................................................ *passim*

*In re Linerboard Antitrust Litig.*,
305 F.3d 145 (3d Cir. 2002) ................................................................................................23, 24

*In re Lipitor Antitrust Litig.*,
868 F.3d 231 (3d Cir. 2017) ................................................................................................ 6

*In re Lower Lake Erie Iron Ore Antitrust Litig.*,
998 F.2d 1144 (3d Cir. 1993) ..............................................................................................24, 25

*Mayor and City Council of Baltimore v. Merck Sharp & Dohme Corp.*,
No. CV 23-828, 2023 WL 8018980 (E.D. Pa. Nov. 20, 2023)............................................ 8

*Meijer, Inc. v. 3M*,
No. Civ.A. 04-5871, 2005 WL 1660188 (E.D. Pa. July 13, 2005)......................................17, 25

*Miller Indus. Towing Equip. Inc. v. NRC Indus.*,
659 F. Supp. 3d 451 (D.N.J. 2023) ................................................................................... 18

*Molinari v. Consol. Energy Inc.*,
No. 12CV1085, 2012 WL 5932979 (W.D. Pa. Nov. 27, 2012) ......................................... 10

*Multiple Energy Techs., LLC v. Under Armour, Inc.*,
No. 2:20-CV-664-NR, 2022 WL 345059 (W.D. Pa. Feb. 4, 2022) ................................... 8

*In re Mushroom Direct Purchaser Antitrust Litig.*,
514 F. Supp. 2d 683 (E.D. Pa. 2007) ................................................................................10, 11

*Mylan Pharms. Inc. v. Warner Chilcott Pub. Ltd. Co.*,
838 F.3d 421 (3d Cir. 2016) ...............................................................................................13, 14

*In re NCAA 1-A Walk-On Football Players Litig.*,
398 F. Supp. 2d 1144 (W.D. Wash. 2005) ........................................................................ 22

*Newcal Indus., Inc. v. Ikon Office Sol.*,
513 F.3d 1038 (9th Cir. 2008) ........................................................................................... 7

*In re Nexium (Esomeprazole) Antitrust Litig.*,
968 F. Supp. 2d 367 (D. Mass. 2013) ............................................................................... 16

*In re Nine W. Shoes Antitrust Litig.*,
80 F. Supp. 2d 181 (S.D.N.Y. 2000)................................................................................... 24

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
555 U.S. 438 (2009) ........................................................................................................... 18

*In re Payment Card Interchange Fee and Merch. Disc. Antitrust Litig.*,
__ F. Supp. 3d __, No. 05-MD-1720 (MKB), 2024 WL 1556931 (E.D.N.Y. Apr. 10,
2024) .................................................................................................................................. 18

*Phillips v. Cnty. of Allegheny*,
515 F.3d 224 (3d Cir. 2008) ............................................................................................... 6

*Premier Comp Sols. LLC v. UPMC,*
　163 F. Supp. 3d 268 (W.D. Pa. 2016) ............................................................................. 8

*Rebel Oil Co. v. Atl. Richfield Co.,*
　51 F.3d 1421 (9th Cir. 1995) ...................................................................................12, 13

*Royal Mile Co. v. UPMC,*
　No. 10-1609, 2013 WL 5436925 (W.D. Pa. Sept. 27, 2013) ....................................12, 16

*Sitts v. Dairy Farmers of Am., Inc.,*
　417 F. Supp. 3d 433 (D. Vt. 2019) ...........................................................................15, 16

*SmithKline Corp. v. Eli Lilly & Co.,*
　575 F.2d 1056 (3d Cir. 1978) ...................................................................................12, 21

*Standard Oil Co. of Cal. v. United States,*
　337 U.S. 293 (1949) ...................................................................................................... 18

*Standard Oil Co. v. United States,*
　221 U.S. 1 (1911) .......................................................................................................... 19

*Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.,*
　875 F.2d 1369 (9th Cir. 1989) ........................................................................................ 8

*Todd v. Exxon Corp.,*
　275 F.3d 191 (2d Cir. 2001) .................................................................................. *passim*

*Tops Mkts, Inc. v. Quality Mkts, Inc.,*
　142 F.3d 90 (2d Cir. 1998) ........................................................................................... 13

*Tugboat, Inc. v. Mobile Towing Co.,*
　534 F.2d 1172 (5th Cir. 1976) ...................................................................................... 22

*Turner v. McDonald's USA, LLC,*
　No. 19 C 5524, 2020 WL 3044086 (N.D. Ill. Apr. 24, 2020) .................................22, 23

*United States v. Am. Tobacco Co.,*
　221 U.S. 106 (1911) ...................................................................................................... 19

*United States v. Dentsply Int'l, Inc.,*
　399 F3d 181 (3d Cir. 2005) ................................................................................ 18, 20, 21

*United States v. Google LLC,*
　No. 20-CV-3010 (APM), 2024 WL 3647498 (D.D.C. Aug. 5, 2024) .......................12, 20

*United States v. Grinnell Corp.,*
　384 U.S. 563 (1966) ................................................................................................17, 19

*United States v. Microsoft Corp.,*
　253 F.3d 34 (D.C. Cir. 2001) ........................................................................................ 21

*Valley Liquors, Inc. v. Renfield Importers, Ltd.*,
822 F.2d 656 (7th Cir. 1987) ................................................................................. 16

*W. Penn Allegheny Health Sys., Inc. v. UPMC*,
627 F.3d 85 (3d Cir. 2010) ......................................................... 6, 7, 18, 25

*Weiss v. York Hosp.*,
745 F.2d 786 (3d Cir. 1984) ............................................................................... 9

*Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co., Inc.*,
549 U.S. 312 (2007) ............................................................................... 1, 12

*ZF Meritor, LLC v. Eaton Corp.*,
696 F.3d 254 (3d Cir. 2012) ............................................................................. 20

**Federal Statutes**

15 U.S.C. § 2 ....................................................................................... *passim*

15 U.S.C. § 15b ........................................................................................... 23

**Rules**

Fed. R. Civ. P. 8 .................................................................................. 6, 23, 24

Fed. R. Civ. P. 12 ................................................................................. *passim*

**Other Authorities**

Areeda & Hovenkamp, 3 Antitrust Law 701b ............................................... 19

Blair & Harrison, *Antitrust Policy and Monopsony*, 76 Cornell L.Rev. 297 (1991) ....................... 1

Ioana Elena Marinescu and Eric A. Posner, SSRN, Why Has Antitrust Law Failed Workers?
(Feb. 14, 2019), https://ssrn.com/abstract=3335174 (accessed Aug. 19, 2024) ............ 12

Roger D. Blair Jeffrey, *Antitrust Policy and Monopsony*, 76 Cornell L. Rev. 297, 322 (1991) ...................... 13

SEIU, OP-ED: Washington can do better than UPMC (Sep. 19, 2023),
https://seiuhcpa.org/op-ed-washington-can-do-better-than-upmc/ (accessed Aug. 18,
2024) ................................................................................................. 14

## I.       **INTRODUCTION**

Plaintiffs' First Amended Complaint (the "Complaint")[1] states plausible antitrust claims against University of Pittsburgh Medical Center ("UPMC") under Section 2 of the Sherman Act. It is hard to imagine a complaint having more robust allegations pre-discovery. The Complaint lays out how UPMC acquired monopsony power through a series of mergers, acquisitions, consolidations, and facility shutdowns; sets forth direct and circumstantial evidence of UPMC's employment market power, including exclusionary conduct such as maintaining a do-not-hire blacklist and suppressing labor organizing efforts; and explains how this conduct was designed to have, and has resulted in, anticompetitive effects, such as suppressing compensation and career opportunities for Plaintiffs and the Class of similarly-situated Skilled Healthcare Workers. *See* fn.4, & § III.A(1), *infra* (describing Skilled Healthcare Workers' unique attributes).

But Plaintiffs offer more. In addition to Plaintiffs' detailed factual allegations of UPMC's monopsonistic conduct, Plaintiffs also offer citations to academic articles and economic analyses that bolster their allegations regarding the relevant geographic market where UPMC possesses monopoly power for the provision of inpatient hospital services (the output market) and, importantly, where UPMC possesses monopsony power over the employment of Skilled Healthcare Workers (the input market) and the anticompetitive effects resulting therefrom.[2] Plaintiffs also cite to an independent empirical study specifically of UPMC's operations conducted by Econ One Research, a prominent economic research and consulting firm, that found UPMC's campaign of expanding its market dominance by acquiring competitors resulted in increased market concentration and, in turn, had an adverse and statistically significant negative impact on wages within the relevant geographic market on Skilled Healthcare Workers employed by UPMC.

