**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JENNIFER MIZELL, MARIA PAULDING, KATHLEEN PEAPPLES, VICTORIA ROSS, and NATHAN SIMPSON, individually and on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br><br>  v.<br><br>UNIVERSITY OF PITTSBURGH MEDICAL CENTER,<br><br>    Defendant. | Case No: 1:24-cv-00016-SPB<br><br>Electronically Filed |

**STATEMENT OF INTEREST OF**
**THE UNITED STATES OF AMERICA**

JONATHAN S. KANTER
*Assistant Attorney General*

DOHA MEKKI
*Principal Deputy Assistant Attorney General*

JOHN W. ELIAS
ANDREW J. FORMAN
*Deputy Assistant Attorneys General*

RYAN J. DANKS
*Director of Civil Enforcement*

DAVID B. LAWRENCE
*Policy Director*

KATRINA S. ROUSE
*Deputy Director of Civil Enforcement*

YIXI (CECILIA) CHENG
*Counsel to the Assistant Attorney General*

JILL C. MAGUIRE
KARL D. KNUTSEN
TYLER BRODY (PA ID No. 93242)
*Attorneys*

ERIC G. OLSHAN
*United States Attorney*

LEE J. KARL
*Chief, Civil Division*

Joseph F. Weis, Jr. U.S. Courthouse
700 Grant Street, Suite 4000
Pittsburgh, Pennsylvania 15219
(412) 644-3500 (Phone)
(412) 644-4549 (Fax)
Lee.Karl@usdoj.gov
PA ID No. 87856

DANIEL E. HAAR
NICKOLAI G. LEVIN
KARINA LUBELL
PETER M. BOZZO
DANIELLE D. DRORY
SARAH R. SCHEINMAN
*Attorneys*

*United States Department of Justice*
*Antitrust Division*
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001
(202) 803-1196 (Phone)
Peter.Bozzo@usdoj.gov

**TABLE OF CONTENTS**

**INTEREST OF THE UNITED STATES** ............................................................. 1

**STATEMENT OF LAW AND FACTS** ............................................................. 2

**ARGUMENT** ............................................................................................................ 7

**I.  THE COURT SHOULD REJECT UPMC'S ATTEMPT TO RESOLVE
FACTUAL DISPUTES OVER PLAINTIFFS' RELEVANT-MARKET AND
MONOPSONY-POWER ALLEGATIONS AT THE MOTION-TO-DISMISS
STAGE** ....................................................................................................... 9

**II.  UPMC MISSTATES SECTION 2 LAW ON SERIES OF ACQUISITIONS** ................. 11

    **A.  Defendant misstates the law under Section 7 of the Clayton Act, which
contains no presumption of legality.** .......................................................... 11

    **B.  Section 2 of the Sherman Act, which controls this case, permits challenges
to monopolistic and monopsonistic series of acquisitions.** .................... 12

    **C.  The complaint's allegations about UPMC's acquisitions should be
assessed as a whole—and in conjunction with the complaint's other
allegations of exclusionary conduct.** .......................................................... 15

**III.  UPMC URGES FLAWED LEGAL STANDARDS FOR ANALYZING ITS
EMPLOYMENT PRACTICES** ................................................................. 17

**IV.  UPMC'S UNTIMELINESS ARGUMENT RUNS AFOUL OF THE
CONTINUING-VIOLATION DOCTRINE** .............................................. 20

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Anderson v. Shipowners' Ass'n of Pacific Coast*,
  272 U.S. 359 (1926)..................................................................................... 1, 4

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
  472 U.S. 585 (1985)............................................................................................ 19

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
  603 F.2d 263 (2d Cir. 1979)......................................................................21-22, 23

*Broadcom Corp. v. Qualcomm Inc.*,
  501 F.3d 297 (3d Cir. 2007)......................................................................... 9, 13, 18

*Brown Shoe Co. v. United States*,
  370 U.S. 294 (1962).......................................................................................... 9, 12

*Cable Line, Inc. v. Comcast Cable Commc'ns of Pennsylvania., Inc.*,
  767 F. App'x 348 (3d Cir. 2019) ........................................................................3-4

*Carpenter Tech. Corp. v. Allegheny Techs. Inc.*,
  No. 08-2907, 2011 WL 4528303 (E.D. Pa. Sept. 30, 2011).................................... 10

*Chase Mfg. v. Johns Manville Corp.*,
  84 F.4th 1157 (10th Cir. 2023) .......................................................................17-18

*City of Anaheim v. Southern California Edison Co.*,
  955 F.2d 1373 (9th Cir. 1992) ............................................................................ 15

*Clean Water Opportunities, Inc. v. Willamette Valley Co.*,
  759 F. App'x 244 (5th Cir. 2019) ....................................................................... 16

*Contintental Ore Co. v. Union Carbide & Carbon Corp.*,
  370 U.S. 690 (1962)........................................................................................... 15

*CSX Transportation, Inc. v. Norfolk S. Ry. Co.*,
  No. 23-1537, 2024 WL 3974989 (4th Cir. 2024) .................................................. 22

*Deslandes v. McDonald's USA, LLC*,
  81 F.4th 699 (7th Cir. 2023) .............................................................................. 4

*Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*,
  111 F.4th 337 (4th Cir. 2024) ...................................................................... 15, 19

ii

*Eastman Kodak Co. v. Image Tech. Servs.*,
  504 U.S. 451 (1992) ..................................................................................... 14, 18

*Fineman v. Armstrong World Indus., Inc.*,
  980 F.2d 171 (3d Cir. 1992) ............................................................................ 9, 22

*FTC v. Facebook, Inc.*,
  560 F. Supp. 3d 1 (D.D.C. 2022) .......................................................................... 14

*FTC v. Hackensack Meridian Health, Inc.*,
  30 F.4th 160 (3d Cir. 2022) ............................................................................. 11, 12

*FTC v. Penn State Hershey Medical Center*,
  838 F.3d 327 (3d Cir. 2016) ............................................................................. 11, 12

*fuboTV Inc. v. Walt Disney Co.*,
  No. 24-CV-01363, 2024 WL 3842116 (S.D.N.Y. Aug. 16, 2024) .......................................... 15

*Hanover Shoe, Inc. v. United Shoe Machinery Corp.*,
  392 U.S. 481 (1968) .................................................................................... 21, 23

*Host International, Inc. v. Marketplace, PHL, LLC*,
  32 F.4th 242 (3d Cir. 2022) ............................................................................... 18

*In re Lipitor Antitrust Litig.*,
  855 F.3d 126 (3d Cir. 2017) ............................................................................... 15

*In re Lower Lake Erie Iron Ore Antitrust Litig.*,
  998 F.2d 1144 (3d Cir. 1993) ........................................................................... 21, 22

*In re NCAA I-A Walk-on Football Players Litig.*,
  398 F. Supp. 2d 1144 (W.D. Wash. 2005) ..................................................................... 4

*In re Wholesale Grocery Prods. Antitrust Litig.*,
  752 F.3d 728 (8th Cir. 2014) ............................................................................... 22

*International Boxing Club of New York, Inc. v. United States*,
  358 U.S. 242 (1959) .................................................................................... 4, 15

*Klehr v. A.O. Smith Corp.*,
  521 U.S. 179 (1997) ....................................................................................... 21

