**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

**JENNIFER MIZELL, MARIA PAULDING, KATHLEEN PEAPPLES, VICTORIA ROSS, and NATHAN SIMPSON, individually and on behalf of those similarly situated,**

**Plaintiffs,**

**v.**

**THE UNIVERSITY OF PITTSBURGH MEDICAL CENTER,**

**Defendant.**

**Civil Action No. 1:24-cv-00016-SPB**

**Electronically Filed**

**Oral Argument Requested**

# REPLY IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS UNDER FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)

David C. Kiernan
JONES DAY
555 California St., 26th Fl.
San Francisco, CA 94104
Telephone: 415.626.3939
Fax: 415.875.5700
dkiernan@jonesday.com

Peter Schwingler
JONES DAY
90 South Seventh Street, Suite 4950
Minneapolis, MN 55402
Telephone: 612.217.8866
Fax: 844.345.3178
pschwingler@jonesday.com

Rebekah B. Kcehowski (PA ID No. 90219)
Anderson T. Bailey (PA ID No. 206485)
Daniel P. Johnson (PA ID No. 335058)
JONES DAY
500 Grant Street, Suite 4500
Pittsburgh, PA 15219
Telephone: 412.391.3939
Fax: 412.394.7959
rbkcehowski@jonesday.com
atbailey@jonesday.com
dpjohnson@jonesday.com

*Counsel for Defendant UPMC*

# TABLE OF CONTENTS


INTRODUCTION ..... 1

ARGUMENT ..... 2

I. Contrary to Plaintiffs' Contentions, They Have Not Pleaded Required Components of a Relevant Market ..... 2

- A. The Product Market Allegations Are Insufficient ..... 3
- B. Plaintiffs' Geographic Market Remains Implausible ..... 6
- C. The Statement of Interest Also Ignores Plaintiffs' Pleading Burden ..... 8

II. Not Only Do Plaintiffs Fail to Allege Market Power, They Also Continue to Impermissibly Conflate Different Markets ..... 9

- A. Plaintiffs Have Not Pleaded Direct Evidence of Market Power ..... 9
- B. Plaintiffs Have Not Pleaded Indirect Evidence of Market Power ..... 11

III. The Amended Complaint Should Be Dismissed for Lack of Exclusionary Conduct ..... 12

- A. Plaintiffs Do Not Identify Any Exclusionary Conduct ..... 12
- B. The SOI's Legal Arguments Are Misplaced ..... 14

IV. Plaintiffs Do Not Allege Concealment and Err in Describing Continuing Violations ..... 18

- A. Plaintiffs Confirm That They Cannot Allege Fraudulent Concealment ..... 18
- B. The Continuing Violations Doctrine Is Inapplicable ..... 19

CONCLUSION ..... 20

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................13

*Aya Healthcare Servs., Inc. v. AMN Healthcare*,
2018 WL 3032552 (S.D. Cal. June 19, 2018)....................6

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)....................2, 4, 5

*Broadcom Corp. v. Qualcomm Inc.*,
501 F.3d 297 (3d Cir. 2007)....................13, 17

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962)....................9

*Burtch v. Milberg Factors, Inc.*,
662 F.3d 212 (3d Cir. 2011)....................2

*Cable Line, Inc. v. Comcast Cable Commc'ns of Penn.*,
2018 WL 2209518 (M.D. Pa. May 14, 2018)....................7

*Carpenter Tech. Corp. v. Allegheny Techs. Inc.*,
2011 WL 4528303 (E.D. Pa. Sept. 30, 2011)....................10

*Chase Mfg., Inc. v. Johns Manville Corp.*,
84 F.4th 1157 (10th Cir. 2023)....................16, 17

*City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc.*,
442 F. App'x 672 (3d Cir. 2011)....................13

*Clarke v. Baptist Memorial Healthcare*,
2007 WL 9870961 (W.D. Tenn. May 17, 2007)....................5, 6

*Concord Assocs., L.P. v. Ent. Properties Tr.*,
817 F.3d 46 (2d Cir. 2016)....................8

*Cowell v. Palmer Twp.*,
263 F.3d 286 (3d Cir. 2001)....................19

*Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*,
111 F.4th 337 (4th Cir. 2024) ....................17

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
504 U.S. 451 (1992)....................17

*Eichorn v. AT & T Corp.*,
248 F.3d 131 (3d Cir. 2001)....................7

*Fineman v. Armstrong World Indus., Inc.*,
980 F.2d 171 (3d Cir. 1992)....................9

*Frederico v. Home Depot*,
507 F.3d 188 (3d Cir. 2007)....................4

*FTC v. Hackensack Meridian Health, Inc.*,
30 F.4th 160 (3d Cir. 2002) ....................15

*Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc.*,
386 F.3d 485 (2d Cir. 2004)....................11

*Giordano v. Saks Inc.*,
654 F. Supp. 3d 174 (E.D.N.Y. 2023) ....................6

*Hanover Shoe, Inc. v. United Shoe Machinery Corp.*,
392 U.S. 481 (1968)....................20

*Harrison Aire, Inc. v. Aerostar Int'l, Inc.*,
423 F.3d 374 (3d Cir. 2005)....................9

*Klehr v. A.O. Smith Corp.*,
521 U.S. 179 (1997)....................19, 20

*Le v. Zuffa*,
216 F. Supp. 3d 1154 (D. Nev. 2016)....................12

*Lorain J. Co. v. United States*,
342 U.S. 143 (1951)....................17

*Med Vets Inc. v. VIP Petcare Holdings, Inc.*,
2019 WL 1767335 (N.D. Cal. Apr. 22, 2019) ....................9

*Midwestern Mach. Co. v. Nw. Airlines, Inc.*,
392 F.3d 265 (8th Cir. 2004) ....................19, 20

*Mylan Pharms. Inc. v. Warner Chilcott Pub. Ltd. Co.*,
838 F.3d 421 (3d Cir. 2016)....................10, 11

*New York v. Facebook, Inc.*,
549 F. Supp. 3d 6 (D.D.C. 2021)....................16

*New York v. Meta Platforms, Inc.*,
66 F.4th 288 (D.C. Cir. 2023)....................16

*Novell, Inc. v. Microsoft Corp.*,
731 F.3d 1064 (10th Cir. 2013)....................17

*Phila. Taxi Ass'n, Inc v. Uber Techs., Inc.*,
886 F.3d 332 (3d Cir. 2018)....................2, 12

