IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

VICTORIA ROSS, individually :
and on behalf of herself and :
all others similarly situated, :
Plaintiffs :
:
v. : No. 1:24-CV-16-SPB
:
UNIVERSITY OF PITTSBURGH :
MEDICAL CENTER (UPMC), et al., :
Defendants :

Transcript of the proceedings on January 28, 2025, United States District Court, Erie, Pennsylvania, before District Judge Susan Paradise Baxter.

APPEARANCES:

For the Plaintiffs: Austin Blair Cohen, Esquire
Levin Sedran & Berman

Christopher K.L. Young, Esquire
Joseph Saveri Law Firm, LLP

Steven E. Riley, Jr., Esquire
Purchase George & Murphey, P.C.

For the Defendants: Rebekah B. Kcehowski, Esquire
Anderson T. Bailey, Esquire
Daniel Paul Johnson, Esquire
Jones Day - Pittsburgh

Peter Schwingler, Esquire
Jones Day - Minneapolis

Court Reporter: Janis L. Ferguson, RPR, CRR

Proceedings recorded by mechanical stenography; transcript produced by computer-aided transcription.

P R O C E E D I N G S

11:01 a.m.

(All parties present in open court.)

THE COURT: All right. I figure that we have the Movant start.

However, before we start, I just wanted to explain, in the Western District world, once you file a case, its name remains forever, whether someone is dismissed from it or whether you call it something else later. It will be forever to me the Ross v. UPMC case. And I noticed that the other filings have been coming in "Mizell."

We don't mind that that's the case, but you will find that we will always call it Ross, because that was the first. And then the docket remains the same unless there's a motion to change the docket. Okay? I just wanted to explain all that, when I keep calling it the Ross case, or if I do, so you're all aware.

And I think the first thing we should do is place all counsel's names on the record. So let's start with Plaintiffs' counsel.

MR. RILEY: Good morning, Your Honor. Tim Riley.

THE COURT: Good morning, Mr. Riley.

MR. COHEN: Good morning, Your Honor. Austin Cohen.

THE COURT: Good morning, Mr. Cohen.

MR. YOUNG: Good morning, Your Honor. Christopher

Young, Joseph Saveri Law Firm for Plaintiffs.

THE COURT: Nice to meet you all. Well, I know Mr. Riley quite well.

MS. KCEHOWSKI: Good morning, Your Honor. Becky Kcehowski from Jones Day for Defendant UPMC.

THE COURT: Good morning.

MR. SCHWINGLER: Good morning, Your Honor. Peter Schwingler from Jones Day for UPMC.

THE COURT: Good morning. And are those the Jones Day folks behind you?

MR. BAILEY: Good morning, Your Honor. Anderson Bailey, Jones Day, for Defendant.

THE COURT: Good morning.

MR. JOHNSON: Good morning, Your Honor. Daniel Johnson with Jones Day as well.

THE COURT: Good morning. Okay. And is anyone here from the Government?

(No response.)

(Discussion held off the record.)

THE COURT: I just wanted it noted on the record. I didn't know if they could come or continue on with the case.

All right. So I take it that -- well, I don't know. Is it going to be Ms. Kcehowski?

MS. KCEHOWSKI: Yes, Your Honor.

THE COURT: Okay.

MS. KCEHOWSKI: And one preliminary question before we get started. Would you like us to argue from here? Would you like us at the podium? Where -- what is your preference as to --

THE COURT: I don't have a preference. And whatever is more comfortable for you.

MS. KCEHOWSKI: Okay. Well, I appreciate --

THE COURT: We don't really have a podium. We have a podium, but it stays over there for some reason. So it's harder with your things, perhaps. But you're welcome to come up there. It's fine. We have a microphone there for you.

MS. KCEHOWSKI: I will do that. I will come up, Your Honor. Thank you.

THE COURT: Okay. Thank you.

MS. KCEHOWSKI: All right. Well, good morning, Your Honor. We appreciate your time this morning.

We are here today on our two pleading motions because the Plaintiffs don't even come close to alleging the facts that they would need to allege to pursue the large-scale anti-trust claim that they're putting forward in their Complaint.

They're trying to sweep in a 28-year class period, nearly three decades; everywhere UPMC has ever owned a hospital; hundreds of thousands of employees; and an unknown number of job titles. It's too many people, it's too much

time.

And what they fail to allege with sufficient facts are basic required elements of an anti-trust claim, the relevant market, labor competition, competing employers.

And in a case --

THE COURT: And it's hard to get -- wrap my hands around the relevant geographic market, I can tell you. That's a tough one.

MS. KCEHOWSKI: I appreciate that. And that's a key piece that we're planning to argue for -- for Your Honor this morning, and we'll talk about that.

And in this case, it's supposed to be about competition among employers to hire workers in this geographic market or otherwise. We don't know anything about competing employers from the Plaintiffs' Complaint.

So we've got this broad theory, basic pleading failures, and the Complaint can't move forward.

We've got four main pleading problems, Your Honor, that we plan to address in our argument this morning. The first is the failure of the product market. The second is failure of the geographic market. The third is a lack of exclusionary conduct. And the fourth is timeliness.

Now, these issues crosscut across the Motion to Dismiss and the Motion to Strike. So for efficiency, our plan was to argue those issues by issue, as opposed to motion, and

make clear as we're going through which one of the two motions that we're addressing.

We also plan to divide the arguments. I'm taking the first two on the market issues. My colleague, Mr. Schwingler, will argue the second two, with Your Honor's permission for that.

THE COURT: That makes some sense.

I do want to say, though, at the outset that the issue about the class representatives I think is more appropriately taken up once we do class discovery and we have a Motion to Certify.

MS. KCEHOWSKI: Okay.

THE COURT: So if you want to spend less time on that.

MS. KCEHOWSKI: So I -- I appreciate your comments. Sounds like we've got a little bit of work to do on -- on that issue.

THE COURT: On that issue.

MS. KCEHOWSKI: We'll be glad to answer any questions that -- that you might have.

We did also put together a few slides to help streamline. They're excerpts from the pleadings or the materials that are before Your Honor. The idea, we have to flip through as we work through. And with your permission, we've got copies for counsel. We would hand those up to -- to

Your Honor as well.

THE COURT: All right. Are you going to use the paper, or do you want to put them on the screen?

MS. KCEHOWSKI: We have paper. Just to keep it simple, planning to use the paper and can reference them that way.

THE COURT: I'm of the paper era. Thank you.

MS. KCEHOWSKI: You just never know. It makes it less complicated in some ways.

All right. May it please the Court. So the starting point for any Sherman Act Section 2 claim is the relevant market. This is a fundamental baseline allegation. Without it, the Court can't assess the other elements of the claim, whether it's the power to exclude competition from the market, whether it's the -- the ability to exclude competitors.

And we've got two components. We've got the product and the geography as part of the market components, and both have to be plausibly alleged.

So starting with the product market, the allegations here do fail the 12(b)(6) standard. The product market in this context is a buy side labor anti-trust market. It's monopsony power with allegations of power on the buy side of the theories. So the claim is focused on an employer; here alleged to be UPMC as a buyer of worker services.

And because we've got this labor market that's at issue, the product market, per se, is competing buyers of the at-issue worker services. And we're talking about alternative employers.

THE COURT: I'm going to stop you for one second. You're speaking a little quickly, and I can tell when my court reporter is getting -- getting a little nervous there. Thank you.

MS. KCEHOWSKI: Understood. I appreciate that. We talked about this in advance, and I'm already violating the very clear sign. So I will take note of that --

THE COURT: That's quite all right.

MS. KCEHOWSKI: -- and make an effort to -- to slow down.

THE COURT: That's okay.

MS. KCEHOWSKI: So we're looking at the question of who else hires these employees, who would these employees consider as alternative employers in -- in this market.

And the Third Circuit has an express pleading standard that applies in this context. It's an express pleading standard for alleging a product market. It governs in this case, is the Queen City Pizza standard. And we've excerpted that on Slide 2.

And there are two components to the Queen City Pizza rule. The first is that the Plaintiffs have to

plausibly define the product market with regard to the rule of reasonable interchangeability and cross-elasticity of demand.

(Attorney Kcehowski asked for clarification by the reporter.)

MS. KCEHOWSKI: Cross-elasticity. Elasticity.

And the second is they have to include plausibly interchangeable substitute products in the product market to plausibly allege that market.

So what does that mean in this context? It means that roughly equivalent economic substitute jobs need to be in product market or the Plaintiffs have to explain why there are no roughly equivalent economic substitute jobs. Otherwise, the market isn't pled adequately under the Queen City standard. And the First Amended Complaint here fails this test on both prongs.

So we've got thin allegations in the Complaint about the product market, but the Plaintiffs do set up their product market in a footnote. It's Footnote 1 of the First Amended Complaint. It's their definition of skilled healthcare workers. This is what they claim as their product or labor market in this case.

THE COURT: Can you explain to me, do you know -- or I'll ask the Plaintiffs. RN's, nurses, and LPN's, they have those as three separate categories in that definition of skilled healthcare workers, and I don't understand how

registered nurses are different from nurses. I do understand the difference of LPN's.

MS. KCEHOWSKI: So you've keyed in on a really important issue, Your Honor, and that's the vagueness in the definition. I plan to talk about that particular issue in the context of the Motion to Strike class allegations, because that vagueness, that lack of objectivity is a reason why this can't go forward as their class definition. And that's an issue that's layered on top of the issue with regard to the definition of the product market.

So as it relates to the product market, as you know, there's a lot that's unclear about this definition. But the one thing that is clear about this definition is, as highlighted here, the Plaintiffs are limiting the definition of skilled healthcare workers, their product market, to inpatient hospital jobs only. That's a specific limit on the product market, and the Plaintiffs have to meet the Queen City standard --

THE COURT: So we can't talk about private -- a nurse going with a private physician or a pharmacy worker going with Rite Aid.

MS. KCEHOWSKI: So what the Plaintiffs need to do -- that's correct, Your Honor. And what -- what the Plaintiffs need to do in this context, they've got to plead sufficient facts that would rule out those alternative employers that you

just identified as roughly equivalent economic substitute jobs, or they have to broaden their product market to include it in the product market. So they have to tell us --

(Attorney Kcehowski interrupted by the reporter.)

MS. KCEHOWSKI: Or they have to broaden their product market to include these alternative non-hospital employers. That's the Queen City standard.

And the problem, as you've identified, Your Honor, is that the Plaintiffs don't allege any facts to explain why these workers, in their skilled healthcare worker definition, could not get jobs outside the four walls of the hospital at alternative employers like you've identified.

And there are lots of options. You identified some. There are also nursing homes, home healthcare, outpatient surgery centers, urgent care centers, other residential facilities, retail pharmacies.

And the Plaintiffs actually concede these alternative employers. And we don't have to look any further than Paragraph 68 of the First Amended Complaint, which we have excerpted on Slide 4, where they're talking about all the UPMC-owned non-hospital facilities that are in this market.

So they plead senior communities, pediatric locations, urgent care centers, outpatient rehab, doctors' offices. And those are just the UPMC-owned facilities. None of these are in their product market. And then consider all

the other non-UPMC-owned nursing homes, surgery centers, clinics owned by other providers.

And the Plaintiffs haven't alleged facts to rule out these employers, they haven't alleged facts to support this hospital-only jobs market.

Another example, excerpt on Slide 5. I'm a nurse assistant. I'm included within the skilled healthcare definition. What do I do? The Plaintiffs don't tell us. But the Bureau of Labor Statistics, the government resource, does give us some context, and they say I'm a nurse assistant, I provide basic care, I help patients with activities of daily living. So I'm cleaning and bathing patients, I am taking vitals, serving meals, and helping patients eat. I can do that in the four walls of a hospital, but I can also do that at a skilled nursing facility, I can do it in a retirement community, I can do it in a home healthcare setting.

And, in fact, the Bureau of Labor Statistics, which we've also included on Slide 5 -- and we cited this handbook in our opposition to our Motion to Dismiss -- say that more of us nurse assistants work outside the hospital than work inside the hospital.

And what the Plaintiffs's Complaint does is effectively just assume away all these non-hospital employers; completely conclusory. They tell us nothing about the competing employers in this region. We've got no allegations

about differential wages in and out of the product market, difference in job duties or requirements in and out of the product market, specific skill sets --

THE COURT: Well, they don't exactly take them out. They bring them in, as you showed in the previous slide, sometimes and take them out other times. These -- these alternative places.

MS. KCEHOWSKI: Well, the -- what we've excerpted on Slide 68 is an allegation about UPMC's operations in the relevant market. And they have conceded that our operations include hospitals, but also include other types of facilities as well.

Their product market definition, which is Footnote 1 on Slide 3, is expressly limited to hospitals -- hospitals only. And so they've got to have allegation that rule out these other employers. They don't have that.

And it's more than just a failure of pleading here, Your Honor. The Plaintiff's actually plead themselves out of court on this issue. And here's why: They cite a series of studies in their First Amended Complaint, and those studies on their face establish repeatedly that healthcare workers within their definition can substitute to jobs that are reasonably comparable outside of the hospital setting.

And we've excerpted that on Slides 6 through 8; just a handful of -- of examples from those studies, Your

Honor. In the interest of time, I will say that each one of these -- each one of these recognizes that healthcare workers like those at issue, who are the nurses, others, they have options for comparable employment outside of and in non-hospital settings.

So Prager and Schmitt, this first example, says that --

(Attorney Kcehowski asked for clarification by the reporter.)

MS. KCEHOWSKI: Prager and Schmitt is the name. So it's the authors' names of this particular study. And they say that nursing and pharmacy workers may substitute to employment in non-hospital settings.

The next slide has an excerpt from Yett, which says that nurses can and do substitute to physician offices at appreciably similar salaries.

And the last example which we have on Slide 8 says that nurses can and do work in urgent care centers, other facilities.

So we have these totally conclusory allegations about a hospital-only job market with studies that contradict those conclusory allegations. The product market is not plausibly alleged.

And the Plaintiffs, they -- they agree they've got a pleading burden here. They claim they've done enough.

They point to a few paragraphs in the Amended Complaint, and they say it's a fact issue for later.

The issue for the Plaintiffs is all they do is use the word "specialized" again and again and again without any context. They never tell us what is specialized for the hospital setting versus the non-hospital setting for the workers that are within their definition. And just throwing out the word "specialized," with nothing to make it plausible, isn't sufficient, particularly where you've got their own studies in the Complaint contradicting those allegations.

So the product market allegations fail Twombly, they fail the Queen City standard, and that alone is a ground to grant the Motion to Dismiss.

The next issue, Your Honor, is the geographic market, which you flagged at the outset. And these allegations also fail under 12(b)(6).

So the geographic market in this context has got to be the area where these workers, given their skills, given the commercial realities of the industry, would look for alternative employment.

We agree with the Plaintiffs on that standard. It's where these employees, from their perspective, would go and look for other jobs.

THE COURT: Would that be taken care of by just building submarkets?

MS. KCEHOWSKI: No, it cannot be taken care of by building submarkets in this context, because it has to be plausibly alleged from the perspective of the employees where they would commute and where they would relocate. And the boundaries that have been identified here are not consistent with the commuting or relocating standards for skilled healthcare workers, in light of the commercial realities of the industry, the skills of these workers, and the relevant time period.

And the Plaintiffs do recognize that they need to allege something that recognizes these commercial realities, is consistent with the commuting and relocating of these workers, and they say they've done that.

In their brief, they say that they've alleged a market that's consistent with the commuting and relocating standards of -- of these workers.

And the issue here, Your Honor, is that the Plaintiffs do not include any allegations in their Complaint about the commuting or relocating preferences of these workers. Nothing else about commercial realities.

THE COURT: But that would be taken care of with an amendment?

MS. KCEHOWSKI: So, Your Honor, in terms of what they may or may not be able to do to amend, I think from our perspective, that's a -- that's a question that the Plaintiffs

would need to answer. We would consider it, to the extent that they wanted to draw large swaths of their Complaint here, narrow the geography, limit it to some specific job titles in a specific period of time. We would consider that, and we'd have to consider how it impacts the other elements of an anti-trust claim here.

THE COURT: We don't even have an understanding of that point with the six named Plaintiffs. Correct?

MS. KCEHOWSKI: I'm sorry, Your Honor?

THE COURT: We don't even have an understanding of where they could relocate or whether they could relocate, what their -- with the six named Plaintiffs, let alone the description of the class.

MS. KCEHOWSKI: That's correct. So there is nothing alleged as to the named Plaintiffs, to the other folks within the class.

And what they do is they pick up a map from UPMC's website, which is -- we've excerpted that on Slide 9. It's in Paragraph 71 of their Amended Complaint. And it's a map of where UPMC has identified administrative services, regions and has patient care locations. It doesn't have anything to do with those commuting and relocating preferences for the named Plaintiffs or -- or anybody else.

And it's -- it's the wrong perspective, it's the wrong market. It's UPMC's views of its regions where it

provides patient care. It is not skilled healthcare workers' views of where they could turn for alternative employment.

And as pled, it's just not plausible, Your Honor, for a number of reasons. It's a static geography. They have 28 years folded into this class period. They have pleaded elsewhere that UPMC's market had changed substantially over time in terms of where UPMC was operating its footprint. And they've got this static geographic market that's supposed to cover the entirety of that 28-year period.

It's also implausible as a geographic market for workers --

THE COURT: Could you tell me what the geographic market was at the beginning of the proposed class time?

MS. KCEHOWSKI: So what the Plaintiffs have alleged in Paragraph 71 is what they're calling the relevant geographic market, and they've alleged this singular static geographic market for the entirety of that nearly 30-year period. So they haven't given us an indication --

THE COURT: You have the first -- the first acquisition. What was that? '96, '97?

MS. KCEHOWSKI: They have alleged some initial acquisitions in -- in that time period, Your Honor, yes.

THE COURT: And they were all in the Allegheny County area, correct?

MS. KCEHOWSKI: The initial acquisitions were in the

Pittsburgh -- greater Pittsburgh region, right.

THE COURT: Okay. Go ahead.

MS. KCEHOWSKI: So this region, it's also implausible because even today -- so even if we take the market just static today --

THE COURT: The reason I asked that -- and I'm just going to follow up --

MS. KCEHOWSKI: Certainly.