---

[1] ECF 31. Citations to "¶" herein refer to paragraphs in the Complaint. Capitalized terms have the same meaning as set forth in the Complaint, unless otherwise defined herein.

[2] "Monopsony power is market power on the buy side of a market." Blair & Harrison, *Antitrust Policy and Monopsony*, 76 Cornell L.Rev. 297 (1991). "As such, a monopsony is to the buy side of the market what a monopoly is to the sell side and is sometimes colloquially called a 'buyer's monopoly.'" *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co., Inc.*, 549 U.S. 312, 320 (2007).

UPMC's Motion to Dismiss[3] main quibble with the Complaint is really a challenge to the weight of the allegations on the merits. But, when deciding a Rule 12 motion, the Court's task is not to weigh inferences—all inferences must be drawn in Plaintiffs' favor. At this time, the inquiry the Court must undertake is determining whether Plaintiffs' claims are plausible, not whether Plaintiffs will ultimately prevail. UPMC's attack on the merits of the Econ One study as "one sided," "non-peer reviewed," and "fundamentally flawed" is emblematic of the Motion's faults—UPMC's argument that the study should not be credited is inappropriate for a motion to dismiss. UPMC's attempt to discredit Plaintiffs' allegations of UPMC's exclusionary conduct fares no better. Plaintiffs have adequately alleged that UPMC intentionally acquired and maintained monopsony power over the employment of Skilled Healthcare Workers and that UPMC exploited that power to artificially suppress wages. While UPMC may eventually offer its own version of the facts, either to a jury or to this Court at summary judgment, Plaintiffs' allegations must be taken as true in assessing the adequacy of the Complaint under Rule 12. UPMC's Motion must be denied.

## II.   <u>RELEVANT FACTUAL BACKGROUND</u>

### A.   **Background**

UPMC is the largest private sector employer in Pennsylvania with over 95,000 workers and over $26 billion in annual revenue. ¶¶5, 69, 118. Rather than entering new markets by competing, UPMC became the dominant inpatient hospital services provider (and employer of Skilled Healthcare Workers)[4] by way of a series of anticompetitive mergers and acquisitions of existing hospitals, thereby expanding its monopoly geographically without having to face competition, and by facility shutdowns

---

[3] Defendant's Motion to Dismiss Under Federal Rule of Civil Procedure 12(b)(6) (ECF 36) is referred to herein as the "Motion" or "Motion to Dismiss" or "MTD". Defendant's Brief in Support of its MTD (ECF 40) is referred to herein as "Br."

[4] "'Skilled Healthcare Workers' is defined . . . as workers who possess specialized inpatient hospital skills or qualifications that they have obtained as a result of either formal education and training or as the result of extensive on-the-job training and includes, without limitation, licensed practical nurses (LPNs), Nurses, Medical Assistants, registered nurses (RNs), Nurse Assistants, Orderlies, and Pharmacy workers." Compl., n.1. As discussed, *infra*, the Complaint contains allegations explaining who these employees are, why they differ from other employees, and why the inpatient hospital setting is unique. ¶¶8, 56–64, 91–92, 99, 120–125, 161.

that helped it consolidate its market power. ¶¶62–90, 124–134. Between 1996 and 2018 UPMC acquired approximately 28 competitor healthcare providers in order to expand its footprint. ¶¶62–90. At the same time that UPMC was acquiring competitors in order to expand its market power, it was also reducing the availability of healthcare services within the Relevant Market. *Id.* During the same period that it acquired 28 competitors, it also closed four hospitals and downsized three others, eliminating 353 beds and 1,367 full-time and 433 part-time healthcare jobs. *Id.* The result of UPMC's anticompetitive conduct was that the communities where UPMC's hospitals are located saw a reduction in healthcare quality and outcomes, and, importantly, a reduction in healthcare employment opportunities. *Id.*; *see also* ¶¶6, 7 10, 11, 99–102.

### B.   UPMC's Acquisition of Market and Monopsony Power

UPMC's current operations include forty (40) academic, community and specialty hospitals located within the Relevant Market with over 8,800 beds.[5] ¶68. The Complaint alleges that UPMC's rise to dominance was not due to superior business acumen or historic accident, instead it was the result of a series of strategic anticompetitive acquisitions of competitor healthcare systems in geographically contiguous regions that allowed it to systematically reinforce and expand its market power. ¶¶10-61, 72, 76-90. UPMC's strategy of hospital consolidation throughout the Relevant Market began in the 1990s and continued through the 2000s. ¶¶74, 76-90. The result of these acquisitions and consolidation is that UPMC acquired monopsony power in the Relevant Market. ¶¶68–69, 76-90; *see also* ¶72 n.18.

UPMC possesses monopsony levels of control over inpatient hospital workers (including Skilled Healthcare Workers) in the Relevant Market. For example, in Allegheny County, UPMC employs approximately 67% of the hospital employees and controls 60% of licensed hospital beds. ¶¶67, 91-102. In Pittsburgh, UPMC employs 76% of hospital employees and controls roughly 71% of

---

[5] In addition to operating 40 hospitals providing inpatient care, the Complaint also alleges that UPMC itself also operates many non-hospital healthcare facilities in the regions comprising the relevant geographic market that are not part of the hospital labor market. ¶68 (UPMC operates more than 60 cancer centers, 12 Senior Communities, etc.).

all licensed hospital beds. ¶67. A review of UPMC's market share by ZIP code shows that UPMC's market share exceeds 50% in all six regions comprising the Relevant Market. ¶¶72–73. Further, most of the hospital markets in the regions where UPMC operates are considered "highly concentrated" using the Herfindahl-Hirschman Index (HHI), a metric used by antitrust enforcers to determine if a market is susceptible to monopolization. ¶¶53, 96–98.

UPMC also used its market power to engage in additional anticompetitive conduct intended to drive existing competitors out of the Relevant Market (¶¶62-90; 103-116) or to keep potential competitors from entering the Relevant Market (¶111). For example, the Complaint alleges how UPMC coerced insurers to enter into exclusive dealing agreements with UPMC to prevent them from offering to cover comparable medical services performed by competing hospitals. ¶106. Conversely, UPMC has also been accused of refusing to deal with health insurance provider Highmark to protect its market power. ¶¶109–110, 112–13. In February 2019, former Attorney General Josh Shapiro filed a petition to intervene in the UPMC and Highmark action to protect Pennsylvanians from UPMC's "corporate greed." ¶115.

### C.      UPMC Used its Monopsony Power to Depress Wages

Plaintiffs allege evidence of actual suppression of wages as a result of UPMC's exercise of monopsony power. Plaintiffs cite to independent research conducted by Econ One, an independent economic research firm, and their conclusion that UPMC's campaign of acquiring dominant market share in new regions by acquiring competitors resulted in increased market concentration and decreased wages for Skilled Healthcare Workers. ¶¶117-128. Econ One's analysis found that UPMC was able to impose a significant $1,289.60 annual "wage penalty" on UPMC nurses when compared to nurses who worked at hospitals in comparator markets unaffected by UPMC's conduct. ¶¶122–123.

In addition, Plaintiffs reference academic research explaining that this result is precisely what is to be expected when a hospital provider like UPMC monopsonizes and abuses its monopsony power. Professors Elena Prager and Matt Schmitt have done research and published articles finding

that hospital consolidations and mergers lead to depressed healthcare industry wage growth. ¶¶52, 58, 120. In addition, a 2012 Robert Woods Johnson Foundation study found that hospital consolidation and concentration that reduced competition also negatively affected hospital workers. ¶54. Indeed, studies reaching back to the 1970s have shown decreased wages for nurses working in markets with high market concentrations. ¶55.

### D.     UPMC Used its Monopsony Power to Degrade Working Conditions

In addition to its "wage penalty," UPMC also imposed onerous terms of employment on its Skilled Healthcare Workers in order to maximize its profitability, requiring them to do more work without additional pay. ¶¶129–38. A hospital's staffing ratios (*i.e.*, the number of staff per patient) measure the labor purchased by a hospital relative to the demand for its services. ¶133. As part of its anticompetitive scheme, UPMC required its nurses to care for more patients without providing additional pay. ¶131. Thus, as UPMC's market power increased, it decreased its staffing ratios when compared with hospital systems in other markets. ¶¶134–36. The result is that UPMC pays its Skilled Healthcare Workers less than comparable hospitals while requiring them to do more work. ¶137.