*Le v. Zuffa, LLC*,
  No. 2:15-cv-01045-RFB-BNW, 2023 WL 5085064 (D. Nev. Aug. 9, 2023) ........................................ 4

*LePage's Inc. v. 3M*,
    324 F.3d 141 (3d Cir. 2003)...................................................................... 13, 14, 15, 20

*Lorain Journal v. United States*,
    342 U.S. 143 (1951)............................................................................................ 18

*Mandeville Island Farms v. American Crystal Sugar Co.*,
    334 U.S. 219 (1948)............................................................................................. 4

*Midwestern Machinery Co. v. Northwest Airlines, Inc.*,
    392 F.3d 265 (8th Cir. 2004) ......................................................................... 12, 23

*Mylan Pharms. Inc. v. Warner Chilcott Pub. Ltd. Co.*,
    838 F.3d 421, 435 (3d Cir. 2016) ...................................................................... 10

*NCAA v. Alston*,
    594 U.S. 69 (2021)........................................................................................... 1, 4

*North Carolina State Bd. of Dental Examiners v. FTC*,
    574 U.S. 494, 502 (2015)……............................................................................. 1

*Novell, Inc. v. Microsoft Corp.*,
    731 F.3d 1064 (10th Cir. 2013) ......................................................................... 17

*Otter Tail Power Co. v. United States*,
    410 U.S. 366 (1973)...................................................................................... 19, 20

*Pacific Bell Telephone Co. v. linkLine Communications, Inc.*,
    555 U.S. 438 (2009)........................................................................................... 17

*Philadelphia Taxi Ass'n, Inc. v. Uber Techs., Inc.*,
    886 F.3d 332 (3d Cir. 2018).............................................................................. 15

*Phillips v. County of Allegheny*,
    515 F.3d 224 (3d Cir. 2008)................................................................................ 5

*Radovich v. NFL*,
    352 U.S. 445 (1957)............................................................................................ 4

*Rebel Oil Co. v. Atlantic Richfield Co.*,
    51 F.3d 1421 (9th Cir. 1995) ............................................................................. 10

*Standard Oil Co. of New Jersey v. United States*,
    221 U.S. 1 (1911)............................................................................................... 13

*Swift & Co. v. United States*,
    196 U.S. 375 (1905) ..................................................................... 4, 15

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001) ............................................................. 4, 9

*Tunis Brothers Co. v. Ford Motor Co.*,
    952 F.2d 715  (3d Cir. 1991) ................................................................ 9

*Turner v. McDonald's USA, LLC*,
    No. 19-C-5524, 2020 WL 3044086 (N.D. Ill. Apr. 24, 2020) ................... 22

*United States v. American Tobacco Co.*,
    221 U.S. 106 (1911) ...................................................................... 4, 13

*United States v. AT&T, Inc.*,
    916 F.3d 1029 (D.C. Cir. 2019) ........................................................... 11

*United States v. Bertelsmann SE & Co. KGaA*,
    646 F. Supp. 3d 1 (D.D.C. 2022) .......................................................... 2

*United States v. Brown*,
    936 F.2d 1042 (9th Cir. 1991) ............................................................. 4

*United States v. Dentsply International, Inc.*,
    399 F.3d 181 (3d Cir. 2005) ...................................................... 9, 10, 13

*United States v. E. I. du Pont de Nemours & Co.*,
    351 U.S. 377 (1956) .......................................................................... 9

*United States v. Grinnell Corp.*,
    384 U.S. 563 (1966) .............................................................. 4, 13, 14, 16

*United States v. Google LLC*,
    No. 20-cv-3010 (APM), 2024 WL 3647498 (D.D.C. Aug. 5, 2024) ............ 13

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001) .............................................................. 14

*United States v. Paramount Pictures*,
    334 U.S. 152 (1948) ...................................................................... 13, 14

*United States v. United States Sugar Co.*,
    73 F.4th 197 (3d Cir. 2023) ................................................................ 12

*US Airways, Inc. v. Sabre Holdings Corp.*,
   938 F.3d 43 (2d Cir. 2019) ........................................................................ 22

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
   540 U.S. 398 (2004) ............................................................... 13, 17, 18, 19

*Viamedia, Inc. v. Comcast Corp.*,
   951 F.3d 429 (7th Cir. 2020). .................................................................. 19

*Weiss v. York Hospital*,
   745 F.2d 786 (3d Cir. 1984) ....................................................................... 9

*West Penn Allegheny Health Sys., Inc. v. UPMC*,
   627 F.3d 85 (3d Cir. 2010) ........................................................................ 22

*Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*,
   549 U.S. 312 (2007) ............................................................................... 3, 4

*Wisniewski v. Fisher*,
   857 F.3d 152 (3d Cir. 2017) ..................................................................... 20

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
   401 U.S. 321 (1971) ............................................................................ 21, 24

## STATUTES

15 U.S.C. § 2 .................................................................................................. 3

15 U.S.C. § 15b ............................................................................................. 20

28 U.S.C. § 517 ............................................................................................... 1

## MISCELLANEOUS

H.R. Rep. No. 81-1191 (1949) ...................................................................... 12

S. Rep. No. 81-1775 (1950) .......................................................................... 12

2023 MERGER GUIDELINES ....................................................................... 9, 12

## INTEREST OF THE UNITED STATES

The United States submits this Statement of Interest under the authority of 28 U.S.C. § 517, which permits the Attorney General to direct any officer of the Department of Justice to attend to the interests of the United States in any case pending in a federal or state court.

The United States has a strong interest in the correct application of the antitrust laws to labor markets.  Competition for workers among rival employers supports economic opportunity for all Americans by improving wages, benefits, and other working conditions.  In contrast, exercises of monopsony power in labor markets by employers deprive workers of fair competitive pay and of the ability to bargain for better working conditions.  Rivalry among employers to hire and retain workers is therefore foundational to a properly functioning, market-based economy.

Indeed, the antitrust laws have long served as a "central safeguard for the Nation's free market structures," ensuring "the preservation of economic freedom and our free-enterprise system."  *N. Carolina State Bd. of Dental Exam'rs v. FTC*, 574 U.S. 494, 502 (2015).  And it is beyond dispute that those laws apply with equal force to markets for labor:  For nearly 100 years, the Supreme Court has recognized that restrictions on competition for labor "[are] precisely what [the Sherman Act] condemns."  *Anderson v. Shipowners' Ass'n of Pac. Coast*, 272 U.S. 359, 363 (1926).  The antitrust laws apply to labor in the healthcare sector where healthcare employers should compete for the labor of their workers.  *See, e.g.*, *NCAA v. Alston*, 594 U.S. 69, 109-10 (2021) (Kavanaugh, J., concurring) ("Hospitals cannot agree to cap nurses' income in order to create a 'purer' form of helping the sick.").