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
124 F.3d 430 (3d Cir. 1997)....................2, 3, 4, 6

*Rebel Oil Co. v. Atl. Richfield Co.*,
51 F.3d 1421 (9th Cir. 1995)....................11

*Sapir v. Averback*,
2016 WL 554581 (D.N.J. Feb. 10, 2016)....................5

*Seirus Innovative Accessories, Inc. v. Cabela's, Inc.*,
2010 WL 6675046 (S.D. Cal. Apr. 20, 2010)....................9

*Todd v. Exxon Corp.*,
275 F.3d 191 (2d Cir. 2001)....................4, 6

*Tunis Bros. Co. v. Ford Motor Co.*,
952 F.2d 715 (3d Cir. 1991)....................9

*United States ex rel. Kuriyan v. HCSC Ins. Servs. Co.*,
2021 WL 5238332 (D.N.M. Jan. 29, 2021)....................10

*United States v. Am. Tobacco Co.*,
221 U.S. 106 (1911)....................15

*United States v. Dentsply Int'l, Inc.*,
399 F.3d 181 (3d Cir. 2005)....................9, 11

*United States v. Sineneng-Smith*,
590 U.S. 371 (2020)....................10

*United States v. United States Sugar Co.*,
73 F.4th 197 (3d Cir. 2023) ....................15

*Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*,
540 U.S. 398 (2004)....................16

*W. Penn Allegheny Health Sys., Inc. v. UPMC*,
627 F.3d 85 (3d Cir. 2010)....................19

*Weiss v. York Hospital*,
745 F.2d 786 (3d Cir. 1984)....................6, 9

*Westlake Servs., LLC v. Credit Acceptance Corp.*,
2015 WL 9948723 (C.D. Cal. Dec. 7, 2015) ....................9

**OTHER AUTHORITIES**

Brief of the United States, in *New York v. Meta Platforms*,
No. 21-7078 (D.C. Cir. July. 29, 2021) ....................16

E. Prager & M. Schmitt, *Emp'r Consol. And Wages: Evidence from Hosps.*, 111
Am. Econ. Rev. 397, 405 (2021) ....................5

Revised Delineations of Metropolitan Statistical Areas, OMB Bulletin No. 23-01
(July 21, 2023), *available at* https://www.whitehouse.gov/wp-content/uploads/2023/07/OMB-Bulletin-23-01.pdf....................12

S. Allegretto & D. Graham-Squire, *Monopsony in Prof'l Lab. Mkts.: Hosp. Sys. Concentration and Nurse Wages* 12 (Ctr. Econ. & Policy Rsch., Jan. 5, 2023)....................5

Statement of Interest, in *Intel Corp. v. Fortress Investment Group*,
No. 3:19-cv-07651 (N.D. Cal. Nov 20, 2019) ....................9

Plaintiffs' Opposition confirms they have failed to plead even the most basic elements of an antitrust claim. To start, Plaintiffs' Opposition points to no well-pleaded facts establishing either a product or a geographic market. As to the former, Plaintiffs claim, without explanation, that "Skilled Healthcare Workers"—a disparate swath of workers including nurses, pharmacy workers, assistants, orderlies, and others of undefined qualifications—somehow form a single in-hospital labor market based on unstated "specialized skills" supposedly valuable only in a hospital setting (and not, *e.g.*, in nursing homes, outpatient centers, or other facilities). That does not allege a plausible product market based on reasonable interchangeability of demand, as the Third Circuit requires. Plaintiffs fare no better on geographic market. They never explain how drawing a line around UPMC's hospitals today, across hundreds of miles, but *excluding* all competitors in neighboring counties, is a remotely plausible geographic market for a complaint spanning 28 years. Given the commercial realities of healthcare jobs, there is nothing magical, for instance, about the Northumberland-Schuylkill county line. These market pleading flaws alone warrant dismissal.

But Plaintiffs' Opposition also does not and cannot remedy the Amended Complaint's three other independently dispositive flaws. Plaintiffs have no valid response to the Amended Complaint's failure to allege market power in any market, let alone a relevant one. Their Opposition, for example, never identifies UPMC's share of "Skilled Healthcare Workers" across Plaintiffs' entire multi-state "Relevant Area." And the Amended Complaint spends pages airing various labor grievances but never alleges actual exclusionary conduct harming competition in a labor market. Finally, the Amended Complaint's allegations are outside the limitations period.

Unable to address the Amended Complaint's glaring holes, Plaintiffs' Opposition—now echoed by the Department of Justice's Statement of Interest ("SOI")—seeks to stave off dismissal by contending that UPMC is prematurely attacking "the weight of the allegations." Opp. 2; *see*

*also* SOI 9. Wrong. Before Plaintiffs can pursue "a potentially massive factual controversy" under the Sherman Act and impose the "enormous expense" of discovery, Plaintiffs must plausibly allege—*in their Amended Complaint*, not their Opposition—each element of an antitrust claim. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558–559 (2007) (quotation marks omitted). Plaintiffs' failure to do so is not an issue for later but a ripe one that requires dismissal on the pleadings now. *Id*. at 570 (ordering dismissal); *Phila. Taxi Ass'n, Inc v. Uber Techs., Inc.*, 886 F.3d 332, 340, 342 (3d Cir. 2018) (failure to allege market power and exclusionary conduct); *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 438 (3d Cir. 1997) (lack of valid product market). For the reasons in UPMC's motion and this reply, UPMC asks that the Court grant the motion to dismiss.

## ARGUMENT

The question before the Court is whether the Amended Complaint's "factual allegations . . . plausibly give rise to an entitlement to relief." *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 220 (3d Cir. 2011) (marks omitted) (affirming dismissal of Sherman Act claim). To do so, Plaintiffs must include facts that plausibly allege an antitrust market, monopsony power in that market, and conduct by UPMC within the limitations period that harms competition. *E.g.*, *Phila. Taxi Ass'n*, 886 at 338–339; *Queen City*, 124 F.3d at 436. Plaintiffs' suggestion that the Court should assume "any set of facts" consistent with their Complaint, even if not alleged (Opp. 7), is wrong. That "incomplete" standard "is best forgotten" and not good law, as *Twombly* made clear 17 years ago. 550 U.S. at 562–563. Plaintiffs bear the burden of alleging facts that make the Amended Complaint plausible. *Id*. at 570. But, as the Opposition confirms, they have failed to do so here.