THE COURT: -- so you can see what I was thinking.

My thought is you cannot have a continuing violation allegation if you don't have a larger market. Follow me on this. I hope I'm explaining it well. Because even though we start there, the acquisitions take on a broader geographic location.

And it wouldn't be continuing if there were smaller markets, would it? So that would mess the statute of limitations.

MS. KCEHOWSKI: So I think what you've identified is a -- is a very serious issue with the time period that the Plaintiffs have tried to fold into their Complaint here, and how they have not married up their allegations to the time period, to what they're alleging, and facts to make this geographic market plausible in 1996, today, or any time period down the road.

In terms of the statute of limitations, my

colleague, Mr. Schwingler, is planning to argue that issue, and I am sure he would --

THE COURT: But I think that sometimes these things are interrelated, and that may be why the geographic market is so large. It's just harder to look in such a large market for alternative -- to find the elasticity to look for alternatives, because some markets, Pittsburgh and Erie, have that readily obvious, others may not.

MS. KCEHOWSKI: So you're identifying issues and the reason why what they have alleged isn't plausible as a geographic market. And they certainly haven't alleged facts to explain these issues that you're identifying, Your Honor. They just haven't identified a market that would be consistent with where people are going to commute for jobs.

THE COURT: Well, they do sometimes. They'll throw in almost an anecdote of a hospital that was closed -- Lock Haven, for example. And then -- and then use that as an example of the reason the geographic market is large and as an example of the inability to find other positions in that area or have them to travel for a long distance. But then that's not representative of the rest of the market.

So my concern is: Do monopsonies lend themselves to a difficulty in describing a geographic market as a whole, so that they really don't have any other way to define it in their papers? Or do you think this is

particularly deficient and unable to be corrected?

MS. KCEHOWSKI: So, Your Honor, at least as pled, they have not met the standard that they concede is the standard here. So this does need to be plausibly defined in terms of these commuting and relocating preferences, and they don't talk about that at all.

So allegations about mergers --

THE COURT: No allegations of that.

MS. KCEHOWSKI: No allegations of that at all.

And it's just implausible to suggest that workers would not commute across county lines.

So on Slide 9, we've got this geographic market. It's the colored areas, with the gray areas that are allegedly outside of the geographic market. And workers commute over county lines all the time. And that includes -- we did a -- we did a closeup on Slide 10 of the county lines here on the eastern side of the market. And you can see that Northumberland, Columbia County, Dauphin County, Lebanon County, those are in the market, but you have that hard stop at the county boundaries. Schuylkill County is out, even though it's just right between counties that are in the market. They haven't alleged any facts that would exclude these neighboring counties. And Schuylkill County is home to Geisinger Hospitals, Lehigh Valley Health Network.

So they just haven't plausibly alleged that

these skilled healthcare workers would come farther in the opposite direction --

THE COURT: So you're suggesting it get bigger.

MS. KCEHOWSKI: So it could potentially be bigger. It's got to be -- it's got to be pled sufficiently to tie out to the workers they have in their class. It's got to be -- match commercial realities, the skills of the workers, the education, the demand, the industry focus. We don't have any of those allegations, so it is on its face deficient and another independent reason to grant the Motion to Dismiss.

So the last piece for me, Your Honor, goes back to the skilled healthcare worker definition. But this -- but in the context of the Rule 23(d) requirement and the Motion to Strike.

So we talked about the problems with that definition as it relates to the product market, the Motion to Dismiss, but the vagueness in that definition, the lack of specificity also creates this Rule 23(d) issue. This definition is it's so vague, it's so ambiguous that we can't tell --

THE COURT: Why is that not appropriate for a Motion for Class Certification instead?

MS. KCEHOWSKI: So on this point, I think it is important for us to talk for a minute about the pleading burden that the Plaintiffs have under Rule 23(d).

There is a pleading burden under that rule. It's separate from the Motion to Dismiss. The Plaintiffs concede it, the cases talk about it.

And that burden is they have to make a prima facie showing that the class requirements, Rule 23, are satisfied or discovery is likely to produce substantiation of those class allegations. And class allegations should be stricken from the Complaint where the Plaintiffs don't do that. So they have to do this on the face of the Complaint.

And the key case here, Your Honor, is the In Re: Railway Workers decision from Judge Conti in 2019. It is a labor market anti-trust case. And she does a lot of analysis of this Rule 23 burden and how it applies at the pleading stage.

And the pleading burden includes defining the class by objective criteria. That's the ascertainability requirement, and members of the class have to be identifiable by reliable and administratively feasible mechanism --

THE COURT: I wish we were back in the time when the ascertainability requirement wasn't there.

MS. KCEHOWSKI: I understand. But it is there in the Third Circuit --

THE COURT: That is a confusing requirement, despite Judge Brooks' efforts in his Tome opinions to explain it to me. All right.

MS. KCEHOWSKI: Understood.

THE COURT: So that's an ascertainability issue.

MS. KCEHOWSKI: It is, but it is -- it is simple as applied in this context, Your Honor: And that is they have to have objective criteria to define the class. And this definition the Footnote 1 is not objective for a number of reasons. It's highly subjective, it's got vague criteria on vague criteria.

We've highlighted on Slide 11 four key phrases to focus on there. And the first is, similar to as we talked in the product market definition, is this concept of specialized inpatient hospital skills. What does "specialized" mean in this context? We don't know, the Plaintiffs don't tell us, and they certainly don't define it by any objective criteria.

So every employee who works in a hospital at UPMC is left to wonder if their role is sufficiently specialized to inpatient hospital care, as opposed to any other type of care, to be somebody who has specialized inpatient hospital skills. It's vague, it's not objective, it's subjective.

They layer on top of that other requirements, whether it's formal education or training, extensive on-the-job training.

What's sufficiently formal? When does

something cross the line from informal training to formal training? The Plaintiffs don't tell us. They don't tell us anything objective about that. It is highly subjective.

So is training by a mentor enough? Is training by an elementary school a formal training? Is training by a high school, a trade school sufficient? Online courses?

THE COURT: Well, it says "on the job," so I don't know.

MS. KCEHOWSKI: Well, the first piece is formal education and training or --

THE COURT: Correct.

MS. KCEHOWSKI: -- as the result of extensive on-the-job training. So they've kind of got it as --

THE COURT: It doesn't say formal. That's your medical education.

MS. KCEHOWSKI: And that second point, to pick up on your point, Your Honor, when does training become extensive? Is it the first day on the job? A week on the job? A month on the job? A year?

And under the ascertainability requirement, another thing that is clear is that class members can't self-select to be in the class. They can't choose to be in the class because they feel like they had some training some day that was extensive.

The burden is on the Plaintiffs to make this

prima facie showing. They have to have a class that's defined by objective criteria.

And the last piece here goes to the point that Your Honor made at the beginning. So they've got this without limitations, it's all these things: Specialized inpatient skills, formal education, extensive on-the-job training, is without limitation, and then seven undefined job categories.

So what's in and out of those categories isn't defined. And the key question is the one that you raised. So there's RN's and LPN's. They've got licenses. We know what they are. Who else is a nurse? They haven't told us. That's something they could define, but they don't do it.

How about orderly? They haven't given us an objective criteria to determine who is or who is not an orderly.

Same thing with pharmacy workers. Is somebody who does computer entry a sufficiently specialized pharmacy worker, or do you have to do something more technical with the actual medications themselves?

And the last example I'd make on this point is the named Plaintiffs themselves. We've excerpted these allegations on Slide 12. And there you have allegations about Ms. Paulding and Ms. Peapples. Ms. Paulding is alleged to be a senior practitioner nursing student, and Ms. Peapples is alleged to be a senior -- or worked as a senior surgical

technologist. So those were their job titles that they've identified while they were working for UPMC.

Are those job titles in and out of class? And why? We don't know. The Plaintiffs haven't explained that to us. And so --

THE COURT: Well, they do say "without limitation."

MS. KCEHOWSKI: They do say "without limitation." But let's just take the nursing student example. Is that -- was she a nurse? Was she in the class for some other reason? At what point did her training as a student turn her into somebody who had sufficiently extensive or formal training to become a member of this class?

Those are the kinds of things that the Plaintiffs have an obligation to do at the outset of the case in defining the class with objective criteria. There's no amount of discovery that's going to make these terms less vague.

So, Your Honor, I appreciate your questions. I'm happy to answer any additional questions that you might have before turning it over to Mr. Schwingler. But this is the type of case that should be dismissed on the pleadings.

We've got basic requirements for sustainable claims that haven't been met. We are not asking on these issues for grandiose rulings of -- of anti-trust law. They've got to tell us something about the competing employers.

And, practically, if we don't have a well-defined market, we're not -- we're going to have a number of challenges in -- in litigating this case going forward. It's going to define what's relevant discovery, what's in, what's out, what third parties are in, what third parties are out. And without a well-defined market that meets the Twombly requirements, that meets the Queen City pleading standards, we're going to have any number of issues with that going forward.

So glad to answer any more questions. Otherwise, I'll turn it over to Mr. Schwingler.

THE COURT: Let's move on. I'll probably have more as we go. But thank you very much.

MS. KCEHOWSKI: I appreciate it, Your Honor. Thank you.

MR. SCHWINGLER: Good morning, Your Honor.

THE COURT: Good morning.

MR. SCHWINGLER: As Ms. Kcehowski noted, I'll focus on exclusionary conduct and the statute of limitations, but I did want to make one point about monopsony power.

THE COURT: Okay.

MR. SCHWINGLER: And the point is this: The starting point for monopsony power and for everything else is the alleged market.

And here, because the proposed relevant market

includes everywhere UPMC has a facility, that means the Plaintiffs must allege plausibly that UPMC has monopsony power everywhere it has a hospital.

And so when you look at Slide 9, that map of the relevant market, that means they have to allege UPMC has the power to suppress wages and exclude rival employers from the market everywhere on this map.

They do not allege UPMC's market share in the labor market in this region. It's not in the Complaint. And they do not allege that UPMC --

THE COURT: Well, they have a chart.

MR. SCHWINGLER: Their chart is not --

THE COURT: The HH --

MR. SCHWINGLER: Paragraph 97 of the Amended Complaint?

THE COURT: Yes.

MR. SCHWINGLER: Paragraph 97 is licensed hospital beds in specific statistical areas. So these are not labor market shares. And it is also not a share that would be covering the entire relevant market.

What's interesting about that chart, though, Your Honor, is that in several locations, by Plaintiff's admission, UPMC's share of beds is 7 percent -- 17 percent.

THE COURT: I saw that.

MR. SCHWINGLER: Yeah. And what they need to

plausibly allege is that UPMC has the economic clout to suppress wages at those facilities where they're surrounded by other rivals, other hospitals where presumably orderlies and nurses could go work if they are underpaid.

THE COURT: Just at a base level, when I saw that, my thinking was the other way around. That if they are closing hospitals or eliminating beds, then does that mean they're eliminating their market power? It didn't -- it didn't hit me correctly, that chart. But I was wondering if that chart alleged anything to you.

So thank you. Okay.

MR. SCHWINGLER: Yeah, I view it as essentially an admission that UPMC could not have monopsony power everywhere it has a hospital. But, again, they're -- they're simply talking about beds, and they're not talking about where --

THE COURT: Geography.

MR. SCHWINGLER: -- the employees could actually work.

And then they point to what they call direct evidence, which is the idea that if you've actually suppressed wages, that must be evidence you have the power to suppress wages.

But, again, they don't allege that UPMC has done that at every hospital in its current footprint, and so they don't support -- they don't allege monopsony power --

THE COURT: There is that question again. Would an amendment work?

MR. SCHWINGLER: So --

THE COURT: If you can't allege it, then we'd know.

MR. SCHWINGLER: I don't see how they could amend their Complaint to sustain the broad theory that they're currently pursuing. If they were to amend the Complaint, it would have to look fundamentally different than what -- the Complaint we're looking at today, and that will have significant problems for the other elements, which is actually probably a good transition to exclusionary conduct, unless the Court has more questions.

THE COURT: No, that's -- go ahead.

MR. SCHWINGLER: So it's black letter law that having monopsony power is not illegal, and neither is exercising that power, if you have it, by paying lower wages.

What violates Section 2 is the unlawful acquisition or maintenance of monopsony power through anti-competitive means.

So what does that mean? That is what courts call exclusionary conduct, and it's -- it's actually pretty simple. It's conduct that tends to destroy competition on the merits.

So we have a slide that lays out the Third Circuit language on this from the -- I believe it's the Mylan

Pharmaceuticals case, which is Slide --

(Atty. Schwingler asked for clarification by the reporter.)

MR. SCHWINGLER: Mylan Pharmaceuticals. And it's Slide 14, which says -- it says, "The Sherman Act directs itself against conduct which unfairly tends to destroy competition itself."

So Plaintiffs must allege that plausibly and not just anywhere, but across this entire geographic market. If they were to seek leave to amend or be given leave to amend and then try to narrow their markets, they would then have to show exclusionary conduct in each of those new markets.

THE COURT: But their allegations in that regard include, if I recall, a blacklist. Can you talk to me about that?

MR. SCHWINGLER: Yeah. So the first point I would make on the blacklist, Your Honor, is if you look at what they actually allege and they don't allege, it's entirely unclear what this blacklist actually is.

So they have -- I think, Paragraph 143. They generically refer to a blacklist. And then the very next sentence they start talking about hearsay; a common complaint among employees is this blacklist. And then they go on to say, over the course of 28 years and across 35 or 40 hospitals, they give a grand total of three examples of

employees who allegedly were not rehired, including one employee who was terminated after saying negative things in the press about UPMC and whether that -- you know, this isn't a labor complaint, this is a manager's complaint.

THE COURT: But they're going to say to me, I need discovery to find others. Here are some; I just need discovery.

MR. SCHWINGLER: They don't need discovery to allege whether this -- this blacklist actually exists and what it consists of. And that's -- so the starting point is what are the facts they've have alleged. The facts they've alleged are vague hearsay in three examples. They haven't plausibly alleged that UPMC actually has this system-wide blacklist not to hire anyone who leaves for any reason.

THE COURT: And didn't one of the named Plaintiffs come back?

MR. SCHWINGLER: I believe that's the case. And, in fact, many, many, many Plaintiffs have been re-hired by UPMC. That's not, of course, in the Complaint, but that's why the Plaintiffs can't put a clear allegation in front of the Court as to what this blacklist is or isn't.

So that's the starting point. But the more point is they have to connect this list, whatever it is, to harm to rival employers in their relevant market. Right? And so how did the blacklist affect other employers for these

employees in Erie, in Lancaster, in York? The Complaint is entirely silent on this.

THE COURT: But in an monopsony, isn't the harm to the worker?

MR. SCHWINGLER: Yes. So to -- to show damages, to collect damages, you would have to show impact to the worker. To show that the monopsony existed --

THE COURT: You have to show monopoly power, and to show that, you have to show harm to other hospitals.

MR. SCHWINGLER: Yes. The unlawful acquisition or maintenance of the monopsony power through the conduct.

So if your theory is there was a blacklist, well, how did that work? If you look at Paragraph 97 again and this allegation that in Oil City UPMC has 100 percent of the licensed beds, is that because Oil City is a rural, remote location, there are no other hospitals around because there's only 9,000 people, or is it because of a blacklist? Right? They don't have a claim if it's the former, and the Complaint is entirely silent on that critical issue.

THE COURT: They say that that's why they acquired these. Correct?

MR. SCHWINGLER: So the acquisitions is really kind of the crux of their Complaint, as I read it.

THE COURT: I'm trying to follow, and I'm losing out, so keep -- keep trying.

MR. SCHWINGLER: Yeah. Why don't I take a step back and let's just kind of walk through what --

THE COURT: Okay.

MR. SCHWINGLER: -- the three categories of conduct are. And we actually have them on Slide 14.

So the first -- and this is the heart of their case, I believe --

THE COURT: Yeah, because --

MR. SCHWINGLER: -- and that would be the hospital acquisitions.

So your Honor's question to Ms. Kcehowski earlier really kind of hit the nail on the head; what was the -- is the market the same for the entire period, and the answer is yes.

And so the Plaintiff's theory is that by acquiring a couple of hospitals in Pittsburgh in 1996, UPMC magically became a monopsonist over labor across this entire geographic region. That makes absolutely no sense.

Now, they don't allege any facts about the acquisitions in Pittsburgh that would suggest there was harm in Pittsburgh either. But it certainly doesn't allege that they unlawfully acquired monopsony power everywhere.

Then that's the starting point. So the starting point is '96, '97, '98, there's some acquisitions in the Pittsburgh area. Then you get to the teens. All of these

acquisitions, by the way, are more than four years before the Complaint was filed, all of them in broad daylight. These are reviewed by the government for anti-trust issues before they can close. And supposedly this was all part of the secret scheme to monopsonize the labor market. That just doesn't make any sense.

And I'll get to the timeliness issues later. But the bottom line is: How do you become a monopsonist over labor across this large region by acquiring some hospitals in 1996 in Pittsburgh? How does acquiring a hospital a few blocks from this courthouse in 2011 cement or solidify that monopsony power, which is what the Plaintiffs allege the subsequent acquisitions were intended to do. How does acquiring a hospital in Lancaster in 2017 have any impact on competition for -- for nurses or orderlies anywhere in the market, including in Lancaster, where the Plaintiffs concede the UPMC facility is a very small player. The Complaint is silent on all of this.

So our point isn't that a merger could never be part of a Section 2 claim. It's that all the Plaintiffs have alleged is the fact that these mergers occurred and nothing else.

The claim is facially implausible for the reasons I mentioned, but it also just fails Twombly, because there's nothing but labels and conclusions.

So that's the crux of the case. And then that brings us to sort of the -- the long tail. And the Plaintiffs do throw a lot at the wall trying to get around the statute of limitations. And we think about those allegations in two other categories.

So one would be -- we would call run-of-the-mill labor complaints; things that actually have nothing to do with competition. So that would include the allegation that workers are overworked and underpaid, that UPMC has a market-based wage structure that varies by location. In other words, UPMC is just like the Federal Government, the GS pay scale. And that UPMC has resisted unionization.