UPMC also imposes restrictions on Skilled Healthcare Workers to minimize their ability to demand better working conditions, to prevent them from seeking alternative comparable employment opportunities, and to inhibit them from being able to negotiate better working conditions from UPMC. ¶¶139-149. These restrictions include: (1) enforcing a system-wide salary structure, preventing workers from being able to negotiate for higher pay by taking a job at a different UPMC facility, ¶142; (2) employing a do-not-rehire blacklist policy that would punish any employee who dared to leave UPMC to take a position at a competing facility, ¶143;[6] and (3) imposing restrictions such as Tuition Assistance Programs (otherwise known as "TRAP" or "Training Repayment Agreement Programs") that would saddle employees with onerous debt obligations if they were to leave UPMC employment,

---

[6] UPMC misstates the purpose of imposing this restriction, which was to inhibit current UPMC employees from leaving UPMC, not to prevent UPMC from rehiring former employees when it was in UPMC's best interest. ¶145. Accordingly, the *in terrorem* effect of this policy worked to prevent workers from leaving. ¶¶146-47.

¶¶150-157. Labor experts and the FTC have also noted that TRAP policies such as the one used by UPMC act as functional non-compete clauses—*i.e.*, they disincentivize workers from leaving UPMC. ¶153.

Finally, UPMC aggressively suppresses and stifles efforts by workers to organize. ¶¶158-167. The ability of workers to organize and form a labor union is a way for workers to limit an employer's market power. ¶158-167. Suppression of that ability, as UPMC has done, exacerbates an employer's monopsony power. ¶160. UPMC has been able to prevent the formation of unions at almost all of its facilities by engaging in employee surveillance, harassment, intimidation, and if necessary, termination. ¶¶163–164. UPMC's union-busting activities are evidenced by the fact that it has faced 133 unfair labor practice charges since 2012 including 159 separate allegations. ¶¶165–166. Approximately 74% of those violations related to UPMC attempting to prevent workers from unionizing. ¶165.

## III.   ARGUMENT

"[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations[.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Rule 8(a) requires only a "short and plain statement" of facts supporting a claim. Fed. R. Civ. P. 8(a). *See Twombly*, 550 U.S. at 569 n.14, 570. There is no heightened pleading standard in antitrust cases. *See W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 98 (3d Cir. 2010).

When deciding a Rule 12 motion to dismiss, the court must accept as true "all factual allegations in the complaint and draw all inferences from the facts alleged in the light most favorable to [Plaintiffs]." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008). The court examines the allegations for *plausibility* to "'determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief.'" *In re Lipitor Antitrust Litig.*, 868 F.3d 231, 249 (3d Cir. 2017) (quoting *Bronowicz v. Allegheny County*, 804 F.3d 338, 344 (3d Cir. 2015) (internal citation omitted)). At the pleading stage, Plaintiffs need not show that they will prevail at the end, "but only whether [they] should be entitled to offer evidence to support the claim." *Butterbaugh v. Chertoff*, 479 F. Supp. 2d 485, 489–490 (W.D. Pa. 2007). "A claim warrants dismissal only if it is clear that relief would not be

available under any set of facts that could be proved consistent with the allegations." *Id*. Furthermore, the allegations should be evaluated holistically, not piecemeal. *See Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962).

Plaintiffs allege all the elements of a Section 2 claim. Plaintiffs define the contours of the relevant markets, both the product (or more accurately, services) market and the geographic market. Plaintiffs also set forth both direct and circumstantial evidence of UPMC's monopsony power. Plaintiffs further set forth allegations of UPMC's exclusionary conduct and the anticompetitive effects flowing therefrom. Finally, Plaintiffs include allegations explaining how UPMC concealed its anticompetitive intent and most of its illegal conduct, while continuing to violate the antitrust laws (*i.e.*, by underpaying Skilled Healthcare Workers). Plaintiffs' Complaint passes muster.[7]

### A.  Plaintiffs Properly Allege the Relevant Markets

To properly allege a relevant market, a plaintiff must plead "both a relevant geographic and a relevant product market." *Lifewatch Servs. Inc. v. Highmark Inc.*, 902 F.3d 323, 337 (3d Cir. 2018). As the Third Circuit has recognized, "courts are cautious before dismissing for failure to define a relevant market." *Id.*; *see also Todd v. Exxon Corp.*, 275 F.3d 191, 202 (2d Cir. 2001) ("There is a danger in applying these factors mechanically in the context of monopsony or oligopsony."). Accordingly, "[b]ecause market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market." *Todd*, 275 F.3d at 199–200. Indeed, "[t]here is no requirement that [relevant markets] be pled with specificity." *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008). Because this is a monopsony case, the analysis should proceed from the seller's viewpoint with the relevant "'market [being] comprised of buyers [*i.e.*, employers]

---

[7] UPMC does not separately challenge Plaintiffs' attempted monopolization/monopsonization claim. Establishing attempted monopolization is a lower threshold than monopolization, the key distinction being that for attempted monopolization, in addition to showing specific intent, a plaintiff need only show that there is "a dangerous probability of achieving monopoly power" rather than actually achieving monopoly power. *See W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 108 (3d Cir. 2010). Given that Plaintiffs adequately pled monopolization, it follows that Plaintiffs have adequately pled a dangerous probability of monopolization. *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 453 (4th Cir. 2011).

who are seen by sellers [*i.e.*, Skilled Healthcare Workers] as being reasonably good substitutes.'" *Lifewatch Servs.*, 902 F.3d at 337 (quoting *Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111, 1118 (10th Cir. 2008)); *see also Todd*, 275 F.3d at 203 ("At issue is the interchangeability, from the perspective of an MPT employee, of a job opportunity in the oil industry with, for example, one in the pharmaceutical industry.").

As the Third Circuit has explained "'in most cases, proper market definition can be determined only after a factual inquiry into the commercial realities faced by . . . sellers, in [monopsony cases].'" *Lifewatch Servs.*, 902 F.3d at 337 (quoting *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997)); *accord Multiple Energy Techs., LLC v. Under Armour, Inc.*, No. 2:20-CV-664-NR, 2022 WL 345059, at *1 (W.D. Pa. Feb. 4, 2022) (same); *see also Todd*, 275 F.3d at 199–200 (collecting cases). That is why "absent some obvious oversight in the pleadings, 'courts are cautious before dismissing for failure to define a relevant market.'" *Mayor and City Council of Baltimore v. Merck Sharp & Dohme Corp.*, No. CV 23-828, 2023 WL 8018980, at *8 (E.D. Pa. Nov. 20, 2023) (quoting *Lifewatch Servs. Inc.*, 902 F.3d at 337) (internal citation omitted); *see also Premier Comp Sols. LLC v. UPMC*, 163 F. Supp. 3d 268, 278 (W.D. Pa. 2016). Nonetheless UPMC challenges Plaintiffs' well-pleaded product (or services) market, and geographic market. Br. at 8–13. In so doing, UPMC argues that Plaintiffs' markets, as alleged, are simultaneously too broad and too narrow. As explained below, this is wrong.

### 1.   Plaintiffs Have Alleged a Relevant Product (or Service) Market

"[A] product market is typically defined to include the pool of goods or services that qualify as economic substitutes because they enjoy reasonable interchangeability of use and cross-elasticity of demand." *Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1374 (9th Cir. 1989). Antitrust labor markets can be industry specific, even where the class of affected employees within the industry possess varied skills. *Todd*, 275 F.2d at 202–05. Plaintiffs have alleged a product market of Skilled Healthcare Workers who are employed at inpatient hospitals. The proposed class of Skilled Healthcare Workers is well-defined in the Complaint with objective criteria. *See* Compl. at n.1. This class of employees is defined to include employees who have particularized training or qualifications that

makes them particularly valuable for an inpatient hospital setting. *Id.*; *see also* ¶¶8, 56, 64. The Complaint sets forth seven (7) specific job descriptions—licensed practical nurses (LPNs), Nurses, Medical Assistants, registered nurses (RNs), Nurse Assistants, Orderlies, and Pharmacy workers— each of whom possess specific inpatient hospital skills that collectively comprise the category of Skilled Healthcare Workers. *Id.*; *see also* ¶¶120–125, 161. The Complaint also sets forth other hospital job descriptions (*e.g.*, kitchen workers and housekeepers) that are not Skilled Healthcare Workers. *E.g.*, ¶¶8, 56, 64.