The United States has a strong interest in the proper application of the law in labor cases and the outcomes in those cases.  To that end, the United States has filed amicus briefs and statements of interest addressing the antitrust laws' application to labor markets, *see, e.g.*,

1

*Giordano v. Saks & Co. LLC*, No. 23-600 (2d Cir. Aug. 7, 2023), ECF No. 89; *Deslandes v. McDonald's USA, LLC*, No. 22-2333 (7th Cir. Nov. 18, 2022), ECF No. 51; *Illinois v. Elite Staffing, Inc.*, No. 128763 (Ill. Sup. Ct. June 13, 2023); *Seaman v. Duke Univ.*, No. 1:15-cv-00462-CCE-JLW (M.D.N.C. Mar. 7, 2019), ECF No. 325.  The United States has also brought antitrust actions against employers who committed anticompetitive acts that harmed workers, *see, e.g.*, *United States v. Koch Foods Inc.*, No. 1:23-cv-15813 (N.D. Ill. Nov. 9, 2023), ECF No. 1; *United States v. Hee*, No. 2:21-cr-00098-RFB-BNW (D. Nev. Mar. 30, 2021), ECF No. 1; Complaint, *United States v. eBay, Inc.*, No. 5:12-cv-05869-EJD (N.D. Cal. June 4, 2013).  It has successfully challenged the merger of two book publishers that would have harmed competition for authors.  *See [United States v. Bertelsmann SE & Co. KGaA](), 646 F. Supp. 3d 1 (D.D.C. 2022)*.  The United States has taken these actions as part of a broad effort aimed at ensuring competition in labor markets for the benefit of American workers.

The United States' interest in protecting competition in labor markets is especially strong when it comes to healthcare workers.  These workers not only make up a significant share of overall employment, but they also provide critical services that affect the health and wellbeing of the American people.  Many healthcare workers provide life-saving care under difficult working conditions.  When competition for their labor suffers—resulting in lower pay and even worse working conditions—the health of the nation suffers, too.

The pending motion to dismiss (ECF No. 36) raises significant questions of interest to the United States pertaining to the continued application of the antitrust laws to labor markets.

## STATEMENT OF LAW AND FACTS

This case involves allegations that the University of Pittsburgh Medical Center ("UPMC") monopolized and attempted to monopolize a labor market in violation of Section 2 of

the Sherman Act, 15 U.S.C. § 2.  Amended Complaint ("Am. Compl."), ECF No. 31, ¶¶ 5-6, 70, 75-90.

According to the complaint, UPMC "cemented" its power over workers through employment terms that restricted worker mobility as well as a series of mergers and acquisitions that made it "the largest non-governmental employer" in Pennsylvania, with control of over 76% of all hospital employees in Pittsburgh and 67% of all hospital employees in Allegheny County. Am. Compl. ¶ 67.  UPMC allegedly used its monopsony power to "harm competition (and ultimately workers)" by "keep[ing] workers from leaving," "suppressing wages," and "increasing workloads." *Id*. ¶ 7.  UPMC also allegedly has a "systemwide do-not-rehire blacklist" that prevents employees who leave UPMC "from working throughout the entire UPMC healthcare system." *Id*. ¶ 143.  These allegations, if true, suggest a breakdown in the competitive process harmful to tens of thousands of healthcare workers and hundreds of thousands of patients.

1. Because the allegedly monopolized market is on the *buy* side—markets where employers purchase labor—these types of claims are frequently called "monopsony" claims. The terminology of monopsony claims may differ from monopoly claims, but the harms they cause are no less pernicious than monopoly claims and the Sherman Act condemns both with equal vigor.

Section 2 makes it unlawful to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2.  Courts frequently use "monopolization" to refer to dominance on the sell side of a market and "monopsonization" to refer to dominance on the buy side of a market.  *See Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 320 (2007); *Cable Line, Inc. v. Comcast Cable Commc'ns*

*of Pa., Inc.*, 767 F. App'x 348, 351 (3d Cir. 2019).  Monopsonization is the "mirror image" of "monopolization," and Section 2 bars monopsonization to the same extent that it bars monopolization.  *Weyerhaeuser*, 549 U.S. at 321-22.  Indeed, the Supreme Court has long made clear that the Sherman Act—including Section 2—"does not confine its protection to consumers, or to purchasers, or to competitors, or to sellers."  *Mandeville Island Farms v. Am. Crystal Sugar Co.*, 334 U.S. 219, 236 (1948); *see Swift & Co. v. United States*, 196 U.S. 375, 391, 396 (1905); *see also United States v. Brown*, 936 F.2d 1042, 1045 (9th Cir. 1991).  "The Act is comprehensive in its terms and coverage, protecting all who are made victims of the forbidden practices by whomever they may be perpetrated."  *Mandeville*, 334 U.S. at 236.  Accordingly, the act protects workers from anticompetitive practices by employers.  *See Alston*, 594 U.S. at 86-96; *Int'l Boxing Club of N.Y., Inc. v. United States*, 358 U.S. 242, 244-46, 248, 252 (1959); *Radovich v. NFL*, 352 U.S. 445, 448-49, 453-54 (1957); *Anderson*, 272 U.S. at 360-65 (1926); *United States v. Am. Tobacco Co.*, 221 U.S. 106, 183-84 (1911); *see also Deslandes v. McDonald's USA, LLC*, 81 F.4th 699, 703 (7th Cir. 2023), *cert. denied*, 144 S. Ct. 1057 (2024); *Todd v. Exxon Corp.*, 275 F.3d 191, 201 (2d Cir. 2001) (Sotomayor, J.).

Section 2 claims for monopsonization of a labor market therefore have the same elements as any other Section 2 monopolization claim.  *See Le v. Zuffa, LLC*, No. 2:15-cv-01045-RFB-BNW, 2023 WL 5085064, at *15 (D. Nev. Aug. 9, 2023); *In re NCAA I-A Walk-on Football Players Litig.*, 398 F. Supp. 2d 1144, 1151-52 (W.D. Wash. 2005).  Those elements are: "(1) the possession of monop[sony] power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."  *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966) (monopolization claim).

2.  Plaintiffs are employees and former employees of defendant UPMC, a hospital network that employs 95,000 workers and is the largest private-sector employer in Pennsylvania. Am. Compl. ¶¶ 16-23, 69.  Plaintiffs allege, among other claims, that UPMC has monopsonized and attempted to monopsonize the labor market at facilities providing acute inpatient care in violation of Section 2.  *Id.* ¶¶ 175-86.[1]

Plaintiffs identify a long-running sequence of acts that UPMC allegedly used to maintain and extend its monopsony power, including engaging in a series of anticompetitive mergers and acquisitions and imposing employment restraints to inhibit worker mobility.  Am. Compl. ¶¶ 74-90, 139-67.  The complaint alleges that this "series of interconnected anticompetitive restraints" formed a scheme to monopsonize the relevant labor market and resulted in many anticompetitive effects, including artificially depressing wages, restricting employee mobility, and degrading working conditions for UPMC's healthcare workers.  *Id.* ¶¶ 7, 117-38.

Specifically, plaintiffs allege that UPMC acquired no fewer than 28 competitor healthcare-service providers to expand its market power.  Am. Compl. ¶¶ 5-6, 70, 75-90. According to the complaint, UPMC's mergers and acquisitions "cemented" its "monopsony power."  *Id.* ¶ 67.  The acquisitions turned UPMC into "the largest non-governmental employer in the Commonwealth of Pennsylvania" with control of over "76 percent of all hospital employees" in Pittsburgh and "67 percent of all hospital employees" in Allegheny County.  *Id.* According to the complaint, UPMC then used its monopsony power to depress wages and force workers to accept fewer benefits, longer hours, and reduced job mobility.  *Id.* ¶¶ 117-49.

_____

[1] Because this case is at the motion-to-dismiss stage, one assumes the truth of the complaint's allegations and "draw[s] all inferences from the facts alleged in the light most favorable to" plaintiffs. *Phillips v. County of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008).  The United States takes no position on the facts underlying those allegations.