### I. Contrary to Plaintiffs' Contentions, They Have Not Pleaded Required Components of a Relevant Market

Plaintiffs acknowledge what is required to survive dismissal. Their Opposition concedes that the Amended Complaint "must plead 'both a relevant geographic and relevant product

market,'" including: (a) a product market based on "'economic substitutes,'" and (b) a geographic market defined by boundaries that reflect the "'commercial realities of the industry'" and "where workers would reasonably seek alternative employment." Opp. 7, 8, 10, 11. But the Amended Complaint fails to do either—exactly the type of "obvious oversight" that Plaintiffs concede is grounds for dismissal. *Id*. at 8 (quotation marks omitted).

### A. The Product Market Allegations Are Insufficient

Under Third Circuit precedent that Plaintiffs tellingly ignore, a § 2 case must be dismissed when the allegations fail to plead a product market "with reference to the rule of reasonable interchangeability and cross-elasticity of demand." *Queen City*, 124 F.3d at 436. For a monopsony case like this, that requires plausible allegations that the workers with "specialized in-patient hospital skills" within the putative class would not consider substitute positions with non-hospital employers. UPMC Br. 8–9. The Amended Complaint has no such allegations. Plaintiffs never plead what "specialized in-patient hospital skills" supposedly turn the nonexclusive list of job categories in the class definition into a plausible product market, nor allege why non-hospital employers would not pay similar wages for the same skills. Am. Compl. 1 n.1, ¶ 29.

Recognizing the need to address "reasonable interchangeability," *Queen City*, 124 F.3d at 436, Plaintiffs attempt to bolster the Amended Complaint with attorney say-so. They argue that the Amended Complaint alleges a putative class with "particularized training or qualifications that makes [the workers] particularly valuable for an inpatient hospital setting" and "less valuable outside of the hospital." Opp. 8–9 (citing ¶¶ 8, 56, 64, 91–92, 99, 120–125, 161).

The allegations they cite do no such thing. The Amended Complaint does not provide job descriptions. Rather, it merely lists generic job categories—"licensed practical nurses (LPNs), Nurses, Medical Assistants, registered nurses (RNs), Nurse Assistants, Orderlies, and Pharmacy workers"—with no descriptions of these roles whatsoever. Am. Compl. 1 n.1, ¶ 29. Nor does the

Amended Complaint explain how "specialized skills" of the listed jobs differentiate in-hospital and out-of-hospital employment. Plaintiffs never define "orderly," for example, much less explain why a hospital orderly could not earn similar pay at a nursing home.

Plaintiffs' closest allegation (¶ 56) asserts that "Trauma Nurses who typically work in Emergency Rooms . . . cannot find comparable work in a non-hospital setting." But the purported labor market is *not* emergency-room trauma nurses; it encompasses *all* hospital nurses, medical assistants, orderlies, pharmacy workers, and some untold number of other jobs. In any event, the Amended Complaint includes no allegations to support its bald conclusion about trauma nurses. The remaining cited paragraphs have *nothing* to do with any description of "specialized skills" or "objective" differentiating criteria. Opp. 8–9; *see* ¶ 91 (assertion of monopoly power over "output market"), ¶ 92 (claiming patients lack substitutes for hospital care), ¶ 99 (asserting "patient care" is harmed by downsizing); *see also* ¶ 8 (discussing a "wage study"), ¶ 64 (describing "hospital concentration"), ¶¶ 120–25 (noting "economic studies"), ¶ 161 (assertion about unions).

Plaintiffs cannot simply lump different groups of employees into a single product market through conclusory allegations. *See* *Todd v. Exxon Corp.*, 275 F.3d 191, 202 n.5 (2d Cir. 2001) (emphasizing "different types of employees" require different proof of "interchangeability among employers"). Nor can they ask the Court to consider after-the-fact assertions in an opposition brief when "determining the sufficiency of [a] complaint." *Frederico v. Home Depot*, 507 F.3d 188, 201–202 (3d Cir. 2007). At bottom, Plaintiffs plead little more than the conclusory claim that "Skilled Healthcare Workers" have "specialized" skills. Am. Compl. 1 n.1. Accepting that assertion as sufficient would defy *Twombly*'s insistence on "'specificity in pleading,'" 550 U.S. at 558, and the Third Circuit's market-definition rules, *Queen City*, 124 F.3d at 436–437.

Plaintiffs next say "empirical studies" cited in the Amended Complaint support their product market definition. Opp. 9 (citing ¶¶ 58, 119–128). For reasons UPMC already explained—and to which Plaintiffs never respond—those studies do the opposite. UPMC Br. 10. Prager and Schmitt, for instance, explain "Nursing and pharmacy workers" may "***substitute to employment in non-hospital settings***." *Emp'r Consol. and Wages: Evidence from Hosps.*, 111 Am. Econ. Rev. 397, 405 (2021) (emphasis added; referenced ¶¶ 58, 120). That is the exact opposite of Plaintiffs' argument. *See also* S. Allegretto & D. Graham-Squire, *Monopsony in Prof'l Lab. Mkts.: Hosp. Sys. Concentration and Nurse Wages* 12 (Ctr. Econ. & Policy Rsch., Jan. 5, 2023) (analyzing "registered nurses employed in the hospital *and urgent care sectors*" because both are "potentially affected by hospital consolidation" (emphasis added; referenced ¶ 58)). In the Third Circuit, courts reject assertions (like Plaintiffs' empty claims here) that are "contradicted by 'documents incorporated into the complaint by reference.'" *E.g.*, *Sapir v. Averback*, 2016 WL 554581, at *10 (D.N.J. Feb. 10, 2016); *see Twombly*, 550 U.S. at 569 n.13 (The court "was entitled to take notice of the full contents of the published articles referenced in the complaint.").