So these allegations have no bearing on the critical question, which is: What has UPMC done to exclude rival employers from competing for these workers through better wages, better working conditions, et cetera. It's a total non-sequitur, and so it gets them nowhere.

There's also a section of the Complaint that just repeats allegations from old lawsuits. Three reasons those don't count.

One, they're all well outside the statute of limitations.

Two, allegations about allegations are not well-pleaded facts. They don't count. And the Plaintiffs

don't actually dispute that in the briefing.

And then third, again, as with the blacklist allegation, the Plaintiffs do nothing to connect those old lawsuits -- or they axe that issue there with harm to labor competition throughout their market. For the most part, it looks like they are talking about competition in Pittsburgh, but it tells you nothing about Lancaster, Erie, Susquehanna, or anywhere else.

THE COURT: Makes me wonder why the case is here.

But here's my -- it seems to me that the only way they can lay out their tale of what has been going on year after year is to show this long time period of acquisition and downsizing and acquisition and downsizing.

What I don't understand -- and maybe you can help me -- is were they acquiring those acquisitions to -- how were they acquiring those acquisitions, under the Complaint, to monopolize power and then, as you point out, destroy other competition?

MR. SCHWINGLER: So I did neglect to mention the downsizing. So thank you, Your Honor.

This allegations is truly a mystery to me. Because what they allege is in one instance I believe there was an acquisition in 2000, and then in 2020 there was a unit eliminated at the hospital. Which 20 years is a long time.

But the broader point is how does downsizing a

facility harm rival employers, exclude them from competing for workers? It would do the exact opposite. It would free up, you know, individuals entering the labor market who are looking for work and who would be available --

THE COURT: Yeah, but it does harm the employers.

MR. SCHWINGLER: So the rival -- let's say I'm another hospital. I'm not UPMC --

THE COURT: You are members of the class.

MR. SCHWINGLER: Yeah. Well, so, again, there's the question of injury to the class members, and then there's a question of whether UPMC unlawfully acquired --

THE COURT: Monopoly --

MR. SCHWINGLER: -- the monopsony power. And that's -- we're not litigating injury today. We're focused on what did UPMC supposedly do to get rid of all the rival employers that would constrain it in the labor market. And downsizing at a few hospitals over a 25-year period has no impact on other employers and their ability to hire workers.

It actually has the opposite, because those workers are now available. If, in fact, they were downsized. Right?

You can also, if you have two facilities that have OB units that are half empty, right, you might be -- they're close enough, you might be able to combine them, keep the same number of employees, same number of services, but if

you only look at the facility that got closed, right, which is what the Complaint does --

THE COURT: That was -- part of that is what I -- what I'm trying to wrap my hands around -- or my head around. The thought that if there is a lone hospital in a non-city location, would that not have been a monopoly before acquisition? Do you understand what I'm saying? I don't --

MR. SCHWINGLER: Yes.

THE COURT: -- understand where that -- so all of those acquisitions have to be looked at separately, it seems to me, which is why I have a hard time getting my head around them; the geographic climate.

MR. SCHWINGLER: I could not agree more. That is the -- the struggle to tie these allegations into a coherent narrative is certainly something I've been grappling with. But the truth is there is no way to connect them together.

And acquiring a remote hospital is not an act of monopsonization. Right? That hospital, if it was a monopsonist before someone acquires it, nothing changes about competition. Right? And -- but it's not just a problem for rural hospitals. The Plaintiffs have to explain how these acquisitions individually are even collectively -- what was the effect on competition? The Complaint is simply silent on it.

THE COURT: Do you believe they have to allege

monopoly power with each acquisition or with each of the UPMC hospitals in the large geographic area in order to satisfy that requirement?

MR. SCHWINGLER: So they have to allege monopsony power in a relative anti-trust market. So if their market is the whole footprint, then they --

THE COURT: So if they have some, that's okay?

MR. SCHWINGLER: Yeah, in a -- but that's the -- that's the point of the market definition. You're trying to figure out, okay, where -- what's the arena of effective competition. That's what the Supreme Court said in the American Express case.

Once we figure out the arena, then we analyze what was going on in the arena and was it anti-competitive and did it exclude rivals and ultimately did it harm workers.

If your arena is arbitrary and just a mishmash of things that have no connection to competition, then it fails in that purpose. Right?

And so -- but if you start -- if the Plaintiffs here are the master of their pleadings, so they chose that arena, if the Court disagrees with Ms. Kcehowski, that's what they are -- that's what they then have to show monopsony power and exclusionary conduct in.

Now, if the Court's question is do I have to look at each thing in isolation, no, you look at --

THE COURT: So then --

MR. SCHWINGLER: -- all of the allegations together.

THE COURT: -- if they -- if they show monopsony power some places in that region, then that would be enough?

MR. SCHWINGLER: Not -- no, not to sustain the case that they have pled.

So, hypothetically, if they came back and said, you know, never mind, we'll allege a market that's just this particular city, they would have to plausibly allege monopsony power in that market that was obtained or maintained through exclusionary anti-competitive conduct. That's a -- that -- that's going to be a problem for them.

THE COURT: But my point is: By defining a large geographic market, do they satisfy it if they find monopsony power anywhere in that market?

MR. SCHWINGLER: No. They have to -- so being a monopsonist in Oil City does not give you the power to suppress wages in Lancaster or Pittsburgh.

So the -- if there -- this is why the relevant market is so important. So they can't -- they can't state a claim that covers hundreds of thousands of people --

THE COURT: In Lancaster they'd say where's Oil City. But go ahead.

MR. SCHWINGLER: Yes. But that's the -- that's the issue.

So we could imagine that -- a different Complaint with different markets, and then they would need to satisfy the elements for each of those markets.

THE COURT: I see what you're saying. Okay. Thank you.

MR. SCHWINGLER: And the Court didn't ask about tuition assistance. I'll just say briefly, like the blacklist, that's an allegation. When you read the paragraphs in the Complaint, it's unclear what they're intending to allege.

They allege UPMC has a tuition assistance program, they allege that sometimes nurses, quote, may have to pay back tuition, but they don't allege anything else, which is interesting, because as current and former employees, they know exactly how UPMC's tuition assistance program works, they know that it's above board, and they've chosen to allege nothing about it.

THE COURT: Well, was their point not that if they leave, they have to pay it back?

MR. SCHWINGLER: So the --

THE COURT: Which -- forgive me if I'm wrong -- I think is in a lot of contracts.

MR. SCHWINGLER: It is. And so the facts matter and plausibility matters here. There's nothing anti-competitive about paying for your employees' education if they want to go

to night school, if they want to get a degree. Right? There's nothing anti-competitive, if the employee takes your money, gets the degree, and turns around the next day and leaves, to say we'd like you to repay the tuition.

And certainly a rival employer, if I'm done --

THE COURT: Say I don't do that, so that's not a competitive -- I don't do that to you.

MR. SCHWINGLER: Yeah. And it's voluntary. Right? So employees don't have to take the money to begin with.

But if I'm a rival employer, and I say, look, this individual now has a degree, I want the benefit of that degree.

But they're saying if they leave within a certain period of time, they have to repay the tuition. I can pay for the tuition. I don't have to free ride on UPMC.

So there's nothing inherently anti-competitive about tuition assistance, and there's nothing alleged in the Complaint about UPMC's program that would suggest there's a problem with it.

THE COURT: Thank you.

MR. SCHWINGLER: So unless -- unless the Court has questions about exclusionary conduct, I'd like to very briefly address the statute of limitations --

THE COURT: Statute of limitations, sure. Go right ahead.

MR. SCHWINGLER: -- and then I will -- I will sit down.

So we're addressing this last simply because it overlaps a little with exclusionary conduct, but it is dispositive of the entire case. And there's two issues.

The first is fraudulent concealment. There's a four-year statute of limitations. And so to get damages for the entire 28-year class period, the Plaintiffs must allege fraudulent concealment. That's a tolling doctrine that requires allegations of affirmative acts of concealment through fraud must be alleged with particularity under Rule 9(b). And then there's other elements like diligence. But the Plaintiffs don't get to first base because they don't allege any act of concealment.

THE COURT: I was trying to find concealment. The only thing I could think of was the blacklist issue. But I think they hang their hat more on continuing violation.

MR. SCHWINGLER: I definitely agree with that.

And the thing I would note just about the blacklist, they allege -- in order for the blacklist to work in theory, employees have to know about it, because otherwise it would have no chilling effect on leaving. Right? If you don't know about it, then how could other employers be harmed by it? So, logically, it just doesn't fit in a concealment case, but they have no allegations about it either way.

So on continuing violations, the -- going back to the premise of the case, we started as a monopsonist in 1996 when we acquired some hospitals, and --

THE COURT: Before you were UPMC.

MR. SCHWINGLER: UPMC, that's correct. And the -- and then there were a series of other acquisitions up until 2018 or '19. So all of these occurred more than four years before the Complaint was filed.

And the case law is clear that claiming that a merger was anti-competitive and violated the anti-trust laws, the violation occurs when the merger is closed. And the continuing existence of the merged firm is not a continuing violation. And neither is higher or lower -- higher prices or lower wages.

So the cases we cite, Midwest Machinery in the Eighth Circuit, the Z Technologies case in the Sixth Circuit are clear, you can't just --

THE COURT: I think you can make the argument that if you continue the same behavior over the long period of time that you're alleging is -- is harming -- the power is harming by acquiring more and more and more, that it's just a continuation of the same behavior. So you can't stop each acquisition. Then all of that could not be remedied by the courts.

Do you follow me?

MR. SCHWINGLER: So the most recent acquisition is more than four years before this Complaint was filed. So all of the acquisitions are untimely.

THE COURT: Could they not all be sort of a totality of the circumstances? The acquisitions occur, and then you wield the power, and the power you're wielding to lower wages, or their arguments, occurs in that four-year period?

MR. SCHWINGLER: So that's -- that's the question, is do mergers that closed years ago, but that allow you to charge higher prices --

THE COURT: Is that continuing --

MR. SCHWINGLER: -- or pay lower wages today or in the last four years, is that a continuing violation. The answer is no. The two cases we cite from the Courts of Appeal are crystal clear.

And the Plaintiffs, in fact, concede on Page 24 of their opposition, that to allege a continuing violation, they must allege -- I think they use the word "overt act." But an affirmative anti-competitive act to maintain the alleged monopsony within that four-year period.

So just saying wages remained too low isn't enough. They have to allege the violation continued. And the violation is acquisition or maintenance of monopsony power, not being a monopsonist.

And so this is why we -- we ended with this

argument, Your Honor, is because the only allegations that could be viewed as being in the last four years are the -- would be the non-merger conduct, which we -- we would submit is not exclusionary and certainly not plausibly alleged to be so. And so that doesn't get them across the finish line.

I will just say one -- one quick thing about predominance, because I understand the Court's view is this may be easier to deal with after discovery. But I will say this: The class that they've alleged includes a registered nurse in Pittsburgh in 1996, an orderly in Hamot in 2012, a nurse assistant in Lancaster in 2023.

And they allege, as Your Honor noted, acquisitions over time where circumstances changed, right, and then also the question of all these different people that are different job categories who may have different options, depending on their level of education. That is not a coherent class, and it -- class discovery is very expensive, it takes a lot of resources for the Court in the event of disputes, and so we just -- so judicial economy --

THE COURT: Well, it would require from you, I suspect, lists of employees spanning a long period of time in a large geographic area.

MR. SCHWINGLER: Yeah. We don't even know if it would be possible to -- to comply with class discovery for that whole period.

But the point is: Understanding -- understanding that oftentimes these issues are resolved after discovery, here, that would be an expensive and arduous process, when we know at the outset that the case really doesn't add up.

And so we would ask for the Court to exercise its discretion. Even if the Court doesn't dismiss the Complaint, to trim it down or require a new class definition.

And unless the Court has any questions --

THE COURT: So -- so just my gut was to say we will handle class when the class time comes, if you survive Motion to Dismiss. But you're pointing out that no matter what happens on the Motion to Dismiss, that class allegations should be stricken because it's too unwieldy?

MR. SCHWINGLER: Among other things.

THE COURT: Okay.

MR. SCHWINGLER: But if the -- if the Court dismisses the case, I think there's no class left --

THE COURT: Well, there's not. That's not --

MR. SCHWINGLER: Right. And so if the Complaint survives, we are left with a class where we can't tell you who is in it and who is out of it, and the members of the class can't tell you either.

And so do I have a statute of limitations that has been tolled, you know, or do I need to bring my own case?

There will be how many workers that don't -- can't answer that question today because there's no objective criteria.

And then on the predominance point, which is -- which is what I was alluding to, how do you show common impact, which is what you're required to show in a damages anti-trust class action. Impact through common proof, when you have class members that have no conceivable relation to each other and clearly different circumstances across locations and over time.

So we could go through an expensive discovery process and get --

THE COURT: You'll get totality --

MR. SCHWINGLER: Yeah, we get to the answer we already know, which is that this class makes no sense and needs --

THE COURT: I appreciate your argument. Thank you so much.

MR. SCHWINGLER: Thank you, Your Honor.

(Discussion held off the record.)

THE COURT: Let's take a 15-minute break, and we'll be back. Thank you.

(Recess held from 12:05 p.m. till 12:23 p.m.)

THE COURT: We are ready for you. Come on up.

(Discussion held off the record.)

MR. COHEN: May it please the Court. My name is

Austin Cohen, with Levin Sedran & Berman. I'm here on behalf of class Plaintiffs.

I'm going to address UPMC's arguments that we've not accurately alleged a relevant market and that the statute of limitations bars much of our claims.

My colleague, Chris Young, will in turn address UPMC's arguments that we have not plausibly alleged UPMC's exclusionary conduct was anti-competitive. And, separately, he will address UPMC's Motion to Strike our class allegations.

Turning to UPMC's arguments regarding our product and geographic markets, I'd like to emphasize at the outset the standard of review. It's simply a plausible standard. That's all we need to allege. And we don't need to allege detailed factual allegations before discovery.

Almost all of the arguments they made are predicated on highly factual, specific determinations that are better reserved for class certification, summary judgment, or even trial.

THE COURT: Except for I do want to -- I'm just going to jump right in there.

MR. COHEN: Absolutely.

THE COURT: I know so little of the five named Plaintiffs. Three of them, I don't even know when they worked for UPMC.

So don't you have to give me something for

these -- these Plaintiffs? Some sort of allegations in your Complaint that -- that at least they were harmed?

MR. COHEN: Well, I will jump ahead a little bit.

THE COURT: Okay.

MR. COHEN: But to answer you specifically, for the representative Plaintiffs, what we need to do is identify them as being members of our proposed class.

THE COURT: Correct.

MR. COHEN: Here, we've done that. We've given them job titles. Those job titles, which is one of the issues I'm going to discuss, those are the job titles that come from UPMC itself.

THE COURT: Okay.

MR. COHEN: When UPMC says it doesn't know what these are, those are UPMC's division of job titles for nurses.

Now, I will go into, in a minute, the categories that we have in our skilled healthcare worker definition, because you asked about that. And the quick answer right now is those titles probably match up. But the titles we use come from U.S. Government healthcare data that was relied upon by Professors Prager and Schmitt when they did an analysis of market consolidation and the effect it has on healthcare hospital workers. They found an effect on what they call hospital nurses and hospital pharmacy workers.

Econ One, which is a study that looked directly

at UPMC's conduct, went a little further. They took that hospital nurse category, and they broke it down, using the government data, into those categories. Those are the categories that are reported to the government. They all complies in-hospital healthcare nurses, where they found there to be significant, durable, substantial damages, depressed wages. But we'll -- I'll address that.

But that --

THE COURT: I'm sorry I interrupted you. Go ahead.

MR. COHEN: That's fine. That goes into the titles for the Plaintiffs. They are UPMC employees, they qualify as nurses. We've vetted them as being UPMC employees. So they are adequate class reps for now.

Now, UPMC -- let me do a couple of things on the standard of review, because it pervades UPMC's arguments.

They're asking this Court to consider each of our allegations separately. Again, that's not the standard, because evidence is to be considered as a whole, not piecemeal.

The Third Circuit explained in LePage that, quote, "It would not be proper to focus on specific individual acts of an accused monopolist while refusing to consider the overall combined effect. We are dealing with what has been called the synergistic effect of the mixture of the elements," close quote. That's from LePage, 324 F.3d. at 162.

Now -- and I will get to this -- the geographic market. But UPMC suggests the Court can't consider our allegations that its acquisitions were anti-competitive because they were approved by regulators. Again, that's not the law. Legal acts can be considered part of an illegal scheme.

In Le v. Zuffa, the District of Nevada court noted that legal acts can be part of an illegal scheme. And it quoted the same language that the LePage court used, that, "It would not be proper to focus on specific individual acts of an acute monopolist while refusing to consider their overall --"

(Atty. Cohen interrupted by the reporter.)

MR. COHEN: "-- appropriate to consider individual acts of an accused monopolist while refusing to consider the overall combined effect."

The DOJ Statement of Interest discusses several cases where a series of mergers were found to be anti-competitive; mergers which may well have been legal individually. In the DOJ's Statement of Interest, that's the American Tobacco Case, the Grinnell case, and I think it's the Paramount movies case.

But this same point was also raised in the Facebook opinion that we submitted as supplemental authority. In that case, the FTC successfully argued that Facebook's

acquisition of potential competitors could be part of an illegal monopolization scheme, notwithstanding the fact that the FTC itself had previously approved the acquisitions. And you can find that as FTC v. Meta, 2024 WL --

(Atty. Cohen asked for clarification by the reporter.)

MR. COHEN: 4772423, Pages *4 to 5. And --

THE COURT: That was the one you sent to the Court, the supplemental --

MR. COHEN: Yes, it was the -- it was attached to the supplemental authority.

THE COURT: I have that.

MR. COHEN: At Page *25, the Court noted, "It is hard to imagine an action that benefits the definition of anti-competitive than a monopolist buying out his rivals."

THE COURT: What about when a firm buys a hospital that's already the only one in town?

MR. COHEN: Well, when it buys -- when -- and I will -- when I discuss the geographic market --

THE COURT: Okay.