The Complaint describes how Skilled Healthcare Workers possess specialized skills that are less valuable outside of the hospital setting. *E.g.*, ¶¶56, 91, 92, 99. Plaintiffs' defined services market is also supported by empirical studies referenced in the Complaint. ¶¶58, 119–128; *see also Lifewatch Servs., 902 F.3d at 338* (noting plaintiff's reliance on a study to support the relevant market). Further, Plaintiffs' services market is akin to antitrust markets recognized by other federal courts, including the Third Circuit. *See, e.g., Weiss v. York Hosp., 745 F.2d 786, 825–27 (3d Cir. 1984)* (determining "inpatient hospital health care services supplied by hospitals and their medical staffs" as a relevant antitrust market); *Clarke v. Baptist Mem'l Healthcare Corp., No. 06-2377 MA/V, 2007 WL 9870961, at *9–11 (W.D. Tenn. May 17, 2007)* (accepting nurses' allegations that employment in hospital was different than employment outside of the hospital setting). Plaintiffs have "alleged specific facts that support a narrow product market in a way that is plausible and bears a rational relation to the methodology courts prescribe to define a market for antitrust purposes." *Todd, 275 F.3d at 203*; *see also Giordano v. Saks Inc., 654 F. Supp. 3d 174, 206 (E.D.N.Y. 2023)* (finding plaintiffs alleged a relevant product market for employees who "have specialized skills and training"); *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc., No. 17CV205-MMA (MDD), 2018 WL 3032552, at *19 (S.D. Cal. June 19, 2018)*.

UPMC's attempted challenge to the precise parameters of the proposed class of Skilled Healthcare Workers is not a basis to dismiss at this juncture. *See Todd, 275 F.3d at 202 n.5* (differences in jobs "does not indicate that plaintiff fails to state a claim upon which relief can be granted"). UPMC's challenge is little more than a claim that any such market should be broader and include "doctors' offices, ambulatory surgery centers, and many other types of non-hospital healthcare

providers [that] need—and compete for—nurses, medical assistants, and others."[8] Br. at 10. But, as noted above, the question to be addressed later will be, from the perspective of Skilled Healthcare Workers, whether those employers' jobs are a reasonable substitute for their inpatient hospital employment. *See Todd, 275 F.3d at 202; see also Lifewatch Servs., 902 F.3d at 337.* Accepting the Complaint's allegations as true, they are not. ¶¶56, 91–92. While surely a surgical nurse or hospital pharmacist may find work in a high school or local pharmacy, that does not make them appropriate substitutes for inpatient hospital work, which requires specialized skills and training. *See, e.g., Todd, 275 F.3d at 203* ("[P]laintiff's point is hardly counter-intuitive. It is consistent with common sense and empirical research that employees' industry-specific experience may cause them to suffer a pay cut if forced to switch industries."); *Clarke, 2007 WL 9870961, at \*9–11.*

### 2.  Plaintiffs Plausibly Allege a Geographic Market Consisting of Regions Where UPMC Operates Hospitals

The relevant geographic market in a labor monopsony case like this is the geographic boundaries of where workers would reasonably seek alternative employment. *See Hanover 3201 Realty, LLC v. Village Supermarkets, Inc., 806 F.3d 162, 183–84 (3d Cir. 2015).* A geographic market "may be local, regional, national or international in origin." *In re Mushroom Direct Purchaser Antitrust Litig., 514 F. Supp. 2d 683, 697 (E.D. Pa. 2007); see also Brown Shoe Co. v. United States, 370 U.S. 294, 337 (1962).* The relevant geographic market is also typically unable to be determined on a motion to dismiss because

---

[8] The cases cited by UPMC are inapposite. *See, e.g., Cable Line, Inc. v. Comcast Cable Commc'ns of Pa. Inc., 767 F. App'x 348, 351-52 (3d Cir. 2019)* (plaintiffs had not invoked Section 2 monopsony claim until reply brief on appeal and never alleged market power in a relevant market); *Eichorn v. AT & T Corp., 248 F.3d 131, 136, 139, 147-48 (3d Cir. 2001), as amended (June 12, 2001)* (reviewing market definition on a motion for summary judgement); *Molinari v. Consol. Energy Inc., No. 12CV1085, 2012 WL 5932979, at \*6 (W.D. Pa. Nov. 27, 2012)* (addressing claims where the market was comprised of a single entity unlike here where all inpatient hospitals in the relevant geographic market are part of the market). In addition, UPMC's citation to a book cited by Plaintiffs is for the sole (and inappropriate) purpose of offering a different factual interpretation of the material. Br. at 10 (citing DONALD E. YETT, AN ECONOMIC ANALYSIS OF THE NURSE SHORTAGE 190-191 (Lexington Books 1975)); *Graham v. Cent. Garden & Pet Co., No. 22-CV-06507-JSC, 2023 WL 2744391, at \*2 (N.D. Cal. Mar. 30, 2023)* ("Defendant's interpretation of the studies requires the Court to draw inferences in its favor, whereas the Court must draw all reasonable inferences in Plaintiff's favor at the motion to dismiss stage.") (citations omitted).

it too "is a question of fact to be determined in the context of each case in acknowledgment of the commercial realities of the industry under consideration." *Borough of Lansdale v. Phila. Elec. Co.*, 692 F.2d 307, 311 (3d Cir. 1982); *see also Ecker v. Williamsport Hosp.*, No. 1:16-CV-00693, 2016 WL 8200436, at *6 (M.D. Pa. Oct. 7, 2016); *In re Mushroom Direct Purchaser Antitrust Litig.*, 514 F. Supp. 2d at 696–97.

Here, Plaintiffs allege a geographic market comprised of six contiguous geographic regions located in Central and Western Pennsylvania and "adjacent portions of Ohio, Southwestern New York, Northwestern Maryland, and West Virginia." ¶71. As alleged, the geographic scope of the Relevant Market is limited by the distance in which Skilled Healthcare Workers are willing to commute or relocate. This is an objective metric that has also withstood Rule 12 muster in other labor antitrust cases. *Clarke*, 2007 WL 9870961, at *2 (plaintiffs alleged that nurses "often are constrained from moving between geographic areas because of region-specific licensing requirements, professional obligations, and family obligations"). Plaintiffs' allegations are further corroborated by expert analyses also cited by Plaintiffs in their Complaint. ¶¶121–127 & n.22; *see also Lifewatch Servs.*, 902 F.3d at 338 (noting plaintiff's reliance on a study to support the relevant market).

UPMC advances arguments that amount to little more than an effort to prematurely raise factual issues regarding the Relevant Market as alleged by Plaintiffs. Br. at 10–13. To be clear, the Relevant Market is not limited to UPMC facilities, it includes all inpatient hospitals in the Relevant Market. The scope of the Relevant Market overlaps with UPMC's geographic footprint, because, as discussed above, UPMC has grown outward, becoming the dominant player in each region, simply by acquiring their potential competitors. Plaintiffs likely could have alleged each region as a separate market or submarket but, in light of the commercial realties, including UPMC's treatment of the six-region area as one market, Plaintiffs alleged a single geographic market comprised of six regions. *E.g.*, ¶¶141–42. UPMC's suggestion that jobs outside of the Relevant Market may be substitutes (Br. at 12) also misses the mark because it misconstrues the point of view from which substitutes must be determined—i.e., it is what the employee perceives as substitutes that matters. UPMC's remaining challenges are fact-specific inquiries that are also not appropriate for a motion to dismiss. Br. at 12; *see also Hanover 3201 Realty, LLC*, 806 F.3d at 183–84.

**B.     Plaintiffs Adequately Allege Monopoly Power in the Hospital Services Output Market and Monopsony Power in the Relevant Market**

Besides market definition, Plaintiffs have also made out the other elements of a Section 2 claim. Market power in a relevant market is the first element of a Section 2 claim.[9] "The Supreme Court has defined monopoly power as 'the power to control prices or exclude competition.'" *SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056, 1065 (3d Cir. 1978) (citing *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956)). "Monopsony power is market power on the buy side of the market." *Weyerhaeuser Co.* 549 U.S. at 320 (citations omitted); *Le v. Zuffa, LLC*, 216 F. Supp. 3d 1154, 1163 (D. Nev. 2016). "[T]he Supreme Court has made clear . . . that because antitrust law operates to correct all distortions of competition, it condemns market actors who distort competition, whether on the buyer side or seller side." *Id.* at 1163 (quoting *California v. Safeway, Inc.*, 651 F.3d 1118, 1161 (9th Cir. 2011)). In the context of labor markets, "[e]mployers with monopsony power . . . can suppress wages (and degrade working conditions) in order to save labor costs."[10] Market power may be demonstrated through "direct evidence of the injurious exercise of market power" or "circumstantial evidence pertaining to the structure of the market." *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995).