Plaintiffs also allege that UPMC harmed workers by imposing anticompetitive employment restrictions on its workforce.  Am. Compl. ¶ 150.  According to the complaint, UPMC required many of its physicians to sign explicit noncompete restrictions as a condition of employment.  *Id.* ¶ 151.  These restrictions allegedly bar physicians who resign from (1) obtaining future UPMC employment, (2) practicing in the same county for one year post-employment, and (3) soliciting employees with whom the physicians worked at UPMC.  *Id.* ¶¶ 151-52.  In addition, plaintiffs allege that UPMC has a "systemwide do-not-rehire blacklist, effectively preventing" employees who leave UPMC "from working throughout the entire UPMC healthcare system."  *Id.* ¶ 143.  Both the noncompete restrictions and alleged no-rehire policy "disincentivize[] workers from considering jobs elsewhere."  *Id.* ¶ 153.

The complaint further details other UPMC conduct to restrict worker mobility.  It alleges that nurses may be required to repay UPMC for UPMC-provided training programs.  Am. Compl. ¶¶ 154-55.  According to the complaint, UPMC may garnish employees' wages to repay these debts, and nurses who leave the UPMC system may become liable for full repayment—even if they left because they were fired.  *Id.*  UPMC also allegedly worked to "suppress and stifle efforts of UPMC workers to collectively organize."  *Id.* ¶ 163.  The complaint alleges that the anti-unionization effort, alongside UPMC's other employment restrictions, hampers the ability of employees to negotiate salary increases or improve working conditions.  *Id.* ¶ 167.

Through this "overarching anticompetitive scheme," plaintiffs allege that UPMC's acts enabled it to wield monopsony power in the relevant labor market.  Am. Compl. ¶ 117.  According to the complaint, UPMC's actions caused harm by "prevent[ing] workers from exiting or improving their working conditions," "suppress[ing] workers' wages and benefits," and "drastically increas[ing] their workloads."  *Id.* ¶¶ 1, 4; *see also id.* ¶¶ 7-9, 11, 59, 117, 121.

6

UPMC has filed a motion to dismiss the amended complaint.  Defendant's Motion to Dismiss, ECF No. 36-1 ("MTD").  UPMC argues that plaintiffs: (1) fail to allege a relevant product or geographic market (*id.* at 8-13); (2) fail to plead monopsony power in any market (*id.* at 13-15); (3) do not allege exclusionary conduct based on either UPMC's past acquisitions (*id.* at 16-18) or its other employment practices (*id.* at 18-22); and (4) cannot rely on acquisitions that occurred outside of the limitations period to establish exclusionary conduct (*id.* at 22-24).

The United States addresses the legal standards that apply to assessing allegations of relevant markets and monopsony power, as well as UPMC's arguments that plaintiffs failed to plead exclusionary conduct and that portions of the complaint are untimely.

## ARGUMENT

UPMC's motion to dismiss misstates and misapplies the legal standards governing Section 2 labor-market-monopsonization claims.  Over and over, the motion raises the bar to nearly insurmountable heights for complaints alleging exclusionary conduct that harms workers, demanding a level of granularity that plaintiffs will rarely be able to satisfy pre-discovery.  The Court should reject defendants' efforts to dismiss plaintiffs' claims that UPMC's alleged exclusionary conduct resulted in tangible harm to workers.

UPMC's motion fails to engage with the proper legal standards for evaluating allegations of relevant markets and monopsony power.  The motion then mistakenly urges the Court to treat each of UPMC's acquisitions as presumptively lawful.  That standard is inconsistent with the case law under Section 7 of the Clayton Act on which UPMC relies—and, even more important, the standard is inconsistent with the Supreme Court's case law under Section 2 of the Sherman Act, which directly controls this case.  UPMC also errs in its analysis of the alleged restrictive employment practices, mischaracterizing the conduct to shoehorn it into a legal category where it

does not belong.  And in incorrectly arguing the complaint is untimely, UPMC disregards the continuing-violation doctrine and improperly relies on case law related to a different statute.

These erroneous arguments not only seek to hold plaintiffs in labor-market-monopsonization cases to a demonstrably—and improperly—higher standard than the one applicable in other Section 2 contexts, but also potentially enable real anticompetitive harm to healthcare workers.  The complaint catalogues the ways that healthcare-sector concentration allows providers to exploit their front-line workers' labor, hurting both those workers and the patients who depend on them.  Am. Compl. ¶¶ 50-60.  The damage may be especially pronounced, as plaintiffs claim, for nurses, pharmacy technicians, and medical assistants who "have specialized skills that do not easily translate to other jobs"—the same specialized skills, in other words, that render these workers' services so vital.  *Id.* ¶ 56.  Due to UPMC's alleged exclusionary conduct, these workers allegedly take home less pay, receive fewer benefits, work longer hours, and have reduced job mobility, leaving them burdened by their own medical debt due to the "expensive but minimal health insurance plans" that UPMC offers.  *Id.* ¶¶ 117-49.

The consequences of adopting the legal standards that UPMC proposes would extend far beyond the immediate case.  Applying an improperly high bar to labor-market-monopsonization claims would upend longstanding legal precedent treating labor markets the same way that courts treat product markets under the Sherman Act.  It would also give monopsonist employers a blank check to wield unlawfully acquired market power, which could result in reduced wages and worse working conditions in concentrated markets.

**I. THE COURT SHOULD REJECT UPMC'S ATTEMPT TO RESOLVE FACTUAL DISPUTES OVER PLAINTIFFS' RELEVANT-MARKET AND MONOPSONY-POWER ALLEGATIONS AT THE MOTION-TO-DISMISS STAGE**

UPMC argues that plaintiffs fail to allege monopsony power through either structural or direct evidence.  MTD at 7-15.  The Court should decline to resolve factual disputes on the pleadings and instead evaluate these arguments based on standards that courts have developed for assessing market-definition and monopsony-power allegations at the motion-to-dismiss stage.

1.  "Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead" a relevant market.  *Todd*, 275 F.3d at 199-200.  Accordingly, the Third Circuit has stated that market-definition issues are "best allocated to the trier of fact."  *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 199 (3d Cir. 1992); *see Tunis Bros. Co. v. Ford Motor Co.*, 952 F.2d 715, 722 (3d Cir. 1991); *Weiss v. York Hosp.*, 745 F.2d 786, 825 (3d Cir. 1984).  Indeed, allowing the factfinder to address market-definition questions is especially appropriate because those questions are subject to "a pragmatic, factual approach," *Brown Shoe Co. v. United States*, 370 U.S. 294, 336 (1962), that looks to "economic realities" rather than "formalistic" doctrines, *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 189 (3d Cir. 2005); *see also* 2023 MERGER GUIDELINES § 4.3 & n.77 (relevant markets may be broad and "[m]ultiple overlapping markets can be appropriately defined relevant markets.").

2.  UPMC's motion misstates the law on how to establish monopsony power through direct evidence.  *See* MTD at 13-15.  The first element of a monopsonization claim—possession of monopsony power—is "the power to control prices or exclude competition," *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956), on the buy side of the relevant labor market.  Monopsony power can be proven through either direct or indirect evidence.  *See Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 (3d Cir. 2007) (monopolization claim).