Plaintiffs also say that "other federal courts" have accepted similar product markets (Opp. 9), but those other cases only highlight the deficiencies in this Amended Complaint. Unlike here, the pleadings in those cases did expressly and plausibly differentiate jobs within the proposed market from potential substitutes. In *Clarke v. Baptist Memorial Healthcare*, for example, the parties *agreed* that hospital and non-hospital Registered Nurse positions in Memphis could at that time "differ in 'benefits, hours, working conditions, and other relevant factors,'" and the plaintiffs alleged (among other facts) significant wage and other career differentials between hospital and non-hospital Memphis Registered Nurses. 2007 WL 9870961, at *10–11 (W.D. Tenn. May 17, 2007). The pleadings were thus sufficient to "differentiate hospital employment from non-hospital

employment" for the narrow putative class of specific nurses alleged. *Id*. at *11. Plaintiffs offer no such allegations for their broad list of all "Skilled Healthcare Workers" here.[1]

Plaintiffs' reliance on *Weiss v. York Hospital*, 745 F.2d 786 (3d Cir. 1984), is even more of a stretch. Their argument comes down to this: because the Third Circuit sustained a York-area hospital services product market (not a labor market) based on the trial record in that case (*id*. at 825), the Amended Complaint in this case therefore sufficiently alleges a hospital labor market for the entirety of the claimed multi-state "Relevant Market." That is a *non sequitur*, and *Weiss* supports the opposite conclusion. The *Weiss* court upheld the jury's product-market determination because plaintiffs' expert explained multiple ways in which out-of-hospital medical care was not a substitute for in-hospital medical care. *Id*. at 826–827. Such evidence differentiated the *Weiss* product market from available substitutes. In contrast, Plaintiffs agree their labor market definition must take substitute positions into account (Opp. 8), but they do not offer any well-pleaded allegations that do so. Nothing in *Weiss* or any other case allows Plaintiffs to allege a discrete labor product market by simply naming a handful of job categories.

Finally, Plaintiffs resort to arguing that market definition is best addressed in discovery. But the problem is not the "precise parameters of the proposed class." *Id.* at 9. It is the blatant failure to plead a market in light of "the rule of reasonable interchangeability." *See Queen City*, 124 F.3d at 436. An inadequate product market is not a free ticket to class discovery.

**B. Plaintiffs' Geographic Market Remains Implausible**

The Amended Complaint asserts in conclusory fashion that the geographic market is

[1] For the same reasons, Plaintiffs' other precedent is inapposite. *See Todd*, 275 F.3d at 203–206 (alleging comparative wages, distinct experiences, and industry recognition); *Giordano v. Saks Inc.*, 654 F. Supp. 3d 174, 206 (E.D.N.Y. 2023), *appeal pending* No. 23-600 (showing distinct "skill set"); *Aya Healthcare Servs., Inc. v. AMN Healthcare*, 2018 WL 3032552, at *19 (S.D. Cal. June 19, 2018) (showing "no other service" competes).

"Where UPMC Operates Hospitals," a multi-state area precisely crafted to match UPMC's total hospital footprint today. Opp. 10; *see* ¶ 71. But the Amended Complaint alleges no facts to demonstrate how those boundaries conform to commercial reality in healthcare; why the geographic market should be the same for each job in the putative class; why all UPMC hospitals are within the market but competing health systems in neighboring counties are not; or why UPMC's current footprint should apply for the duration of the 28-year class period when Plaintiffs simultaneously allege that UPMC has significantly expanded since 2016. *See* UPMC Br. 11–13.

The Opposition largely ignores these deficiencies and accuses UPMC of "prematurely" arguing fact issues by challenging whether the Amended Complaint adequately alleges this essential element. Opp. 11. In at least two respects, however, the Opposition demonstrates exactly why the Amended Complaint fails to allege a geographic market and must be dismissed.

*First*, Plaintiffs admit that the employee's "point of view" is the relevant one when setting the geographic market. *Id*. at 11. Indeed, that is why courts reject faux markets defined—like this one—solely by the presence of the allegedly dominant firm. *See* *Eichorn v. AT & T Corp.*, 248 F.3d 131, 147–148 (3d Cir. 2001); *see also* *Cable Line, Inc. v. Comcast Cable Commc'ns of Penn.*, 2018 WL 2209518, at *7 (M.D. Pa. May 14, 2018) (rejecting market defined by plaintiffs' presence). Plaintiffs' problem is not that the geographic market is "*limited* to UPMC facilities," as they attempt to argue. *See* Opp. 11 (emphasis added). It is that their purported market is defined *only* by the presence of UPMC facilities and nothing more, regardless of any employee's point of view. It makes no sense and is implausible, for instance, that Plaintiffs claim nurses in Northumberland County are unwilling to commute to neighboring Schuylkill County to work at a Geisinger hospital, but they are willing to commute the same distance (or even farther) in the opposite direction to work at UPMC. UPMC Br. 12.

*Second*, rather than defend their claims as pleaded, Plaintiffs again attempt to rewrite the Amended Complaint. They now assert, by alleging "six contiguous regions" across Pennsylvania and parts of four additional states, "the Relevant Market is limited by the distance in which Skilled Healthcare Workers are willing to commute or relocate." Opp. 11. But the Amended Complaint says nothing about commuting preferences of "Skilled Healthcare Workers." It simply copies a map of UPMC's current footprint, with no well-pleaded facts that could explain why that map reflects a plausible geographic market for the workers at issue. *See* ¶ 71. If anything, Plaintiffs' new theory about commuting highlights the contradiction in their Amended Complaint: they define a broad, multi-state market, but then rely on allegations about local market shares and local wages. UPMC Br. 12. Injecting new (and unpleaded) assertions about commuting does nothing to fix this problem; it simply confirms they have no basis for defining a market that both *includes* all UPMC hospitals and *excludes* rival employers in neighboring counties.

These are not mere fact questions about whether the market is "too broad and too narrow." Opp. at 8. They are pleading deficiencies requiring dismissal. *E.g.*, *Concord Assocs., L.P. v. Ent. Properties Tr.*, 817 F.3d 46, 53–55 (2d Cir. 2016) (dismissal for implausible geographic market).

**C. The Statement of Interest Also Ignores Plaintiffs' Pleading Burden**

The SOI cannot rescue Plaintiffs' pleading failures. The SOI offers only conclusory defenses of the actual market allegations; makes no attempt to explain how Plaintiffs plausibly allege the elements of an antitrust claim; and does not address the geographic market at all.

The SOI echoes Plaintiffs' mistaken position that it is premature to assess an alleged market on the pleadings. As set forth above, ample precedent doing exactly what this Court should do—dismiss for failure to adequately plead facts to support a relevant antitrust market—belies that argument. Indeed, the Department has acknowledged elsewhere the well-settled principle that "[c]ourts dismiss antitrust claims that are based on allegations of markets that are not limited to

substitutes." Statement of Interest 10, in *Intel Corp. v. Fortress Investment Group*, No. 3:19-cv-07651 (N.D. Cal. Nov 20, 2019). In *Intel*, the Department emphasized many other "examples where courts have dismissed claims, at the pleadings stage" due to improper market definitions. *Id*. (discussing, *e.g.*, *Westlake Servs., LLC v. Credit Acceptance Corp.*, 2015 WL 9948723, at *4–5 (C.D. Cal. Dec. 7, 2015) (dismissing product market not limited to plausible substitutes); *Seirus Innovative Accessories, Inc. v. Cabela's, Inc.*, 2010 WL 6675046, at *3 (S.D. Cal. Apr. 20, 2010) (same); *Med Vets Inc. v. VIP Petcare Holdings, Inc.*, 2019 WL 1767335, at *4–5 (N.D. Cal. Apr. 22, 2019) (market definition failed to delineate substitutes)).[2] The same applies here. Dismissing Plaintiffs' inadequate Amended Complaint says nothing about antitrust law at large, and has no impact on the government's authority to bring properly grounded enforcement actions.