MR. COHEN: -- I'll get to that; how it --

THE COURT: All right.

MR. COHEN: -- can consolidate its operations and rationalize its services across boundaries as it has -- as we allege it has done here.

But they also talk about the fact that no mergers have occurred since -- I think they said the last four years, but we'd also ask the Court to take note there was just the recent merger after we filed our Complaint.

So what we've done here, though, is we have alleged that UPMC has acquired and expanded its monopoly power by way of mergers.

Now, turning to the substance of UPMC's motion, I'd like to note our Complaint is chocked full of factual allegations that we believe are not just plausible, but probable; facts that we expect we'll be able to further substantiate once this case gets going and we're able to get discovery.

We review many of the relevant allegations found in the Complaint at Pages 2 through 6 of our current brief proposing UPMC's motion. We have alleged why and how healthcare markets are uniquely susceptible to monopsony practices that stem from monopolistic hospital mergers.

These allegations are based on academic -- on economic literature and analysis going back 50 years, but include, importantly, the recent study of the effects hospital consolidation had on skilled healthcare workers' wages that was published by Professors Prager and Schmitt. They found that hospital mergers resulting in concentrated markets caused, quote, "persistent, statistically significant, and

robust negative wage effects" on hospital nurses and hospital pharmacy workers.

But we were able in this case to go beyond this general industry literature. I have never been involved in an anti-trust case where we had an econometric analysis of the Defendants' alleged anti-competitive activities before we began to brief class certification.

But here, we had access to the independent Econ One study that considered all of the issues now before the Court. The Econ One study did a detailed analysis of the geographic regions where UPMC operated, including a time series analysis of the effect UPMC's strategy of acquisitions and mergers had as it expanded its reach into adjacent regions.

Econ One also did an econometric analysis of the effect UPMC's alleged anti-competitive policies had on hospital employees and found a wage penalty with regard to the categories of workers that we have defined as skilled health workers, even comparing their salaries to workers, similar workers who were unaffected working in other hospital systems outside the geographic region.

THE COURT: That study started -- or it seems to me it was prompted by folks in the Lancaster area. Is that correct?

MR. COHEN: I don't know where it began, but the

content of the analysis covers the entire UPMC network.

THE COURT: Is that the one that was supported or at least -- supported, I guess, is the best word, by the -- by the representative --

MR. COHEN: It -- yes. And it was attached, I think, to the SEIU's papers that were filed by the Government.

THE COURT: Okay.

MR. COHEN: So it's -- it's a pretty thorough econometric analysis. It is a public document in that sense, and it's something that we also relied upon, because we think the methodology was sound. Certainly sound enough to --

THE COURT: The title assumes one of the things I have to determine. I think the title says how they used their monopoly power to -- yeah.

MR. COHEN: Yes. So -- but what -- in effect, what you're saying is, my -- my next point, which is that the Econ One studies, specific study of the UPMC's conduct, confirms the plausibility of a relevant product and relevant geographic market.

Now, despite the fact that these materials are essential to our allegations, UPMC suggests the Court should not consider them. And I guess you also ignore our factual allegations that cites these materials, because in their papers they claim the Econ One study is fundamentally flawed and not peer-reviewed. This is not the law for a Motion to

Dismiss.

First off, you don't weigh evidence when deciding a Motion to Dismiss.

In the Le v. Zuffa case, the Court refused to exclude an economic --

(Atty. Cohen interrupted by the reporter.)

MR. COHEN: Le, L-E, v. Zuffa, Z-U-F-F-A. So I may just call it the "Le" case going forward to make it easier for you.

The Court refused to exclude an economic expert report prepared by Dr. Hal Singer. Hal Singer is the same Econ One expert at issue here. And the Court there noted that, quote, "Challenges to expert evidence may be brought and should be resolved at the class certification stage," close quote, not at the Motion to Dismiss stage. That is Le, 2024 WL 195994 at *1.

Second, it is appropriate for the Court to assess the plausibility of our allegations by reference to the academic and economic materials we cited and relied on.

In the Mushrooms case, 51 F.Supp.2d 692, the District of New Jersey held that it could consider documents that were integral to or relied on by Plaintiffs in their Complaint, and that considering these materials would not convert the Motion to Dismiss into a Motion for Summary Judgment.

What this means here is that the Court may consider the Prager v. Schmitt (sic) study, as well as the Econ One study --

THE COURT: As well-pled facts.

MR. COHEN: Yes. In support of our allegations.

Now, I do want to make one other point. The handout by UPMC included citations to other outside materials that we did not rely upon and we did not quote from in detail in our -- to support our allegations. Those should not be considered by the Court. Those may be considered when we get to class certification or summary judgment.

So let me turn to the relevant market arguments. And, again, here the standard is we only allege the rough contours of a plausible geographic market and a plausible product market.

In addition, we are required to allege that UPMC possesses marketing power, meaning it has the ability to control prices or restrict output.

Now, it's important to remember, being an monopsony case that's turned on its -- turned around, as the Todd court noted, so that controlling prices here means depressing wages. Restricting output here means either reducing the number of nurses it hires or requiring them to do more.

THE COURT: But this is where the geographic market

is difficult for me to -- to work with, to determine whether or not there are enough allegations of abuse of power. And that's because you may find that there are areas in the geographic market where UPMC has monopoly power. Maybe not here in Erie, but there are places where that's the case.

But if they depress wages in Erie, then you can use such a broad definition, such a broad market to bring your case. And I'm not sure that that's exactly what monopsony power or misuse of monopsony power is about.

MR. COHEN: Well, I will --

THE COURT: Did you follow that?

MR. COHEN: I think -- I do follow that, I believe, and I think I'm going to address some of that. But let me -- I also want to answer your questions in realtime.

THE COURT: Thank you.

MR. COHEN: So the studies that we cited that found an actual wage penalty relied on what are commonly used by economists: Commuting zones. The government defines commuting zones. They find that people within those zones -- generally, 80 percent of them will apply for another job within the same zone.

THE COURT: Wouldn't that be a subgeographic market, then? Because it's not a commuting zone from Lancaster to Erie.

MR. COHEN: Well, it's -- it's okay to have regions

or submarkets, as you alluded to earlier. But one of the things we've alleged here that ties all of UPMC's conduct together, which they seem to argue is a pro-competitive policy, is standardizing the wages. Because what that does is it means regardless of what the supply of skilled healthcare workers is in one commuting zone, you're going to get the same wage, with an adjustment just for the cost of living.

So it's the same wage across the entire UPMC system. You can't say, well, I will -- I live at the edge of a commuting zone, I will drive over to the next hospital and get a higher wage because there's a shortage of nurses there. You get the same wage.

So they have eliminated the incentive and the ability of people to avoid the effect of their conduct because they control all the hospitals and they set all the wages the same.

The same thing applies with healthcare, which I'll get to -- services, which I'll get to. But I'll give an example of how them expanding their market throughout the entire relevant market we've alleged geographically enhances their power.

If you lived in Townville, and you needed to get hospital healthcare services or you wanted to work for a hospital, you could technically commute or come to Erie for some healthcare services, to Hamot, or you could drive down to

Pittsburgh.

But the fact is, once UPMC acquired Hamot, you don't have a choice. Your only choice now is to get your healthcare services at UPMC. Because they control both of those regions within the relevant market.

And I'm going to explain how to then rationalize the healthcare to --

THE COURT: But how does that affect the worker?

MR. COHEN: The same thing for the worker who would be commuting between different hospitals to consider taking alternative employment. The supply and demand --

THE COURT: But if they had to commute to Hamot, couldn't they commute to St. Vincent and get a higher wage?

MR. COHEN: There may be an opportunity for them to get -- some number of people to get employment at another facility.

We're going to touch on and get to the fact that, number one, not every job that implies a nurse is the same as an in-hospital nurse. They have unique skills. We've made that allegation, and we've relied on literature and cases that find the same thing.

And, number two, UPMC has implemented exclusionary policies, which Mr. Young will discuss, to try and keep the community seeking those jobs. And number three, just having a number of other options available for some

people doesn't mean that they haven't exercised monopoly powers. Or virtually all -- it can be an oligopsony power. They don't have to have a hundred percent of every market throughout the entire region to find -- plausibly allege they have market power.

THE COURT: Okay. I interrupted you again.

MR. COHEN: Okay. No, that's -- that's --

THE COURT: I understand the argument.

MR. COHEN: Numerous cases explain proving a relevant market and proving market power are highly factual specific determinations and often require extensive discovery.

(Atty. Cohen interrupted by the reporter.)

MR. COHEN: Proving market power are highly factual specific determinations and often require extensive discovery.

For this reason, courts rarely grant the Motion to Dismiss unless the relative market is the legal impossibility. Our relative market allegations are clearly not a legal impossibility, and our proposed relevant product and geographic markets are plausible, and we expect we will substantiate them with discovery.

Now, I want to -- before going into the product market, I want to go back to a point that was raised by UPMC when they kept discussing the Queen City standard.

The Queen City case is wholly inappropriate or inapplicable to this case. Queen City involved a case where

Domino's franchisees sued because they had to buy their supplies from Domino's under the terms of the franchise contract agreement.

And what the Court found was they hadn't excluded the alternative products because it wasn't a matter of the products not being the same. It was a matter of them being contractually restricted from buying them. The Court even noted at one point Domino's would buy tomato sauce and cheese and other supplies in the market and then resell the exact same product to the franchisees at a marked-up price, but the franchisees, by contract, couldn't buy the same product. And the Court said at one point, this is really a franchisee contract case, this isn't an anti-trust case.

The Newcal v. Ikon, 513 F.3d 1098 (9th Circuit) case does a very good job of distinguishing why Queen City does not apply to instances like this.

A better example would be, for instance, the Todd case, the Second Circuit, 275 F.3d. 191; the Clarke case, which I'm going to touch on that involved registered nurses in Tennessee, 2007 9870961; and the Weiss case, where the Third Circuit found that one hospital providing healthcare services could be a relevant market.

Now, turning to the product market, we have alleged a class of skilled healthcare workers comprised of hospital nurses and hospital pharmacy workers. We believe

this is certainly a plausible class, as proved by the academic and economic literature we cite and relied on that found -- we cited and relied on, that found nurses and pharmacy workers who worked in the hospital settings possessed unique skills that may qualify them as a unique class. You can find that at Paragraphs 92 and 56 of our Complaint in particular.

As referenced at Paragraphs 52 and 58, Professor Prager and Schmitt's study researched the effects that hospital consolidation had on three groups of hospital employees: Unskilled, skilled, and administrative hospital workers.

They found that skilled hospital workers defined by them as hospital nurses and pharmacy workers suffered significant, durable, and persistent wage depression after mergers; harm that they could not avoid by seeking alternative employment because of the unique attributes of their hospital skills.

I want to go back and look, but I think that the cite provided by UPMC is a bit misleading, because I believe what they were doing is distinguishing between the skilled hospital workers and other hospital workers like administrative staff that weren't providing healthcare services.

THE COURT: But I -- I do take their point that if you are describing skilled workers as someone -- as those who

have had formal education of some kind and/or on-the-job training, it would seem to me that that would be broader than skilled healthcare workers.

MR. COHEN: Well, the -- we -- we narrow it to the categories where -- for instance, Econ One was able to assemble economic data from the healthcare reports to the government --

THE COURT: Okay.

MR. COHEN: -- to quantify the depressed wages and to determine the effect that UPMC's policies would have had on their ability to move from employment to employment.

Prager and Schmitt, for example, and I think Econ One as well -- actually, Econ One, I know, found that the policies had a significant effect all across the board for everyone who worked at hospitals.

For example, it may be someone who worked doing laundry or worked for the janitorial staff actually, by economic analysis, suffered a depressed wage. But what they found was when they broke it into the individual categories, these categories that we've alleged are the ones where that was considered to be statistically significant and durable.

THE COURT: How do I know that a pharmacy worker is not someone who -- who mops the floor, which is needed in the pharmacy?

MR. COHEN: We're -- again, we're relying on the

reporting to the government of pharmacy workers --

THE COURT: You're using the same names that they did.

MR. COHEN: We're using the same names and titles that they used when they assembled this data.

THE COURT: So that's not -- that's specific to UPMC?

MR. COHEN: No. The -- the data we're using is specific to the -- I think it's done by -- there's a name for it. Healthcare some -- I can get the full name of it. But it's collected by the government from hospitals.

THE COURT: So then that same category would be at -- would be at West Penn.

MR. COHEN: Yes. And that's -- that's the reason why, I believe, you would rely on that; those titles and that data, is because you want to try and match apples to apples when you're comparing wages in the affected market and wages in the unaffected market.

THE COURT: But you could not use those titles to go to a private practice or for a pharmacy -- pharmacy worker to go to Walgreens.

MR. COHEN: Well, there's always an opportunity for someone who works in the hospital to get a job somewhere else.

THE COURT: In the private sector.

MR. COHEN: In the private sector. The question is

whether or not that job would replicate the premium that they could get paid if they were working at the hospital. You know, I could do a lot of different things, but I may not make the same salary I make doing what I do here.

THE COURT: Well, I don't want to go into that argument since that's --

MR. COHEN: But that's also getting into the -- that would be something where when we get to class certification and we present our detailed economic and econometric modeling, they'll be able to challenge it and say, you didn't include the right people. You know, we're --

Now, the one thing I believe that they did have to do is you have to take the data we have for UPMC -- well, they took the data they had from UPMC's reporting to the government and compared it to other regions. That's how they came up with the wage differential.

But as noted by several courts, including Todd, the best information about what titles -- what the job titles are is the data or the information you get from discovery from the employer. Todd noted that when it was talking about the --

(Atty. Cohen asked for clarification by the reporter.)

MR. COHEN: The petrochemical employees. And I'm going to touch on Todd in a minute.

But what that means here is, for instance, you -- you noted the discretion -- or you noted the discrepancy between titles of represented Plaintiffs and the titles in that chart, where it's just sort of those five categories.

Those -- the reason is because of that distinction between what UPMC's own internal human resources department does and what they report to the U.S. Government and the Government collects for nursing. We will be able to figure that out after discovery.

THE COURT: So they'd be able to find those categories quickly in a --

MR. COHEN: We'd expect we'd be able to find it quickly or at least --

THE COURT: -- a discovery search.

MR. COHEN: -- an expert would be able to match up those job titles using UPMC's own materials to the government job titles and do an analysis based on that across the board.

THE COURT: That's interesting. Go ahead.

MR. COHEN: All right. So -- now, I went through the -- the Econ One study, I think, and the Prager and Schmitt study. But I also want to touch on that these studies and precedent are further supported by relevant -- support our relevant product market allegations -- I'm sorry. Let me back up and start over.

In addition to the studies, the precedent we cite further supports our relevant market allegations.

(Atty. Cohen interrupted by the reporter.)

THE COURT: Especially with -- you're also going very quickly with citations, and I'm not --

MR. COHEN: Okay. I will slow -- I'll try to slow down.

THE COURT: I just write down that -- because I remember reading some of those cases, so I just --

MR. COHEN: Right. I will try to go slower.

THE COURT: Try to slow down.

MR. COHEN: If you want me to slow down so you can catch me, please -- please ask me.

THE COURT: Yes. I will ask you to slow down as well.

MR. COHEN: So precedent we cite further supports our relevant product market allegations.

In the Clarke case I mentioned, 2007 WL 970961, the Western District of Tennessee considered the plausibility the of product market defined as RN's employed by hospitals in that metropolitan statistical area.

Like here, the Defendant there argued the proposed market definition was too narrow because hospital nurses could seek alternative employment beyond the hospital setting. The Court there rejected that argument for the same

reasons we allege. In particular, the Court found that RN's hired by hospitals can constitute a valid class because they possess unique skills and gain industry-specific experience as they work. That's at Page *2 of the Clarke opinion.

As these skilled healthcare workers gain experience, hospitals become the only practical outlet for them to sell their services at an amount reflecting their skills and knowledge. Also at Page *2.

Accordingly, the Clarke court found that the narrow contours of the alleged market were justified because of the hospital-specific skills the workers, RN's possessed. That's at *10.

In Weiss I mentioned briefly, the Third Circuit upheld a jury determination that inpatient hospital healthcare involving all services offered in the hospital could by itself comprise a single relevant product market. That's at Weiss 745 F.2d. 826.

Likewise, in the Todd case, 275 F.3d. 191, a case that's highly instructive here for several points, Judge Sotomayor, who was on the Second Circuit at the time, found that even general employees like managerial, professional, and technical employees working for petroleum companies can, quote, "accumulate industry-specific knowledge that renders them more valuable to employers in the petrochemical field," close quote. And that's Todd 275 F.3d. at 203.

Accordingly, UPMC's attack on hard-to-find skilled healthcare workers market is not only premature, it's also at odds with the literature and the finding of other courts that have considered whether industry-specific employees can constitute a separate product market. In other words, our proposed and alleged product market of skilled healthcare workers is plausible.

Before I move on to --

THE COURT: I think that my skepticism was not so much that they wouldn't define a product market, that I didn't know how to define them; each of those names. And you've explained to me that they came from the study.

MR. COHEN: Government data.

THE COURT: And that they are the terms of UPMC Health --

MR. COHEN: Oh, the -- the Plaintiffs --

THE COURT: The names.

MR. COHEN: Those are the titles we got from the Plaintiffs --

THE COURT: Well, no, not just the Plaintiffs. But the category. When you say nurse, LPN, and pharmacy workers, I couldn't define who they would be necessarily.

MR. COHEN: Right. Okay. I --

THE COURT: You tell me pharmacist, I know pharmacist. Who's a pharmacy worker? I don't know.

MR. COHEN: Right. And I'm trying to create the distinction, because you asked at one point --
THE COURT: Right.
MR. COHEN: -- about the title specifically attached to the Plaintiffs.
THE COURT: To the Plaintiffs, yes.
MR. COHEN: Those come from UPMC.
THE COURT: From them.
MR. COHEN: The titles attached to the econometric analysis that we rely on --
THE COURT: Came from --
MR. COHEN: -- came from Econ One --
THE COURT: All right. So --
MR. COHEN: -- and from the government.
THE COURT: So they can't just put those into any discovery computer and pop out all the people who would --
MR. COHEN: I suppose the first step would be an interrogatory asking them --
THE COURT: Okay.
MR. COHEN: -- to identify what categories that they use. They would -- for instance, if they report this data to the government, when you report RN data, name all of the job titles from your employment system that you report as RN data.
THE COURT: I understand.
MR. COHEN: So there are objective ways we can get

it, without requiring them, as I say, to go back 30 years and pull all this stuff out.