"[T]he material consideration in determining whether a monopoly exists is not that prices are raised and that competition is actually excluded but that *power exists* to raise prices or exclude competition when it is desired to do so." *United States v. Google LLC*, No. 20-CV-3010 (APM), 2024 WL 3647498, at *74 (D.D.C. Aug. 5, 2024) (quoting *Am. Tobacco Co. v. United States*, 328 U.S. 781, 811 (1946)); *see also id.* ("It is not necessary that the power thus obtained should be exercised. Its existence is sufficient."). Such determination requires "full consideration of the relationship between market

---

[9] *See Royal Mile Co. v. UPMC*, No. 10-1609, 2013 WL 5436925, at *29 (W.D. Pa. Sept. 27, 2013) ("To state a claim for monopolization, a plaintiff must allege '(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historical accident.'") (quoting *Schuylkill Energy Res., Inc. v. Penn. Power & Light Co.*, 113 F.3d 405, 412–13 (3d Cir. 1997)).

[10] Ioana Elena Marinescu and Eric A. Posner, SSRN, Why Has Antitrust Law Failed Workers? (Feb. 14, 2019), https://ssrn.com/abstract=3335174 (accessed Aug. 19, 2024), at 6.

share and other relevant market characteristics." *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 98 (2d Cir. 1998). As such, at the motion to dismiss stage, "[d]ismissals for insufficient pleading of market power are rare pre-discovery and are generally reserved for complaints bereft of factual allegations or which contain market share or market power allegations that are purely conclusory." *Allen v. Dairy Farmers of Am., Inc.*, 748 F. Supp. 2d 323, 340 (D. Vt. 2010) (citations omitted).

Here, Plaintiffs plausibly allege detailed facts which, taken as true, are both direct and circumstantial evidence of UPMC's monopoly power in the Hospital Services Output Market and its monopsony power in the Relevant Market.[11]

> **1.    Direct Evidence of Market Power: UPMC Controlled Demand and Paid Skilled Healthcare Workers Subcompetitive Wages**

"If the plaintiff puts forth evidence of restricted output and supracompetitive prices, that is direct proof of the injury to competition which a competitor with market power may inflict, and thus, of the actual exercise of market power." *Rebel Oil*, 51 F.3d at 1434 (citation omitted); *cf. Todd*, 275 F.3d at 206 ("If a plaintiff can show that a defendant's conduct exerted an actual adverse effect on competition, this is a strong indicator of market power."). This is one of those "rare" cases where direct evidence of market power is available. *Mylan Pharms. Inc. v. Warner Chilcott Pub. Ltd. Co.*, 838 F.3d 421 (3d Cir. 2016). Indeed, Plaintiffs plausibly allege direct evidence of monopoly and monopsony power, including without limitation that UPMC (1) artificially depressed wages, and (2) controlled demand for Skilled Healthcare Worker employment in the Relevant Market by increasing workloads and restricting output in the Hospital Services Output Market. *See Rebel Oil*, 51 F.3d at 1434; *Todd*, 275 F.3d at 206 (defining monopsony power in labor context as "defendants' *ability* to depress salaries") (emphasis added); *Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111, 1118 (10th Cir. 2008).

But Plaintiffs allege more than monopsony power. Plaintiffs' plausible allegations of UPMC's

---

[11] While Plaintiffs adequately allege monopoly power in the Hospital Services Output Market, strictly speaking that is not necessary to support Plaintiffs' monopsonization claims. *See* Roger D. Blair Jeffrey, *Antitrust Policy and Monopsony*, 76 Cornell L. Rev. 297, 322 (1991) ("A series of horizontal mergers among firms that buy the same inputs may lead to a case of pure monopsony. In other instances, the merger may result in a dominant firm in a market with several smaller or fringe buyers. In both cases, the merger-to-monopsony need not involve monopoly in the output market.").

monopoly power is itself evidence of UPMC's monopsony power. *Le v. Zuffa, LLC*, No. 215CV01045RFBBNW, 2024 WL 195994, at *6 (D. Nev. Jan. 18, 2024) (denying summary judgment where plaintiffs "us[ed] evidence of monopoly power as evidence of monopsony power and anticompetitive effects"). Plaintiffs detail how UPMC's strategy was to expand outward across Pennsylvania and into neighboring states, obtaining market power in the Hospital Services Output Market not by skill or by a superior product, but by acquiring and shutting down competitors. *E.g.*, ¶¶6, 71–90. 99–100.[12] Plaintiffs further allege that during the same period, "UPMC closed four hospitals and downsized three others, eliminating 353 beds and 1,367 full-time and 433 part-time healthcare service jobs." ¶6; *see also id.*, ¶¶77, 84–90. Further, Plaintiffs connect UPMC's restriction of output to both higher costs for the public and lower wages for Skilled Healthcare Workers. ¶¶61, 102. Because the relevant labor market for Skilled Healthcare Workers is comprised of all inpatient hospitals within the same geographic region, market power in the Hospital Services Output Market reflects market power in the input market (the hospital labor market). *E.g.*, ¶¶56–75, 117–28. This inference is also supported by the close correlation between increased hospital concentration and decreased hospital wages. *E.g.*, ¶¶54–55, 121–27; *see also Lifewatch Servs.*, 902 F.3d at 338. Accepting Plaintiffs' allegations as true, "these facts describe a monopsony." *Campfield*, 532 F.3d at 1118.

UPMC's arguments to the contrary are unavailing.[13] UPMC attempts to discredit Plaintiffs' allegations by casting doubt on their merit. But at the Rule 12 stage, the Court's task is not to weigh

---

[12] In June 2024, not long after Plaintiffs filed the Amended Complaint, UPMC acquired the financially struggling Washington Health System despite fears raised by SEIU that "UPMC will blow smoke about what they will do for [the community], then do the opposite." SEIU, OP-ED: Washington can do better than UPMC (Sep. 19, 2023), https://seiuhcpa.org/op-ed-washington-can-do-better-than-upmc/ (accessed Aug. 18, 2024). As discussed below, UPMC's ongoing acquisitive conduct is a continuing violation of Section 2. *See infra*, Section III.D.

[13] UPMC incorrectly argues that Plaintiffs must provide "an analysis of the defendant's costs" and allegations "that the defendant had an abnormally high price-cost margin" in addition to direct evidence of restricted output. Br. at 14 (quoting *Carpenter Tech. Corp. v. Allegheny Techs. Inc.*, No. 08–2907, 2011 WL 4528303, at *12 (E.D. Pa. Sept. 30, 2011)). That is not the standard. Plaintiffs need only plausibly allege direct evidence market power, which they have done. Furthermore, UPMC's reliance on cases decided at summary judgment is misplaced because those cases were decided after fact and expert discovery. *See Carpenter Tech*, 2011 WL 4528303 at *7-8; *Mylan*, 838 F.3d 421 at 440 (noting that the case had "proceeded through full discovery and resulted in a robust record").

competing inferences—all reasonable inferences must go in favor of Plaintiffs. For instance, UPMC argues that its "elimination of positions would make it *easier* for competitors to hire labor." Br. at 18. This argument is not only misplaced, it is premature. *In re eBay Seller Antitrust Litig.*, 545 F. Supp. 2d 1027, 1033 (N.D. Cal. 2008) ("A procompetitive benefit may rebut a *prima facie* case. However, to survive dismissal Plaintiffs are required only to establish a *prima facie* case."). Further, UPMC purports to attack the quality of the economic analysis cited by Plaintiffs to allege direct evidence that UPMC wages fell as the Hospital Services Output Market became more concentrated and UPMC's market share increased. Br. at 15. UPMC alleges that the study "suggests UPMC does *not* have the power to exclude competing employers and suppress wages everywhere it owns a hospital" and claims that "[t]his is obvious given the allegation that UPMC's share of licensed beds in several locations is under 20%." *Id.* But there is no authority for dismissing a complaint at the pleading stage based on a *defendant's* allegation regarding market share. *See Allen*, 748 F. Supp. 2d at 340–41 (holding that "[c]ertainly there is no authority for dismissing a complaint at the pleading stage based upon [defendant's] approach of simply adding up the bottling plants in the relevant geographic market").