Direct evidence is evidence that a party has "actual[ly] exercise[d]" monopsony power.  *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995) (monopolization claim).  Indirect evidence is evidence that a party has monopsony power "in the relevant market" and "that there [a]re barriers to entry into the market."  *Mylan Pharms. Inc. v. Warner Chilcott Pub. Ltd. Co.*, 838 F.3d 421, 435 (3d Cir. 2016) (monopolization claim).

According to UPMC, direct evidence is "insufficient in the Third Circuit unless accompanied by 'an analysis of the defendants' costs' and allegations 'that the defendant had an abnormally high price-cost margin' and 'restricted output.'"  MTD at 14 (citing *Carpenter Tech. Corp. v. Allegheny Techs. Inc.*, No. 08-2907, 2011 WL 4528303, at *12 (E.D. Pa. Sept. 30, 2011)).

The Third Circuit has stated that "the existence of monopoly power *may be proven* through direct evidence of supracompetitive prices and restricted output."  *Mylan*, 838 F.3d at 434 (emphasis added).  But the court has not held that these are the *only* ways to prove monopoly or monopsony power.  For example, the fact that a firm "sets prices with little concern for its competitors" is direct evidence of monopoly power because "a firm without a monopoly would have been unable to do" so.  *Dentsply*, 399 F.3d at 191.  By the same token, if a buyer can demand low purchase prices with little concern that it will be outbid, that behavior is direct evidence of monopsony power.  Moreover, the Third Circuit has never stated that plaintiffs *must* analyze costs or establish "an abnormally high price-cost margin," MTD at 14, to provide direct evidence of monopoly or monopsony power.  Rather, the court has said that, *if* plaintiffs argue that a firm's "set[ting] supracompetitive prices" is "direct evidence of monopoly power," the plaintiffs "must *often* provide an analysis of the defendant's costs" and show "that the defendant had an 'abnormally high price-cost margin.'"  *Mylan*, 838 F.3d at 434 (emphasis added).

## II.  UPMC MISSTATES SECTION 2 LAW ON SERIES OF ACQUISITIONS

UPMC misstates the law by arguing that mergers and acquisitions are "presumptively lawful."  MTD at 17.  UPMC relies on cases decided under Section 7 of the Clayton Act, but there is no presumption of lawfulness under that statute.  Nor is there such a presumption under the distinct provision at issue—Section 2 of the Sherman Act—which has long permitted claims based on series of acquisitions.  And UPMC's presumption of legality would be inconsistent with, among other features of Section 2 doctrine, the principle that courts must evaluate a course of conduct as a whole in assessing if a plaintiff has pleaded exclusionary conduct.

### A.  Defendant misstates the law under Section 7 of the Clayton Act, which contains no presumption of legality.

Contrary to UPMC's reliance on cases decided under Section 7, there is no "presumpti[on]" of "lawful[ness]" under that statute.  *See* MTD at 17.  To prove that an acquisition is unlawful under Section 7, the plaintiff "must establish a *prima facie* case that the merger is anticompetitive."  *FTC v. Hackensack Meridian Health, Inc.*, 30 F.4th 160, 166 (3d Cir. 2022).  Courts assess whether the plaintiff has established a *prima facie* case by assessing market-concentration statistics or conducting a fact-specific evaluation of the "evidence," *id.* at 173-75—without, in other words, placing a thumb on the scale by presuming that acquisitions are lawful or unlawful.  Only if the plaintiff's evidentiary showing establishes certain facts—that the acquisition would produce certain levels of (and increases in) market concentration—is the acquisition "presumed to be likely to enhance market power."  *Id.* at 172; *see FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 347 (3d Cir. 2016).  But even if there is no presumption of *illegality* in a given case, that does not mean the opposite—that the merger is presumed lawful— is true either.  Rather, courts simply undertake the normal fact-specific evaluation of the evidence.  *See United States v. AT&T, Inc.*, 916 F.3d 1029, 1032 (D.C. Cir. 2019).

11

UPMC also makes the overbroad assertion that "mergers have positive impacts on competition in many ways." MTD at 16. But this statement, too, is inconsistent with the Third Circuit's recognition that some mergers "will probably lead to anticompetitive effects in th[e] market"—specifically, those mergers that produce certain levels of post-merger market concentration and generate specified increases in market concentration. *Hackensack Meridian*, 30 F.4th at 172; *Penn State Hershey*, 838 F.3d at 347.

When a firm engages in a series of acquisitions, which plaintiffs allege is exactly what UPMC has done here, Am. Compl. ¶¶ 70, 75-90, that conduct may violate Section 7. When enacting the statute, Congress recognized that a cumulative series of mergers can "convert an industry from one of intense competition among many enterprises to one in which three or four large [companies] produce the entire supply." *Brown Shoe*, 370 U.S. at 334 (citing S. Rep. No. 81-1775, at 5 (1950); H.R. Rep. No. 81-1191, at 8 (1949)); *see also* 2023 MERGER GUIDELINES § 2.8 ("A firm that engages in an anticompetitive pattern or strategy of multiple acquisitions in the same or related business lines may violate Section 7.").

The cases cited by UPMC say nothing to the contrary. In *United States v. United States Sugar Co.*, the Third Circuit stated that the plaintiff bears the burden of establishing a *prima facie* case but nowhere suggested that acquisitions are presumptively lawful. 73 F.4th 197, 203 (3d Cir. 2023). And *Midwestern Machinery Co. v. Northwest Airlines, Inc.* says only that "Congress did not prohibit all mergers in the Clayton Act," 392 F.3d 265, 272 (8th Cir. 2004)— not that Congress authorized a presumption of legality for *all* mergers.

### B. Section 2 of the Sherman Act, which controls this case, permits challenges to monopolistic and monopsonistic series of acquisitions.

Although UPMC misstates the law under Section 7, the court need not grapple with that statute because this case was brought under Section 2 of the Sherman Act—a separate statutory

provision altogether.  And the Supreme Court has repeatedly held that a series of acquisitions can violate Section 2 if it results in a firm's obtaining or maintaining a monopoly.

To state the second element of a Section 2 monopsonization claim, the plaintiff is required to allege that "the acquisition or possession of monop[sony] power" was "accompanied by some anticompetitive conduct on the part of the possessor."  *Broadcom*, 501 F.3d at 308. Courts apply a flexible inquiry because "the means of illicit exclusion, like the means of legitimate competition, are myriad."  *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 414 (2004) (citation omitted).  In doing so, courts recognize that "[b]ehavior that otherwise might comply with antitrust law may be impermissibly exclusionary when practiced by a monopolist."  *Dentsply*, 399 F.3d at 187; *see also LePage's Inc. v. 3M*, 324 F.3d 141, 151-52 (3d Cir. 2003) (similar); *United States v. Google LLC*, No. 20-cv-3010 (APM), 2024 WL 3647498, *103 (D.D.C. Aug. 5, 2024) (similar).

The Supreme Court has explained that the means of exclusion can be a series of acquisitions.  For example, in *American Tobacco*, tobacco companies were found liable under Sections 1 and 2 for "b[uying] and clos[ing] up some thirty competing corporations and partnerships," in addition to engaging in other anticompetitive acts (including some acts in the labor market).  221 U.S. at 163-66 & n.5, 181-83.  In *Grinnell*, the Supreme Court held that a series of three acquisitions, coupled with other "restrictive agreements" and "[p]ricing practices," made out a Section 2 violation.  384 U.S. at 576.  And in *United States v. Paramount Pictures*, the Supreme Court ordered divestiture of multiple acquisitions where "these acquisitions were the fruits of monopolistic practices or restraints of trade."  334 U.S. 131, 152 (1948); *see also Standard Oil Co. of N.J. v. United States*, 221 U.S. 1, 32, 71-77 (1911).