## II. Not Only Do Plaintiffs Fail to Allege Market Power, They Also Continue to Impermissibly Conflate Different Markets

The Opposition does not dispute that Plaintiffs must plead sufficient market power or that the usual way to do so is to allege a dominant share of the relevant market. *See Harrison Aire, Inc. v. Aerostar Int'l, Inc.*, 423 F.3d 374, 381–382 (3d Cir. 2005). But, what is UPMC's market share of Skilled Healthcare Workers across the entire five-state "Relevant Market"? The Amended Complaint doesn't say. And nothing in the Opposition overcomes that fatal gap in the pleadings.

### A. Plaintiffs Have Not Pleaded Direct Evidence of Market Power

Plaintiffs first argue they need not allege actual market share because this is one of the

[2] The SOI cites to four Third Circuit decisions supposedly suggesting that, "at the motion to dismiss stage," district courts must defer to a factfinder's resolution of "market-definition issues." SOI 9. Each of those cases predates *Twombly*, and none addresses the standard for pleading a relevant market. *See Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 199 (3d Cir. 1992) (jury product market finding); *Weiss*, 745 F.2d at 826 (same); *Tunis Bros. Co. v. Ford Motor Co.*, 952 F.2d 715, 725 (3d Cir. 1991) (trial evidence *did not* support jury's product market finding); *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 188 (3d Cir. 2005) (trial decision); *see also Brown Shoe Co. v. United States*, 370 U.S. 294, 338 (1962) (trial evidence).

"'rare' cases" where they can allege direct evidence of market power. Opp. 13 (quoting *Mylan Pharms. Inc. v. Warner Chilcott Pub. Ltd. Co.*, 838 F.3d 421, 434 (3d Cir. 2016)). The allegations come nowhere close to meeting the high bar for pleading a direct-evidence case. In the Third Circuit, direct evidence of market power requires "an abnormally high price-cost margin" (that is, "supracompetitive prices") and "restricted output." *Carpenter Tech. Corp. v. Allegheny Techs. Inc.*, 2011 WL 4528303, at *12 (E.D. Pa. Sept. 30, 2011) (quotations omitted); *see* *Mylan*, 838 F.3d at 434–435. Plaintiffs' allegations do not meet this standard. Plaintiffs instead try to analogize alleged downsizing at discrete locations to a "restriction of output" across the Relevant Market. But Plaintiffs do not allege any actual change in either healthcare services or the total number of Skilled Healthcare Worker positions in the Relevant Market. Similarly, allegations about "lower wages" in a handful of areas within the Relevant Market (Opp. 14) say nothing about either UPMC's price-cost *margin* anywhere, or that its price-cost margin throughout the entire Relevant Market is "abnormally high." *Carpenter*, 2011 WL 4528303, at *12. Plaintiffs' primary support for their claim of suppressed wages—a union-funded "wage study"—does not show UPMC restricted wages below competitive levels across the Relevant Market. Indeed, it shows the opposite. If wages at UPMC facilities vary based on local market shares, UPMC does not have the power to exclude competing employers and suppress wages throughout the alleged relevant market. UPMC Br. 15. Plaintiffs thus fail to meet the Third Circuit's test.

The SOI suggests there may be other ways of alleging direct evidence of market power in § 2 cases. SOI 10. As a filing by a nonparty, the SOI cannot "advance or expand arguments not presented by the parties." *United States ex rel. Kuriyan v. HCSC Ins. Servs. Co.*, 2021 WL 5238332, at *1 (D.N.M. Jan. 29, 2021) (striking a § 517 statement of interest); *see also* *United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020). Regardless, the SOI fails to identify *any* § 2

case where direct evidence of market power was sustained *absent* "evidence of supracompetitive prices and restricted output." Mylan, 838 F.3d at 434 (quotation marks omitted); *accord* *Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc.*, 386 F.3d 485, 500 (2d Cir. 2004) (plaintiffs cannot directly show market power without evidence of margins and restricted output); *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995) (direct evidence under the Sherman Act requires "the plaintiff [to] put[] forth evidence of restricted output and supracompetitive prices").[3] Nor does the SOI ever say *what* new test should be applied here, or *how* the Amended Complaint's allegations satisfy that unspecified standard.

### B. Plaintiffs Have Not Pleaded Indirect Evidence of Market Power

Plaintiffs also argue that they circumstantially alleged UPMC's market power as an *employer* of "Skilled Healthcare Workers" by pleading UPMC's share of the *provider* market for healthcare services to hospital patients. Opp. 15–17. The contortion fails for two reasons.

*First*, as UPMC demonstrated, even looking at the healthcare services provider market alone, the Amended Complaint does not allege UPMC's share in the relevant area. UPMC Br. 14. Plaintiffs instead point to 11 discrete "statistical areas" scattered throughout UPMC's footprint and allege different shares of those local provider markets—shares that vary from 7 to 100 percent. *Id.*; *see* ¶¶ 97–98. The Opposition again tries to shore up the pleadings, arguing that these 11 statistical areas—some as small as Oil City—"compris[e] the Relevant Market." Opp. 16. But nothing in the Amended Complaint alleges that the Relevant Market includes *only* these 11

[3] The closest the SOI gets is to note that, in another case, "the fact that a firm 'sets prices with little concern for its competitors'" was direct evidence of monopoly power. SOI 10 (quoting *Dentsply*, 399 F.3d at 191). *Dentsply* did not sustain a direct-evidence theory without reference to price, margin, and output, though. Rather, the evidence that helped sustain the claims *included* an express analysis of supracompetitive prices and persistently elevated margins. *Id.* at 188–191. Because there are no such allegations here, *Dentsply* lends no support to Plaintiffs.

statistical areas.[4] Plaintiffs' burden at the pleading stage is to plausibly allege monopsony power throughout the entire Relevant Market. They never do, and cannot get there by looking at UPMC's share of a different product market in a small subset of locations.