THE COURT: Got it.

MR. COHEN: But before I go, I'm going to discuss the geographic market a little bit.

THE COURT: Oh, good.

MR. COHEN: So --

THE COURT: Because that's a big one.

MR. COHEN: Okay.

THE COURT: And talk about some of the criticisms Defendants made, especially in commuting areas that are not part of the market, but also have healthcare facilities. As they point out, Geisinger is right across --

MR. COHEN: And it may be. And that's taken into account when they do the analysis by the regions that make up the relevant market.

One thing you'll see we've alleged and they found was that the effect -- the wage penalty, as well as the increased work loads, were inversely proportion at to UPMC's share within the regions that make up the relevant market.

So as you get further and further into UPMC territory, the harder it is for you to potentially avoid UPMC by driving over that line, the higher your wage penalty would be. And inversely proportional, again, is the nurse-to-patient ratio, meaning you're required to do more

work for less pay.

So that's -- there's nothing that says that damages have to be uniform across an entire class, throughout an entire class period. It's an argument often raised by plaintiffs -- defendants in -- in price fixing cases in general and uniformly rejected by the courts. We can deal with that at the damages phase for economic modeling.

That's what some of that gets to, but it also gets to determining the amount of the undercharge here is a matter of economic modeling when we get to damages. The class cert, we have an element of --

(Atty. Cohen asked for clarification by the reporter.)

MR. COHEN: At class cert, we will have an economic model that will survive a challenge, and then hopefully it will be accepted.

Let me turn to UPMC's attack on our proposed geographic market, which we think bears no better. Because, again, it's also a highly factual issue that requires both discovery and economic analysis.

All we need to do here is plead the rough contours of a proposed geographic market, and we've done that. We have faced our geographic market definition as it emphasizes on the Econ One study and as importantly on UPMC's own representations. I'll go into more detail about the Econ

One study of UPMC's geographic market when I get to market power. But suffice it to say we plausibly allege a geographic market in conferencing --

(Atty. Cohen interrupted by the reporter.)

MR. COHEN: Suffice to say we plausibly allege a geographic market in conferencing the regions where UPMC is the dominant -- not necessarily the exclusive, but the dominant provider of healthcare services. And by extension, UPMC is the dominant employer of hospital healthcare workers.

As -- as they noted, we even rely on UPMC's own representations about the areas it services, breaking down the alleged relevant marketing in six regions where UPMC is a dominant provider of healthcare services and a dominant employer of healthcare workers. That's at Paragraph 71.

UPMC argues our market allegations and our market power allegations are legally impossible because they encompass all the regions where UPMC operates. There's nothing impossible about this, nor is there anything implausible about this.

As we allege, UPMC expanded into areas adjacent to its operations not by opening new facilities to compete against the existing competitors that were there; instead, it simply acquired the hospitals that would have been its competitors, instantly giving it market powers in these regions.

As you, I think, noted, Paragraph 74 through 90 of our Complaint go through the history of UPMC's acquisitions.

But even more relevant is the fact that UPMC did these acquisitions by expanding into contiguous regions. It didn't, for instance, purchase a hospital network --

THE COURT: Jump over to Maryland.

MR. COHEN: I was going to say New Jersey or Ohio, Western Ohio, yes. Instead, it acquired facilities adjacent to where it already operated --

THE COURT: You say that they have some in Ohio. I read that.

MR. COHEN: They are on the -- the eastern end of Ohio, but not disconnected from their contiguous relevant market that we've alleged.

THE COURT: So I've walked down the street in Rome and saw UPMC on the street -- office building. They're everywhere.

MR. COHEN: Rome, Ohio or Rome, Italy?

THE COURT: Rome, Italy.

MR. COHEN: Okay. They're not in our market. Yet.

So -- but as we allege, that by acquiring facilities in this way, it allowed UPMC to rationalize its operation in order to increase its market power, including its market power in particular over --

(Atty. Cohen interrupted by the reporter.)

MR. COHEN: Increase its market power, including, in particular, its market power over employees.

For example, we allege UPMC was able to shut down the maternity unit at its Bedford hospital because it knew most Bedford patients' only reasonable option was to commute to UPMC's Altoona facility. That's at Paragraph 87.

We have similar allegations of it rationalizing its operations to increase its power over employees at Paragraphs 99 through 101. And that also is sort of emphasizing the example I gave earlier about commuting between Hamot versus Pittsburgh. Before Hamot was a UPMC facility.

THE COURT: Bedford's closer to Altoona.

MR. COHEN: So UPMC attacks our allegations by citing to some parts of the Econ One study where, for a particularized location within the proposed geographic market, it didn't have a dominant market share.

But UPMC, again, it will have its chance to poke holes in the Econ One geographic market analysis or whatever analysis we ultimately do present --

THE COURT: Summary judgment.

MR. COHEN: -- when we get to certification of summary judgment, correct.

For now, UPMC doesn't get to challenge Econ One's reasonable economic conclusions, which are conclusions

that we cite and we rely on at Paragraph 73 and 94 through 98.

Accordingly, we believe our geographic market allegations for now are not implausible.

Now, I was next going to discuss market power, but I want to make sure that you don't have any other questions before I move on about the geographic market contours.

THE COURT: No. I mean, I still have a difficult time trying to understand how you are going to make allegations across the span of it, and I couldn't --

MR. COHEN: In terms of time or in terms of --

THE COURT: Geography. How your allegations, when you -- when you start making specific allegations about specific instances in one area, how that should -- should translate to an area five hours away.

But are you planning -- so are you planning, then, to subcategorize in the regions, the geographic areas, knowing that you can cross regions, especially at the edges, if you --

MR. COHEN: So it -- it ties into what I was saying earlier about the Econ One analysis showing an inverse relationship.

THE COURT: Right. And I understood that, when it went --

MR. COHEN: So --

THE COURT: So the center of this large market --

MR. COHEN: Or the centers of the six regions.

THE COURT: The region markets --

MR. COHEN: Right.

THE COURT: -- are different than the edges.

MR. COHEN: They may be. And it may be -- again, that's -- when we get an economist to do their analysis, you know, we -- we'll be able to compare if competitive forces at the borders of the market have an effect on the wages and work conditions within the adjacent regions. But that's something that --

THE COURT: But for now, your allegations are the power is wielded equally all across the region.

MR. COHEN: Correct. And part of the reason for that is we have alleged that they implemented system-wide structures in order to try and prevent workers from being able to avoid the effects of their policies, such as the standardized wages, such as the blacklist that prevents them from leaving. It's more of an in terrorem effect.

They talk about the fact that they've hired plenty of people who formerly worked for UPMC. That's fine. They have the ability at their discretion to hire someone back when they need them. But the reputation they have, that if you leave, you're not going to come back here, is going to disincentivize people from leaving. And workers already are

less likely to switch jobs than say, if you have price fixing of a product, where you can just switch brands. So it creates a --

THE COURT: What about my discussion we had with defense counsel about the repayment of tuition fees -- tuition?

MR. COHEN: So the repayment of tuition fees, first off, we don't have the details of what the repayment policies are.

But, secondly, it is worth noting that the government itself has found that -- they call them TRAP provisions for a reason. They call them the functional equivalent of non-compete clauses.

So once we -- again, when we get discovery, we'll be able to do a better analysis of that. We probably would even be able to do an economic analysis whether employees with TRAP provisions are less likely to leave even than regular employees, to show the effect that it has on the workforce.

THE COURT: And we have a legal policy now that says non-competes are in disfavor. Do we have one about TRAP policies, you know --

MR. COHEN: The -- I believe there was --

THE COURT: Other than that --

MR. COHEN: There was a proposal to make them

illegal, but I don't think it was enacted, and I am doubtful that it will be enacted in the near future.

So -- but -- but the point is the analysis of experts is that they are the functional equivalent of non-competes.

THE COURT: Okay.

MR. COHEN: We do point out the fact -- we've alleged a lot of conduct they engaged in beyond simply skilled healthcare workers to show how they have used their power throughout their entire hospital system, including, for instance, explicit non-competes with physicians. Those are there to demonstrate their market power. They're not there to say that they subjected our class, proposed current class to actual non-compete provisions. But they are relevant evidence of their conduct.

THE COURT: All right.

MR. COHEN: So let me turn to market power, which is also known as monopoly power, which is defined as the power to control prices or exclude competition. The Ductile Pipe case explains that; 2013 WL 812143 at *14.

What this means is we're required to allege UPMC possessed monopoly power. And we can do this either by providing direct evidence of depressed wages and restricted output or providing circumstantial evidence of the structure and composition of the skilled healthcare worker employment

market. This distinction is pointed out in the Broadcom case, 501 F.3d. 297 and 307 and again in the Ductile case.

In the Todd case, which I cited to earlier, the Court there noted that, quote, "If a Plaintiff can show actual adverse effect on competition," close quote, courts, quote, "do not require a further showing of market power." And, quote, "Plaintiffs may avoid a detailed market analysis."

THE COURT: That's in a monopoly, not a monopsony, right?

MR. COHEN: That's a monopsony.

THE COURT: That's a monopsony.

MR. COHEN: That was -- the Todd case involved MPT workers for petrochemical companies --

THE COURT: Oh, that's petrochemical. All right.

MR. COHEN: -- who were subjected to fixed -- they exchanged information about wages to depress the wages across the board.

THE COURT: Okay.

MR. COHEN: And, again, that's -- it's also -- it's relevant, as I mentioned, for several reasons.

One is the idea that you can have a class that consists specifically of -- for instance, they use the example of accountants or attorneys; that they could have specific skills for a petrochemical company that makes them less valuable working for a law firm.

They also explained that you can have a class as disparate as engineers and attorneys and accountants, because the proper way to look at it is not from the standpoint of the dispersion of the employees who are subject to restriction, but from the policies of the employer, which in that case --

THE COURT: Is equal on all positions.

MR. COHEN: Which would be equal on -- correct.

So when they talk about you have different nurses or you have pharmacy workers, how can you have all these different people being subject to the same restrictions, because the restrictions come from one employer.

THE COURT: Okay.

MR. COHEN: And that's what Todd stands for.

So turning back to -- to market power, we have adequately alleged direct evidence of UPMC's market power regarding employment of skilled healthcare workers. And even though that by itself should be enough, we've also alleged circumstantial evidence of UPMC's market power.

So as to the direct evidence --

THE COURT: True. But that -- but the allegations you make in your Complaint fall differently in Pittsburgh than they do in Oil City. They fall differently --

MR. COHEN: In -- in terms of the depressed wages --

THE COURT: How -- how they have the market power --

MR. COHEN: That's -- that's correct. So the test would be when you do your economic analysis, can you show a statistically significant reduction in salary or wages paid by UPMC or wage penalties --

THE COURT: That's to prove it. But to allege it --

MR. COHEN: So to allege it --

THE COURT: -- across the board.

MR. COHEN: -- what we've actually got here is we have the average across the board of the Econ One study that showed a significant wage penalty. And it looked at the salaries across the regions, because it talks about the differences --

THE COURT: I know. And that's where it's hard for me, because the average -- the allegations of an average hit really differently if you live in Oil City than if you live in Pittsburgh.

MR. COHEN: They may. And, like I said, right now we're only required to allege --

THE COURT: Make the --

MR. COHEN: -- plausible contours. We will get to the economic modeling.

THE COURT: And so --

MR. COHEN: We are allowed to conform our class to the facts after we engage in full discovery, as well as class certification economic reporting.

And if, for instance, you found for some odd reason there's one, you know, five-mile region within the middle of this relevant market --

THE COURT: Yeah, my point is, though --

MR. COHEN: -- it could exclude it.

THE COURT: -- if you're making the allegation based on an average of very different things, that's --

MR. COHEN: We're -- we're --

THE COURT: Is that plausible?

MR. COHEN: -- making the allegation based on the --

THE COURT: Because you said you --

MR. COHEN: I believe numerous courts have held that alleging depressed wages across not just a -- a one plus state region, across an entire United States class, the -- the Exxon -- or the Todd case was a U.S. class. And, certainly, there could have been areas within the country where they may have had different wages or where their effect may not have been as significant.

There are other cases -- I think the -- is -- is the Semen v. Duke case, which I think was a -- well, I think that was a small market.

But there are -- there are cases we cite where you have a larger class, a U.S. market class, and the Court has certainly at the Motion to Dismiss stage upheld the allegations as adequate, without requiring you to quantify

where within the U.S. in particular the damage effects or the harm would have been felt.

THE COURT: It's so much easier in a monopoly than in a monopsony, though.

MR. COHEN: It -- it certainly is. So.

THE COURT: To wrap your head around. All right.

MR. COHEN: Yes. We -- I am constantly having to completely reverse my thinking about all this.

THE COURT: Thank you. I'm sorry. Go ahead.

MR. COHEN: So -- so as I was saying -- well, I don't know if I started this yet, but showing -- this is the direct -- for direct evidence. Showing UPMC's conduct had an actual adverse effect on employment of skilled healthcare workers as a class in terms of both wages and work conditions is direct evidence of UPMC's market power. That's explained in the Allen case, the District of Vermont, 748 F.supp. 2d 323 and 340. Again, providing direct evidence of market power often obviates the need to provide indirect evidence, such as what's been called elusive market shares or market share figures. Allen says that at 340. Todd says that as well --

THE COURT: That's what we usually use. They may be elusive, but that's what we usually use.

MR. COHEN: Well, the reason they're called circumstantial or indirect is because they are actually more difficult to discern usually at this stage of the litigation

than actual effects, because you normally don't have economic modeling where you can show actual depressed wages based on an econometric model.

Todd makes that same point at 275 F.3d. 206.

And while we allege UPMC's conduct resulted in both reduced wages and reduced employment, we need only allege either reduced wages or reduced employment to properly allege market power. Again, this is the Le case, 2024 WL 195994 at *5, Footnote 7.

THE COURT: That may be true, but that's going to make it harder to argue the commonality of class.

MR. COHEN: It -- it may make it harder.

THE COURT: You might have to sub --

MR. COHEN: When -- when we get to -- we believe we've alleged both --

THE COURT: We'll think about that later.

MR. COHEN: And we'll get to that later. We'll get to substantiating it later. But we also have alleged they did not just either/or, we've alleged they did both. They depressed the wages, and they also depressed the employment by the demand for the employment, by reducing or rationalizing the hospitals. We have the hospitals where, for instance, we allege that they eliminated hospital beds. That may not a direct allegation that they eliminated nurses, but there are allegations of them actually reducing their employment of

skilled healthcare workers at those facility. That changes the supply/demand point. And we've alleged they engaged in conduct that was designed to increase the workload on the employees they did keep. So they are actually there reducing the output in terms of wages paid.

THE COURT: Your explanation to me of how you view the case explains to me why this -- why you see it as a class action and not a multi-district litigation, which --

MR. COHEN: Yes.

THE COURT: -- when I first read it, came to mind; that this would be a bunch of claims all around a region or all around wherever UPMC is, that would come together in one multi-district --

MR. COHEN: Well, by --

THE COURT: -- litigation for pretrial, and then go back. But now I understand more your theory of --

MR. COHEN: Right. Let me -- let me just use an example from my personal history. The Air Cargo litigation.

THE COURT: Um-hum.

MR. COHEN: It involved city -- over -- I think over 3,000 city pairs, where we allege that they fixed the prices they charged to people shipping cargo on -- by air. And one of the arguments the Defendants made was that every city pair is unique, every market is different, the demand is different, but you couldn't bring that as a multi-state action. You'd

have to bring 3,000 multi-state actions possibly.

But it was -- obviously, that's what the anti-trust laws are designed to cover; where you have uniform conduct, which we've alleged, that affects a large category or class of people who are similarly situated -- not identically situated, but similarly situated. And that's what we believe we have here, limiting it to the class of skilled healthcare workers where the econometric modeling has already shown significant durable depressed wages.

Does that --

THE COURT: That helps. Thank you.

MR. COHEN: Okay. So, like I said, we could allege either. We've alleged both. I think I cited the Le case. We've alleged that UPMC's anti-competitive conduct resulted in depressed wages for the proposed class --

(Atty. Cohen interrupted by the reporter.)

THE COURT: Hold on one second, because I'm going to cut in.

So reduced wages and reduced power, some have both, some may have one or the other.

MR. COHEN: There are cases where they say you just need to have either reduced wages or reduced output, is what they --

THE COURT: Output. Power output.

MR. COHEN: Right. We -- we've alleged both here.

There are many cases where you do allege both. We have alleged both.

THE COURT: But not necessarily "and." It could be --

MR. COHEN: It could be "or." And that was the -- the point I raised by citing to the Le case, was that we believe it could be "or." But we've gone beyond that. We've alleged both.

Paragraph 8, we discussed the inverse relationship between the market share and the wage penalty, and we have other allegations that cover both categories --

THE COURT: But some of your categories, skilled health workers will be easier on -- on both than others.

MR. COHEN: It -- it may be.

THE COURT: I think.

MR. COHEN: But we've also actually included a chart that shows the econometric model actually showing the -- quantifying the harm, the wage penalty on every category individually.

THE COURT: And that was in your Complaint?

MR. COHEN: Yeah, I believe that chart is in the Complaint. It certainly is in the Econ One study. Their study actually goes beyond that, like I said, to every category. But we found, adopting the logic of Prager and Schmitt, that those are the categories where it was

significant and durable.

The other paragraph of the Complaint I was going to reference are 119 through 128.

Now, this is something we -- I think I already discussed, the idea that UPMC used its market power with regard to the provision of health services to rationalize its operations --

(Atty. Cohen interrupted by the reporter.)

MR. COHEN: We've alleged UPMC used its market power to rationalize its operations, reducing its demand for employment and skilled healthcare workers. And we've alleged that UPMC required the skilled healthcare workers it did employ to do more work without increased compensation.