### 2. Indirect Evidence of Market Power: UPMC's Dominant Market Share Is Protected by High Barriers to Entry

To demonstrate market power circumstantially, a plaintiff must show that the defendant has a dominant share in a relevant market, and that there are significant barriers to entry. *See Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 (3d Cir. 2007); *cf. Graco Inc. v. PMC Glob., Inc.*, No. CIV.A. 08-1304, 2012 WL 762448 (D.N.J. Mar. 6, 2012) ("Market power 'may ordinarily be inferred from a predominant share of the relevant market.'") (citation omitted). "[M]arket share in the range of 50% is evidence of monopsony power and 'a party may have [monopsony] power in a particular market, even though its market share is less than 50%.'" *Sitts v. Dairy Farmers of Am., Inc.*, 417 F. Supp. 3d 433, 477 (D. Vt. 2019) (quoting *Hayden Pub. Co. v. Cox Broad. Corp.*, 730 F.2d 64, 69 n.7 (2d Cir. 1984)) (alteration in original).

As set out above, Plaintiffs have alleged direct evidence of UPMC's market power. Accordingly, the Court "need not engage in an extensive analysis of circumstantial evidence of market

power because direct evidence of such power is available." *In re Nexium (Esomeprazole) Antitrust Litig.,* *968 F. Supp. 2d 367, 389 (D. Mass. 2013)*. Nonetheless, Plaintiffs have also alleged circumstantial evidence of UPMC's market power. First, Plaintiffs plausibly allege that UPMC possesses well over 80% market share in five out the eleven statistical areas comprising the Relevant Market—including 100% market share in two areas—and substantially over 50% in three others.[14] ¶¶97–98. These levels are sufficient to establish market dominance. *See, e.g., Royal Mile Co., Inc.,* 2013 WL 5436925, at *30 ("Courts within the Third Circuit have held a defendant has significant market share supporting an inference of monopoly power if the defendant possesses sixty percent or more market share in the relevant market.") (citations omitted); *Sitts,* 417 F. Supp. 3d at 477 (Market share in the range of 50% or less may be sufficient to prove monopsony). UPMC does not dispute this. UPMC instead argues that Plaintiffs' allegations "address the wrong market—the provision of inpatient hospital services."[15] Br. at 14. But UPMC's argument is a red herring, because Plaintiffs are appropriately "using evidence of monopoly power as evidence of monopsony power and anticompetitive effects." *Le,* 2024 WL 195994, at *6. In short, UPMC's "monopoly power plays an explanatory or evidentiary role" with respect to Plaintiffs' monopsony claims. *Id.* at *6 n.10.

Second, Plaintiffs adequately allege high barriers to entry in the Relevant Market. ¶¶103–06, 110. "A barrier to entry is a cost that a new entrant must incur that was not incurred by the incumbent." *In re Ductile Iron Pipe Fittings ("DIPF") Direct Purchaser Antitrust Litig.,* 2013 WL 812143, at *17 (D.N.J. Mar. 5, 2013) (citing *Burlington N. R.R. Co. v. Surface Transp. Bd.,* 114 F.3d 206, 214 (D.C. Cir. 1997) and *L.A. Land Co. v. Brunswick Corp.,* 6 F.3d 1422, 1428 (9th Cir. 1993)). For example,

---

[14] Plaintiffs' allegations of UPMC's 55% market share in the Pittsburgh statistical area (¶97) does not take into account UPMC's recent acquisition of Washington Health System. *See supra,* n.12.

[15] UPMC suggests that Plaintiffs' allegations of less than 20% market share in two statistical areas are insufficient to establish market dominance. *See* Br. at 14. Even in those areas, however, Plaintiffs plausibly allege market dominance given the "special market conditions" of the Relevant Market and "other compelling evidence" of UPMC's market power. *Valley Liquors, Inc. v. Renfield Importers, Ltd.,* 822 F.2d 656, 667 (7th Cir. 1987); *see also id.* (implying that 17% market share is "legally sufficient to sustain a finding of monopolization" and that even lower market shares may suffice with "special market conditions or other compelling evidence of market power") (citation omitted).

Plaintiffs allege that special conditions in the "hospital healthcare market [create] natural barriers to entry including: (1) large capital costs required to construct and to continually maintain and upgrade the hospital; (2) costs of recruiting and paying a large specialized and skilled medical staff; (3) negotiating costs associated with contracting with third-party payors; and (4) and the costs associated with drawing in patients who are already familiar with hospitals in the market." ¶103. UPMC's motion is silent as to these allegations. But Plaintiffs' allegations go beyond the natural barriers to entry, alleging that UPMC "engaged in . . . other anticompetitive tactics aimed at creating additional barriers to entry that prevented the expansion of rival hospital systems and frustrated the entrance of potential additional competitors" including coercing insurers to enter into exclusive dealing agreements with UPMC in order to harm potential competitors. ¶¶105, 106.

UPMC argues that "Plaintiffs do not connect these . . . allegations about healthcare services to any impairment in any labor market."[16] Br. at 21. Also false. Evidence of monopoly power may serve as evidence of monopsony power and anticompetitive effects. *See Le*, 2024 WL 95994, at *6 (denying summary judgment in monopsony case because "monopoly power plays an explanatory or evidentiary role"). Plaintiffs explicitly allege that "UPMC's monopoly power in the Hospital Services Output Market gave it outsized power over health insurers seeking to compete in the six-county Pittsburgh metropolitan area." ¶110. Plaintiffs also allege that "UPMC's anticompetitive conduct had the effect of preserving UPMC's market power and limiting expansion for competitor hospital systems." ¶116. This, in turn, enhanced its monopsony power.

### C.    Plaintiffs Allege Exclusionary Conduct

Plaintiffs sufficiently plead the second element of a Section 2 claim: the willful acquisition of monopoly (or monopsony) power through an exclusionary scheme. *See United States v. Grinnell Corp.*,

---

[16] UPMC also argues that these allegations concern "ancient history" and are "not cognizable here." Br. at 21. These statements misconstrue the purpose of fact pleading.  Here, for example, UPMC's "historic" conduct is relevant at a minimum to prove its intent and its ongoing antitrust violations. *See, e.g., Meijer, Inc. v. 3M*, No. Civ.A. 04-5871, 2005 WL 1660188, at *4 (E.D. Pa. July 13, 2005) (noting that "an unlawful act which took place outside the limitations period but continues to allow the defendant to maintain market control" may be relevant to prove injury).

384 U.S. 563, 570–71 (1966). A defendant engages in anticompetitive conduct when it attempts "to exclude rivals on some basis other than efficiency." *W. Penn Allegheny Health Sys., Inc.*, 627 F.3d at 108; *see also Broadcom,* 501 F.3d at 308 ("Anticompetitive conduct may take a variety of forms, but it is generally defined as conduct to obtain or maintain monopoly power as a result of competition on some basis other than the merits."). "[Exclusionary conduct] may involve a 'course of dealing' that, even if profitable, indicates a 'willingness to forsake short-term profits to achieve an anticompetitive end.'" *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 458 (2009). "[C]ourts must look to the monopolist's conduct taken as a whole rather than considering each aspect in isolation." *LePage's, Inc. v. 3M*, 324 F.3d 141, 162 (3d Cir. 2003); *see also Le*, 216 F. Supp. 3d at 1168 ("[I]t would not be proper to focus on specific individual acts of an accused monopolist while refusing to consider their overall combined effect.") (citation omitted). "Conduct must do more than merely harm competitors, it must harm the competitive process itself." *Miller Indus. Towing Equip. Inc. v. NRC Indus.*, 659 F. Supp. 3d 451, 466 (D.N.J. 2023) (citing *Broadcom Corp.*, 501 F.3d at 308). "[A]nticompetitive conduct may include otherwise *legal* conduct." *Free FreeHand Corp. v. Adobe Sys., Inc.*, 852 F. Supp. 2d 1171, 1180 (N.D. Cal. 2012) (internal quotation marks and citations omitted; italics in original); *United States v. Dentsply Int'l, Inc.*, 399 F3d 181, 187 (3d Cir. 2005) ("Behavior that otherwise might comply with antitrust law may be impermissibly exclusionary when practiced by a monopolist.").

Section 2 liability encompasses "arrangements which, albeit not expressly exclusive, effectively foreclosed the business of competitors." *LePage's,* 324 F.3d at 157. Plaintiffs need only allege exclusionary conduct or anticompetitive effects and are not required to define foreclosure with specificity. *See In re Payment Card Interchange Fee and Merch. Disc. Antitrust Litig.,* ___ F. Supp. 3d ___, No. 05-MD-1720 (MKB), 2024 WL 1556931, at *18 (E.D.N.Y. Apr. 10, 2024). An alleged scheme satisfies Section 2 when "competition has been foreclosed in a substantial share of the line of commerce affected." *Standard Oil Co. of Cal. v. United States,* 337 U.S. 293, 314 (1949); *Dentsply Int'l,* 399 F.3d at 191 ("The test is not total foreclosure, but whether the challenged practices bar a substantial number of rivals or severely restrict the market's ambit.").