UPMC's presumption of lawfulness would be inconsistent with these Supreme Court decisions. In these cases, the Court eschewed "formalistic distinctions" and instead looked to "actual market realities." *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 466-67 (1992) (citations omitted) (affirming denial of summary judgment). Specifically, the Court assessed whether the challenged series of acquisitions, combined with other conduct, harmed the competitive process. *E.g.*, *Grinnell*, 384 U.S. at 576 (defendant's "control of" three acquired firms "eliminated any possibility of an outbreak of competition"). UPMC's unsupported presumption would improperly replace fine-grained factual engagement with disfavored "formalis[m]." *Kodak*, 504 U.S. at 466-67.

The Supreme Court's decisions also embody the principle that, where a series of acquisitions reflects "monopolistic practices," those acquisitions may be unlawful even if they would be permissible in a competitive market. *Paramount Pictures*, 334 U.S. at 152. As the Third Circuit has explained, monopolists, and by implication monopsonists, are "not free to take certain actions that a company in a competitive (or even oligopolistic) market may take." *LePage's*, 324 F.3d at 151-52.

Indeed, "'[i]t is well established' in the Section 2 context "that mergers may constitute one . . . 'means'" that "tend[s] to 'destroy competition itself.'" *FTC v. Facebook, Inc.*, 560 F. Supp. 3d 1, 31 (D.D.C. 2022) (quoting *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001) (en banc)). Treating mergers as presumptively lawful thus would fail to appreciate the serious competitive dangers posed by a monopolist's or a monopsonist's acquisition of a rival or, as alleged here, a series of rivals.

**C. The complaint's allegations about UPMC's acquisitions should be assessed as a whole—along with the complaint's other allegations of exclusionary conduct.**

Under Supreme Court precedent, the proper approach is to assess the alleged series of acquisitions as a whole alongside other allegations of anticompetitive acts.  In light of the Supreme Court's acceptance of serial-acquisitions theories under Section 2, when a plaintiff alleges an anticompetitive course of conduct under Section 2, "[t]he relevant inquiry is the anticompetitive effect of [the defendant]'s exclusionary practices considered together." *LePage's*, 324 F.3d at 162; *see In re Lipitor Antitrust Litig.*, 855 F.3d 126, 147 (3d Cir. 2017); *see also* Plaintiffs' Brief in Opposition to Defendant's Motion to Dismiss Under Federal Rule of Civil Procedure 12(b)(6), ECF No. 45, at 18, 21.  Thus, "courts must look to the monopolist's conduct taken as a whole rather than considering each aspect in isolation." *Phila. Taxi Ass'n, Inc. v. Uber Techs., Inc.*, 886 F.3d 332, 339 (3d Cir. 2018) (citation omitted); *see Swift*, 196 U.S. at 396; *Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 111 F.4th 337, 354 (4th Cir. 2024); *City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373, 1376 (9th Cir. 1992); *fuboTV Inc. v. Walt Disney Co.*, No. 24-CV-01363, 2024 WL 3842116, at *17 (S.D.N.Y. Aug. 16, 2024); *cf. Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) ("plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components").  This is because "[a] monopolist bent on preserving its dominant position is likely to engage in repeated and varied exclusionary practices.  Each one viewed in isolation might be viewed as de minimis or an error in judgment, but the pattern gives increased plausibility to the claim." *Duke*, 111 F.4th at 355 (citation omitted); *see also Int'l Boxing Club*, 358 U.S. at 245-49, 252.

Here, UPMC focuses on allegations regarding its 2016 acquisition of Susquehanna Health, MTD at 17, but the complaint does not allege that acquisition alone is unlawful.

Plaintiffs allege that UPMC obtained and maintained a monopsony by acquiring no fewer than *28 competitors* between 1990 and 2019.  Am. Compl. ¶¶ 70, 75-89.[2]

And the complaint contains allegations that these 28 acquisitions harmed the competitive process.  Plaintiffs allege that UPMC's "series of strategic acquisitions" enabled UPMC to "bec[o]me the dominant leader" in the labor market.  Am. Compl. ¶ 72.  For example, the complaint claims that an "initial" series of acquisitions between 1996 and 1999 "led to the consolidation of" seven hospitals under the UPMC umbrella, *id.* ¶ 76; that UPMC acquired another hospital in 1998 "to expand its market share in furtherance of maintaining its monopsony," *id.* ¶ 77; and that UPMC acquired seven more hospitals in 2017, "further expand[ing] its dominance in the south-central region of Pennsylvania" and "solidif[ying] UPMC's dominance of the hospital labor input market in Pennsylvania," *id.* ¶ 83.  UPMC purportedly "used the monopsony power it acquired" to "harm competition (and ultimately workers)" by "keep[ing] workers from leaving," "suppressing wages," and "increasing workloads."  *Id.* ¶ 7.  Thus, UPMC's elimination of multiple competing employers through acquisitions allegedly "perfected the monop[sony] power to exclude competitors and fix [wages]" in a way that "eliminat[ion]" of a single "alternative" might not have achieved.  *Grinnell*, 384 U.S. at 576.

---

[2] Of course, even a single acquisition can qualify as exclusionary conduct under Section 2.  *See Clean Water Opportunities, Inc. v. Willamette Valley Co.*, 759 F. App'x 244, 247 (5th Cir. 2019) (noting, in case brought under Section 2 of Sherman Act and Section 7 of Clayton Act, that "[t]he Supreme Court has recognized that the acquisition of a competitor alone may constitute a violation of federal antitrust laws, under certain circumstances").

### III.   UPMC URGES FLAWED LEGAL STANDARDS FOR ANALYZING ITS EMPLOYMENT PRACTICES

UPMC similarly misstates the applicable legal standards when analyzing the specific restrictive employment practices alleged in the complaint.  The motion subjects some allegations to a doctrinal test for refusals to deal with rivals that does not apply here.  And the motion, again, focuses only on the acts in isolation, not as part of an exclusionary course of conduct.

1.  Plaintiffs allege that UPMC has a "systemwide do-not-rehire blacklist, effectively preventing" employees who leave UPMC "from working throughout the entire UPMC healthcare system."  Am. Compl. ¶ 143.  UPMC errs in asking the Court not to apply general antitrust standards and instead to shoehorn this allegation into a conduct-specific test for refusals to deal with rivals.  This "narrow" category of conduct, *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1076 (10th Cir. 2013) (Gorsuch, J.), applies in only two situations.  The first is when a dominant firm outright refuses to sell a requested product or service to (or buy a requested product or service from) a rival.  *See Trinko*, 540 U.S. at 407-09.  The second is when a competitor challenges an ongoing deal with a dominant firm that is taking place on commercially disadvantageous terms—that is, when a dominant firm refuses to deal with a competitor on better terms.  *See Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 442, 451 (2009).