*Second*, Plaintiffs cite no authority for using local monopoly power in a *services* market to substitute for monopsony power in a multi-state *labor* market. The only case they cite is *Le v. Zuffa*, 216 F. Supp. 3d 1154 (D. Nev. 2016). Opp. 13–14, 16–17, 19, 21. There, the plaintiffs attempted to bolster claims of monopsony power over a national market of "Elite Professional MMA Fighter[s]" by, among other things, showing the defendant's power in the national market for producing elite fighting events. *Le*, 216 F. Supp 3d at 1159, 1165. That is an inapt comparison. *Le*'s product market was far narrower: it involved fighters only, not everyone with skills relevant to MMA bouts (fighters, announcers, production staff, etc.). And *Le* did not also attempt—like Plaintiffs do here—the sleight of hand of alleging market power in discrete localities rather than throughout the relevant geographic market. *Le* does not support Plaintiffs' attempt to allege market power over a range of different job categories by looking at UPMC's output share in a few local markets. Notably, the SOI never tries to defend the theory of indirect evidence that Plaintiffs assert here. The SOI instead agrees with UPMC that any indirect-evidence theory requires Plaintiffs to allege "monopsony power 'in the relevant market.'" SOI 10. Plaintiffs have not done so.

## III. The Amended Complaint Should Be Dismissed for Lack of Exclusionary Conduct

### A. Plaintiffs Do Not Identify Any Exclusionary Conduct

Plaintiffs must allege facts establishing that UPMC acquired or maintained monopsony power through exclusionary conduct that harmed competition. *See Phila. Taxi Ass'n*, 886 F.3d at

[4] The Court can judicially notice that as of 2023, the federal government recognizes approximately 50 different statistical areas in Pennsylvania alone. *See* Revised Delineations of Metropolitan Statistical Areas, OMB Bulletin No. 23-01 at 170–172 (July 21, 2023), *available at* https://www.whitehouse.gov/wp-content/uploads/2023/07/OMB-Bulletin-23-01.pdf.

341, 346 (dismissing for lack of anticompetitive conduct). Plaintiffs have not alleged that UPMC actually excluded any competing employer of "Skilled Healthcare Workers"—a point the Opposition never denies. UPMC Br. 16–22. Plaintiffs instead try to tally up UPMC's alleged conduct "as a whole." Opp. 18. But claims are not stated by stacking together non-actionable, conclusory, and illogical allegations. "To put it succinctly . . . zero plus zero equals zero." *City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc.*, 442 F. App'x 672, 675 (3d Cir. 2011).

The Opposition points to hospital "acquisitions" and lumps them together with alleged "mobility restrictions" like noncompete agreements, alleged "blacklists," tuition benefits, and market-based wages. Opp. 19–21. But Plaintiffs concede they are "not alleging that the acquisitions themselves are exclusionary," and Plaintiffs' generic arguments that UPMC's acquisitions left them "unable to sell their labor in a competitive market" are wholly conclusory and unsupported by any factual allegations. *Id.* at 19. Plaintiffs never explain, for example, how acquisitions in regions where UPMC had no other facilities supposedly harmed competition.

Plaintiffs also do not dispute that *none* of the putative class members is subject to any alleged noncompete agreement. *See id.*; UPMC Br. 18. Nor do Plaintiffs ever explain why as a matter of "common sense" their allegations about market-based wages and tuition assistance support a plausible claim. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009); *see also* UPMC Br. 18–21; Opp. 20–22. How is it plausible that UPMC offering a "market" wage, which varies by geography, would prevent other employers from competing against UPMC? UPMC Br. 18. Plaintiffs never say. If UPMC is paying market wages, then by definition, competition is working. And how is it plausible for optional tuition assistance to prevent other employers from competing, given that rival employers are free to attract employees by reimbursing the very tuition costs at issue? *Id.* at 19. Again, no response. On the alleged blacklist, Plaintiffs cite *Broadcom Corp. v.*

*Qualcomm Inc.*, 501 F.3d 297 (3d Cir. 2007), which did not involve blacklists, and argue that UPMC's alleged refusal to rehire "troublemakers" and "malcontents" is intended to "keep workers in line." Opp. 20–22. But antitrust laws protect competition, not the right of "troublemakers" and "malcontents" to be rehired. Plaintiffs' blacklist theory is nothing more than an attempt to substitute recycled employment grievances for relevant antitrust elements.

What is left is a series of conclusory and improper allegations, none of which the Court can credit. The Opposition reiterates allegations from old lawsuits (*id*. at 20–21), but it does not dispute that "allegations about allegations" are unsupported by well-pleaded facts and cannot support a claim. UPMC Br. 21 & n.4. Similarly, Plaintiffs argue that UPMC "engag[es] in 'data blocking' to impede the flow of patient information." Opp. 20. A close look at the allegations in the Amended Complaint, however, shows that they are not directed at UPMC: "data blocking" is a tactic that Plaintiffs say "*[h]ealth systems*" frequently use, but they include no allegations that UPMC itself employs such tactics. ¶¶ 104–105 (emphasis added). Innuendo is not valid pleading.

Nor do Plaintiffs explain how alleged "hostility" to unions can harm competition (or can be properly adjudicated by a court in the first instance, UPMC Br. 22 n.5). Plaintiffs cite only a series of cases that recognize that unions may have standing to assert antitrust injuries. Opp. 22. That is irrelevant and conflates injury to an employee or union with harm to competition. The only issue here is whether UPMC's alleged resistance to unions excludes other employers from competing for "Skilled Healthcare Workers." Plaintiffs' silence on that point is again deafening.

None of the allegations in the Amended Complaint—either individually or taken together—satisfies Plaintiffs' burden to plausibly allege exclusionary conduct impacting competition in the "Relevant Market."

### B. The SOI's Legal Arguments Are Misplaced

Again without any meaningful analysis of the allegations in this Amended Complaint, the

SOI offers a series of abstract legal arguments and accuses UPMC of "mistat[ing] the law." SOI 11.[5] The SOI either misconstrues or misstates UPMC's positions.