Paragraph 101 discusses consolidation. Paragraphs 10 and 135 discuss these points. And Paragraph 137 discusses the increased workloads. This qualifies as alleged evidence of reduced output.

In sum, we've alleged sufficient direct evidence of UPMC's --

THE COURT: Or facts and allegations.

MR. COHEN: Right. Right. We've alleged sufficient direct -- we have alleged evidence -- or facts of UPMC's market power needing to go forward. We wouldn't even need to allege indirect evidence of UPMC's market power, but we've done that as well.

To allege indirect evidence of market power, we're required to allege UPMC had a dominant share of the market for employing skilled healthcare workers within the geographic market and that there are barriers to entry for any prospective hospital operator, preventing them from competing with UPMC for the employment of its hospital healthcare workers.

As previous noted, UPMC's provision of hospital healthcare services can be considered a proxy for its employment of hospital healthcare workers. And we've alleged UPMC is a dominant provider overall, on average, of healthcare services --

THE COURT: Of all the services.

MR. COHEN: -- of their employment, healthcare worker employment in the relevant geographic market. That's at Paragraphs 67, 97, 98, and even Paragraphs 107 through 109, where we allege that UPMC took steps to frustrate West Penn from competing against it. 110 through 115, where we have allegations about how UPMC coerced Highmark to shut out competitors and/or not compete against it.

We have also alleged barriers to entry that UPMC has --

(Atty. Cohen interrupted by the reporter.)

MR. COHEN: Barriers to entry that UPMC has employed to maintain its position as the dominant hospital services

provider/employer, including conduct it's done to forestall and/or shut down competitors. And steps is taken to limit the power of the skilled healthcare workers, the other side of the employment equation, to negotiate for better wages or conditions. That, again, is the -- the statewide salary structure, Paragraph 142.

Paragraph 117 and 118 are the do-not-rehire list. And 158 through 166 cover the fact that UPMC has engaged in anti-unionization activities which are designed to prevent employees from having the power to collectively negotiate and counteract their market power.

In sum, we believe we have clearly provided plausible, relevant market allegations addressing the geographic market, the product market, and UPMC's market power.

Now, the -- let me make sure --

THE COURT: I have to give my court reporter lunch at some point, so I think we'll stop when he finishes and pick up with you.

MR. COHEN: Okay. So do you want me to --

THE COURT: So are you close? That's why I was --

MR. COHEN: I am close. I wanted to touch on statute of limitations. I think I covered their slide --

THE COURT: Hold on one second.

(Discussion held off the record.)

MR. COHEN: So let me address the argument of the statute of limitations applies to all our claims.

THE COURT: Heavily spend your time on fraudulent concealment, because I understand the arguments on -- on continuing violation.

MR. COHEN: Okay. So -- so focusing specifically on --

THE COURT: If you don't mind. I mean, you can make your argument however you wish, but that's --

MR. COHEN: Right. But I just -- there are a couple of points I just want to emphasize to counter --

THE COURT: Sure. Absolutely.

MR. COHEN: Counterpoints to their argument about continuing violations.

THE COURT: That's fine.

MR. COHEN: But let me -- let me lead me off with fraudulent concealment, I guess.

So as a separate way to toll the statute of limitations, fraudulent concealment, we have alleged in Paragraph 168 to 174 specific facts regarding what it did to conceal its anti-competitive conduct, such as problems we had where UPMC even refused to provide its own employee, who is a class representative, with their own employment records. Because most of the employment is done electronically now. You ask them for your records, and they tell you no. We still

don't have those records.

So at this early stage, we think that type of conduct is enough to at least allow us to do additional discovery into other potential steps UPMC took to conceal the overarching effect of its conduct --

THE COURT: What would their records have shown, though? They know what their wages have been and --

MR. COHEN: The records may have shown write-ups with a specific mention of a blacklist, since she was an employee of UPMC. It may have shown reports back, if she engaging in unionization meetings or activity, because we -- we have alleged that they surveilled workers to make sure they weren't engaging in unionization acts. We don't know, because we didn't get them. Once we are allowed to get discovery, we'll be able to substantiate that. But that's for the fraudulent concealment.

Turning to the continuing violation, I just wanted to correct one point; that they were arguing that once they depressed wages, that's it, you've got four years. That's not the law. In -- I have to find the case that talked about --

THE COURT: Well, they're saying once you had your last merger --

MR. COHEN: Well, it's not your last merger, because -- I think it's the Turner case in the Northern

District of Ohio that applies a more strict standard than the Third Circuit does.

They noted, first off, that affirmative -- that fraudulent -- statute of limitations itself is an affirmative defense, which is not something that should be addressed in a Motion to Dismiss.

But on top of that, I believe that they said that every paycheck that is issued that reflects a depressed wage is misconduct that continues the statute of limitations.

THE COURT: Northern District of Ohio said that?

MR. COHEN: It's 2020 WL 3044086 at *4.

Now, they distinguished between the types of acts that would constitute a continuing violation, but they did note that even if you had policy where you depressed wages, every time you make a payment, you begin a new statute of limitations as for that wage.

So their argument, once you depress the wages, you're done. After four years, you can't sue, even if you're continue to get depressed pay. That's not the law.

Now, there, in their circuit, the Court took a more strict view on what constitutes a continuing act; whether or not it has to be independent and an overt new act.

The Third Circuit has taken a more expansive view. And we think -- one of the reasons I thought this could go quickly is because the Department of Justice Statement of

Interest does a very good job marching through the elements for why you have a continuing violation and how that conduct qualifies -- allows it to continue.

But one other point I wanted to address, maybe one of the reasons why this is not an issue that's decided in the Motion to Dismiss stage, and it goes to the discovery that they were discussing, is that even if the Court found it legally impossible for us to seek damages going back more than four years from the date when we filed our Complaint, we would still be entitled to and need to seek discovery on the earlier conduct in order to substantiate UPMC's anti-competitive intent, its monopoly power, and its market power. So there's no reason for the Court to address this motion prematurely. It's not going to change or it shouldn't change the course of this litigation.

So at this early stage --

THE COURT: Then you need to go -- then you need to go all the way back to the first acquisition.

MR. COHEN: We -- we may need to go back to ascertain from the documents when an -- when acquisitions went from being merely an acquisition, to being part of a scheme or an intent to monopolize markets. You know, what were the thought process that went into each one and what employment policies they put in place after each acquisition and how they affected the workers.

So I also wanted to just emphasize the point made by the Allen Court, where they noted that the continuing violations there, they said were weak. They weren't de minimis. And at the Motion to Dismiss stage, that was enough. That's Allen at Pages 352 to 53. That's 748 F.supp 2d 323.

So that's --

THE COURT: Thank you, sir. I appreciate it.

MR. COHEN: Thank you.

THE COURT: It was helpful.

Because it takes a little bit more time if you're going to get something to eat, I'm going to give us an hour and 15 minutes, so we're going to go to 2:45 to come back, and then we'll start with you. Okay?

Thank you.

(Recess held from 1:30 p.m. till 12:46 p.m.)

THE COURT: As you all know, this is the time of day when all the jurors go to sleep. I expect you all to stay awake.

And you are up, sir. Thank you.

MR. YOUNG: Thank you, Your Honor. Christopher Young, Joseph Saveri Law Firm, on behalf of Plaintiffs.

I'll only a couple -- a few words to say about exclusionary conduct and the Motion to Strike.

So I think it's important for us to emphasize why we allege that the acquisitions -- there was a lot of talk

today about what did UPMC do to really exclude its rivals, and I think the acquisitions are very key to understand that.

The acquisitions are not just the acquisition of the rivals. It is also the destruction and the shutdown of the rivals, which effectively shuts down competition for the employees, the class members at issue here.

Plaintiffs have alleged a series of exclusionary conduct that must be taken together, including the acquisitions, but also the retaliatory conduct. For example, the blacklist or the TRAP provisions, which -- which --

(Atty. Young asked for clarification by the reporter.)

MR. YOUNG: The blacklist and the TRAP provisions, which on its own has been recognized by courts as being sufficient to justify a Section 2 claim.

And the citation for that, Your Honor, we would point you to is -- one moment. We cite to Broadcom. And there is also the American President Lines v. Matson decision we cite in our opposition, 633 F.Supp. 3d 209 out of the D.C. District, where if -- that case pointed out that the threats of retaliation alone by a monopolist against its potential customers was sufficient to justify or to allow a Section 2 claim to proceed.

And, here, we also have much more. We have

ability restrictions in the form of non-competes and the TRAP provisions, which -- which really suppress the workers' freedom of choice.

And I know that there's been a lot of talk today about the Le v. Zuffa case. I do want to point out that Mr. Le is -- his last name is pronounced Le. I have it on good authority.

But that case is important because that case was a monopsonist case -- a monopsony case involving labor. It specifically involved a class of elite MMA fighters; mixed martial arts fighters. And Zuffa, which is the organization that runs the Ultimate Fighting Championship, UFC, also engaged in a series of anti-competitive acquisitions and shutdowns, mainly of its rivals, Strike Force, Pride. Shut them down, prevented its fighters from -- from competing in those -- what would have been competing organizations with the UFC.

That case also involved contract provisions that Your Honor pointed out, for example, earlier today that TRAP provisions might be common in contractual -- in contracts.

But there is a lot of case law that recognizes that even otherwise legal conduct may become illegal if practiced by -- by a monopsonist.

THE COURT: I'm going to cut in there, and not on

that exact point. Something you said right before.

In those cases, in the Le case, for example, is the monopsony alleged from the minute of the first acquisition or later down the road?

MR. YOUNG: So in Le -- I believe it was from the first acquisition. There was, I believe -- and I enjoy from memory here because --

THE COURT: Can you agree with me that some monopsonies would not produce -- or would not wield their power illegally, as they are charging here, from the first acquisition?

MR. YOUNG: I would say that that would be a factual issue, yes. I think that's certainly possible. But whether or not -- so I think what we're talking --

THE COURT: Because here we're going back a long way.

MR. YOUNG: Yes, that's true. I -- I do not dispute that our allegations here go -- reach back quite a bit in time. However, I think we have met our pleading burden to allege what we need to in order to survive Rule 12.

Now, whether or not we'd be able to prove anti-competitive conduct all the way back 28 years, that is a separate question, but that's not what we're here to decide today.

THE COURT: That's correct. Go ahead on your

argument. I'm sorry to have interrupted.

MR. YOUNG: Yes. So I think Le v. Zuffa is also important because we've cited three decisions from that -- that same case, where the case -- where Le was decided on Rule 12, or a Motion to Strike Class Allegations, was stricken similarly based on the class description, and where the case survived Rule 12, including -- including contractual restrictions. I believe the case in Le, the 2016 opinion that we cite in our opposition brief, Your Honor, goes into detail of the contractual division -- provisions that Plaintiffs in that case challenged.

And defendants, like they do here, try to pick apart each of the provisions in isolation, but you have to look at the entire conduct in -- to get here. Where the TRAP provision may be common in certain -- certain contracts, taken together with the blacklist, with the acquisitions, that together makes an anti-competitive scheme.

So --

THE COURT: Let me ask this: Should you not pick apart the separate actions if they apply to different members of the class? Or different Plaintiffs?

MR. YOUNG: I -- I would say that as a -- as a theoretical concept, yes, but I don't think that's what we have here, because I think the conduct that we allege is system-wide and -- and uni -- and defendant-wide.

So, for example, the blacklist, we do not say apply to -- by job title or job title.

(Atty. Young asked for clarification by the reporter.)

MR. YOUNG: We do not apply that job title by job title, position by position. We allege that that -- that is -- that is uniform.

Likewise, the -- we've alleged a system-wide salary structure, which is how UPMC imposes sub-competitive wages system-wide, which is -- which addresses the point about how -- I believe UPMC makes its argument about how all it really has done is varied wages geographic -- by geographic region by geographic region.

Well, that is similar in other labor anti-trust cases. For example, we cite a string of no-poach cases --

(Atty. Young asked for clarification by the reporter.)

MR. YOUNG: A string of no-poach, N-O P-O-A-C-H. This is at Note 11 of our opposition to the Motion to Strike.

In those cases, there are regional variations in pay structures all the time. But what is important is that the anti-competitive conduct suppresses wages across -- across the -- across the firm, when it's single-firm conduct, unilateral conduct, which is what we allege here.

So simply because a UPMC worker in one region

may be paid a little differently, that is because we allege -- as we allege, there is a firm-wide system in place which captures the anti-competitive conduct firm-wide.

THE COURT: And I suppose that an argument could be made that that's what class actions are about anyway.

MR. YOUNG: That's right.

THE COURT: That's why you didn't have --

MR. YOUNG: That's right.

THE COURT: All right.

MR. YOUNG: That's right.

THE COURT: Continue. Thank you.

MR. YOUNG: Just a quick point about the allegations -- or the prior lawsuits. We're -- we're not making allegations about allegations. What we're really providing is background about what has happened before and really is part of the tale about how UPMC built its monopsonistic power across -- across the time. So that's really what those allegations are about. We're not really trying to dig up old -- old lawsuits. We're really using those allegations as colorful -- what -- what we allege is building UPMC's market value.

So I am going to pause there quickly to see if there are any further questions about the exclusionary conduct. And, otherwise, I just have a couple points about the Motion to Strike.

THE COURT: Not really. But I do want to ask a bit about -- and we got into it some, of course, with your co-counsel, about the argument of the tuition repayment as one of the -- suppressing one of the conducts.

MR. YOUNG: Certainly.

THE COURT: So talk to me a bit about that one.

MR. YOUNG: Yeah. So how -- how that would work, tuition payment for the TRAP --

THE COURT: Is that in a contract of any sort, do you know?

MR. YOUNG: I do not know right now. I believe it's mentioned in the Complaint, but I don't have that information handy.

THE COURT: Yeah. I was wondering if it was a contract point with the class members.

MR. YOUNG: Yeah. Well, whether or not it is, you know, that's something that we could certainly suss out in -- in discovery.

But right now, what we have alleged is that this is a uniform policy or this is a firm-wide policy.

And, you know, whether -- and part of the issue is we've asked for our class members' or class reps' contracts, and we haven't been able to get them --

(Atty. Young asked for clarification by the reporter.)

MR. YOUNG: Our class reps' contracts, and we have not been able to verify.

THE COURT: Go ahead.

MR. YOUNG: So just a couple of words about the -- the Motion to Strike.

I do think it is important to note that our class definition -- and this bleeds into a little bit about our relevant -- relevant services market, products market, is that it is based off of objective criteria, not only from economic data, but also UPMC's own data, own -- own titles, as was communicated to us.

I will mention that if you look up in that same Note 11 I mentioned earlier in our opposition to the Motion to Strike, there's a citation to In re: High-Tech Employees, which is a no-poach anti-trust -- anti-trust action where a class was certified by reference to an appendix of specific job titles. So job titles themselves can be objective criteria by which to define a class. And if it's good-enough class certification at Rule 23, it is certainly good enough at Rule 12.

THE COURT: I don't disagree with that. It's just I'm having a hard time defining the class title -- I mean, the job titles --

MR. YOUNG: Right.

THE COURT: -- and trying to figure out where they

come from.

Now, as it was explained to me, those are coming right from either the study or the -- or UPMC themselves, so I suppose we should go with that. But I don't even know that we can say who the folks are in -- in the class at this point.

MR. YOUNG: Yeah. Well, Your Honor, I think that's why we go through the Rule 23 -- that's what the Rule 23 provisions are for. Rule 23(b)(3), like the notice and the opt-out procedures --

THE COURT: Yeah, but also cases are dismissed when they can't figure out who the class is.

MR. YOUNG: Certainly.

THE COURT: Ascertainability.

MR. YOUNG: Yes, absolutely. However, UPMC employees know what their titles are, know what their -- what -- know what their responsibilities are.

You know, for example, you know, a pharmacy worker is likely not -- I mean, a pharmacy worker may incidentally, for example -- I believe Your Honor used "sweeping the floors." But a --

THE COURT: I don't know. I don't know if that's a pharmacy worker at all.

MR. YOUNG: Okay.

THE COURT: Or not.

MR. YOUNG: But -- but I think that the title of pharmacy worker by itself is objectively definable. A pharmacy worker is someone who is likely going to be measuring or counting, prescribing the pills in a pharmacy.

THE COURT: In essence, the skilled workers definition in your Complaint could be everyone but physicians. It could be physicians, except for that you exclude them in another footnote.

MR. YOUNG: Yes. Well, no, I would not say that. So there is -- there is a category of workers who we exclude; so-called unskilled workers. So these are -- these are people exactly like -- for example, perhaps janitorial staff or kitchen --

THE COURT: But because -- some could say an orderly was an unskilled worker.

MR. YOUNG: I would say that that's a factual dispute about whether or not -- whether or not an orderly is, in fact, a skilled worker or not.

But what is important about the skilled workers in our Complaint is that they have skills unique to inpatient hospital services. That -- that is the defining --

THE COURT: That's the key.

MR. YOUNG: Yes, that is the key.

And I will -- I will say, I don't think we've cited all of these cases. But cases like this have survived

Rule 12 Motion to Strikes.

You know, I've -- there's a case out of the District of New Jersey called Robinson v. Jackson Hewitt, which is --

(Atty. Young asked for clarification by the reporter.)

MR. YOUNG: Jackson Hewitt. And I apologize, Your Honor. This case wasn't cited in our briefing. But that involved skilled -- tax preparers, which was alleged to be skilled workers in the tax preparation context.

The High-Tech workers was about skilled High-Tech workers. People who worked at -- for example, at Pixar, Disney -- Disney -- I believe Lucas films.

THE COURT: Interesting, the one in New Jersey. So it wouldn't necessarily be an accountant. It would be someone who prepared taxes, who are often trained --

MR. YOUNG: That's right.

THE COURT: -- by H & R Block.

MR. YOUNG: Yes. So that case that dealt with -- I believe it was industry specific or Jackson Hewitt specific.

THE COURT: What's the name of that one again?

MR. YOUNG: Robinson v. Jackson Hewitt. It is a case out of the District of New Jersey.

There's also the Deslandes case out of -- I believe it's the Northern District of Illinois. Another

no-poach case.

(Atty. Young asked for clarification by the reporter.)