Plaintiffs have plausibly alleged UPMC engineered an exclusionary scheme. This scheme

involved: (1) acquiring and eliminating actual or potential rivals in the market for both providing inpatient hospital services and employing Skilled Healthcare Workers; (2) restricting rivals' access to patients by wielding its market power to coerce insurers not to cover services at non-UPMC facilities; (3) locking in Skilled Healthcare Workers perpetually and exclusively for UPMC; and (4) retaliating against employees who dared challenge UPMC's monopsonistic control.

### 1.    Acquisitions

UPMC's anticompetitive scheme included eliminating competition for skilled healthcare workers within the Relevant Market by acquiring them or driving them out of business. *See United States v. Grinnell, Corp.*, 384 U.S. 563, 576 (1966) ("By those acquisitions [of competitors] it perfected the monopoly power to exclude competitors and fix prices."); *Standard Oil Co. v. United States*, 221 U.S. 1, 72–75 (1911) (Section 2 prohibits competitor acquisitions "with the purpose of excluding others from the trade"). This has long been recognized as anticompetitive. *United States v. Am. Tobacco Co.*, 221 U.S. 106, 182–83 (1911) (listing as anticompetitive a "persistent expenditure of millions upon millions of dollars in buying out plants, not for the purpose of utilizing them, but in order to close them up and render them useless for the purposes of trade."); *see also* ¶72 n.18.

UPMC misapprehends Plaintiffs' allegations. UPMC's acquisitions are part and parcel of continuing Section 2 violations. Plaintiffs are not alleging that the acquisitions themselves are exclusionary, but that they eliminated competition for employing Skilled Healthcare Workers, leaving Plaintiffs unable to sell their labor in a competitive market. *See* Areeda & Hovenkamp, 3 Antitrust Law 701b ("The monopolist's acquisition of a rival must be treated the same way—not strictly speaking as *exclusionary*, but clearly as anticompetitive to the extent that it eliminates competition that might otherwise have dissipated the monopolist's power."). UPMC's acquisition of its prior (or potential future) competitors "is further evidence of [UPMC's] anticompetitive conduct." *See Le*, 216 F. Supp. 3d at 1159-60 (denying motion to dismiss in monopsony case where allegations included "direct acquisitions of actual or potential rivals").

### 2.   Mobility Restrictions

A key component of UPMC's anticompetitive scheme is its control of a key input for rival hospitals: skilled medical professions including Skilled Healthcare Workers. The fact that some alternative employment opportunities may exist where Skilled Healthcare Workers could sell their labor does not foreclose a Section 2 claim. *See Glen Holly Ent., Inc. v. Tektronix, Inc.*, 352 F.3d 367, 374 (9th Cir. 2003) ("One form of antitrust injury is '[c]oercive activity that prevents its victims from making free choices between market alternatives.'") (citation omitted); *see also Google LLC*, 2024 WL 3647498, at *99 ("The fact that Google's browser partners can contract with its rivals for distribution through less efficient channels does not, however, immunize the challenged agreements from being deemed exclusive."). This type of restriction of freedom of choice is precisely what Plaintiffs allege here.

UPMC implements a series of anticompetitive restrictions in order to reduce worker mobility and functionally lock in its employees. Because Skilled Healthcare Workers cannot sell their services to non-UPMC hospitals without incurring significant penalties, UPMC's monopsony power is enhanced. *See* ¶¶150–60; *see also Dentsply Int'l*, 399 F.3d at 194 ("An additional anti-competitive effect is seen in the exclusionary practice here that limits the choices of products open to dental laboratories, the ultimate users"). Further, many aspects of UPMC's anticompetitive scheme were done in way to avoid public scrutiny. For example, Plaintiffs allege UPMC maintains a blacklist which locked in workers under threat of not being rehired at other UPMC locations. The Third Circuit has recognized this as exclusionary. *See Broadcom*, 501 F.3d at 312 (citing *United States v. Microsoft Corp.*, 253 F.3d 34, 76–77 (D.C. Cir. 2001)).

### 3.   Restricting Rivals' Access to Inputs

In addition, UPMC maintains and enhances its monopsony and monopoly power by restricting rivals' access to other necessary inputs. To achieve this, UPMC engaged in anticompetitive conduct such as entering into exclusive dealing contracts with insurers, refusing to accept patients with certain insurance, and engaging in "data blocking" to impede the flow of patient information. ¶¶104–16; *see also ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 284–85 (3d Cir. 2012) (citing exclusive

dealing arrangements as basis for section 2 claim). Efforts to maintain monopoly power can have explanatory and evidentiary value for claims of monopsony. *See Le,* 2024 WL 195994, at *6. These contracts are cognizable elements of an anticompetitive scheme. *See United States v. Microsoft, Corp.,* 253 F.3d 34, 76–77 (D.C. Cir. 2001). This is borne out by allegations of UPMC's ever-growing market share, and the few rivals entering the hospital market. *See Dentsply Int'l,* 399 F.3d at 194 ("The paltry penetration in the market by competitors over the years has been a refutation of theory by tangible and measurable results in the real world."); *see also SmithKline,* 575 F.2d at 1065 ("The evidence demonstrates that Lilly's competitors did not have the actual or potential ability to capture a significant share of Lilly's business."). The cumulative effect of these exclusive contracts is foreclosure, which is all that is required for finding exclusionary conduct. *See LePage's,* 324 F.3d at 157, 162 (holding that anticompetitive acts must be considered as a whole and that anticompetitive agreements "effectively foreclosed the business of competitors" invoked Section 2); *see also Dentsply Int'l,* 399 F.3d at 191 (holding that "[t]he test is not total foreclosure, but whether the challenged practices bar a substantial number of rivals or severely restrict the market's ambit."). By inhibiting the entrance of potential rivals, UPMC limits the ability of Skilled Healthcare Workers' options to sell their labor, giving rise to a Section 2 claim.

### 4.   Retaliation

Plaintiffs also set forth the punitive measures UPMC employs to enforce its monopsony. "Threats and retaliation, even if they occur in a separate market, might reasonably produce an anticompetitive effect in the relevant market." *Am. President Lines, LLC v. Matson, Inc.,* 633 F. Supp. 3d 209, 231 (D.D.C. 2022). Because UPMC is the dominant employer, those retaliated against have no option but to accept the retaliation or to leave their chosen profession altogether. Specifically, Plaintiffs allege at least two methods of retaliation:

First, Plaintiffs describe a "blacklist" which UPMC wields to ensure UPMC facilities do not hire those who it deems as troublemakers. ¶¶150–151. While not openly known, it was widely understood throughout UPMC's workforce that UPMC would employ draconian tactics against those

who it believed to be malcontents. That threat is all that is needed to keep workers in line.

Second, UPMC restricts workers' ability to form unions. ¶¶158–167. Restrictions on forming a union is a form of anticompetitive conduct. *See Am. President Lines, LLC*, 633 F. Supp. 3d at 231. The key inquiry is that the objective of the antitrust laws is to prevent employers from obtaining market power to raise prices over (or reduce wages under) competitive levels. *See Harrison Aire, Inc. v. Aerostar Int'l, Inc.*, 423 F.3d 374, 385 (3d Cir. 2005) ("This type of injury—prohibitively high consumer prices resulting from allegedly monopolistic behavior—is the type the antitrust laws are designed to redress.") (citations omitted); *Turner v. McDonald's USA, LLC*, No. 19 C 5524, 2020 WL 3044086, at *3 (N.D. Ill. Apr. 24, 2020) (discussing why "the injury of depressed wages to employees due to anticompetitive behavior of employers" is an "injury to competition") (cleaned up) (citations omitted). The Third Circuit for example has permitted antitrust claims to proceed on behalf of a union for the loss of employment or employment opportunities. *See Int'l Ass'n of Heat and Frost Insulators & Asbestos Workers v. United Carpenters Ass'n*, 483 F.2d 384, 394 (3d Cir. 1973). Other circuits are in accord. *E.g.*, *Carpenters Dist. Council v. United Contractors Ass'n*, 484 F.2d 119 (6th Cir. 1973). It follows then that being denied the opportunity to form a union (and suffering retaliation for attempting to do so) is itself also exclusionary or anticompetitive conduct cognizable under the antitrust laws. *See Tugboat, Inc. v. Mobile Towing Co.*, 534 F.2d 1172, 1176 (5th Cir. 1976) ("If their ability to organize workers is injured by a conspiracy involving employers, the union's ability to attract membership and represent employees is weakened.").