Adopting a no-rehire policy does not fall into either of these two confined categories.  Plaintiffs allege not that UPMC refused to deal with its competitors, but that UPMC refused to deal with non-rival input suppliers (i.e., former UPMC employees).  *See* Am. Compl. ¶¶ 143-47.  That is, the refusal to deal is not alleged to be with rivals—so this line of cases cannot apply.  The Tenth Circuit recently declined to apply this framework to an alleged refusal to deal with certain customers—the sell-side equivalent of the alleged refusal here—on the ground that a refusal-to-deal framework "applies to narrow situations" not present in that case.  *Chase Mfg. v.*

*Johns Manville Corp.*, 84 F.4th 1157, 1173 (10th Cir. 2023).  Likewise, in *Broadcom*, the Third

Circuit refused to extend precedent governing unilateral refusals to deal with rivals.  501 F.3d at

315.  As the court explained, the claim in that case involved an "intentional false promise" to

license technology on certain terms, and "d[id] not involve a refusal to deal" with rivals.  *Id.* at

315-16; *see also Host Int'l, Inc. v. Marketplace, PHL, LLC*, 32 F.4th 242, 250 n.7 (3d Cir. 2022).

Moreover, in typical refusal-to-deal-with-rivals cases, the competitive harm comes from

denying rivals a necessary input.  *See, e.g.*, *Trinko*, 540 U.S. at 407-09.  But, again, that feature is

lacking here.  The alleged exclusionary aspect of the no-rehire policy occurs through its effect on

*current* workers, with whom UPMC does deal, who are allegedly "prevent[ed] . . . from leaving

UPMC employment," Am. Compl. ¶ 145—rather than on the ex-workers with whom UPMC

purportedly refuses to deal.

The Supreme Court's opinion in *Kodak*, addressing a monopolist's policy of selling parts

only to customers that agreed not to purchase services from the monopolist's competitors, is

instructive.  504 U.S. at 463 n.8.  The Court explained that, even if the monopolist's "refusal to

sell parts to" its rivals "c[ould] be characterized as a unilateral refusal to deal, its alleged sale of

parts to third parties [i.e., customers] on condition that they buy service from [the monopolist]

[wa]s not." *Id.*; *see also Lorain Journal v. United States*, 342 U.S. 143, 143-44, 149-50, 152-53

(1951) (analyzing Section 2 claim that newspaper publisher refused to deal with customers who

advertised on competing radio station).

In any event, the test that UPMC proposes for analyzing refusals to deal with rivals—

even if the present claim involved rivals—is incorrect.  UPMC claims that such a refusal is

exclusionary only if "the defendant has terminated a profitable, prior course of dealing and has

no legitimate business justification for refusing to deal."  MTD at 20.  But a refusal to deal with

18

rivals is exclusionary when the refusal (1) is "predatory"—characterized by "attempting to exclude rivals on some basis other than efficiency"—and (2) has an anticompetitive effect. *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 (1985). There is no rigid checklist for determining whether a particular refusal to deal with rivals is predatory. When addressing such refusals, the Supreme Court has fact-intensively analyzed "the particular structure and circumstances of the industry at issue." *Trinko*, 540 U.S. at 411; *see Aspen*, 472 U.S. at 605; *Otter Tail Power Co. v. United States*, 410 U.S. 366, 377-78 (1973); *see also Duke*, 111 F.4th at 362-65; *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 463 (7th Cir. 2020).

2. In addition, UPMC's argument about the no-rehire policy fails because plaintiffs are not alleging that the policy "in isolation amounted to a § 2 violation under a refusal-to-deal theory of liability," *Duke*, 111 F.4th at 366. Instead, plaintiffs claim that the policy "was but a part of a larger scheme" aimed at "foreclosure [of] competition," *id.*, in the labor market. *See* Am. Compl. ¶ 140. The Fourth Circuit recently rejected a similar attempt to break off one component of a broader exclusionary plan and apply the refusal-to-deal-with-rivals framework to that component. *See Duke*, 111 F.4th at 366.

The same point applies to the remaining allegations of restrictive employment practices, which should be considered—along with the alleged no-rehire policy and acquisitions—as components of the broader alleged scheme. Among other allegedly anticompetitive acts, plaintiffs claim that "UPMC requires many of its physicians to sign explicit noncompete restrictions as a condition of employment," Am. Compl. ¶ 151; that UPMC's tuition-assistance program "saddle[s] employees with potentially disastrous debt obligations if the employees seek to end their UPMC employment," *id.* ¶ 154; and that UPMC "stifle[d] efforts of UPMC workers to collectively organize," *id.* ¶ 163. Even if a court were to conclude that some of these acts,

viewed in isolation, would be lawful, taken as a whole the complaint plausibly pleads that they are part of an "overarching anticompetitive scheme." *Id.* ¶ 4.  And such a scheme establishes exclusionary conduct where it "prevent[s]" rivals "from eroding [a firm's] monop[sonistic] position." *Otter Tail*, 410 U.S. at 378.

For example, physician noncompete restrictions may prevent UPMC physicians from joining rival practices or prevent departing UPMC physicians from soliciting other employees to leave the hospital system as well.  Am. Compl. ¶ 151.  Plaintiffs also allege that UPMC provides proprietary training that nurses may be required to repay through "wage[] garnish[ment]." *Id.* ¶ 155.  However, according to plaintiffs, if a nurse leaves the UPMC system, including if a nurse is fired by UPMC, the nurse may become "liable for full repayment," which has the effect of "trapping" nurses at UPMC through threats of "prohibitive debt" or "potentially disastrous debt obligations." *Id.* ¶¶ 154-55.  And anti-unionization tactics by a monopsonist arguably limit unionized rivals' ability "to compete profitably," *LePage's*, 324 F.3d at 159-60, by lowering UPMC's costs relative to the rival's.  Accordingly, these acts should be considered not as standalone claims, but rather as part of UPMC's alleged overarching anticompetitive scheme to monopsonize the relevant labor market.

## IV.  UPMC'S UNTIMELINESS ARGUMENT RUNS AFOUL OF THE CONTINUING-VIOLATION DOCTRINE

UPMC's untimeliness argument (MTD at 22) fails because of the continuing-violation doctrine.  The statute of limitations establishes "an affirmative defense." *Wisniewski v. Fisher*, 857 F.3d 152, 157 (3d Cir. 2017).  The limitations period thus provides grounds for dismissal only when the "defense is apparent on the face of the complaint." *Id.*  Here, the statute of limitations provides that damages actions under the Sherman Act "must be commenced within four years after the cause of action accrued." 15 U.S.C. § 15b.  "Generally, a cause of action

accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971).

In *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, the Supreme Court explained how this principle applies to Section 2 claims.  The Court affirmed the Third Circuit's decision that, when a defendant commits "a continuing violation of the Sherman Act" that "inflict[s] continuing and accumulating harm," the statute does not expire four years after the anticompetitive conduct's "earliest impact."  392 U.S. 481, 502 n.15 (1968), *aff'g in relevant part*, 377 F.2d 776 (3d Cir. 1967).  Instead, for continuing violations, "an injurious act within the limitations period may serve as a basis for an antitrust suit" to recover damages resulting from that act.  *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1172 (3d Cir. 1993).[3]

In *Hanover Shoe*, the "continuing violation" consisted of the defendant's ongoing implementation of a decades-old exclusionary policy—which the Court distinguished from "a violation [that], if it occurs at all, must occur within some specific and limited time span."  392 U.S. at 502 n.15.  Accordingly, "[a]lthough the plaintiff could have sued" when the policy was initiated "in 1912 for the injury then being inflicted, it was equally entitled to sue" when the complaint was filed in 1955.  *Id.*  Accordingly, when a monopolist engages in anticompetitive conduct before the limitations period but "use[s] the power it has gained illicitly to overcharge its customers" during that period, customers may sue for overcharges incurred during the limitations

---

[3] Absent any tolling of the limitations period (an issue that the United States does not address), plaintiffs typically can recover only for injuries stemming from conduct committed within the preceding four years.  *See Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997).

period. *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 295-96 (2d Cir. 1979);[4] *see*

*Lower Lake Erie*, 998 F.3d at 1172-73.