*First*, the SOI focuses heavily on mergers, but spends the bulk of this argument quibbling over semantics. *Id.* at 11–16. The SOI takes issue with UPMC stating that mergers are "presumptively" lawful. *Id.* at 11. But UPMC is not suggesting any heightened pleading requirement. UPMC Br. 16–17. UPMC's point is simply that a merger is lawful unless a plaintiff alleges and ultimately proves that it is anticompetitive. The SOI agrees, conceding as it must that "the plaintiff *bears the burden* of establishing a prima facie case" that a merger is anticompetitive. SOI 12 (emphasis added) (quoting *United States v. United States Sugar Co.*, 73 F.4th 197, 203 (3d Cir. 2023)); *see also id.* at 11 (similar) (quoting *FTC v. Hackensack Meridian Health, Inc.*, 30 F.4th 160, 166 (3d Cir. 2002)). It is similarly undisputed that there is *nothing unlawful* about the fact of a merger itself. *Id.* at 13 (arguing that mergers as a "means of exclusion" may be unlawful); *see also United States v. Am. Tobacco Co.*, 221 U.S. 106, 182 (1911) (that "many corporations" were "united" by mergers was not itself anticompetitive, but *subsequent* exclusionary acts were). And of course, the SOI cannot contest that where § 2 allegations fail to connect a merger to exclusionary conduct, they must be dismissed. In short, however phrased, the point is that Plaintiffs must allege sufficient facts showing that UPMC's mergers (many of which preserved local healthcare in acutely underserved rural areas) were unlawful. A complaint (like Plaintiffs') that lists mergers without connecting them to exclusionary conduct must be dismissed.

*Second*, the SOI accuses UPMC of "misstat[ing] the applicable legal standards" by

[5] Where the SOI does address the actual claims in this case, it does nothing more than parrot Plaintiffs' conclusory allegations. For instance, the SOI quotes Plaintiffs' allegation that acquisitions helped UPMC become "dominant" in the "labor market." SOI 16 (¶ 72). Once again, a conclusory assertion of "dominance" is insufficient, and Plaintiffs do not allege UPMC's share in the "Relevant Market" or show some measure of "dominance."

applying the duty-to-deal test to alleged refusals to deal with former employees, when that "narrow" test should instead be limited "to refusals to deal *with rivals*." SOI 17 (emphasis added). Here, the SOI relies on failed attempts to change the law, not on binding or persuasive precedent. In *Meta Platforms*, for example, the Department similarly attempted to distinguish Facebook's refusals to deal *with app developers* from refusals to deal *with rival platforms*. Brief of the United States at *14–15, in *New York v. Meta Platforms*, No. 21-7078 (D.C. Cir. July. 29, 2021). In doing so, the Department made the same effort to narrow the governing law as the SOI does here. *Compare* SOI at 17 (arguing here that the no-duty-to-deal-with-rivals rule governs a "'narrow' category of conduct" and "applies in only two situations"), *with* Brief in *Meta Platforms* at *14–15 (arguing, similarly, that only "two narrow, related situations . . . are properly analyzed as unilateral refusals to deal with rivals"). Over the Department's objection, however, the D.C. Circuit affirmed the district court's order dismissing the complaint for failure to state a claim. The panel noted the "general rule [that] businesses are free to choose the parties with whom they will deal," and did not adopt the Department's efforts to distinguish past cases, including *Trinko*, which make clear that an alleged monopolist has a duty to deal only in narrow circumstances that are inapplicable here. *New York v. Meta Platforms, Inc.*, 66 F.4th 288, 306 (D.C. Cir. 2023); UPMC Br. 20–21 (discussing *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408–409 (2004)); *see also New York v. Facebook, Inc.*, 549 F. Supp. 3d 6, 28–29 (D.D.C. 2021) (articulating three criteria necessary to show an unlawful refusal to deal and dismissing the case).

The SOI also cites no case that supports imposing a legal duty on UPMC to rehire former employees. *See* UPMC Br. 20–21. The cases it cites relate to a different issue—efforts to block *others* from dealing with a competitor. In *Chase Mfg., Inc. v. Johns Manville Corp.*, for instance, the parties agreed that the district court should not have analyzed through a duty-to-deal framework

an effort to organize a boycott of a particular upstart rival. 84 F.4th 1157, 1173 (10th Cir. 2023). There, the defendant-supplier applied "heavy economic pressure" to its distributors, refusing to sell any of its extensive line of products and threatening delayed shipments if they purchased a particular competing product from another supplier. *Id.* at 1165, 1172. The defendant was not picking and choosing its *own* relationships—it was attempting to block *others* from dealing with a particular competitor. So too in *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 463 (1992) (impermissible tying to block competitors), and *Lorain J. Co. v. United States*, 342 U.S. 143, 152 (1951) ("forcing advertisers to boycott a competing radio station").

The SOI also relies on *Broadcom*, 501 F.3d at 315. SOI 18; *see also* Opp. 20. But once more, that case did not involve allegations of blacklists. *See* 501 F.3d at 315–316. *Broadcom* says nothing about a duty to rehire employees.

Nor do the SOI's other authorities. In *Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, the Fourth Circuit concluded that a defendant who unilaterally terminated a profitable agreement with a rival power company to achieve an anticompetitive end could be held liable under a § 2 duty-to-deal theory. 111 F.4th 337, 342, 364–365 (4th Cir. 2024). This falls squarely within *Trinko*'s framework. Indeed, the court reiterated the "typical[]" rule that "firms have no duty to deal with their competitors." *Id.* at 362. And in *Novell, Inc. v. Microsoft Corp.*, then-Judge Gorsuch *rejected* a duty to deal in that case, holding that "Microsoft's conduct does not qualify as anticompetitive behavior." 731 F.3d 1064, 1080 (10th Cir. 2013).

The SOI also speculates that an employer's alleged opposition to unions "arguably" limits a unionized competitor's ability to "compete profitably." SOI 20. The sole case that the SOI cites on this issue has nothing to do with unionization. Moreover, the SOI's bald theorizing is disconnected from the Amended Complaint, which never alleges any harm to a competing

employer from UPMC's allegedly anti-union activities. What matters here is competition to hire workers. If employees desire to work at unionized hospitals, then UPMC's unionized rivals should have no problem competing for talent. UPMC Br. 22. Neither Plaintiffs nor the SOI has identified a single case where alleged opposition to unionization somehow harmed competition in a labor market. That is not surprising: labor law—not antitrust law—exists to mediate disputes between employers and employees over unionization.