MR. YOUNG: Deslandes.

And that case was about McDonald's fast food workers, where the allegations were even a fast food worker had skilled -- had special skills unique to the fast food --

THE COURT: I believe it.

MR. YOUNG: Yeah. So that case did get tossed out of class certification and was over -- was reversed on class certification. And I apologize again, Your Honor. That -- that case wasn't cited in our brief.

But those are kind of exemplary cases where skilled -- skilled class definitions survived Rule 12.

THE COURT: Okay. Thank you.

MR. YOUNG: Um-hum. Now, unless there's anything else --

THE COURT: So the Court -- let's say the Court doesn't throw out the allegations because they're sufficient --

MR. YOUNG: Right.

THE COURT: -- to go forward at this point. They're still going to be around during a Motion for Class Certifications on definitions. I am still concerned about the length of time, as well as the non-specificity somewhat in the

description of the skilled hospital workers -- or healthcare workers.

So that could all be dealt with at a later time, to your mind?

MR. YOUNG: Yes. I think, you know -- I think at this stage we have pled enough to get us past the -- our pleading burden, and we are entitled at Rule 23 to conform our class definition to the proof. I mean, it's almost --

(Atty. Young asked for clarification by the reporter.)

MR. YOUNG: Conform our class definition to the proof.

I think it's quite -- it's quite routine for Plaintiffs to refine their class definition based off of what is uncovered during discovery, and I think that it's very common sensical, because we don't know right now all of the internal workings of UPMC, we don't know all the principles of internal equity that might -- that UPMC might adhere to. And we don't have -- we don't yet have expert analysis geared towards all the Rule 23 factors. Really, the predominance, the typicality, all the -- all the Rule 23 expert report material that will -- that will be presented to you at a later time.

THE COURT: Thank you. I appreciate it. Thank you, Mr. Young.

MR. YOUNG: Thank you.

THE COURT: I bet we have some counterargument.

MS. KCEHOWSKI: Some rebuttal, if you will indulge us, Your Honor.

THE COURT: Take your time.

MS. KCEHOWSKI: I will try to keep it focused on key issues.

THE COURT: Key points. Okay. Thank you.

MS. KCEHOWSKI: And be succinct here.

All right. To the first point --

THE COURT: I was going to say, on rebuttal I would like to keep it to -- let's not go past 20 minutes, a half hour. Okay?

MS. KCEHOWSKI: Understood, Your Honor. Thank you. That should not be -- that should not be an issue.

THE COURT: I want to make sure you can all drive down 79 in the light.

MS. KCEHOWSKI: Understood. Understood. It's a nice drive.

All right. So I think the first point that I'd like to make is that the Plaintiffs have thrown a lot that's out there. They're mixing concepts, they're blending the issues, they're blending the legal issues.

And to take a step back, it's really important to do an element-by-element analysis here of the requisite

components of the pieces that they have to allege under a Section 2 claim.

THE COURT: And though I agree with that, let's start with something that really hit me hard, and that is the -- the Queen case standard.

MS. KCEHOWSKI: Correct.

THE COURT: Talk about that.

MS. KCEHOWSKI: Yes. And that's exactly the first thing I wanted to talk about.

Because on the product market -- so this is the product market standard -- the Plaintiffs are applying the wrong standard. So they suggested that we have to prove it's a legal impossibility, that they get to allege the rough contours. That is not the standard. The standard is the Queen City standard, and it's got to be plausibly alleged under Twombly.

Distinguishing Queen City on its facts does not change the Third Circuit pleading standard for what makes a plausible product market. And that is the Queen City standard. It applies. It applies in this context.

The Plaintiffs have got to talk about reasonable, interchangeable substitute jobs, they have to rule them out with plausible facts, or else they've got to broaden the market.

This is the legal standard, Your Honor, that

applies here. And, again, they have to allege facts that meet the standard, and they've got to allege it plausibly. And they don't meet facts -- they do not plead facts -- excuse me -- that -- that meet that standard.

So they identify two paragraphs of the Complaint for you; it's Paragraph 56 and Paragraph 92.

Paragraph 56 is totally conclusory, entirely circular --

THE COURT: Well, they also said it's a course of conduct. It's the totality of the circumstances and everything else that they --

MS. KCEHOWSKI: And this is where I think we've got to sort of step back and say, okay, what about that pleads a product market.

So the product market is identifying what the scope of the jobs that are going to be at issue and assessed in considering whether we've got market power, we're excluding rival employers. So this concept of a product market is -- it's just -- it's a starting point for all of this here.

And so the concept of, you know, course of conduct, other acts, that's not focused on -- it's not the right analysis for the question of what creates a product market in this context. And so --

THE COURT: And you would say something like hospitals compete primarily with other hospitals for their

labor is a conclusory --

MS. KCEHOWSKI: It is a -- it is a conclusory statement, that's right, because it's key from the sentence before, where they just use the word "specialized" five times -- four or five times in a row without articulating what that means or not.

So they -- they are saying that specialized workers have special -- do specialized tasks, have specialized skills, and, therefore, have few options for their labor, and, therefore, they're specialized.

So all they've done -- what is specialized? We have no idea. They don't tell us. They never tell us anywhere in the Complaint what is specialized to a hospital job, as compared to any other roles. And there's nothing to help us understand what that line is.

They go on in that paragraph and they concede that there is a distinction; that there are some workers that are sufficiently specialized and skilled that hospitals compete with other hospitals, and then there are other broader array of employers that would be available for the less skilled workers, and they use this "specialized" word as the dividing line, and they never explain the difference between the two.

It's a legal conclusion. Where are the facts to support it? We don't have those allegations here at all.

The same thing with Paragraph 92. That paragraph is talking about patient care. It's not talking about labor, and it's not talking about a market for labor in any way.

So what they do -- and they talked a lot about studies. They try to fall back to these studies, but they don't support them on this issue explained in our opening argument as to why the studies actually prove why we win. Those studies say that the workers that were at issue in those studies can substitute to jobs outside the hospital.

On each one of these slides, those studies say that.

The first one, Prager and Schmitt --

THE COURT: Isn't that an argument, though, on the sufficiency of the evidence?

MS. KCEHOWSKI: It's not when they haven't alleged facts that support a product market.

THE COURT: Well, their facts are the studies.

MS. KCEHOWSKI: So their -- but the studies say that there is an ability to substitute to other jobs. They never say the opposite. They cite the studies for wage impact and other issues that go to other elements. But the studies, in terms of --

THE COURT: The description of the --

MS. KCEHOWSKI: -- of where -- who can -- where

people can work and whether these workers in their skilled healthcare worker definition can get jobs outside the hospital, these studies say that they can. And they say it repeatedly.

And this goes to the next point that I -- that I wanted to make, with regard to how they're describing what the skilled healthcare workers definition is.

They talk about job titles. They've talked about job titles a lot. They've suggested that the job titles came from these studies. Their skilled healthcare workers definition is not a job titles definition. It is not a job titles definition. It is any worker who has specialized skills through formal education and training, extensive on-the-job training, including, without limitation, seven job categories.

So their definition is not job titles. They haven't identified who falls within those job categories. But it's --

THE COURT: I think I might agree with you on that. But they were going -- they wanted to get into discovery to find out what specific titles were in the UPMC system.

MS. KCEHOWSKI: So -- but they've got a pleading standard here, and we're talking about -- this is kind of blending into two different things.

One is the product market, right, and what they

have to do --

THE COURT: And that's where you are, right?

MS. KCEHOWSKI: That's where I am.

THE COURT: Okay.

MS. KCEHOWSKI: That is -- that is where I am.

This question of whether they can get into discovery to round out their -- their class definition is a separate issue, and I want to address that piece too.

But in terms of the product market itself, they have -- they have got to allege why all of these workers within this definition -- not just the job titles, which they say come from the studies -- why all these workers, these undefined specialized workers cannot find reasonable substitute employment outside of the hospital. And they don't allege any facts to substantiate that.

And the cases they cited to you, Your Honor, they have the types of allegations that would be necessary and that we don't have here.

So they talked about the Todd case. Your Honor, that case has very specific allegations about lowered wages outside of the product market. So there's a specific allegation in that Complaint that those workers would be paid less if they worked outside the hospital.

Same thing with regard to -- to the Clarke case as well. There were very specific allegations that narrow

that market in a way that is -- that is fundamentally different from what we have here.

You had specific allegations about differences in experience, in pay for RN's -- so it was limited to RN's only in Clarke. It was not this broad definition. And there were specific allegations that separated the inpatient and the outpatient market. And the parties then agreed that those differences existed.

So those cases, they have allegations that distinguish them from our circumstance, and they don't support what we have here.

I heard Mr. Cohen say that he agreed with you that there's always an opportunity for somebody to work outside of a hospital, for these skilled healthcare workers to work outside of the hospital, and then he followed that by saying, but there's a premium to be paid at these hospital jobs. They don't allege that.

They don't allege anywhere in the Complaint that these workers would be paid less outside of the hospital than inside the hospital. Those allegations are nowhere.

So those are the types of allegations that they would need --

THE COURT: But he does allege -- he did argue today that he specifically -- they specifically pled so that we weren't saying that they could look outside at non-hospital

jobs. They pled the Complaint hospital job to hospital job. Correct?

MS. KCEHOWSKI: But for -- that's for the wage impacts. They have a study that they have cited that they claim establishes a wage impact. It doesn't, and --

THE COURT: Well, wasn't that defined with product market?

MS. KCEHOWSKI: So a study that compares hospital worker wages to hospital worker wages does not establish anything about wages outside the hospital. And that's what -- that's what those studies are doing. They're saying in one place you make a certain amount as a hospital --

THE COURT: Correct. But if they define their product market as hospital to hospital, then that would follow.

MS. KCEHOWSKI: So they define their -- their product market as hospital only. But for them to substantiate a hospital-only product market, they have to establish that there are not reasonably substitute jobs outside of a hospital for those workers. So they have to --

THE COURT: Oh, I see. And you say there are no allegations to that.

MS. KCEHOWSKI: Correct. So there are no allegations that would support a wage differential or some other impact or reason why the workers -- all of the workers,

not just the job titles, all of the workers that they've included in their skilled healthcare worker definition would be unable to find substitute work outside of the hospital. That's the Queen City standard.

THE COURT: Wasn't that defined in the Second Circuit case? What was the name of the case? Todd? Was that Todd?

MS. KCEHOWSKI: Yes. So Todd -- Todd is the case that they talked about, and Todd is a case that has very express allegations about wage differentials. There's actually an allegation in the Todd Complaint specifically about cross-elasticity of demand. And they allege that there's a low level of cross-elasticity of demand between workers in the product market and workers outside the product market. They allege differences in experiences, difference in job duties.

So the -- the case --

THE COURT: The allegations were in the Complaint.

MS. KCEHOWSKI: Correct. Those are allegations in the Complaint, apparent on the face of those cases, and we don't have any of those allegations in this case here.

So cases they rely on have the types of allegations that we don't have, and they have told us nothing in this Complaint about why the workers in their skilled healthcare worker definition can only find jobs in the four

walls of a hospital.

On geographic market, it continues to be something that's completely arbitrary and unprincipled. It's not based on the facts of the law. And there is a pleading standard for geographic market as well, and they have to allege facts that would support an area where workers could reasonably turn for alternative employment. And that's the standard.

They have not alleged facts that support that standard in any way. And the Plaintiff's arguments on this point didn't have anything to do with where workers could reasonably turn for alternative employment. That, for example, UPMC has system-wide policies is totally irrelevant to the question of where skilled healthcare workers can look for other jobs. They just don't have anything to do with the issue. Or that in-house lawyers can go to another place. It just doesn't have anything to do with the skilled healthcare workers here and where all of these workers could potentially turn for alternative work.

THE COURT: What about the person who is in Lock Haven? Where do they turn?

MS. KCEHOWSKI: So that's something that the Plaintiffs would have an obligation to allege, and they -- they have not done that. So --

THE COURT: But it's your contention that they have

to show that.

MS. KCEHOWSKI: They do. They do. They have to plausibly support the allegations with allegations related to whether it's the community or relocating preferences of the workers or the commercial realities based on the skills. Depends on what worker you're talking about. Where would they go to find alternative employment, and they haven't done anything to support that.

There is -- there is a case on this particular issue that I think is -- that I point out to Your Honor here. It's the Concord Associates case from the Second Circuit in 2016. It's 817 F.3d. 46.

And the -- the Court here does talk about that it is appropriate for the District Court to look at whether the Plaintiffs' Complaint asserts sufficient facts on the existence of a product market, the existence of a geographic market, and when they don't allege facts that would make it plausible, that they make no attempt to define what that geographic market is, those allegations fail.

So there's a -- there is a pleading standard. They need to meet that before they get into discovery or before they are allowed to get into discovery. And that's a fundamental failure on that market; Allegation 2.

Now, as it relates to the -- the class definition, just go back to this point where there was a lot

of discussion about cases, including the High-Tech case, that were -- that were based on class definitions of job titles. And the point here, again, for the pleading requirement at the -- on the Rule 23 pleading burden standard is what we articulated. They have to make a prima facie showing.

As it relates to the -- the class definition, it's got to be objective. That's the -- it's the ascertainability standard.

And so the -- the class is not just job titles here. It's much broader than that. And the -- the sort of standards that are in the rest of the class definition are not objective. And they didn't say anything that made any of those terms objective. And that a class might be justified based on specific job title. They could have pled a job titles class, but they -- they did not do that, they did not plead that.

THE COURT: They said they don't know them yet.

MS. KCEHOWSKI: But the -- their -- but it's their obligation to define their case and to define a class by objective criteria.

So this is -- I think this goes back to the standard we talked about at the outset, where they have to make this prima facie showing, and they haven't done that, and they're not going to be able to make that prima facie showing with the -- the words that they've used in this skilled

healthcare workers definition that they built into their class definition.

So they are not going to make this definition objective with the word "specialized," "extensive," "formal," "without limitation," than this laundry list of job titles --

THE COURT: See, they rely on these studies, and they take the terms from the studies. So by pleading the studies as facts until they discover more specifically here and using the same terms, why is that not enough?

MS. KCEHOWSKI: They do not plead a definition that matches their studies. So it might have been one thing if they said we are going to use these studies, and we are defining our class based on the terms used in these studies and government references. None of that is alleged. That's not what they do.

They are the masters of their Complaint. They have pled a class that is far broader than that and is not defined with any objective criteria, and it doesn't meet that pleading standard.

So, again, it's something they have an obligation to do now, and they haven't -- they have not -- they haven't done so. There's nothing that's going to make the terms here less vague going forward. And they -- they have not.

So there's nothing in the Complaint -- like, I

was listening to them talk about, well, we got these from these different studies. You know, the studies don't talk about the categories that they have here. They're a bunch of different studies that they've cited for a lot of different reasons. And what they never say is our class is based on these studies. So, like, we're hearing that for the first time in the discussion with you this morning, Your Honor.

They also talked about -- they were giving you case citations on cases that they didn't cite in the briefing and suggesting that that should be issues that Your Honor takes under advisement. I would respectfully request an opportunity to consider those, in terms of -- in terms of the issues here.

But -- but as it relates to --

THE COURT: Are you telling me you want to brief more?

MS. KCEHOWSKI: Excuse me?

THE COURT: Are you saying you want more briefing?

MS. KCEHOWSKI: I don't know whether I want more briefing because I haven't looked at the cases, and I haven't had a chance to take a look at them while we're here today.

So my position would be Your Honor should not be considering cases that were not cited --

THE COURT: On that point, if there's anything that was said here that was not argued in the -- in the papers, and

you want to say that, do it quickly and send it off to the docket. But I'm not going to ask for more briefing.

MS. KCEHOWSKI: So I appreciate that, Your Honor. And I appreciate the opportunity to -- to consider -- to consider that issue.

But I think, again, just the fundamental point on the class definition, it's not a job titles class. They don't plead it based on these studies. They've pled something that's far broader than that. They've chosen to -- to define their class based on non-objective criteria, and that doesn't meet the -- the pleading standard under Rule 23(d), as articulated in the In re: Railway case.

So I think that's all I have. Unless Your Honor has more questions for me, I'll pass it off to my --

THE COURT: No. I'm excellent at interrupting, and I'm sorry about that. But I think -- I think I understand your argument quite well.

MS. KCEHOWSKI: I appreciate your -- the opportunity, Your Honor. Thank you.

MR. SCHWINGLER: Thank you, Your Honor. Good afternoon.

THE COURT: Good afternoon.

MR. SCHWINGLER: Just a few points on monopsony power and the statute of limitations and exclusionary conduct.

On the monopsony PowerPoint, I just want to

make it very clear what's in the Complaint and what is not.

So there is no allegation that UPMC has suppressed wages everywhere in the relevant market. It's not in there, it's not in the Econ One study.

THE COURT: I kept asking that. And I believe their response continued to be that it was a generic -- that I was looking at it too granularly; that it was a generic market where all of what UPMC does when it acquires and moves on, they have the same wages everywhere, they have the same structure, and so it affects everyone in all of those markets. That's how I heard it.

MR. SCHWINGLER: Yeah. And so the -- this is -- this point is --

THE COURT: The totality of the circumstances-type argument.

MR. SCHWINGLER: Yes, for exclusionary conduct. But just taking a step back to whether they have alleged that UPMC is a monopsonist in their relevant market, they -- they talked about what they called direct evidence, and they said, look, UPMC has suppressed wages, and that's direct evidence of monopsony power, because if you weren't a monopsonist, how could you suppress wages, right?

And the point I'm making here is they do not allege that that is the case everywhere within the market at all of the facilities. So they have not alleged direct

evidence of monopsony power --

THE COURT: That's why I kept asking, if it's somewhere in the market, is that enough?

MR. SCHWINGLER: The answer is no.

THE COURT: Okay.

MR. SCHWINGLER: No, if they want to allege a different market, that's a different question. But they have the justify the market they've pled.

They also talk a lot about alleged reductions in output. And, again, they don't allege that UPMC has reduced output everywhere. They actually don't express that UPMC has reduced output anywhere, but I don't need to belabor that point.

But what matters for today is that they have to justify their entire alleged market, and they say nothing about overall output or overall employment levels across the entire market.