### 5.   Antitrust Injury

Plaintiffs have also sufficiently pled antitrust injury.[17] "An antitrust plaintiff must allege not only cognizable harm to herself, but an adverse effect on competition market-wide." *Todd*, 275 F.3d at 213. "Injury to competition can occur by monopsony just as it may result from monopoly." *In re NCAA 1-A Walk-On Football Players Litig.*, 398 F. Supp. 2d 1144, 1151 (W.D. Wash. 2005) (citing *Nat'l Macaroni Mfrs. Ass'n v. FTC*, 345 F.2d 421, 426 (7th Cir. 1965)). Here, Plaintiffs "ha[ve] alleged injury

---

[17] Other than a single conclusory statement bordering on a non sequitur, UPMC's motion is silent as to Section 2's injury requirement. *See* Br. at 18.

to competition, namely the injury of depressed wages to [Skilled Healthcare Workers] due to anticompetitive behavior of [UPMC]." *Turner*, 2020 WL 3044086, at *3. Further, Plaintiffs' allegations of mobility restrictions, such as UPMC's TRAP provisions and "do not rehire" blacklist, describe a paradigmatic antitrust injury. *See Giordano*, 654 F. Supp. 3d at 198 (citing *In re High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d 1103, 1120–23 (N.D. Cal. 2012)). Accordingly, Plaintiffs have set out antitrust injury. *See Le*, 216 F. Supp. 3d at 1169 (holding that Plaintiffs need only allege sufficient facts from which the court can discern elements of injury based on the anticompetitive conduct).

### D.   Plaintiffs' Claims Are Not Barred by the Statute of Limitations

UPMC wrongly claims that any claim that accrued more than four years before this action began is barred by the statute of limitations. Br. at 22; 15 U.S.C. § 15b. But this is mistaken. The statute of limitations was tolled here because of UPMC's fraudulent concealment, and because Plaintiffs plead continuing violations.

In this Circuit, "it is well established that the doctrine of fraudulent concealment tolls the limitation period when a plaintiff's cause of action has been obscured by the defendant's conduct." *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 160 (3d Cir. 2002). In order to establish the applicability of the doctrine, an antirust plaintiff must show: (1) fraudulent concealment; (2) failure on the part of the plaintiff to discover the cause of action notwithstanding such concealment; and (3) that the plaintiff's failure to discover occurred notwithstanding the exercise of due care. *Id*. The Complaint sets forth each of the requisite elements of fraudulent concealment.

First, Plaintiffs have alleged numerous aspects of UPMC's schemes that were conducted in secret, away from the prying eyes of Plaintiffs and others outside of UPMC's control group. The Complaint sets forth UPMC's use of a do-not-rehire blacklist which inhibits worker mobility. While whispers of the blacklist have persisted, its existence was not confirmed (and certainly not to a level rising above speculation into plausibility as required by Rule 8) until accounts were collected by the Complaint and other sources. ¶¶143–46. The Complaint also describes how UPMC jealously guards access to even employees' own employment files. ¶¶170–71. The fact that UPMC took great pains to

conceal its anticompetitive scheme is dispositive. *See* Linerboard, 305 F.3d at 163 ("It is not the conspiracy of the defendant that is relevant on the issue of tolling the statute of limitations, it is the act of concealing the conspiracy.").

Second, the Complaint describes how Plaintiffs, who do not have access to UPMC's internal documents and statistical research, could not have discovered the extent of UPMC's anticompetitive conduct with the specificity required by Rule 8 and Twombly until the release of Congresswoman Lee and then-Representative Innamorato's report, as well as the economic analysis conducted by Econ One. ¶¶2, 168–169. Plaintiffs' Complaint followed soon after the public disclosure of important aspects UPMC's anticompetitive scheme. Courts have found due diligence in such contexts. *See, e.g.,* In re Nine W. Shoes Antitrust Litig., 80 F. Supp. 2d 181, 193 (S.D.N.Y. 2000) (finding due diligence where complaint was filed "days after the national media reported on allegations of price-fixing"). "Once [P]laintiffs were alerted to their potential claims . . . they promptly filed suit and thus have satisfied the due diligence requirement." *Id.*

UPMC's reliance on In re Aspartame Antitrust Litigation, 416 F. App'x. 208 (2011) is misplaced. Br. at 22. Critically, *Aspartame* was based on a more developed factual record, after discovery was conducted, that included, *inter alia*, deposition testimony from two essential witnesses who indicated the plaintiffs had failed to exercise due care. *Id.* at 210–11. Here, discovery has not yet commenced.

Furthermore, UPMC's acquisitions are part and parcel of continuing Section 2 violations and thus tolled by the continuing violations doctrine. In this Circuit, in order to show applicability of the continuing violations doctrine in a Section 2 case, a plaintiff must show (1) that the defendant took some overt avert action to maintain its monopoly (or monopsony) power during the limitations period; and (2) the plaintiff suffered injury during the limitations period. *See* In re Lower Lake Erie Iron Ore Antitrust Litig., 998 F.2d 1144 ,1173 (3d Cir. 1993).

First, with respect to injury, each time a Skilled Healthcare Worker is undercompensated as a result of the anticompetitive scheme, the statute starts anew. *See* Klehr v. A.O. Smith Corp., 521 U.S. 179, 189 (1997) ("[I]n the case of a 'continuing violation,' say, a price-fixing conspiracy that brings about a series of unlawfully high priced sales over a period of years…each sale to the plaintiff starts

the statutory period running again.") (citation and internal quotation marks omitted). Also, Plaintiffs allege they, and others similarly situated, continue to be underpaid under the anticompetitive scheme. Second, UPMC has taken steps to maintain its monopsony power within the limitations period. For example, the Complaint sets forth incidents of UPMC's use of its blacklist to intimidate employees within the limitations period. *See* ¶143 (describing employee placed on blacklist in 2022). Further, UPMC's most recent acquisition occurred in June 2024, amplifying its market power, after the filing of this Complaint. But even setting that acquisition aside, to the extent UPMC contends that acquisitions more than four years ago cannot serve as a basis for liability, courts have held that "the requisite injurious act within the limitations period" can flow from "an unlawful act which took place outside the limitations period but continues to allow the defendant to maintain market control." *Meijer, Inc. v. 3M*, No. CIV.A. 04-5871, 2005 WL 1660188, at *4 (E.D. Pa. July 13, 2005); *see also W. Penn Allegheny Health Sys., Inc.*, 627 F.3d at 108 ("West Penn's conspiracy claims are not time-barred because the complaint adequately alleges that the defendants performed injurious acts in furtherance of the conspiracy within the limitations period."); *In re Lower Lake Erie Iron Ore*, 998 F.2d at 1172 (observing that plaintiffs had satisfied their burden of establishing a continuing violation by showing an injurious act that continued into the limitations period, namely, artificially inflated dock handling rates). Here, UPMC's acquisitions were "initial overt act[s] of unlawful [acquisition and] maintenance of monopoly power that occurred more than four years ago, but which continue[] to allow [UPMC] to commit the injurious act of" suppressing Skilled Healthcare Workers' wages and degrading their working conditions. *Meijer, Inc.*, 2005 WL 1660188, at *4 (citations omitted).

## IV.    **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court deny UPMC's Motion to Dismiss.

Dated: September 5, 2024                    Respectfully submitted,


                                            */s/ Daniel C. Levin*

Joseph R. Saveri
Christopher K.L. Young
**JOSEPH SAVERI LAW FIRM, LLP**
601 California Street, Suite 1505
San Francisco, California 94108
Telephone: (415) 500-6800
Facsimile: (415) 395-9940
jsaveri@saverilawfirm.com
cyoung@saverilawfirm.com

Craig Murphey
Steven E. Riley, Jr.
**PURCHASE, GEORGE & MURPHEY, P.C.**
2525 West 26 Street, Suite 200
Erie, PA 16506
Telephone: (814) 833-7100
Facsimile: (814) 835-0401
craig@purchasegeorge.com
triley@purchasegeorge.com

Austin B. Cohen, (PA Id. 78977)
Daniel C. Levin, (PA Id. 80013)
Keith J. Verrier, (PA Id.  86577)
**LEVIN SEDRAN & BERMAN LLP**
510 Walnut Street, Suite 500
Philadelphia, PA 19106-3997
Telephone: (215) 592-1500
Facsimile: (215) 592-4663
acohen@lfsblaw.com
dlevin@lfsblaw.com
kverrier@lfsblaw.com

*Counsel for Plaintiffs*