These principles apply in buy-side cases to the same extent that they apply in sell-side

cases.  The Third Circuit illustrated that point by invoking the continuing-violation doctrine to

hold that a Section 1 claim based on an alleged buyer's conspiracy was timely.  *See W. Penn*

*Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 106 (3d Cir. 2010); *see also In re Wholesale*

*Grocery Prods. Antitrust Litig.*, 752 F.3d 728, 736-37 (8th Cir. 2014) (applying continuing-

violation doctrine to buy-side conspiracy); *Turner v. McDonald's USA, LLC*, No. 19-C-5524,

2020 WL 3044086, at *4 (N.D. Ill. Apr. 24, 2020) (same, in labor-market case).[5]

Applying the continuing-violation doctrine to the alleged course of exclusionary conduct

as a whole, no statute-of-limitations defense is evident on the face of the complaint.  Despite

UPMC's attempt to dismember the claim into distinct components, *see supra* at 15-16, 19-20,

plaintiffs allege that UPMC is engaged in a single, long-running scheme to monopsonize the

relevant market—i.e., a continuing violation.  *E.g.*, Am. Compl. ¶¶ 75-90, 179-80, 185-86.  As

UPMC concedes, the complaint further alleges that parts of this continuing violation occurred

within four years of the complaint's filing.  *See* MTD at 22 (alleged conduct occurred outside

---

[4] The Third Circuit has declined to follow a statement in *Berkey Photo* regarding a different issue pertaining to liability.  *See Fineman*, 980 F.2d at 204-06.  But the court has never addressed—let alone rejected—*Berkey Photo*'s discussion of the statute of limitations, which applied governing Supreme Court precedent.  *See* 603 F.2d at 295-96.

[5] Some courts have held that, to trigger a new limitations period under the continuing-violation doctrine, the defendant's injurious act "must be a new and independent act that is not merely a reaffirmation of a previous act." *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 68 (2d Cir. 2019); *see CSX Transp., Inc. v. Norfolk S. Ry. Co.*, No. 23-1537, 2024 WL 3974989, at *7 (4th Cir. Aug. 29, 2024).  The Third Circuit, however, has rejected that rule.  *W. Penn Allegheny*, 627 F.3d at 106.  In any event, as one court recognized, charging supracompetitive prices to purchasers is not a reaffirmation of an earlier act, but the "inflict[ion]" of *"new* harm causing *new* injury." *CSX Transp.*, 2024 WL 3974989, at *8.  Similarly, exercising monopsony power to reduce pay or increase working hours re-inflicts harm on workers each time.

four-year window "[s]ave for" the allegations about UPMC's "employment policies and programs"); *see also* Am. Compl. ¶¶ 143, 146.  And the complaint alleges that plaintiffs—all of whom are employed by UPMC or were employed there in the past four years—were harmed due to "suppress[ed] . . . wages and benefits" and "drastically increased . . . workloads."  Am. Compl. ¶ 1; *see id.* ¶¶ 7-9, 11, 59, 117, 121.  These allegations plead "a continuing violation of the Sherman Act" that "inflicted continuing and accumulating harm," *Hanover Shoe*, 392 U.S. at 502 n.15, during the limitations period.  That is sufficient under *Hanover Shoe* to allege a timely Section 2 claim.  *See id.*; *Berkey Photo*, 603 F.2d at 295-96.

UPMC's contrary arguments rest largely on an inapposite Section 7 case.  MTD at 24 (citing *Midwestern Mach.*, 392 F.3d at 271-72).  *Midwestern Machinery* held that, "[g]enerally, a 'Section 7 action challenging the *initial acquisition* of another company's stocks or assets accrues at the time of the merger or acquisition.'"  392 F.3d at 269 (emphasis added).  Plaintiffs here are not challenging UPMC's initial acquisitions alone under Section 7, but a scheme to monopsonize under Section 2 that encompasses those acquisitions, post-acquisition disposition of the acquired assets, and ongoing employment restraints.  *E.g.*, Am. Compl. ¶¶ 75-90, 143, 146, 179-80, 185-86.  Indeed, *Midwestern Machinery* specifically distinguished its facts from Section 2 cases, such as *Hanover Shoe*, that involved active ongoing conduct "to maintain [a] monopoly."  392 F.3d at 270.

Adopting UPMC's statute-of-limitations argument would amount to holding that, if a monopolist or monopsonist "merely retains its illicit market control for four years after its last anticompetitive action," it may use its dominance to inflict harm "until its power is eviscerated in an appropriate suit for equitable relief."  *Berkey Photo*, 603 F.2d at 296.  That reasoning would be "contrary to the congressional purpose that private actions serve as a bulwark of antitrust

enforcement." *Zenith Radio*, 401 U.S. at 340.  The victims of labor-market monopsonies, who may endure suppressed wages or worse working conditions for years after the conduct began, would suffer particular harm as a result of this rule, as would other victims of long-running antitrust violations.

September 30, 2024

Respectfully submitted,

JONATHAN S. KANTER
*Assistant Attorney General*

DOHA MEKKI
*Principal Deputy Assistant Attorney General*

JOHN W. ELIAS
ANDREW J. FORMAN
*Deputy Assistant Attorneys General*

RYAN J. DANKS
*Director of Civil Enforcement*

DAVID B. LAWRENCE
*Policy Director*

KATRINA S. ROUSE
*Deputy Director of Civil Enforcement*

YIXI (CECILIA) CHENG
*Counsel to the Assistant Attorney General*

JILL C. MAGUIRE
KARL D. KNUTSEN
TYLER BRODY (PA ID No. 93242)
*Attorneys*

ERIC G. OLSHAN
*United States Attorney*

/s/ Lee J. Karl
LEE J. KARL
*Chief, Civil Division*

Joseph F. Weis, Jr. U.S. Courthouse
700 Grant Street, Suite 4000
Pittsburgh, Pennsylvania 15219
(412) 644-3500 (Phone)
(412) 644-4549 (Fax)
Lee.Karl@usdoj.gov
PA ID No. 87856

DANIEL E. HAAR
NICKOLAI G. LEVIN
KARINA LUBELL
PETER M. BOZZO
DANIELLE D. DRORY
SARAH R. SCHEINMAN
*Attorneys*

/s/ Peter M. Bozzo
*United States Department of Justice*
*Antitrust Division*
950 Pennsylvania Avenue, NW
Washington, DC  20530-0001
(202) 803-1196 (Phone)
Peter.Bozzo@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on September 30, 2024, I electronically filed the foregoing brief by using the CM/ECF system.  Participants in the case are registered CM/ECF users, and service will be accomplished by the CM/ECF system.

/s/ Peter M. Bozzo