## IV. Plaintiffs Do Not Allege Concealment and Err in Describing Continuing Violations

The Opposition admits that the governing statute of limitations is four years. Opp. 23. The allegations about mergers and lawsuits are thus all time-barred, as the Amended Complaint does not allege any merger within the last four years. UPMC Br. 22. Nor can Plaintiffs pursue any claim based on non-merger conduct that occurred (if at all) outside the limitations period. Although Plaintiffs try to invoke fraudulent concealment or the continuing violations doctrine to keep alive 28 years' worth of alleged damages, neither doctrine applies.

### A. Plaintiffs Confirm That They Cannot Allege Fraudulent Concealment

Plaintiffs do not dispute that a heightened pleading standard applies to allegations of fraudulent concealment, and they never claim to have alleged fraud with particularity. Plaintiffs rest their fraudulent concealment argument on the alleged "blacklist" alone—they make no attempt to show how UPMC hid (or could have hidden) highly public acquisitions, a "market based" salary scale, or tuition assistance offered to employees. And despite arguing that the purported "blacklist policy" was "conducted in secret," Plaintiffs point to no act of concealment (let alone the when, where, and how), and expressly admit that UPMC's alleged tactics were "widely understood." Opp. 21, 23; *see also* ¶¶ 143–144 (alleging UPMC told two workers they were "not welcome to apply for any [UPMC] jobs" (quotation marks omitted)). That is not fraudulent concealment.

### B. The Continuing Violations Doctrine Is Inapplicable

Next, Plaintiffs—and the SOI—invoke the continuing violations rule. Opp. 24–25. That doctrine requires Plaintiffs to allege exclusionary acts within the limitations period. *See W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 106 (3d Cir. 2010) ("injurious acts in furtherance of the conspiracy" were performed "within the limitations period"). Thus, a "continuing violation is occasioned by continual unlawful acts, not continual ill effects from an original violation." *Cowell v. Palmer Twp.*, 263 F.3d 286, 293 (3d Cir. 2001) (quotation marks omitted). And even where it does apply, the doctrine does not throw the door open to decades of damages: "the plaintiff cannot use an independent, new predicate act as a bootstrap to recover for injuries caused by other earlier predicate acts that took place outside the limitations period." *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 190 (1997). At most, the doctrine may permit a litigant to recover for injuries stemming from illegal acts within the limitations period.

The problem for Plaintiffs is that the Amended Complaint does not identify any alleged unlawful acts within the past four years. The alleged mergers took place well outside the limitations period, and as other courts have held, an antitrust plaintiff cannot recover damages allegedly caused by an out-of-time merger, even if Plaintiffs were to plausibly allege lingering wage consequences. UPMC Br. 24 (citing cases). This is because mergers "occur in the public eye and at a reasonably certain date," and once a "merger is completed," the "continued existence of a merged entity is . . . simply the natural unabated inertial consequence" of the merger. *Midwestern Mach. Co. v. Nw. Airlines, Inc.*, 392 F.3d 265, 270–272 (8th Cir. 2004). Permitting a plaintiff to recover damages allegedly caused by mergers occurring many years (or even decades) before filing suit would eviscerate the statute of limitations. *Id.*

As for the various alleged employment grievances, for the reasons noted above, Plaintiffs do not plausibly allege that UPMC's conduct was exclusionary in the first place. Therefore, apart

from whether Plaintiffs have plausibly alleged that UPMC's out-of-time mergers were anticompetitive (they have not), Plaintiffs' Amended Complaint does not plausibly allege *any* exclusionary conduct within the limitations period. That requires dismissal of the entire Complaint. But even if the Court disagrees on that point, Plaintiffs still cannot recover damages from before the four-year limitations period. *See Klehr*, 521 U.S. at 190.

The SOI says that UPMC misstates the continuing violations doctrine, but its argument does not show how. UPMC has not disputed that a plaintiff can recover for injuries if they allege and prove exclusionary conduct within the limitations period, even if the anticompetitive conduct began earlier. SOI 20–22 (discussing *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 502 n.15 (1968)). And the SOI has not disputed that courts uniformly reject claims predicated on out-of-time mergers. As it must, the SOI acknowledges the common-sense holding in *Midwestern Machinery*, which distinguished *Hanover Shoe* as a case involving exclusionary conduct to maintain a monopoly within the limitations period. *See* 392 F.3d 265 at 270.

The crux of the SOI's disagreement is not with UPMC's articulation of the law, but whether Plaintiffs plausibly alleged exclusionary "ongoing employment restraints." SOI 23. They have not. That requires dismissal of the Amended Complaint. Regardless, all agree that Plaintiffs "can only recover for injuries stemming from conduct committed within the preceding four years." *Id.* at 21 n.3; *Klehr*, 521 U.S. at 190. That would leave Plaintiffs—assuming they could allege a plausible market, show market power, and overcome other hurdles—with a sliver of "exclusionary" conduct from which to try to cobble together a case: no mergers, and certainly not 28 years of damages.

**CONCLUSION**

For each independent reason in the briefs, UPMC's motion to dismiss should be granted.

Dated: October 23, 2024

Respectfully submitted,

/s/ *Rebekah B. Kcehowski*

Rebekah B. Kcehowski
(PA ID No. 90219)
Anderson T. Bailey (PA ID No. 206485)
Daniel P. Johnson (PA ID No. 335058)
JONES DAY
500 Grant Street, Suite 4500
Pittsburgh, PA 15219
Telephone: 412.391.3939
Fax: 412.394.7959
rbkcehowski@jonesday.com
atbailey@jonesday.com
dpjohnson@jonesday.com

David C. Kiernan (admitted pro hac vice)
JONES DAY
555 California St., 26th Fl.
San Francisco, CA 94104
Telephone: 415.626.3939
Fax: 415.875.5700
dkiernan@jonesday.com

Peter Schwingler (admitted pro hac vice)
JONES DAY
90 South Seventh Street, Suite 4950
Minneapolis, MN 55402
Telephone: 612.217.8866
Fax: 844.345.3178
pschwingler@jonesday.com

*Counsel for Defendant UPMC*

## CERTIFICATE OF SERVICE

I hereby certify that on October 23, 2024, this Reply in Support of Defendant's Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6) was filed and served on counsel of record via the United States District Court for the Western District of Pennsylvania's CM/ECF system.

/s/ *Rebekah B. Kcehowski*
Rebekah B. Kcehowski
(PA ID No. 90219)
JONES DAY
500 Grant Street, Suite 4500
Pittsburgh, PA 15219
Telephone: 412.391.3939
Fax: 412.394.7959
rbkcehowski@jonesday.com