And just one quick point on that. A layoff is not by itself a reduction of output or evidence of monopsony power. Layoffs happen all the time. Facilities are closed or scaled back all of the time, regardless of whether it's a monopsonist or not. In fact, probably almost all of the time a layoff occurs because a business is struggling or a facility is losing money. So --

THE COURT: We're not going to require you to come

in here and make an argument that this hospital would have closed had we not acquired it.

MR. SCHWINGLER: Yeah. The point for the -- for the -- what they've alleged is alleging that at a couple of facilities there was either a shutdown or a reduction does not mean that there was a reduction of output, much less across the whole market.

THE COURT: I see what you're saying.

MR. SCHWINGLER: Yes.

THE COURT: I'm sorry. I misunderstood.

MR. SCHWINGLER: So on the exclusionary conduct point, then, on the acquisitions, opposing counsel mentioned it's not just the acquisitions, it's acquiring and then shutting down rivals, and then discussed the ultimate fighting case. And that case is in some ways the perfect example of what is not alleged here.

So in that case you had allegations -- and in the Meta -- the Facebook case that counsel mentioned before lunch -- you had specific allegations that a monopolist acquired a rival, a competitor; someone was taking their lunch and instead of beating them on the merits, they just bought them.

THE COURT: They say that about the hospitals you acquired.

MR. SCHWINGLER: They do not say that about the UPMC

hospitals. They used the word "competitor" generically a few times. They do not allege that all of these hospitals were actual competitors in the labor market of UPMC before the acquisition. All right?

And let's look at some of these acquisitions. Lancaster. Lancaster is not only an acquisition, it is one of the few examples of a facility closure. All right?

According to them, we have 7 percent of the -- UPMC has 7percent of the licensed beds in Lancaster. The actual quote from Paragraph 86 of their Complaint is that after -- UPMC shut down a facility, and they called this, quote, "A reduction in capacity in its newly dominated region."

How is it that we are dominating Lancaster County by acquiring a couple of small hospitals, one of which we had to close down -- UPMC had to close down a year later? That makes no sense.

But what they don't allege is that either of those facilities in Lancaster County were competing with any UPMC facility before the acquisition.

So calling a -- just saying generically there were 28 acquisitions of competitors doesn't make it so. It doesn't make it plausible. "Competitor," that's just a label, and they need some facts to make it plausible, and there are none.

And what we would respectfully submit, Your Honor, is when you look at the specific sequence of acquisitions they lay out in the Complaint, and they talk about going kind of further out, they never say Susquehanna Health was a competitor of UPMC's before it was acquired in 2016. They don't make that allegation.

THE COURT: And you say they have to.

MR. SCHWINGLER: Well, if they're going to pretend -- or treat Susquehanna as a competitor of UPMC's, they ought to allege that.

And I'll tell you why they can't. Right? Take Lancaster. That's 200 miles away from Pittsburgh. If they were to allege that until UPMC acquired those facilities, that those were bitter rivals, that they were competing every day for nurses and orderlies, then they would have to accept that, really, any hospital within a 200-mile radius of Pittsburgh would be a competitor --

THE COURT: True. But they also say -- or they argue today -- I can't point to anything in the Complaint. But they argue today that -- that you acquired these before you come into the market so to get rid of the competition. So that they could enter the market -- so you can enter the market without the competition there.

MR. SCHWINGLER: That is not alleged in their Complaints. There's a whole body of anti-trust law that deals

with how you think about potential competitors that aren't actual competitors. It hasn't been alleged, it hasn't been briefed. I could talk all day about it, but I know that that is not what Your Honor would like.

THE COURT: Okay.

MR. SCHWINGLER: The -- and Your Honor asked a question about tuition assistance, and so I just do want to make clear what's alleged and what isn't alleged.

I heard opposing counsel say, well, we don't really know what it is until we -- we take discovery. That's not the case. The Plaintiffs in this case are current and former employees, so they have access to this information. They know about it.

THE COURT: Well, he says they can't get their files.

MR. SCHWINGLER: Well, you don't need your employment file to know what the tuition assistance policy is, because it's made available to the employees. It's part of their benefits package.

And -- but if they're going to allege that it's anti-competitive -- like, they need a basis for alleging that it's harmed competition. So what I'm hearing them say is they don't know what it is, which is another way of saying they can't allege that it's harmful to competition, and we would submit they have not.

THE COURT: They actually said that it's like a -- they likened it to a non-complete.

MR. SCHWINGLER: Yes. So what they've done is point to hypothetical -- what they call TRAP's. And there's literature on this. There's other employers that have done bad things in the past that aren't specifically being alleged about UPMC.

What matters is what they allege about UPMC's program, which I, again, would submit is essentially nothing when you look at the allegations in Paragraph 155 and 156. And that's an issue we'd submit permeates all of their allegations of exclusionary conduct.

So I'll just, like, conclude by discussing the statute of limitations. There's a question Your Honor asked in the context of the class definition and the length, but it really goes to the heart of the statue of limitations question, which is, is this a 28-year case or is it, at most, a four-year case?

Now, that's not a class definition issue. It is a statute of limitations issue. And just to be clear, there's no disagreement on -- on this point with any of the parties. The only way to go back more than four years is fraudulent concealment. That is the tolling doctrine.

So if they want damages --

THE COURT: You can go back further for continuing

violation, but I don't know that there's a continuing violation till 1996.

MR. SCHWINGLER: You can not go back more than four years for a continuing violation. That is clear from the Supreme Court precedent and the Third Circuit precedent that we cited.

So in the anti-trust context, there may be -- I know that in other areas of the law continuing violations might be applied differently. In anti-trust, there's a Supreme Court case called Claire (phonetic) that we cite. It's -- this is not disputed. This is black letter law.

If you have a continuing violation, all it does is allow you to collect damages during the four years immediately prior to the Complaint. It does not toll any otherwise stale claims.

So those are the stakes with fraudulent concealment here. They have not really even attempted to allege fraudulent concealment. The only thing they mentioned in their argument was the -- the employment file. But denying access to an employment file after a Complaint has been filed quite obviously cannot conceal -- cannot be an act of concealment in 1996 or 2002 or 2012, which is what they need to allege. They need to allege affirmative acts of fraud to conceal the conduct, which, of course, was public, and to do so with particularity, and they allege none.

So we would submit the easiest issue the Court should have to decide on these motions is cutting this thing down to four years, because that -- it's crystal clear that without fraudulent concealment, it's only a four-year case.

And so then that leads to the continuing violation point. They cited the Turner case as the case involving McDonald's. It's out of the jurisdiction. But what Turner -- what they cited it for is not a controversial point, which is if you are charged a super-competitive price or, I guess, in this case paid a sub-competitive wage, that that could be injury. Right?

But what they concede in their brief is that in the Third Circuit, injury is only half the equation. To get a continuing violation, you also have to show the affirmative act, the anti-competitive conduct within the four-year limitations period.

So injury alone is not enough. And the Third Circuit's decision in Lower Lake Erie, which we cite in our brief, makes very clear that injury and the overt act, those are two different issues.

And so we're not aware of any Third Circuit case that would -- that would support the notion that all you need to do is allege a higher price or a lower wage. And the cases we cited about the -- the merger specifically reject that expressly.

The Sixth Circuit opinion in --

THE COURT: And, also, there wouldn't be one in the four years if you win on that argument.

MR. SCHWINGLER: That's the -- if the point is, look, there were mergers 20 years ago, but we're getting paid less today, under the case law, that's not a continuing violation. They have to have that additional anti-competitive conduct within the limitations period. And that's just common sense. Otherwise, you would respectively have no statute of limitations in cases involving mergers.

THE COURT: Thank you very much.

MR. SCHWINGLER: Thank you, Your Honor.

THE COURT: Attorney Cohen?

MR. COHEN: Your Honor, if I may have a few minutes for rebuttal.

THE COURT: Absolutely.

MR. COHEN: I wanted to touch on a couple things, and I'll do it in the proper order.

The easiest one first. I think they said that we made a request for our Plaintiffs' employment files after the Complaint was filed. To be fair, as part of our pre-Complaint investigation, we actually requested them before she filed her Complaint --

(Atty. Cohen asked for clarification by the reporter.)

MR. COHEN: Pre-Complaint investigation, and they refused to give them. We renewed our request, and they still refused to give them.

I wanted to go back a bit to some of the points they raised about the definition of the workers, where they talked about Queen City, Todd.

Again, we think that Todd is the proper standard and fits best with the fact pattern here.

First off, as the Todd Court noted, quote, "Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead irrelevant product market." That's at Pages 199 and 200.

The Court also noted, when it was discussing the interchangeability of the managerial, professional, and technical employees there, "The question is not the interchangeability of, for examples, lawyers with engineers." Quote, "The market is not the market of competing sellers, but of competing buyers." That's at Page 202. Here, the buyer would be UPMC.

Quote, "At issue is the interchangeability from the perspective of an MPT employee --"

(Atty. Cohen interrupted by the reporter.)

MR. COHEN: "At issue is the interchangeability from the perspective of an MPT employee of a job opportunity in the

oil industry with, for example, one in the pharmaceutical industry." That's Page 202 as well.

And then I think this is directly on point, where the Court says, "MPT employees accumulate industry-specific knowledge that renders them more valuable to employers in the oil and petrochemical industry than to employers in other industries." That's at Page 303.

The Court goes on to say, "It is consistent with common sense and empirical research that employees' industry-specific experience may cause them to suffer a pay cut if forced to switch industries." That's at Page 303.

The other thing they note, which is the point we're making about when we -- we'll be able to receive discovery is that, "Industry recognition as well establishes a factor that the courts consider in defining a market." And what that means here is we believe we know what skilled healthcare workers are; nurses and pharmacy workers that provide in-hospital services with unique skills. But when we get the discovery from UPMC, we'll be able to see how they treated it.

In Todd, I know that they did not have the type of econometric analysis that we have the benefit of here, showing an actual wage penalty or negative effect, direct evidence of harm. But what they did have, because this was pre-Twombly, is they were allowed before they filed their

Amended Complaint to get discovery from Exxon, one of the largest of the Defendants, regarding their internal documents about their job recognition, job categories. And, as a matter of fact, when they got that discovery, after they filed the original Complaint, they significantly modified the allegations in their Amended Complaint to conform to the documents they got.

So we here have made all our allegations based on econometric studies that show actual wage penalties across the geographic region on average, but without the benefit of any discovery.

THE COURT: Well, I think the first thing that they were talking about in Todd was interchangeability. There's that standard of reasonable interchangeability, which is: Can you get a job -- can you do another job in the hospital, which is not where you are. You are in the cross-elasticity --

MR. COHEN: Well, the cross -- so your --

THE COURT: -- cross-elasticity of demand, which is whether or not they can go to a different job outside of the hospital.

And in that context -- so I think the first part of that was just a different thing. But in the context of outside of a hospital, would you have had to have alleged that the -- that the salaries were less -- less money outside of the hospital?

MR. COHEN: So in terms of defining -- all right. So let me make sure I'm --

THE COURT: To say it was -- yes. In terms of defining --

MR. COHEN: You're agreeing that --

THE COURT: -- what we're talking about.

MR. COHEN: -- what -- what the studies show is, for instance, if you were working as an RN at a UPMC hospital, based on the Econ One study and based on the more general Prager study, you are being paid a substantially lower wage than someone doing the same job at a hospital that was outside of this alleged conduct or the market that was less concentrated --

THE COURT: But in response to them --

MR. COHEN: Now --

THE COURT: -- you were saying -- go ahead.

MR. COHEN: I think what you're asking is: But within the hospital, could they have switched positions --

THE COURT: No, no. That's -- that's the first part of the Todd case. Because there are two things at issue there. There was the interchangeability, the reasonable interchangeability of jobs, which is not here.

MR. COHEN: Well, within the Todd -- there are -- there are two things in the Todd case that fit here.

The first one is the fact that if you're an

attorney working for a petroleum company, you could probably get a job working at a law firm, but it's not going to give you the same --

THE COURT: That's cross-elasticity.

MR. COHEN: That's the cross-elasticity.

THE COURT: Okay.

MR. COHEN: So that's saying, you're a hospital nurse. You can get a job being a nurse at a nursing home, but it's not going to recognize your unique in-hospital skills.

THE COURT: Correct.

MR. COHEN: That's what we've alleged.

The second thing which makes Todd -- where Todd is different is there was Section 1 case where the petroleum companies had agreed to exchange salary information and artificially depress the wages. They did that. If you add them up together, they were acting like an monopolist in --

THE COURT: But that's not the issue here. Correct?

MR. COHEN: Well, that -- that's not the issue here because UPMC didn't have to coordinate with anybody within their commuting zone, within the geographic market to find by reference to the commuting zones. They were able to do that without having to conspire because they had enough market share.

THE COURT: Okay.

MR. COHEN: And the point you raised about acquiring

hospitals -- expanding geographically by acquiring hospitals, actually, the -- the Meta case is on point, to the extent that what Facebook was doing was saying -- or Meta was doing, was saying, there are these new things out there that are adjacent to our product, we'd like to compete in them. Let's just buy them rather than launch our own product, which would not --

THE COURT: Instagram.

MR. COHEN: -- do as well. Right. So they could have launched Facebookgram, but it was easier for them to buy Instagram and monopolize that aspect as -- the social media market that they defined it, by simply acquiring competitors.

Here, as they were saying, they didn't enter into these markets where there were other hospitals by opening up a UPMC facility. They did it by buying it. And they did it by buying hospitals that were adjacent to them, which allowed them, as we've emphasized, to reinforce their market power by rationalizing their offerings and the conduct including their employment.

Much of what they were arguing here sounded to me like affirmative defenses that are based on the facts after we get discovery.

I just wanted to raise one other point, because it was something you discussed, and I want to make sure I'm not misrepresenting something.

I went back, and I looked at the Prager and

Schmitt study for the data sources. And they talk about the primary data source for hospital wages is the Centers for Medicare and Medicaid Services (CMS) Health Costs Report --

(Atty. Cohen interrupted by the reporter.)

MR. COHEN: Medicaid Services (CMS) Healthcare Cost Report Information Systems (HCRIS) from 1996 to 2014. "All Medicare-certified institutional providers, including effectively every hospital in the U.S., are required to submit data to HCRS on an annual basis. We use these data to construct wage measures for all the general acute care hospitals that are never designated as critical access hospitals. Critical access hospitals aren't required to report wages. For each hospital year HCRS reports wage information for several dozen distinct line items corresponding to different types of workers, for each line item, HCRS reports a total amount paid by the hospital to employees falling under that line item."

There's additional information. They didn't --

THE COURT: So I did misspeak. You were not talking about -- so that the titles you use -- or not titles. The groupings you use here come from that report.

MR. COHEN: They come from this and Econ One. They -- they all -- they go on, if you go into the appendix, to discuss using, I think, AMA data as well.

But the point is: What our Complaint contains

are job descriptions that are based on data that has been collected by organizations, used by economists to analyze the effects in these markets, including specifically by Econ One, UPMC's markets. We didn't make up these categories.

THE COURT: I understand.

MR. COHEN: What I said was we can't quantify the specific titles for the class Plaintiffs. Those come from UPMC. We need to see how UPMC breaks their --

THE COURT: How they do it when they --

MR. COHEN: -- jobs into these reports.

THE COURT: I misspoke. I thought that those names came from UPMC.

MR. COHEN: But -- so -- so -- well, the job titles for the Plaintiffs did.

THE COURT: Yes.

MR. COHEN: But the data that --

THE COURT: But not the --

MR. COHEN: -- Econ One did and used and that we rely on and cite to --

THE COURT: And that's what you used --

MR. COHEN: -- comes from -- we rely on these reports. The two reports we rely on are Prager and Schmitt --

THE COURT: But that's also your class definition comes from there.

MR. COHEN: It's -- it's -- well, yes. We use those

definitions of what constitutes skilled in-hospital healthcare workers.

THE COURT: I understand.

MR. COHEN: We're not looking to expand this to be janitorial staff. We've explicitly excluded them, because in those reports they say those categories of hospital workers, while they have to press wages, they may not be as durable and longstanding, like Prager found, for the skilled healthcare workers we've defined.

THE COURT: I understand.

MR. COHEN: Thank you, Your Honor.

MS. KCEHOWSKI: Your Honor, one quick point.

Everything Mr. Cohen talked about in connection with Todd was about the healthcare industry. He's talking about the healthcare industry, industry as a whole. That's not what they've pled as their skilled healthcare workers definition. They've limited it to hospital only, and they haven't alleged facts that would establish that these workers cannot work outside the hospital.

Todd makes very clear that in cases where there's a failure to attempt to plead in a plausible way why the market should be limited in a critical way -- and the limit they've picked here is hospital only. He's talking about the healthcare industry more broadly. They have to justify a limit --

THE COURT: No, at the end -- he was explaining at the end that he was talking about the hospital, and the reason he didn't do other positions in the hospital had to do with the study and -- and the findings of the harm, basically, from those -- from those studies.

MS. KCEHOWSKI: Our point is: They still haven't told us why these workers -- all of these workers within their definition -- not just the job titles. All of the workers within their skilled healthcare definition cannot get comparable jobs outside of the hospital. They haven't alleged the types of facts that he talked about that were alleged in Todd. Those are the types of facts that they need to limit the market this way, and they haven't met their pleading burden.

THE COURT: Okay.

MR. COHEN: Thank you, Your Honor.

THE COURT: Okay. Thank you.

MS. KCEHOWSKI: Thank you, Your Honor.

THE COURT: Do you have anything to add?

MR. YOUNG: Nothing further, Your Honor.

THE COURT: Thank you, Mr. Young.

I appreciate everyone's explanations for me today. This is really quite helpful. And I appreciate your allowing me to interrupt you at whim.

I will ask that if you have anything you wish

to expound on, on paper, that you do it as briefly as possible and get it in within seven days. Thank you.

And safe travels home.

(Hearing concluded at 3:47 p.m.)

C E R T I F I C A T E

I, JANIS L. FERGUSON, RPR, CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled case.

\S\ Janis L. Ferguson — 1/31/2025
JANIS L. FERGUSON, RPR, CRR — Date of Certification
Official Court Reporter